UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                              )
United States of America,     )  File No. 14-MJ-1024 (JSM)
                              )
         Plaintiff,           )
                              )
vs.                           )  Minneapolis, Minnesota
                              )  November 26, 2014
Abdullahi Yusuf,              )
                              )  **DIGITAL RECORDING**
         Defendant.           )
                              )
------------------------------------------------------------

BEFORE THE HONORABLE JANIE S. MAYERON
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

**(PRELIMINARY AND DETENTION HEARING)**


<u>APPEARANCES</u>

  For the Plaintiff:        U.S. Attorney's Office
                            JOHN DOCHERTY, AUSA
                            ANDREW R. WINTER, AUSA
                            600 U.S. Courthouse
                            300 South Fourth Street
                            Minneapolis, Minnesota 55415


  For the Defendant:        Brandl Law, LLC
                            JEAN M. BRANDL, ESQ.
                            Suite 5010
                            310 Fourth Avenue South
                            Minneapolis, Minnesota 55415


  Transcriber:              LORI A. SIMPSON, RMR-CRR
                            1005 U.S. Courthouse
                            300 South Fourth Street
                            Minneapolis, Minnesota 55415




     Proceedings recorded by digital recording; transcript
produced by computer.

1                            **I N D E X**

2                                                              PAGE

JOHN THOMAS
3      Direct Examination by Mr. Winter                          4
       Cross Examination by Ms. Brandl                          26
4
       ABDULLAHI YUSUF
5      Direct Examination by Ms. Brandl                         39
       Cross Examination by Mr. Docherty                        42
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **IN OPEN COURT** |
| 3 | THE COURT:  Good afternoon.  I'm Magistrate Judge |
| 4 | Mayeron.  We're here this afternoon in connection with the |
| 5 | matter of the United States of America vs. Abdullahi Yusuf, |
| 6 | Court File No. 14-1024. |
| 7 | If counsel would identify themselves, starting |
| 8 | first with the United States. |
| 9 | MR. WINTER:  Good afternoon, Your Honor.  Andrew |
| 10 | Winter and John Docherty appearing on behalf of the United |
| 11 | States. |
| 12 | THE COURT:  Thank you. |
| 13 | And on behalf of the defendant? |
| 14 | MS. BRANDL:  Good afternoon, Your Honor.  Jean |
| 15 | Brandl representing Abdullahi Yusuf, who is present here in |
| 16 | custody. |
| 17 | THE COURT:  All right.  Thank you. |
| 18 | We're here today to address the issue of probable |
| 19 | cause and also the issue of detention or release of |
| 20 | Mr. Yusuf. |
| 21 | First of all, Ms. Brandl, is your client |
| 22 | contesting probable cause? |
| 23 | MS. BRANDL:  Yes, he is, Your Honor.  We would ask |
| 24 | for a hearing. |
| 25 | THE COURT:  All right.  And is the government |

```
1     continuing to persist in its request for detention?

2               MR. WINTER:  Yes, Your Honor.

3               THE COURT:  All right.  And is your client

4     contesting detention, Ms. Brandl?

5               MS. BRANDL:  Yes, Your Honor.

6               THE COURT:  All right.  Is the government prepared

7     to proceed?

8               MR. WINTER:  Yes, Your Honor.  The government

9     calls Special Agent John Thomas.

10              THE COURT:  All right.  Right over here.  If you

11    would raise your right hand.

12         (Witness sworn.)

13              THE COURT:  All right.  Please be seated.  State

14    your full name, spelling your last name, please.

15              THE WITNESS:  John Thomas, T-h-o-m-a-s.

16              THE COURT:  You may proceed.

17              MR. WINTER:  Thank you.

18                            (John Thomas)

19                         DIRECT EXAMINATION

20    BY MR. WINTER:

21    Q.  Where do you work?

22    A.  With the FBI.

23    Q.  What's your title?

24    A.  I'm a special agent.

25    Q.  And what are your duties as a special agent?
```

1    A.  Among other duties, I investigate matters that pertain

2    to international terrorism.

3    Q.  Are you familiar with the facts and circumstances that

4    bring us to court today on Defendant Abdullahi Yusuf?

5    A.  I am.

6    Q.  And you're the affiant on the affidavit that was

7    supplied to this court in support of a request for an arrest

8    warrant; is that correct?

9    A.  That's correct.

10   Q.  All right.  The charge involves a conspiracy to provide

11   material support to a foreign terrorist organization.  Who's

12   responsible -- whose responsibility is it to decide or

13   determine what group is a foreign terrorist organization?

14   A.  The United States State Department.

15   Q.  Has the group ISIL or ISIS, as it's known, been

16   designated as a foreign terrorist organization?

17   A.  It has.

18   Q.  And are there essentially multiple names for the same

19   organization?

20   A.  There are.

21   Q.  Does that include ISIL and ISIS?

22   A.  It does, yes.

23   Q.  Does it include other names?

24   A.  The Islamic State, self-described.  It also includes, as

25   listed here, the Islamic State of Iraq and Sham.

1           MS. BRANDL:  Objection, Your Honor.  The officer

2     appears to be reading from his notes rather than testifying

3     from memory.

4           THE COURT:  Do you want to ask him the question if

5     he needs to refresh his recollection?  Then if you could

6     raise that issue through your question.

7           MR. WINTER:  Okay.

8           THE WITNESS:  There are just a number of different

9     alias names.  al-Qaeda in Iraq was where it started and then

10    it's derived from there.

11    BY MR. WINTER:

12    Q.  All right.  The investigation as to Abdullahi Yusuf, it

13    essentially -- on April 28th of 2014 was there an

14    interaction between Mr. Yusuf and a passport specialist that

15    you became aware of?

16    A.  There was.

17    Q.  What did you learn about this interaction between

18    Abdullahi Yusuf and a passport specialist?

19    A.  I learned that on April 28th Mr. Yusuf applied for an

20    expedited passport.

21    Q.  What does an expedited passport mean?

22    A.  It means that you would want it quickly.  You pay a fee

23    for that expedite.

24    Q.  An extra fee over and above the ordinary cost?

25    A.  Yes, sir.

1    Q.  And did you learn what the travel destination was

2    according to this passport specialist?

3    A.  I did.  Istanbul.

4    Q.  Did the passport specialist have a series of questions

5    for Mr. Yusuf when he was making his application?

6    A.  He did.

7    Q.  Did he ask Mr. Yusuf who, if anyone, he was traveling

8    with?

9    A.  He did.

10   Q.  And what did Mr. Yusuf tell this passport specialist?

11   A.  Mr. Yusuf said that he was traveling alone.

12   Q.  Did Mr. Yusuf say why he was going to Istanbul?

13   A.  He was going to Istanbul for vacation.

14   Q.  Did Mr. Yusuf make any statements regarding whether or

15   not his mother was going to go with him or if anyone else

16   was going to go with him?

17            MS. BRANDL:  Objection, leading, Your Honor.

18            THE COURT:  Overruled.

19            THE WITNESS:  He did.  He said that he was not --

20   his family was not going to travel with him.

21   BY MR. WINTER:

22   Q.  Did Mr. Yusuf claim he was meeting any friends?

23   A.  He said that he was meeting -- he had Facebook friends

24   there.

25   Q.  Did the passport specialist note any demeanor change or

 1    make any notations about the demeanor of Mr. Yusuf when he

 2    was having this interaction with him?

 3    A.  Yes.

 4    Q.  And what did he note?

 5    A.  The passport specialist noted that Mr. Yusuf appeared

 6    nervous, avoided eye contact.

 7    Q.  Do you know whether or not Mr. Yusuf indicated where

 8    this friend was within Istanbul?

 9    A.  He did not.

10    Q.  During this exchange did Mr. Yusuf tell the passport

11    specialist where he would be staying once he arrived in

12    Istanbul?

13    A.  He did not.

14    Q.  Did he have any details about a hotel or anything like

15    that?

16    A.  No, no details on travel plans.

17    Q.  Did he -- did the passport specialist relay information

18    provided by Mr. Yusuf as to how he was paying for this trip?

19    A.  I'm sorry.  Can you repeat the question?

20    Q.  Did Mr. Yusuf relay anything to the passport specialist

21    about how he was paying for this trip?

22    A.  He said that he had saved up.

23    Q.  And what about any family connections that he had in

24    Turkey?

25    A.  None.

1    Q.  Based on this interaction, what did the passport

2    specialist do?

3    A.  The passport specialist believed the interaction to be

4    suspicious and alerted the FBI.

5    Q.  Okay.  And based on that alert, you and your fellow

6    agents became involved in this investigation as far as

7    Mr. Yusuf goes; is that correct?

8    A.  Yes, sir.

9    Q.  And that included surveillance; is that right?

10   A.  It did.

11   Q.  I want to draw your attention to the morning of May 5th

12   of 2014.  Was there surveillance being conducted on the

13   defendant?

14   A.  There was.

15   Q.  What was noted on this date?

16   A.  On May 5th he left for school at the Heritage Academy.

17   His father drove him.  He lives in Inver Grove Heights and

18   his father drove him to the Heritage Academy in Minneapolis.

19   What was noteworthy was that after his father dropped him

20   off, he looked over his shoulder, waited for his father to

21   leave and then didn't enter the school, but instead, after

22   his father was out of sight, walked about two blocks to

23   Dar al-Farooq on Como.

24   Q.  And what is Dar al-Farooq?

25   A.  Dar al-Farooq is a mosque in Minneapolis.

1    Q.  What happened after he got to the mosque?

2    A.  He spent some time there.  Later on in the morning he

3    took an indirect route via Metro Transit to the passport

4    office downtown Minneapolis.

5    Q.  So he left the mosque and went to the passport office?

6    A.  Yes, sir.

7    Q.  All right.  Are you familiar with what happened at the

8    passport office, then, on May 5th?

9    A.  He received his passport.

10   Q.  This expedited passport?

11   A.  Yes, sir.

12   Q.  Did anything else occur on May 5th with respect to this

13   passport that you think is relevant?

14   A.  He used his passport later that day as identification to

15   open up a Wells Fargo account.

16   Q.  Ultimately did you examine some bank records from Wells

17   Fargo with respect to this checking account?

18   A.  I did.

19   Q.  And what did you learn about cash deposits into that

20   account by Mr. Yusuf?

21   A.  On May 23rd there were four separate cash deposits, one

22   in the amount of $300, two in the amount of $100, and then

23   later on that evening one in the amount of $1,000.  A total

24   cash deposit of $1,500.

25   Q.  Do you know from your investigation where these deposits

1    were made?

2    A.  They were at a Wells Fargo branch in Minneapolis.

3    Q.  The next day did you notice in the bank records whether

4    or not this Wells Fargo account was used or the checking

5    card associated with the account was used to make a

6    purchase?

7    A.  I did.

8    Q.  What was this purchase?

9    A.  The purchase was an online purchase through a travel

10   entity called Kayak for airfare to Istanbul.

11   Q.  What was the price of this ticket?

12   A.  I don't recall exactly.  It was approximately $1,427.

13   Q.  Do you recall the itinerary that was associated, then,

14   with this ticket?

15   A.  I do.

16   Q.  And what was the itinerary?

17   A.  Mr. Yusuf was going to fly out on May 28th from

18   Minneapolis, connecting through John F. Kennedy

19   International Airport, onward there to Moscow, and from

20   Moscow to Istanbul.

21   Q.  Moving ahead, then, you had a potential departure date

22   of May 28th; is that correct?

23   A.  Yes, sir.

24   Q.  Can you describe, then, what happened on May 28th.

25   A.  So on May 28th Mr. Yusuf was driven to Heritage Academy

1    by his father.  He went to school for a short time.

2    Later on the morning of May 28th he left the school,

3    walked approximately two blocks over to and went into

4    Dar al-Farooq.

5    Q.  Did he appear to remain there for a period of time?

6    A.  He remained there for approximately an hour.

7    Q.  And what happened after an hour?

8    A.  After an hour he was observed leaving Dar al-Farooq and

9    getting into a blue Volkswagen Jetta.

10   Q.  Did he leave in the Jetta?

11   A.  He did, as a passenger.

12   Q.  Okay.  Where did this Jetta go?

13   A.  The Jetta drove for approximately 15 minutes to the

14   vicinity of Hiawatha and 45th.

15   Q.  And what happened there?

16   A.  He was observed getting out of the vehicle and changing

17   clothes.  The driver of the vehicle got out and adjusted

18   bags or luggage, maybe, in the trunk.

19   Q.  After that happened, what did Mr. Yusuf and the driver

20   do?

21   A.  They got back in the car and the driver took Mr. Yusuf

22   to the light rail station on Hiawatha at 50th.

23   Q.  How far was the light rail station from this stop where

24   they're changing clothes and accessing luggage?

25   A.  Approximately five blocks.

1    Q.  Did surveillance notice any exchange between Mr. Yusuf

2    and the driver once at the light rail station?

3    A.  They did.

4    Q.  What was that?

5    A.  Prior to Mr. Yusuf getting out of the car, they observed

6    the driver and Mr. Yusuf hugging.

7    Q.  Was the defendant observed removing any luggage at this

8    point?

9    A.  After he got out of the vehicle, he pulled a duffle bag

10   and backpack from the trunk.

11   Q.  What did he do next?

12   A.  He walked the short distance to the light rail station,

13   boarded a light rail train.

14   Q.  And where did that take him?

15   A.  To the Minneapolis/St. Paul International Airport.

16   Q.  Based on your investigation, do you have -- there were

17   conversations with the family about this trip; is that

18   correct?

19   A.  Yes, sir.

20   Q.  Based on those conversations, what did you learn about

21   their knowledge of this trip to Istanbul by the defendant?

22   A.  The parents were unaware of his having applied for and

23   received a passport, they were unaware of his having

24   purchased his tickets, and they were unaware that he was at

25   the airport at the time.

1    Q.  Did you and your fellow agents then go to the airport on

2    the 28th and attempt to stop or intercept the defendant?

3    A.  We did.

4    Q.  Would you describe for the Judge what happened at the

5    airport.

6    A.  So when we were aware that he was driving -- or boarding

7    the light rail to the airport, we went ourselves to the

8    airport.  And after he had checked in, gone through

9    security, we met him at his departing gate.  We advised him

10   that he was not going to be allowed to fly that day as

11   planned.  We asked him to -- we escorted him.  We asked him

12   to accompany us from the secure side to the public side of

13   the airport.

14          Once we were at the public side of the airport, we

15   advised him that he was not under arrest, that he was free

16   to leave, but that we had an interest in talking to him to

17   kind of see why we were here that day, why we were there,

18   and then we proceeded to have an interview with him.

19   Q.  Did he agree to talk to you?

20   A.  He did.

21   Q.  Did you ask him why he was traveling to Turkey?

22   A.  We did.

23   Q.  What was his answer?

24   A.  He said he was traveling to Turkey for vacation.

25   Q.  Did he indicate whether or not he had any plans to

```
 1    travel past Turkey or go other places?

 2    A.  He did not.

 3    Q.  He had no plans?

 4    A.  He had no plans.

 5    Q.  Okay.  Did you ask him about what his parents knew about

 6    his travel?

 7    A.  We did.

 8    Q.  What was his answer to that?

 9    A.  Initially he had said that his parents did know.

10    Subsequently he said that his dad or that his parents

11    wouldn't care.

12    Q.  Did you ask him about how he paid for that approximately

13    $1,500 plane fare?

14    A.  Yes, sir.

15    Q.  What was his answer to that?

16    A.  He was -- he had saved up money.

17    Q.  Are you aware of any income, based on your

18    investigation, that the defendant would have had to save up

19    $1,500 for that plane ticket?

20    A.  No, sir.

21    Q.  Did you ask him about what he would do or see once he

22    got to Turkey?

23    A.  We did.

24    Q.  What was his response?

25    A.  He was going to go sight-seeing.
```

1    Q.  Did he talk about meeting somebody that he had met on

2    Facebook?

3    A.  He indicated having friends on Facebook.

4    Q.  Did you do any research on his Facebook account to see

5    if there were any friends of his on Facebook that were from

6    Turkey or associated with Turkey?

7    A.  We did.

8    Q.  What did you find out?

9    A.  So we looked just at publicly-available content and did

10   not find much there.  Beyond that, we had executed a search

11   warrant.  We reviewed, upon receipt of the search warrant,

12   friends of his that would have any connection to Turkey

13   generally or Istanbul specifically and we didn't find any

14   connection to any friends there.

15   Q.  Did you ask him about where he was staying once he got

16   to Turkey?

17   A.  We did.

18   Q.  And what was his response?

19   A.  He listed a hotel.  And then when asked where the hotel

20   was, he said he didn't have an address and then beyond that

21   said that he was just going to get to Istanbul and take a

22   cab and take the nearest -- or go to the nearest airport.

23   Q.  At the conclusion of the interview was he -- did he just

24   leave the airport then?

25   A.  He did.

1    Q.  I want to switch gears a little bit and go back to this

2    Volkswagen Jetta that you testified about before.  Once this

3    Jetta was identified, did you do some research on the Jetta?

4    A.  We did.

5    Q.  What did you learn?

6    A.  We learned that on May 22nd the Jetta was involved in a

7    traffic incident, through a Minneapolis Police Department

8    report, and the driver of the vehicle at the time was listed

9    as Abdi Nur.

10   Q.  Was there any damage noted to the vehicle that was

11   somewhat unique?

12   A.  There was.

13   Q.  What was that?

14   A.  The driver's side mirror was broken.

15   Q.  Did you then attempt to find this Abdi Nur?

16   A.  We did.

17   Q.  Tell the Judge what you learned about that.

18   A.  So this was now on May 29th.  As we were looking to

19   identify him or locate him, we learned that Mr. Nur, in

20   fact, had flown out earlier that day and was leaving from

21   Minneapolis to Istanbul himself.

22   Q.  Did you speak with the registered owner or the family of

23   the registered owner of this Volkswagen Jetta?

24   A.  We did.

25   Q.  What did you learn?

1    A.   We learned that the registered owner was the boyfriend

2    of the sister and that he had given the sister permission to

3    drive the vehicle.   Beyond that, the sister said that she

4    had allowed or she had granted Abdi Nur permission to drive

5    the vehicle.

6    Q.   Okay.   This flight for Mr. Nur, when did you -- and I

7    apologize if you said this, but when did you learn about it

8    and what, if anything, were you able to do about it?

9    A.   So we learned about it a matter of a couple of hours

10   probably too late.   We learned about it late on the 29th.

11   He was due to -- or he was flying out on the 29th.   And then

12   subsequent to that we initiated an investigation into

13   Mr. Nur.

14   Q.   And that included his banking records?

15   A.   It did.

16   Q.   What did you find when you looked at his banking

17   records?

18   A.   So we saw that he has a Wells Fargo account.   We learned

19   that he made a cash deposit and an airline ticket purchase

20   in a manner consistent with the way that Mr. Yusuf did.

21   Q.   And was there even -- strike that.

22        What was the cost, roughly, of Nur's plane ticket?

23   A.   Approximately -- I mean, it's in the complaint, but

24   approximately $1,600.

25   Q.   And likewise did you examine his financial situation to

1    determine if there was a way he would have generated that

2    kind of money to be able to pay for that ticket?

3    A.  We did and did not find any.

4    Q.  Were there any deposits that were made by Nur or Yusuf

5    that essentially, you know, connected the two of them

6    together?

7    A.  There was.

8    Q.  What was that?

9    A.  On the 23rd Mr. Yusuf made the four cash deposits I

10   mentioned earlier and within 20 minutes of his third

11   deposit, at the walkup ATM 20 minutes later Mr. Nur

12   deposited $160.

13   Q.  And you also in your earlier testimony talked about a

14   $1,000 deposit made by Mr. Yusuf, correct?

15   A.  Yes, sir.

16   Q.  That was at a drive-up ATM; is that right?

17   A.  It was.

18   Q.  Was there an image that you were able to obtain that

19   depicted that deposit?

20   A.  There was.

21   Q.  What, if anything, could you learn from that image?

22   A.  We were able to see very clearly that the driver's side

23   mirror was broken.

24   Q.  And what about the driver of the vehicle making the

25   deposit?

1    A.   We were able to identify Mr. Yusuf as the driver.

2    Q.   You're familiar with Nur's travel itinerary in terms of

3    when he was supposed to come back from Turkey?

4    A.   I am.

5    Q.   To your knowledge, has Mr. Nur returned from --

6    A.   He has not.

7    Q.   Did Mr. Nur also apply for an expedited passport?

8    A.   He did.

9    Q.   Part of this investigation -- and you've already

10   referenced Facebook -- is examining some electronic

11   communications between various people.  There were some

12   communications that you laid out in your affidavit between a

13   family member and Mr. Nur on Kik, correct?

14   A.   There were.

15   Q.   And also some Facebook messages; is that correct?

16   A.   Correct.

17   Q.   And we're not going to go through them all, but I want

18   to direct your attention to a particular communication

19   which, according to your affidavit, took place on

20   August 23rd of 2014 that took place on Facebook.  Are you

21   familiar with what communication I'm talking about?

22   A.   August 13th maybe.

23   Q.   August 13, 2014.

24   A.   Okay.

25   Q.   Are you familiar with the communication I'm referring

1    to?

2    A.  I believe so.  There were communications between Mr. Nur

3    and his family.  Separately there were communications with

4    Mr. Nur and another individual.

5    Q.  And this other --

6    A.  I believe on August 13th it was the other individual.

7    Sorry.

8    Q.  Thank you for clarifying.  This other individual on

9    August 13th is an individual named Miski?

10   A.  Yes, sir.

11   Q.  And what do you know about this individual named Miski?

12   A.  Miski is currently in Somalia right now.

13   Q.  Is he an indicted individual?

14   A.  He's indicted for having -- my understanding it's

15   material support to Shabaab.

16   Q.  What do you recall about the specific communication

17   between Miski and Abdi Nur on August 13, 2014?

18   A.  May I reference my notes?

19   Q.  Would it help your recollection to be accurate to --

20   A.  It would just to be able to state it specifically.

21   There were a number of communications there.  And if I may?

22            MR. WINTER:  Your Honor, permission for him to

23   refer to the affidavit?

24            THE COURT:  Yes.

25            MR. WINTER:  Thank you.

1    BY MR. WINTER:

2    Q.  And it's page 17, for your...

3    A.  May I just read it verbatim?

4    Q.  Please.

5          MS. BRANDL:  I'm going to object, Your Honor.

6    He's supposed to be testifying from memory.

7          THE COURT:  Overruled.

8          THE WITNESS:  On August 13, 2014 Miski asks Nur

9    how things are and Nur replies, quote, "...good bro, just

10   getting ready for a mahrakah soon inshalla against pkk

11   inshalla where done with frontline rabat now were planning

12   on attacking them soon...but," it says, "IA," inshalla,

13   "today or tomorrow the brothers will take over the airport

14   in dabkah."

15   BY MR. WINTER:

16   Q.  What significance do you attribute to "the brothers will

17   take over the airport in dabkah" in this communication?

18   A.  We know that subsequent to that -- well, first of all,

19   Tabqa is an airport near Raqqa, Syria, so a location within

20   Syria where there's known ISIL fighting.  And subsequent to

21   that communication there was a conflict at the airport.

22   Q.  Moving on to this -- I guess back to this Jetta briefly,

23   was there some documents found in this Jetta that were

24   significant to your investigation?

25   A.  There were.

1   Q.  One was a receipt from a purchase at Macy's; is that

2   correct?

3   A.  That is correct.

4   Q.  Could you tell the Judge sort of where that led you and

5   what you learned.

6   A.  Okay.  So on May 27th, the night before Mr. Yusuf was

7   set to travel, the receipt from the vehicle, the Jetta,

8   showed a purchase made at a Macy's.  And then we reviewed

9   subsequent to that the surveillance video from the Macy's at

10  Southdale and we were able to see that Mr. Yusuf made a

11  purchase there.  The receipt in the car corresponded to that

12  purchase.  And then separately Mr. Nur also made a purchase.

13  Q.  From the video could you see the two of them together?

14  A.  I could.

15  Q.  And did they appear to be socializing and with each

16  other?

17  A.  They did.

18  Q.  Did you also find a piece of paper that had some

19  handwritten words on it?

20  A.  I did.

21  Q.  And do you recall what those referred to or what they

22  said?

23  A.  It said, Chicago, maybe Chicago, Illinois, with an arrow

24  to Gaziantep, Turkey.  I don't know that it said Turkey.  It

25  said Gaziantep.

1   Q.  And what -- based on what you understand about your

2   geography, what is the significance of Gaziantep, Turkey,

3   with respect to Syria?

4   A.  It's in close proximity to the border between Syria and

5   Turkey.

6   Q.  One brief note I want to go back to is the -- you looked

7   at some phone toll records of Mr. Yusuf and Mr. Nur, is that

8   correct, as part of this investigation?

9   A.  That is correct.

10  Q.  And on the day that he was picked up at the mosque and

11  taken to the light rail station, was there phone contact

12  between the two individuals?

13  A.  There was.

14  Q.  And did the phone contact coincide time-wise with the

15  arrival of the Jetta at the mosque to pick up Mr. Yusuf?

16  A.  It did, within a matter of minutes.

17  Q.  Thank you.

18          Are you familiar, based on your investigation,

19  with an associate of the defendant with the initials H.M.?

20  A.  I am.

21  Q.  And what do you know about H.M. currently?

22  A.  He is currently in Syria.

23  Q.  Do you know whether or not Abdullahi Yusuf and H.M. are

24  associated on Facebook?

25  A.  I do.

1    Q.  And what have you seen with respect to that?

2    A.  I've seen that they are Facebook friends and I'm also

3    aware that within a week of H.M.'s departure for Syria

4    Mr. Yusuf queried or conducted a search, a name search, for

5    H.M.

6    Q.  Did you notice any similarities between the manner or

7    method that H.M. got to Syria compared with Mr. Yusuf's

8    attempt and Mr. Nur's travel?

9    A.  I did.  They were consistent.

10   Q.  Okay.  Was H.M.'s departure known to the family, plans

11   and departure known to the family?

12   A.  It was not, no.

13   Q.  Do you know whether or not Abdullahi Yusuf and H.M. had

14   any phone contact with each other?

15   A.  They did.

16   Q.  And could you briefly describe what that was.

17   A.  There were, you know, some -- I don't recall the exact

18   number, but there were phone calls exchanged and, you know,

19   one of them was maybe, you know, two minutes.  I think it

20   was text messages primarily, but a two-minute phone call.

21   Q.  You have looked at Mr. Abdullahi Yusuf's Facebook

22   account; is that correct?

23   A.  That is correct.

24   Q.  What does his profile picture depict?

25   A.  A picture of an individual, of a man with a lion head.

1    Q.  Also back in February of 2014 was there a post by -- on

2    this account that was noteworthy?

3    A.  There was.  Something to the effect of Bashar al-Assad

4    don't deserve to live.

5    Q.  And Bashar al-Assad is whom, based on your

6    investigation?

7    A.  Bashar al-Assad is the president of Syria.

8         MR. WINTER:  I have no further questions at this

9    time, Your Honor.

10        THE COURT:  All right.  We're going to just take a

11   short recess and then I will hear cross examination.

12       (Recess.)

13        THE COURT:  All right.  Ms. Brandl.

14        MS. BRANDL:  Thank you, Your Honor.

15                   **CROSS EXAMINATION**

16   BY MS. BRANDL:

17   Q.  Good afternoon.

18   A.  Good afternoon, ma'am.

19   Q.  Now, ISIL was designated a terrorist organization on

20   May 15th of 2014, correct, by the State Department?

21   A.  As a derivative of al-Qaeda in Iraq, which was

22   previously earlier designated.

23   Q.  Correct.  But ISIL itself was not designated until

24   May 15th of 2014, correct?

25   A.  That's my understanding.

1    Q.  And on May 5th is when Mr. Yusuf obtained his passport,

2    correct?

3    A.  Yes, ma'am.

4    Q.  All right.  June 29th of 2014 is when ISIL announced a

5    name change to Islamic State, correct?

6    A.  As I understand it.

7    Q.  All right.  Now, your understanding -- you're a

8    terrorist expert.  I'm assuming you were aware that Syria

9    has been in the middle of a civil war, correct?

10   A.  Yes, ma'am.

11   Q.  And the president of Syria, in fact, worldwide has been

12   seen as somebody who has been -- I can't remember the word,

13   but basically shunned by the world for his actions, correct?

14   A.  Yes, ma'am.

15   Q.  And the name of that president is what?

16   A.  Bashar al-Assad.

17   Q.  And he is basically worldwide seen as a dictator,

18   correct?

19   A.  Correct.

20   Q.  So a lot of people wanted him dead and people were

21   actually fighting him, people within the country, correct?

22   A.  Correct.

23   Q.  So for Mr. Yusuf to say that he deserves to die is not

24   unusual, probably the majority of the people around the

25   world would maybe not want him to die, but would be very

```
 1    much against him, correct?

 2    A.  Yes, ma'am.

 3    Q.  All right.  In fact, many of the citizens of Syria

 4    itself, correct?

 5    A.  Correct.

 6    Q.  And also if you were looking at Mr. Yusuf's Facebook

 7    page, you would have noticed he also said Vladimir Putin

 8    doesn't deserve to live as well, correct?

 9    A.  I'm not aware of that, ma'am.

10    Q.  You didn't see that in the --

11    A.  I did not, no.

12    Q.  Okay.  Now, one of the factions among -- would it be

13    fair to say dozens of different factions and groups are

14    fighting against the Syrian government and have been for the

15    last three years?

16    A.  Yes, ma'am, that's a fair characterization.

17    Q.  And ISIL is one of those, correct?

18    A.  Correct.

19    Q.  All right.  So let's also look at the fact that in -- it

20    was not until June of 2014 that ISIS declared a caliphate,

21    correct?

22    A.  That is correct.

23              THE COURT:  I'm sorry.  ISIS declared a what?

24              MS. BRANDL:  It's caliphate, Your Honor,

25    c-a-l-i-p-h-a-t-e.
```

1      THE COURT:  Do you want to explain what that is?

2      MS. BRANDL:  I'll actually let our -- I'm sorry --

3   Mr. Thomas explain.

4      THE WITNESS:  Your Honor, a caliphate would be an

5   Islamic state.  It would be the governance of an Islamic

6   government, the establishment of an Islamic government.

7   BY MS. BRANDL:

8   Q.  And this was a month after Mr. Yusuf was stopped at the

9   airport, correct?

10  A.  Yes, ma'am.

11  Q.  All right.  And then also the atrocities of ISIS began

12  in June of this year as far as the serious atrocities that

13  people were starting to take note of, correct?

14  A.  Correct.

15  Q.  And, in fact, ISIS did not claim any atrocities until

16  August of 2014; is that right?

17  A.  I would say that the beheadings and so forth that are

18  obviously now very publicly available are publicly known,

19  yes.  I think atrocities towards others within Syria would

20  have, you know, been conducted earlier than that.

21  Q.  Well, there were no atrocities publicly claimed by ISIS

22  or the Islamic State in June of 2014, correct, or until June

23  of '14, correct, that you're aware of?

24  A.  Not that I'm aware of.

25  Q.  Okay.  And you're aware that both sides in the conflict

1    in Syria -- and I'm loosely using the word "both sides"

2    because there's the government and then there's kind of

3    everybody else who is fighting and then there are little

4    splinter groups that are fighting with Syria -- both sides

5    have been accused of pretty severe atrocities over the past

6    three years; would you agree?

7    A.  I would.

8    Q.  And, in fact, the Syrian government itself has been

9    accused of thousands and thousands of atrocities; would you

10   agree with that?

11   A.  I would.

12   Q.  Now, let's speak specifically about Mr. Yusuf.

13   Mr. Yusuf did not have a ticket to Syria, did he?

14   A.  He did not.

15   Q.  He never told you or anyone else he was heading to

16   Syria?

17   A.  He did not.

18   Q.  He indicated he was heading to Turkey and nowhere else?

19   A.  Correct.

20   Q.  And he obtained his passport, again, before May 15,

21   2014, when the U.S. government declared ISIS to be or ISIL

22   to be a terrorist organization, correct?

23   A.  He obtained his passport on May 15th -- on May 5th.

24   Q.  Correct.

25           Now, after you -- did you search Mr. Yusuf's bags?

1    A.  At the airport?

2    Q.  Yes.

3    A.  When he had gone -- when he went through the

4    Transportation Security Administration checkpoint, his bags

5    were searched pursuant to that.  Beyond that, we did not.

6    Q.  You're not aware of anything illegal or anything suspect

7    being in any of his bags?

8    A.  No, ma'am.

9    Q.  And when you released him, he was told that he could be

10   subject to an arrest or investigation thereafter, correct?

11   A.  When he was told -- or when we interviewed him, we told

12   him that he did not have to talk to us.  We wanted to talk

13   to him.  He was told that he was not under arrest and that

14   he was free to leave at any time.  At no point during the

15   conversation was he told that you're going to be arrested,

16   you know, down the road.  Some two weeks or so later I

17   served him with a target letter that would indicate that he

18   was the target of a federal investigation.

19   Q.  Okay.  And a target of -- a target letter basically lets

20   somebody know we're investigating you, you can come talk to

21   us, right?

22   A.  Yes, ma'am.

23   Q.  And it also lets the person know that they may -- if

24   they are the target of an investigation, there's a

25   possibility that they could be arrested for a crime; is that

```
1     correct?

2     A.  Yes, ma'am.

3     Q.  All right.  Now, you said that was two weeks after he

4     was stopped?

5     A.  I don't -- I want to be careful in not making an exact

6     date.  I mean, that's my recollection, approximately.

7     Q.  So approximately -- so middle of June; would that be

8     fair to say?

9     A.  Yes, ma'am.

10    Q.  All right.  So he's been out of custody, then, since the

11    day of your stop in May; is that correct?

12    A.  Yes, ma'am, that's correct.

13    Q.  And he remained out of custody until yesterday, from

14    basically the date of getting your target letter two weeks

15    later, approximately, until yesterday; is that right?

16              MR. WINTER:  Your Honor, I'm going to object on

17    relevance grounds for --

18              THE COURT:  It bears on detention.

19              MS. BRANDL:  Oh, that's true.  I'll bring those up

20    later.  Thank you, Your Honor.

21              THE COURT:  Well, let me just say I wasn't

22    restricting this -- I realize we're talking about probable

23    cause here, but I actually assumed -- and if I was

24    incorrect, you'll correct me.  You may have some additional

25    evidence to put on as it relates to detention, but I did
```

1    assume that whatever evidence was being obtained from this

2    witness would bear on both probable cause and detention.  So

3    that's the basis for overruling the objection, is it is

4    relevant to the issue of detention.

5              MR. WINTER:  I understand, Judge.

6              THE COURT:  All right.

7              MS. BRANDL:  Then I have permission to pursue the

8    issue of detention --

9              THE COURT:  Yes, you do.

10             MS. BRANDL:  Thank you very much, Your Honor.

11   BY THE COURT:

12   Q.  He had his passport when you stopped him on May 28th; is

13   that correct?

14   A.  Yes, ma'am.

15   Q.  And he left with his passport, correct?

16   A.  He did.

17             MS. BRANDL:  May I approach the witness, Your

18   Honor?

19             THE COURT:  Yes.

20   BY MS. BRANDL:

21   Q.  Do you recognize this as the passport you saw on

22   May 28th?

23   A.  Yes, ma'am, I do.

24             MS. BRANDL:  Your Honor, I do not have this

25   marked.  Do you want me to have it marked or should we

1    address that later?

2             THE COURT:  Let's address it later.

3    BY MS. BRANDL:

4    Q.  As far as you know, he's had access to his passport

5    since May 28th of this year?

6    A.  As far as I know.

7    Q.  Okay.  And as far as you know, he has never left the

8    country or even the state since May of 2014?

9    A.  As far as I know.

10   Q.  And as far as you know, he's not committed any illegal

11   act since May 28th of 2018 -- 2014?  Excuse me.

12   A.  Yes.

13            MS. BRANDL:  May I have one moment, Your Honor?

14            THE COURT:  Certainly.

15   BY MS. BRANDL:

16   Q.  You indicated that in the Jetta there was a note about

17   Gaziantep, which is the airport near Syria, correct?

18   A.  Yes, ma'am.

19   Q.  You don't actually know who wrote that, do you?

20   A.  I do not.

21   Q.  You have no evidence that Mr. Yusuf wrote that note, do

22   you?

23   A.  I do not.

24   Q.  And there's been no contact between Mr. Yusuf and any of

25   the people that you mentioned during your testimony after

1    May 28th; is that correct?

2    A.   To the best of my knowledge, I'm aware of no contact.

3    Q.   And you're monitoring his contact, correct?

4    A.   I have -- as I said, we had the Facebook search warrant.

5    So on facilities that I'm aware of, we have seen no contact.

6    Q.   All right.  Are you aware that many young Muslim people

7    put lions on their heads because it is -- if you are a

8    strict or devout Muslim, it's improper to look at a member

9    of the opposite sex in the face; is that your understanding?

10   Are you aware -- do you see that often when you're looking

11   at Facebook pages of people who are Muslim?

12   A.   I don't.  I've not heard that before, that you would put

13   a lion head on.  I haven't seen that with -- I've seen that,

14   a lion head before.  My understanding of the lion head is

15   the symbolism as it relates to Syria.

16            MS. BRANDL:  May I have one moment, Your Honor?

17            THE COURT:  Certainly.

18            MS. BRANDL:  I have nothing further.  Thank you,

19   Your Honor.

20            THE COURT:  All right.  Mr. Winter, anything

21   further?

22            MR. WINTER:  No redirect.

23            THE COURT:  Anything further that you wanted to

24   address with this witness about detention?

25            MR. WINTER:  No, Your Honor.

1          THE COURT:  All right.  You may step down.  Thank

2     you very much.

3          Does the government have any other evidence it

4     wishes to submit?

5          MR. WINTER:  No.  We rest with respect to the

6     probable cause issue.

7          THE COURT:  All right.  Do you have any other

8     evidence that you wish to submit on the issue of detention?

9          MR. DOCHERTY:  Your Honor, the government intends

10    to, if we get to the issue -- assuming the Court finds

11    probable cause and we get to the issue of detention, the

12    government intends to proceed by way of proffer.

13         THE COURT:  All right.  Then before I hear the

14    proffer, let me first ask:  Ms. Brandl, do you have any

15    evidence that you wish to submit on behalf of Mr. Yusuf as

16    it relates to probable cause or detention?

17         MS. BRANDL:  Only on the issue of detention, Your

18    Honor.  I would like to call my client just on the very

19    limited questioning on -- for the purpose of detention.

20         THE COURT:  All right.  Then why don't you bring

21    him up at this time.  Actually, before we do that, let me

22    hear the proffer from Mr. Docherty that may bear on what you

23    do with your client by way of any questioning.

24         MS. BRANDL:  Thank you, Your Honor.

25         THE COURT:  So, Mr. Docherty, if we could hear the

1    proffer on detention.

2              MR. DOCHERTY:  Yes, Your Honor.  On the issue of

3    detention, which we get to once the Court finds that there

4    is probable cause, the government would note the following:

5    That there is a rebuttable presumption of detention in this

6    case.  The defendant is charged by complaint with conspiring

7    to provide material support to a designated terrorist

8    organization.

9              18 U.S.C. 3142 lists in I believe subpart (f) the

10   various types of crime which lead to a rebuttable

11   presumption.  One of them refers the reader to 18 U.S.C.

12   2332b(5)(g) [sic], which is a list of terrorism-related

13   offenses, and 2339B, material support to a designated

14   foreign terrorist organization, is on that list.  So we are

15   dealing at the outset with a rebuttable presumption.

16             We are also dealing with an offense, Your Honor,

17   that carries a statutory maximum penalty of -- a potential

18   penalty of up to 15 years in prison.  And because of the

19   so-called terrorism enhancement in the sentencing guidelines

20   found at Sentencing Guidelines 3A1.4, we have the unusual

21   situation of guidelines which actually greatly exceed the

22   statutory maximum for the crime with which the defendant is

23   charged, meaning that the guideline sentence is indeed the

24   statutory maximum.

25             Up until this point, Your Honor, it has been

1    potential on the part of the defendant that he might be

2    charged with a crime.  It has now become hardened into an

3    actuality and this is the reality that this defendant is

4    facing.

5            To overcome that presumption there are several

6    arguments that --

7            THE COURT:  Okay.  Let me -- so when I was talking

8    about a proffer, I was assuming that you may have some

9    additional facts that you wanted the Court to be aware of

10   that you're not putting on evidence for.

11           MR. DOCHERTY:  I apologize for the

12   misunderstanding, Your Honor.

13           THE COURT:  No, it's --

14           MR. DOCHERTY:  No, I don't.

15           THE COURT:  All right.

16           MR. DOCHERTY:  I've got an argument.

17           THE COURT:  This sounds like argument.

18           MR. DOCHERTY:  You've heard the first five minutes

19   of it.

20           THE COURT:  All right.  So this sounds like

21   argument, so I am going to have you hold off on your

22   argument --

23           MR. DOCHERTY:  Very well.

24           THE COURT:  -- until the appropriate time.

25           MR. DOCHERTY:  Okay.  Thank you, Your Honor.

```
 1              THE COURT:  All right.  Then, Ms. Brandl, if you

 2     would like to put your client on the stand on the issue of

 3     detention.

 4              MS. BRANDL:  Yes, Your Honor.  Thank you.

 5              THE COURT:  If you want to come over here, please.

 6     I'm going to ask you to raise your right hand.

 7         (Witness sworn.)

 8              THE COURT:  Please be seated.  State your full

 9     name, spelling your last name, please.

10              THE WITNESS:  Abdullahi Yusuf, Y-u-s-u-f.

11              THE COURT:  Thank you.

12              You may proceed, Ms. Brandl.

13              MS. BRANDL:  Thank you, Your Honor.

14                        (Abdullahi Yusuf)

15                        DIRECT EXAMINATION

16     BY MS. BRANDL:

17     Q.  Mr. Yusuf, have you had access -- can you see from

18     there?  Is this your passport?

19     A.  Yes.

20     Q.  Have you had access to that since May 28th of this year?

21     A.  Yes, I have.

22     Q.  Were you aware that after you received the target letter

23     that you could be arrested at any time based on the

24     investigation that the FBI was conducting against you?

25     A.  Yes, I did.
```

```
 1     Q.  And have you made any attempt to leave the country?

 2     A.  No, I have not.

 3     Q.  Are you currently working?

 4     A.  Yes, I am.

 5     Q.  And where are you working?

 6     A.  Best Buy.

 7               MS. BRANDL:  May I approach the witness, Your

 8     Honor?

 9               THE COURT:  Yes.

10     BY MS. BRANDL:

11     Q.  Do you recognize this document?  And if so, can you tell

12     the Judge what it is.

13     A.  It is a check from Best Buy.

14     Q.  And who does it reflect that it's written to?

15     A.  Abdullahi Yusuf.

16     Q.  And that's you?

17     A.  Yes.

18     Q.  Secondly, are you in school anywhere?

19     A.  Yes, I am.

20     Q.  Where are you in school?

21     A.  Inver Hills Community College.

22               MS. BRANDL:  And may I approach the witness again,

23     Your Honor?

24               THE COURT:  Yes.  Please make sure when you ask a

25     question you're near a microphone, whether it's his or
```

1    somebody else's, or we're not recording you.

2              MS. BRANDL:  I just realized that.  Thank you,

3    Your Honor.

4              THE COURT:  All right.

5    BY MS. BRANDL:

6    Q.  Mr. Yusuf, do you recognize this document?

7    A.  Yes, I do.

8    Q.  And what does it reflect?

9    A.  My classes at Inver Hills.

10   Q.  With whom do you live at this time?

11   A.  My parents.

12   Q.  And are they here in court right now?

13   A.  Yes, they are.

14   Q.  Can you point them out.

15   A.  My father is right there and my mother is over there.

16   Q.  Your mother and father are both standing in the back of

17   the courtroom?

18   A.  Yes, they are.

19   Q.  Thank you very much.  And is your father working as well

20   right now?

21   A.  Yes, he is.

22             MS. BRANDL:  May I approach --

23             THE COURT:  Yes.

24             MS. BRANDL:  -- one more time?

25   BY MS. BRANDL:

1    Q.  Do you recognize what this document is?

2    A.  Yes, I do.

3    Q.  And what is that?

4    A.  It's a check for my father.

5    Q.  From his work?

6    A.  Yes.

7              MS. BRANDL:  I have nothing further, Your Honor.

8              THE COURT:  Any cross examination, Mr. Docherty?

9              MR. DOCHERTY:  Yes, Your Honor.

10                    **CROSS EXAMINATION**

11   BY MR. DOCHERTY:

12   Q.  Good afternoon, Mr. Yusuf.

13   A.  Good afternoon.

14   Q.  Mr. Yusuf, your attorney asked you some questions

15   related to your passport and you said that you had not

16   attempted to leave the country since May the 28th; is that

17   correct?

18   A.  Yes.

19   Q.  But you did try to leave the country on May the 28th,

20   did you not?

21   A.  Yes.

22             MS. BRANDL:  Objection, beyond the scope of the

23   evidence.

24             THE COURT:  Overruled.

25   BY MR. DOCHERTY:

1    Q.  Do you remember the question?

2    A.  Yes, I do.

3    Q.  Okay.  Did you try to leave the country on May the 28th?

4    A.  Yes, I did.

5    Q.  And did you learn on May the 28th that you could not

6    leave the country?

7    A.  Yes, I did.

8    Q.  You could not board your airplane, could you?

9    A.  No.

10   Q.  And so after May the 28th you knew that you could not

11   leave the country, is that correct, at least by air?

12   A.  I really did not know.

13   Q.  Okay.

14   A.  According to what Special Thomas -- Special Agent Thomas

15   told me.

16   Q.  But you knew that you were not permitted to fly on May

17   the 28th, correct?

18   A.  I asked him if I was on a no-fly list --

19   Q.  Sir --

20   A.  -- and he didn't respond.

21   Q.  -- that's not the question.  Were you permitted to fly

22   on May the 28th?

23   A.  No, I was not.

24   Q.  You just had your parents stand up to be recognized; is

25   that correct?

```
 1    A.  Yes.

 2    Q.  You were living with your parents on May the 28th; is

 3    that correct?

 4    A.  Yes, I was.

 5    Q.  On May the 28th you were on your way to Turkey, weren't

 6    you?

 7    A.  Yes.

 8    Q.  And your mother and father didn't know you were on your

 9    way to Turkey, did they?

10    A.  No.

11    Q.  You hadn't told them that, had you?

12    A.  No.

13    Q.  Your mother and father didn't know that you had applied

14    for a passport, did they?

15    A.  No.

16    Q.  Didn't know that you had obtained a passport, did they?

17    A.  No.

18    Q.  Didn't know that you had put $1,500 into your bank

19    account in cash, did they?

20              MS. BRANDL:  Objection, beyond the scope at this

21    point, Your Honor.

22              THE COURT:  It all relates to the issue of

23    detention.  Overruled.

24    BY MR. DOCHERTY:

25    Q.  Do you remember the question, sir?
```

1    A.  No, I don't.

2    Q.  Okay.  Your parents were not aware -- when you put that

3    $1,500 into your bank account in cash, your parents didn't

4    know about it, did they?

5    A.  No.

6    Q.  Your parents didn't know you had bought a ticket on

7    Aeroflot to take you to Istanbul via New York and then

8    Moscow, did they?

9    A.  No.

10   Q.  If the Judge releases you, are you going to keep on

11   staying with your parents?

12   A.  Yes.

13   Q.  You were given -- you mentioned a couple minutes ago

14   about the interaction between you and Special Agent

15   Thomas or you mentioned, excuse me, an interaction between

16   you and Special Agent Thomas, correct?

17   A.  Yes.

18   Q.  And on May the 28th when asked questions by Special

19   Agent Thomas, you stated first that your parents did not

20   know about your trip, correct?

21   A.  I do not recall.

22   Q.  And then you stated that your parents did not -- your

23   father, at least, did not care about your trip.  Do you

24   recall that?

25   A.  Yes, I do.

1    Q.  You told the FBI that you were meeting somebody in

2    Istanbul, correct?

3              MS. BRANDL:  Objection.  Now, Your Honor, this is

4    going to the facts of the matter and not to detention.

5              THE COURT:  I'm a little bit at a loss on this

6    line, where you're going with this and how it relates to

7    detention.

8              MR. DOCHERTY:  It relates to the defendant's

9    veracity, Your Honor, and veracity is highly relevant to

10   detention since if released, the defendant will promise to

11   come to court when told to do so.

12             MS. BRANDL:  Your Honor, I would like --

13             THE COURT:  Objection is overruled.

14             MS. BRANDL:  Your Honor, I would like to approach

15   sidebar.

16             THE COURT:  Okay.  Let's go over here.

17        (Pause.)

18             THE COURT:  I'm going to sustain the defendant's

19   objection.

20   BY MR. DOCHERTY:

21   Q.  At this point, Mr. Yusuf, you still have that passport;

22   is that correct?

23   A.  Yes, I do.

24             MR. DOCHERTY:  Nothing further, Your Honor.

25             THE COURT:  All right.  Thank you very much.

1          Any redirect of Mr. Yusuf?

2          MS. BRANDL:  No.  Thank you, Your Honor.

3          THE COURT:  All right.  You may step down.  Thank

4     you very much.

5          Any other evidence on behalf of Mr. Yusuf that

6     relates to probable cause or detention?

7          MS. BRANDL:  No.  Thank you, Your Honor.

8          THE COURT:  All right.

9          MS. BRANDL:  I would ask, though, that the Court

10    receive the documents that I had Mr. Yusuf identify.

11         THE COURT:  If you would like me to, I would

12    certainly be willing to examine them.  And if you want me to

13    have them, then by all means you may offer them and if they

14    have no objections, I'll receive them into evidence.

15         MS. BRANDL:  I would offer these at this time.

16         MR. WINTER:  No objection.

17         THE COURT:  All right.

18         MS. BRANDL:  And your clerk was kind enough to

19    make you a copy, Your Honor.

20         THE COURT:  All right.  Thank you.  Just so the

21    record is clear, I have here a copy of an earnings statement

22    for Mr. Yusuf from Best Buy.  Actually, I have -- let me

23    just make sure.  I'm trying to find -- I have four of them,

24    four pages covering -- they look like they're all identical,

25    the same ones.  So are there -- I think you want to give

1     me -- I'm going to give you three back and you can give me

2     the others.

3          MS. BRANDL:  I think I handed another stack to the

4     prosecution.

5          THE COURT:  And they may have some over there.

6          (Inaudible discussion.)

7          MS. BRANDL:  At this time, Your Honor, the two

8     more critical ones are the ones from -- I will give you two.

9     One is the orientation and one is -- or the registration and

10    one is the Best Buy [inaudible].

11         THE COURT:  All right.  So now what I have is the

12    student orientation that shows the courses that apparently

13    Mr. Yusuf is taking at Inver Grove Heights and then I have

14    a -- it looks like again the same earning statement for

15    Mr. Yusuf from the period of November 2 to November 15,

16    2014.  So now I have two copies of that.  Is that what you

17    wanted me to have or is there a third one?

18         MS. BRANDL:  You can keep the extra copy, that's

19    fine, Your Honor.

20         THE COURT:  All right.  Then I have two exhibits

21    that you're providing?

22         MS. BRANDL:  Correct.

23         THE COURT:  All right.  Okay.  Then at this time I

24    will hear argument first on the issue of probable cause and

25    then on the issue of -- let's address first probable cause

1    and then I will make a ruling on that and then I will hear

2    argument on the issue of detention.

3              Mr. Winter.

4              MR. WINTER:  Your Honor, the government is

5    prepared to rely on the testimony and the affidavit for

6    probable cause.

7              THE COURT:  All right.  Any argument on behalf of

8    your client, Ms. Brandl, on the issue of probable cause?

9              MS. BRANDL:  Yes, Your Honor.

10             THE COURT:  All right.

11             MS. BRANDL:  Your Honor, as far as probable cause

12   in this case, there is no proof that my client was intending

13   to go to Syria.  There's no proof that he was involved at

14   all in ISIL.

15             Frankly, in May of 2014 pretty much everyone in

16   that area was fighting against the head of Syria and there

17   was opposition to the Syrian government worldwide.  So even

18   if there's something to show that some people that Mr. Yusuf

19   knew were fighting against the Syrian government, there's

20   nothing to show that any of the fighting that may have been

21   discussed by the people that Mr. Yusuf knew had anything to

22   do with ISIS, ISIL, or any of the other organizations having

23   to do with that.

24             There's no mention by my client of anything to do

25   with jihad.  No mention of violence anywhere near with

1     Mr. Yusuf.  Although Mr. Nur had a conversation with I think

2     it was M.K., but I could be forgetting, he never talked

3     about violence in any way with Yusuf.  There's been no

4     contact -- with Mr. Yusuf.  There's been no contact between

5     Mr. Yusuf and any of these people since May 28th of 2014.

6              You know, I think it's really important for this

7     Court to look at the fact that just because my client was

8     taking a trip to the Middle East and knew some people who

9     may have had some intentions of fighting in Syria, number

10    one, there's no evidence here which side or where anyone was

11    fighting on; number two, there was no evidence that anyone

12    was fighting with ISIL or ISIS; and number three, ISIL was

13    not declared a terrorist organization until May 15th.

14             Well, Mr. Yusuf obtained his passport and he

15    actually had it in hand on May 5th before it was declared a

16    terrorist organization.  So even if at the time that he

17    purchased his passport there was some intent to maybe go

18    over and fight in Syria, which there is no evidence of that,

19    but even if there were, there's no evidence that he intended

20    to go and help or assist or work with any kind of terrorist

21    organization, none whatsoever.

22             And even -- there were no atrocities by ISIL or

23    ISIS before June of two thousand -- middle of June to late

24    June of 2014.  So even had Mr. Yusuf planned to join ISIL,

25    it wasn't a group that was associated with horrendous

1    atrocities.

2              In fact, the atrocities at the time for three

3    years had been being performed by the Syrian government.  So

4    the fact that Mr. Yusuf wrote in a Facebook post or is

5    alleged to have written in a Facebook post that he was

6    against the Syrian president, as the FBI agent testified,

7    most of the world was against the Syrian president for him

8    using chemical weapons and all sorts of other horrible

9    things that he was doing to his very own people.

10             So I think there was a whole lot of confusion

11   happening in Syria at the time and people were fighting the

12   government and there were all sorts of strange faction

13   alliances, but there is no evidence here that my client

14   intended to assist in any kind of terrorist group or help in

15   a terrorist group or any of the charges in the complaint.

16             So I would ask that the Court find that there is

17   no probable cause to support that Mr. Yusuf was in any way

18   associated with this or intending to commit a crime and that

19   there isn't probable cause to prove that.

20             THE COURT:  All right.  Thank you.

21             Mr. Winter, did you want to respond?

22             MR. WINTER:  Briefly, Your Honor.

23             THE COURT:  All right.

24             MR. WINTER:  The Court is aware the charge is a

25   conspiracy, which is a criminal agreement.  There's ample

1     evidence contained in the complaint and affidavit of this

2     criminal agreement.

3          Yusuf and Nur both applied for expedited passports

4     within days of each other.  Both families were unaware of

5     their travel.  Both their destinations were Turkey, which,

6     as the Court is well aware, borders Syria.  Both lacked the

7     financial means to do any of this.  Both had cash put in

8     their hands and then they deposited for purchase of these

9     tickets.  Both of them used this Volkswagen Jetta.

10          Yusuf was driven to the airport by Abdi Nur.  One

11     day later Abdi Nur does travel and then within months Nur

12     places himself in the midst of a plan, specifically an ISIL

13     plan to attack an air base, which is confirmed by all

14     sources, where 500 people -- 500 Syrian troops were killed,

15     Syrian troops loyal to Assad, who the defendant has said

16     doesn't deserve to live.

17          There's ample probable cause that this

18     defendant entered into an agreement to do exactly as

19     the complaint stated and we'd ask the Court to deny

20     defendant's motion.

21          THE COURT:  All right.  Based upon the evidence

22     that I heard here today, I do find that there is probable

23     cause to believe that the defendant has committed the

24     charges that are set forth in the complaint and therefore he

25     will be held over for further proceedings in this case.

1          I will now move to the issue of detention or

2     release of Mr. Yusuf.  Mr. Docherty.

3          MR. DOCHERTY:  Your Honor, as I've stated earlier,

4     the defendant has been found -- the Court has found that

5     there's probable cause to believe that the defendant has

6     committed a federal crime of terrorism.

7          This is a case in which there is a rebuttable

8     presumption of detention.  This is a case in which the

9     defendant is provided a motive to flee by the severity of

10    the sanctions that he potentially faces upon conviction.

11         The defendant has, as Agent Thomas testified

12    today, made false statements to the Federal Bureau of

13    Investigation when he was questioned at the airport

14    concerning his travel to Turkey, concerning his Facebook

15    friends being from Turkey, concerning his saving up in order

16    to get the money to go to Turkey when, in fact, we know

17    that he received cash, which he then deposited into a

18    newly-opened Wells Fargo Bank account.

19         The defendant was, as my colleague Mr. Winter has

20    said, in a criminal conspiracy with Abdi Nur.  But over and

21    above that, Your Honor, the defendant obtained money from a

22    person and deposited that money into a bank account,

23    obtained airline tickets to Turkey, and made his travel

24    arrangements.

25         None of this is impulsive.  None of this is even

1    something that is done on short notice.  The defendant

2    applied for a passport in April, picked it up on the 5th of

3    May, was taken to the airport on the 28th of May.  Mr. Abdi

4    Nur flew out of the airport on the 29th of May.  This is a

5    longstanding criminal conspiracy with members known and

6    unknown, but the two that are definitely known are Abdullahi

7    Yusuf and Abdi Nur.

8          The defendant, as Ms. Brandl brought out on cross

9    examination of Special Agent Thomas, has been living a quiet

10   life since the 28th of May.  That does not change the fact,

11   however, that his behavior on the 28th of May constituted a

12   criminal act that was in furtherance of a criminal

13   conspiracy.

14         And his reaction of being very punctilious about

15   following society's rules for a period of a few months is

16   not nearly sufficient, I submit, to overcome the presumption

17   of detention that applies in this case.

18         To sum up, Your Honor, the evidence against the

19   defendant, as laid out in the complaint and as summarized a

20   few minutes ago by Mr. Winter, is strong.  This is a federal

21   terrorism offense.

22         This Court should find, I respectfully submit, by

23   clear and convincing evidence that detention is required to

24   safeguard the safety of the community and should find by a

25   preponderance of the evidence that detention is required to

1    require the defendant to come to court when he is obliged to

2    do so.

3              Thank you, Your Honor.

4              THE COURT:  Thank you.

5              Ms. Brandl.

6              MS. BRANDL:  Thank you, Your Honor.  Your Honor, I

7    believe that this is a case where the rebuttable presumption

8    can be actually rebutted.  I think if you look at what this

9    case -- at the timing of this case, I think that's the most

10   important thing to look at.

11             First of all, I will just stress that he is a

12   student at Inver Hills.  He's been quietly going to school

13   for the last two months.  He's been working for the last

14   couple of months at Best Buy, receiving a paycheck, working

15   I can't remember how many hours.

16             In any case, he lives with his parents and I

17   understand the prosecutor believed that this is a big deal

18   that, you know, he didn't tell the truth to his parents on

19   May 28th, but I think what's most important to look at here

20   is what has happened since May 28th and, quite frankly, what

21   happened before.

22             The U.S. Attorney argues there's been a

23   longstanding criminal conspiracy.  Well, the fact is that

24   even if my client is associated with ISIL, it was a

25   terrorist organization for a total of 13 days at the time my

1     client went to the airport.  He received his passport two

2     weeks before it was declared -- or ten days before it was

3     declared a terrorist organization.  So I think we've got a

4     really huge problem as far as motive and intent.

5             On May 5th he could not have been charged with

6     this crime because it wasn't a terrorist organization.  So

7     the fact is that it became a crime possibly ten days after

8     he bought his passport and then 13 days later when he's

9     getting on a plane, which he had purchased earlier.  It

10    only -- there's no evidence that he even knew that there had

11    been a designation by the State Department.  So I think

12    that's really an important thing to look at here.

13            And then secondly, it was very clear to my client

14    that there were potential criminal charges coming down that

15    were very serious in this case and he could have taken this

16    passport that I am holding right here in my hand that's been

17    in his house -- his parents brought it to me today -- he

18    could have gone at any time.

19            I don't know that there was a no-fly order after

20    the 28th, but even if there was, we've got two borders in

21    this country that he could have driven across.  He could

22    have driven across the border into Mexico at some point or

23    over into Canada and traveled to anywhere he wanted to go

24    after that, number one, if he wanted to escape charges here

25    in the United States.

1          But, two, if he was so dedicated to some kind of

2     jihadist regime or some kind of jihadist motive, he's had

3     six months to keep going with that and yet what we see is

4     that after he was stopped in the airport, there's been no

5     communication with any people associated with this, there's

6     been no attempt for him to leave or to become involved any

7     further in this organization.  And believe me, we both know

8     very well that if there was any, we would have heard about

9     it today here in court.

10          I'm asking this Court to find that the presumption

11     has been rebutted.  This is an unusual case in that

12     Mr. Yusuf should be allowed to go home and live outside of

13     jail while he fights this case and I would ask the Court to

14     allow him to live with his family.  He's willing to be on

15     supervised -- on electronic monitoring if the Court would

16     feel more comfortable.

17          But here's a young man.  He was only 18 at the

18     time.  I think he's only 18 now.  He has been doing

19     everything right for the past six months, knowing full well

20     what the consequences were and didn't leave.

21          There is no reason to believe he's a danger

22     because he's shown no inclination to hurting anyone and

23     there's no inclination that he's a flight risk.  I ask the

24     Court to allow him to be released today.

25          Thank you.

1              THE COURT:  A question for you.  You've had an

2      opportunity to see the Pretrial Services report.  I know

3      that they've recommended that he be released subject to

4      certain terms and conditions.  One of the things they didn't

5      recommend, but my question is this, is that his release be

6      subject to -- that he be placed in the custody of his

7      parents.  So just not simply living with his parents, but

8      that, in fact, he be placed in their custody, which would

9      require them to supervise him, to use every bit of their

10     effort to assure that he continues to appear here in court,

11     and to notify the court if he violates any condition of his

12     release.

13             Have you had an opportunity to talk with his

14     parents to see whether they would be willing to undertake

15     that responsibility in the event I were willing to release

16     him and release him to his parents?

17             MS. BRANDL:  Your Honor, I have not specifically

18     addressed that with them, but I could make a very good-faith

19     argument that they would.  And they're here.  I'm sure they

20     could stand up and answer the Court right now if the Court

21     wanted that.

22             THE COURT:  Why don't we do that.  I would like

23     to.  If both parents could come up to the podium, please, if

24     you're willing to do so.  I can't require you, but if

25     Mr. Yusuf's parents could come to the podium.

1          (Inaudible discussion.)

2              THE COURT:  Why don't we go off the record,

3      Mr. Hanson, and let them talk.

4              MS. BRANDL:  I'm sorry.  I should let the Court

5      know there's no official court interpreter, but we do have

6      someone here who is willing to interpret and --

7              THE COURT:  Ah.

8              MS. BRANDL:  -- speaks clearly both languages.  So

9      I don't know if that's going to be sufficient for the Court.

10             THE COURT:  Okay.  Meaning neither of Mr. Yusuf's

11     parents speak English?

12             MS. BRANDL:  They do speak somewhat, but not

13     enough to understand fully the legal language that the Court

14     may --

15             THE COURT:  Do you need more time to be able to

16     speak to them vis-a-vis the interpreter about what I'm

17     inquiring of them?

18             MS. BRANDL:  No, Your Honor.

19             THE COURT:  All right.  Mr. Yusuf?

20             MS. BRANDL:  That's --

21             THE COURT:  I'm sorry.  Mr. Yusuf?  First of all,

22     if the interpreter or the individual who is assisting in

23     interpreting for the defendant's parents, if you could

24     identify yourself.

25             MR. JAMAL:  Omar, O-m-a-r, Jamal, J-a-m-a-l.

```
 1                    THE COURT:  All right.  And you are able to

 2        interpret for the defendant's parents?

 3                    MR. JAMAL:  Yes.

 4                    THE COURT:  And their names are?

 5                    MR. JAMAL:  Their name?

 6                    THE COURT:  Yes.

 7                    MR. SADIIK YUSUF:  (In English)  Sadiik Yusuf.

 8                    THE COURT:  I'm sorry.  You'll have to --

 9                    MR. JAMAL:  Sadiik Yusuf.

10                    THE COURT:  Sadiik, how do you spell that?

11                    MR. SADIIK YUSUF:  (In English)  S-a-d-i-i-k.

12        Last name is Yusuf, Y-u-s-u-f.

13                    THE COURT:  All right.  And his mother's name?

14                    MS. HUDLE:  (In English)  My name is Sahra,

15        S-a-h-r-a.  Last name is Hudle.

16                    THE COURT:  I'm going to need help on that.

17                    MS. HUDLE:  (In English)  Last name H-u-d-l-e,

18        Hudle.

19                    MR. JAMAL:  H-u.

20                    MS. HUDLE:  (In English) d-l-e.

21                    MR. JAMAL:  H-u-d-l-e.

22                    THE COURT:  H-u.

23                    MS. HUDLE:  (In English)  D.

24                    MR. JAMAL:  D, as in David.

25                    THE COURT:  D.
```

```
 1                    MS. HUDLE:  (In English)  l-e.

 2                    THE COURT:  l-e.  And the first name is?

 3                    MS. HUDLE:  (In English)  Sahra.

 4                    MR. JAMAL:  Sahra.

 5                    THE COURT:  How do you spell that?

 6                    MS. HUDLE:  (In English)  S-a.

 7                    MR. JAMAL:  H.

 8                    MS. HUDLE:  (In English)  r-a.

 9                    MR. JAMAL:  r-a.

10                    THE COURT:  r-a.  Sahra Hudle.

11               All right.  Mr. Yusuf and Ms. Hudle, are you

12      married?

13                    MR. SADIIK YUSUF:  (Through interpreter)  Yes.

14                    THE COURT:  Do you live together?

15                    MR. SADIIK YUSUF:  (Through interpreter)  Yes.

16                    THE COURT:  Does your son Yusuf -- I'm sorry.

17      Does your son live with you?

18                    MR. SADIIK YUSUF:  (Through interpreter)  Yes, he

19      does.

20                    THE COURT:  All right.  And the question that I

21      was asking Mr. Yusuf the defendant's attorney is whether you

22      would be willing to take on custody of your son during these

23      proceedings if I were to release him, which carries with it

24      certain obligations on your part.

25                    MR. SADIIK YUSUF:  (Through interpreter)  Yes,
```

1    Your Honor, we will be responsible.

2              THE COURT:  All right.  And what that would mean

3    is that you would agree to supervise him and it would mean

4    you would agree to use every effort to make sure that he

5    appears at all of his court proceedings.

6              MR. SADIIK YUSUF:  (Through interpreter)  Yes,

7    Your Honor.

8              THE COURT:  All right.  And you would agree to

9    notify the court immediately if he violated any of the

10   conditions of release that I might put in place.

11             MR. SADIIK YUSUF:  (Through interpreter)  Yes,

12   Your Honor.

13             THE COURT:  All right.  Thank you.  You may be

14   seated.

15             Do you have anything further, Ms. Brandl, on

16   behalf of your client?

17             MS. BRANDL:  Yes.  I have his passport here for

18   him to surrender to the Court if the Court feels more

19   comfortable if the passport is with the Court rather than in

20   his hands.  If that's one of the conditions, he's absolutely

21   willing to surrender his passport to the Court.

22             THE COURT:  All right.  Thank you.

23             Mr. Docherty, any response to the arguments by

24   Ms. Brandl on the issue of detention or release?

25             MR. DOCHERTY:  Your Honor, the defendant was

1    living with his parents, as the Court may be contemplating

2    releasing him to now, on the 28th of May when the defendant,

3    not to mischaracterize it, tried to surreptitiously leave

4    the United States.  The defendant is charged with an

5    extremely serious crime.  His behavior gives absolutely no

6    confidence that he will appear in court again.

7         The surrender of the passport, as Ms. Brandl

8    herself pointed out, there's ways of getting out of the

9    United States without one.  And I'll go beyond that and say

10   that it's possible to obtain false documents in order to

11   leave the United States, which is something that is

12   absolutely not unknown.

13        The Court should detain the defendant, Your Honor.

14   As I say, he has already tried to surreptitiously leave the

15   United States once and he's charged with a crime of

16   terrorism, for which the Court has found that there is

17   probable cause to believe that he, in fact, committed it.

18   So we persist in our detention motion, Your Honor.

19        THE COURT:  All right.  Thank you very much.

20        MS. BRANDL:  May I have two quick responses, Your

21   Honor?

22        THE COURT:  Very quick.

23        MS. BRANDL:  Very quick.  Your Honor, first of

24   all, I was not arguing that he could leave the country

25   without a passport, but even so, he couldn't leave whatever

1    next country he was in without a passport.

2         So secondly, he did not try to surreptitiously

3    leave the country.  He had an actual passport, a ticket, and

4    went to the airport openly.  He did not sneak across the

5    border.

6         So just that was my response.

7         THE COURT:  All right.  Thank you.

8         We're going to just take a short recess so I can

9    consider the evidence and the arguments of counsel and then

10   I will come back in and announce my decision.

11        MS. BRANDL:  Thank you, Your Honor.

12       (Recess.)

13        THE COURT:  Having considered the evidence that

14   was presented here today, the information that is contained

15   in the bond report, the arguments of counsel, I am denying

16   the government's motion for detention.  I do find that the

17   rebuttable presumption of detention has been overcome by the

18   evidence that was presented here and appears in the bond

19   report by clear and convincing evidence.

20        The fact of the matter is, Mr. Yusuf, you've been

21   charged with a very serious crime and I will not minimize

22   the seriousness of this crime, but apart from the

23   seriousness of the crime, everything else -- and the fact

24   that you lied to FBI agents when they stopped you at the

25   airport, which is also a very serious set of events, the

1     balance of the information that I have does suggest that

2     there are a condition or a combination of conditions that I

3     could put in place that would reasonably ensure not only the

4     safety of the community, but your continued appearance here

5     in court.

6          But I will tell you you are going to be on what I

7     would call a very short -- the conditions I am going to be

8     putting in place are going to be highly restrictive in order

9     to ensure that you do answer to the charges here in the

10    United States and that you do not make any attempt to flee

11    and that you do not do anything to endanger this community.

12          So with that, I am going to walk through with you

13    the order setting conditions of release.

14          I will also say that part of the reason I'm doing

15    this is because of your conduct since May of 2014 when you

16    were stopped.  You have not engaged in any type of activity

17    that would suggest that you were going to flee.  You have

18    virtually no criminal background here.

19          I have no indication, given you have no criminal

20    background, that you wouldn't make your court appearances

21    and I do believe that by putting you in -- and asking your

22    parents to formally agree to take custody of you during the

23    pendency of the proceedings that, again, I can satisfy the

24    conditions I am putting in place.

25          So with that, I am going to read to you the order

1     setting conditions of your release.  When I'm done I'm going

2     to ask you if you will comply with them.  And if you do

3     agree, then I'm going to ask that Ms. Brandl review the

4     order along with the sanctions and penalties section of that

5     order that lays out what will happen if you violate any term

6     or condition of the order.

7             Do you understand, Mr. Yusuf?  I need to hear out

8     loud.

9             THE DEFENDANT:  Yes, Your Honor.

10            THE COURT:  All right.  It is ordered that the

11    defendant's release is subject to the following conditions:

12            Number one, you must not violate any federal,

13    state, or local law while on release.

14            Number two, you must cooperate in the collection

15    of a DNA sample if it is authorized by 42 U.S.C.

16    Section 14135a.

17            Number three, you must advise the court or your

18    pretrial services officer or supervising officer in writing

19    before you make any change of residence or phone number.

20            Number four, you must appear in court as required

21    and, if convicted, you must surrender as directed to serve a

22    sentence that the court may impose.

23            Number five, you must sign an appearance bond, and

24    I am ordering an unsecured bond in the amount of $25,000.

25    This bond will be forfeited or may be forfeited if you fail

1    to appear for court proceedings, if you are convicted if you

2    fail to surrender to serve a sentence the court may impose,

3    or if you fail to comply with any of the conditions set

4    forth in the order setting conditions of release.

5           The next condition is that you are going to be

6    ordered -- your release is going to be subject to your being

7    placed in the custody of your parents, Sadiik Yusuf and

8    Sahra Hudle -- I have indicated their address here in Inver

9    Grove Heights -- who have -- and I will be asking them to

10   sign this order as well -- agreed to supervise you, to use

11   every effort to assure your appearance at all court

12   proceedings, and to notify the court immediately if you

13   violate any condition of your release or are no longer in

14   their custody.

15          The next condition is you must submit to

16   supervision by and report for supervision to the Probation

17   and Pretrial Services Office.  The phone number and date has

18   not been filled in here, but before you leave I'm going to

19   ask that you meet with the pretrial services officer who is

20   here and obtain that information from him.

21          The next condition is you must continually or

22   actively seek employment as required by Pretrial Services.

23          The next condition is you shall continue your

24   education program.

25          The next condition is you will surrender any

1    passport to Probation and Pretrial Services as directed.

2              So, Ms. Brandl, I am going to require that the

3    passport be turned over to Pretrial before Mr. Yusuf leaves

4    the courtroom here today.

5              The next condition is you may not obtain a

6    passport or other international travel document.

7              The next condition is your travel is restricted to

8    Minnesota unless approved by the supervising officer.

9              The next condition is you may not possess a

10   firearm, destructive device, or other weapon.

11             The next condition is you may not use or

12   unlawfully possess a narcotic drug or other controlled

13   substance as defined by 21 U.S.C. Section 802 unless

14   prescribed by a licensed medical practitioner.

15             The next condition is you are going to be subject

16   to a curfew where you are restricted to your residence every

17   day as directed by the pretrial services officer.  So your

18   pretrial services officer is going to have to approve you're

19   going to school, you're going to your job, or if they're not

20   going to approve it, but you're going to be on curfew at

21   your parents' home subject to pretrial services officer

22   approval.

23             You are going to be subject to location monitoring

24   as directed by the Pretrial Services Office or your

25   supervising officer and you're ordered to comply with all of

1      the program requirements and instructions that are provided.

2             You are also going to be required to submit to

3      testing for a prohibited substance if required by the

4      Pretrial Services Office or your supervising officer.

5      Testing may be used with random frequency and may include

6      urine testing, the wearing of a sweat patch, a remote

7      alcohol testing system, or any other form of prohibited

8      substance screening or testing.  You must not obstruct,

9      attempt to obstruct, or tamper with the efficiency and

10     accuracy of any prohibited substance screening or testing.

11            The next condition is you must report as soon as

12     possible to the Pretrial Services Office or your supervising

13     officer every contact you have with law enforcement

14     personnel, including arrests, questioning, or traffic stops.

15            And finally, you will reside with your parents,

16     who are -- I am requiring as part of this that they take

17     custody of you unless another residence is approved in

18     advance by the United States probation officer.

19            Those are the conditions of your release,

20     Mr. Yusuf.  Do you agree to follow them?

21            THE DEFENDANT:  Yes, Your Honor.

22            THE COURT:  All right.  Then, Ms. Brandl, I'm

23     going to ask that you come up here.  If you would take the

24     order and the bond and review them not only with Mr. Yusuf,

25     but also with his parents, with the use of the individual

1    who is here interpreting for them, to make sure that they

2    understand what these documents provide because part of

3    their obligation is to report if there's any violation of

4    this order setting conditions of release.

5              So we'll go off the record at this time for you to

6    do that.

7        (Off the record.)

8              THE COURT:  We are going to go back on the record

9    here for a moment.  Yes, Mr. Docherty.

10             MR. DOCHERTY:  Your Honor, pursuant to 18 U.S.C.

11   3145, the government does intend to seek review of this

12   order by the district court.  We would, with all respect to

13   Your Honor, ask that Your Honor stay execution of this

14   order.  I anticipate filing at least the notice of review

15   today and a memorandum in support within 48 hours.

16             THE COURT:  That motion is denied.  Obviously you

17   can appeal the order and take it up with the district court,

18   but in terms of staying the effect of this order, I will not

19   stay the effect of this order.

20             We'll go off the record.

21             MS. BRANDL:  Thank you, Your Honor.

22       (Off the record.)

23             MS. BRANDL:  I believe everything is here, Your

24   Honor.

25             THE COURT:  All right.

1          MS. BRANDL:  And, Your Honor, I just want to put

2     on the record I am walking over to the pretrial services

3     officer with --

4          THE COURT:  The record is going to reflect,

5     because Ms. Brandl wasn't near a microphone, that she has

6     handed over the passport to the pretrial services officer.

7          Mr. Yusuf, you've had an opportunity to review the

8     order setting conditions of release and the bond with your

9     lawyer and your parents; is that correct?

10          THE DEFENDANT:  Yes, I have, Your Honor.

11          THE COURT:  All right.  And do you agree to follow

12     all the terms and conditions of the bond and the order

13     setting conditions of release?

14          THE DEFENDANT:  Yes, I do, Your Honor.

15          THE COURT:  And do you understand the sanctions

16     and penalties that could be brought to bear against you if

17     you violate any term or condition of this order?

18          THE DEFENDANT:  Yes, I do, Your Honor.

19          THE COURT:  All right.

20     (Pause.)

21          THE COURT:  I have signed the order setting

22     conditions of release and Mr. Yusuf will be released after

23     processing.  I have signed the bond as well.

24          Ms. Brandl, given the obligations of Mr. Yusuf's

25     parents, I would suggest that this order setting conditions

1       of release be translated for them in writing.  I know that

2       you have orally shared with them what it contains, but given

3       their obligations, I think it's very important for them to

4       understand exactly what the terms and conditions are and to

5       have ready access to that.

6                 MS. BRANDL:  I will have that done, Your Honor.

7                 THE COURT:  All right.  Anything further on this

8       matter on behalf of the government?

9                 MR. WINTER:  No, Your Honor.  Thank you.

10                THE COURT:  Anything further on behalf of

11      Mr. Yusuf?

12                MS. BRANDL:  No.  Thank you very much, Your Honor.

13                THE COURT:  All right.  That concludes this

14      proceeding.  We'll take a short recess and then move on to

15      the next detention hearing.

16           (Court adjourned.)

17                                *     *     *

18

19

20           I, Lori A. Simpson, certify that the foregoing is a

21      correct transcript to the best of my ability from the

22      official digital recording in the above-entitled matter.

23

24                Certified by:  *s/ Lori A. Simpson*

25                               Lori A. Simpson, RMR-CRR