UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                                    )
United States of America,           )   File No. 14-MJ-1024
                                    )            (MJD/JSM)
          Plaintiff,                )
                                    )
vs.                                 )   Minneapolis, Minnesota
                                    )   December 3, 2014
Abdullahi Yusuf,                    )   3:15 p.m.
                                    )
          Defendant.                )
                                    )
------------------------------------------------------------

BEFORE THE HONORABLE MICHAEL J. DAVIS
UNITED STATES DISTRICT COURT JUDGE

**(APPEAL/OBJECTION OF MAGISTRATE JUDGE DECISION)**


APPEARANCES

  For the Plaintiff:          U.S. Attorney's Office
                              JOHN DOCHERTY, AUSA
                              ANDREW R. WINTER, AUSA
                              600 U.S. Courthouse
                              300 South Fourth Street
                              Minneapolis, Minnesota 55415

  For the Defendant:          Brandl Law, LLC
                              JEAN BRANDL, ESQ.
                              Suite 5010
                              310 Fourth Avenue South
                              Minneapolis, Minnesota 55415

  Court Reporter:             LORI A. SIMPSON, RMR-CRR
                              1005 U.S. Courthouse
                              300 South Fourth Street
                              Minneapolis, Minnesota 55415

  Interpreter:                Osman Abdulle



    Proceedings recorded by mechanical stenography;
transcript produced by computer.

1                                   **I N D E X**

2                                                                    PAGE

SADIIK YUSUF
3        Examination by the Court                                    31
         Examination by Ms. Brandl                                   39

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **P R O C E E D I N G S**

2                **IN OPEN COURT**

3              THE COURT:  Let's call this matter.

4              THE CLERK:  The United States of America vs.

5       Abdullahi Yusuf, Criminal Case No. 14-MJ-1024.  Counsel,

6       will you please state your appearances for the record.

7              MR. DOCHERTY:  Good afternoon, Your Honor.  May it

8       please the Court, Assistant United States Attorneys John

9       Docherty and Drew Winter for the United States.

10             THE COURT:  Good afternoon.

11             MS. BRANDL:  Good afternoon, Your Honor.  Jean

12      Brandl appearing for Abdullahi Yusuf, who is present in

13      court to my right.

14             THE COURT:  Good afternoon.  Do we need an

15      interpreter?

16             MS. BRANDL:  Your Honor, if the Court is inclined

17      to want to ask questions of my client's parents, we would

18      need an interpreter, but Mr. Yusuf, my client, speaks

19      perfect English.

20             THE COURT:  Swear the interpreter in.

21             THE CLERK:  Please raise your right hand.

22         (Interpreter sworn.)

23             THE COURT:  The government's motion.

24             MR. DOCHERTY:  Good afternoon, Your Honor.

25             THE COURT:  Good afternoon.

1              MR. DOCHERTY:  The United States is here today,

2       Your Honor, pressing its motion pursuant to 18 United States

3       Code Section 3145(a) to have this Court engage in a *de novo*

4       review and to revoke the order of release that was entered

5       by the magistrate judge a week ago today on November the

6       26th of 2014 following a preliminary and detention hearing.

7              I want to begin, Your Honor, by talking about a

8       couple of matters that were raised in defendant's responsive

9       papers.

10             THE COURT:  Let's first outline the burden and the

11      standards that have to be met here.

12             MR. DOCHERTY:  Certainly, Your Honor.  Your Honor,

13      the standard of review here is *de novo*.  This Court is not

14      required to give any weight or deference to the findings

15      made below by the magistrate judge.

16             Detention is appropriate in this case should the

17      Court find by clear and convincing evidence that the

18      defendant poses a risk of danger to the community, and

19      detention would also be appropriate should the Court find by

20      a preponderance of the evidence that the defendant poses a

21      risk of flight.

22             There is a rebuttable presumption of detention in

23      this case.  The reason for that is that the magistrate judge

24      has found and a sworn complaint is before this Court that

25      the defendant has -- there is probable cause to believe that

1    the defendant has committed the crime of conspiring to

2    provide material support to a designated foreign terrorist

3    organization, that being the Islamic State in Iraq and the

4    Levant or ISIL, as I'll refer to it going forward.

5            That crime, Your Honor, is one of the ones

6    enumerated at 18 U.S.C. 2332b(g)(5)(B) and as such, so long

7    as there is a maximum term of imprisonment of 10 years or

8    more, there is a rebuttable presumption of detention.  Since

9    the maximum term of imprisonment is 15 years, that

10   requirement is met.

11           The government filed immediately following the

12   hearing last Wednesday an appeal -- or a motion for review,

13   excuse me, and a brief memorandum.  The government yesterday

14   filed a fuller memorandum, which is something that we said

15   on Wednesday the 26th we would do.

16           The defense has filed a couple of responsive

17   memoranda, one relatively short and one fuller one this

18   afternoon.  In those responsive memoranda, Your Honor, the

19   defendant stresses their view that ISIL was not a designated

20   foreign terrorist organization before I believe the middle

21   of May of 2014.

22           In fact, Your Honor, the State Department's

23   website, which maintains a list of designated foreign

24   terrorist organizations, shows that ISIL under its earlier

25   name al-Qaeda in Iraq was designated as a foreign terrorist

1    organization on the 17th of December of 2014 [sic].  It has

2    changed its name several times.

3            THE COURT:  Not --

4            MR. DOCHERTY:  Excuse me?

5            THE COURT:  December 14th -- December of 2014?

6            MR. DOCHERTY:  December of 2004.  I'm sorry.  Did

7    I say '14?

8            THE COURT:  Yes, you did.

9            MR. DOCHERTY:  Well, that was my mistake and I

10   apologize, Your Honor.  December 17th of 2004, so nearly ten

11   years ago.  The organization has changed its name a couple

12   of times and the designations have been changed to reflect

13   those name changes.  But as I say, the State Department's

14   publicly-available website clearly indicates that this

15   organization has been designated for almost ten years to the

16   day.

17           Counsel also, both in her cross of the agent

18   before Magistrate Mayeron and in the papers presented to

19   this Court, has stated that the attention-grabbing

20   atrocities that ISIL has engaged in were not engaged in

21   before May or June of 2014.  Again, Your Honor, this is

22   simply incorrect.

23           There is a great deal of press coverage going back

24   into 2013 concerning the atrocities that were committed by

25   ISIL.  *Amnesty International* published a report stating that

1    ISIL engaged in torture, summary executions, and beatings.

2    That report was dated 19 December of 2013.

3           I believe that many people have seen reporting

4    going back, again, into last year where the phrase is used

5    that ISIL has become so extreme that even al-Qaeda has

6    broken with it, and that too was definitely in advance of

7    May of 2014.

8           In addition, Your Honor, it is not required that

9    the defendant know of the designation.  The defendant needs

10   to know of the designation or needs to know that the

11   organization engages in terrorism or that the organization

12   engages in terrorist activities, all of them defined terms

13   under the law.

14          Your Honor, the defendant's parents were put in a

15   difficult position because any parent when asked by a judge

16   whether they will take custody of their child and thereby

17   prevent that child from being incarcerated would say, yes,

18   that they would take custody of the child.

19          But in this case, Your Honor, the defendants [sic]

20   cannot adequately supervise Mr. Yusuf.  On May the 5th of

21   2014 --

22          THE COURT:  The parents aren't the defendants.

23   The parents aren't the defendants.

24          MR. DOCHERTY:  No, sir, they are not and I don't

25   mean to suggest that they are.

1          THE COURT:  You said the parents -- you said the

2     defendants cannot adequately supervise Mr. Yusuf.

3          MR. DOCHERTY:  Well, again, Your Honor, I -- maybe

4     I should slow down.

5          THE COURT:  Yes, I think so.  I want to make sure

6     that the parents don't feel like they're the defendants in

7     this case.

8          MR. DOCHERTY:  No, and I apologize for that, Your

9     Honor.  It was certainly not my intent.  It was a

10    misstatement.

11          But the parents, Your Honor, cannot adequately

12    supervise Mr. Yusuf.  There was -- there's a full

13    description in the complaint and there was testimony last

14    Wednesday that on May the 5th Mr. Yusuf was dropped off at

15    school, that he looked back over his shoulder and waited

16    until his father had driven away, that he then went to a

17    nearby mosque and that at that place he caught a bus that

18    took him to the Cedar/Riverside area of Minneapolis and from

19    there he made his way to the passport office in downtown

20    Minneapolis and that's where he picked up his passport.

21          Later on May the 5th he used that passport to open

22    an account at Wells Fargo.  It was the means of

23    identification that he had to give to the bank.  On May the

24    23rd he deposited $1,500 in cash into that account.

25          On May the 24th he bought his ticket and on May

1    the 28th he was again dropped off by his father at school.

2    He went inside.  About one hour later he came out.  Again he

3    went to the same nearby mosque.  He came out with his

4    luggage.  He was picked up in a car.  He was driven to a

5    light rail station and rather than going all the way to the

6    airport, he was taken only to the light rail and then from

7    light rail he proceeded to the airport.

8              At the airport he was met by agents of the Federal

9    Bureau of Investigation.  They asked if they could speak

10   with him.  He agreed to speak with them.  He told them that

11   his parents knew where he was, which was not true because

12   his parents had said -- or said in later interviews that

13   Mr. Yusuf had obtained his passport, obtained his ticket,

14   packed his bag, and gone to the airport to catch a flight to

15   Turkey all without his parents knowing anything.

16             THE COURT:  Well, it would be -- I understand --

17   well, I'm going to let you go on with what you're saying,

18   but my understanding is the only thing the FBI knew at the

19   airport was that they had been alerted by the passport

20   person.

21             MR. DOCHERTY:  At that time that was correct.

22             THE COURT:  That's the only information.

23             MR. DOCHERTY:  That is --

24             THE COURT:  And the question that -- it probably

25   doesn't have anything to do with anything, but I'm just

1    trying to figure it out.  He wasn't put on a watch list?

2              MR. DOCHERTY:  I don't believe that -- I believe

3    that he was, in fact, denied his flight that day.

4              THE COURT:  I understand he was denied, but was he

5    on a watch list before then?

6              MR. DOCHERTY:  I don't know the answer to that

7    specific question, Your Honor, but I know that it was not

8    simply the agents' decision that he would not be on the

9    plane that day.

10             THE COURT:  Well, that's what the FBI officer --

11   agent testified at the hearing, that he wasn't going to get

12   on the flight.  There may have been other people and that

13   wasn't fleshed out at the hearing.  Who made that decision?

14             MR. DOCHERTY:  I believe the FBI nominates people

15   to be on these various watch lists and then there is a

16   review process and then a decision is made as to whether the

17   person will indeed be added to any kind of watch list,

18   no-fly list, selectee list or what have you, Your Honor.

19   That is my understanding of that process.

20             THE COURT:  The only reason I'm asking -- I'm just

21   trying to picture this because, you know, if you're a Lonely

22   Planet person and you just pick up your backpack and you go

23   to buy a ticket and you're going to a country that we

24   recognize, what keeps you from being able to get on that

25   plane?

1              MR. DOCHERTY:  If --

2              THE COURT:  And the only information that the

3      police had -- the FBI has is some person in the passport

4      office saying take a look at this and they didn't have

5      anything other than that.

6              MR. DOCHERTY:  I think they had a bit more than

7      that, Your Honor, as our dialogue goes on.  They had seen

8      the defendant dropped off at school on May the 5th.  They

9      had seen him look back over his shoulder until his father

10     drove off and then, only then, make his way to the passport

11     office.

12              I'm not sure, Your Honor, when it became known

13     that the defendant had put 1,500 in cash into his account.

14     That could have come after he was denied boarding, so I

15     don't want to overstress that.

16              And then there were the events of the day itself

17     when once again the defendant had been dropped at school by

18     his father, had come out of school after only an hour, had

19     gone to the mosque, come out of the mosque with his

20     suitcases, which he hadn't had, car pulls over --

21              THE COURT:  How many kids in this country evade

22     their parents and run away?  Thousands.

23              MR. DOCHERTY:  Thousands.  I don't have an exact

24     number, but thousands.

25              THE COURT:  Right.  And so let's not -- I can't

1    attach -- I just want to understand your process and how he

2    was stopped and why he couldn't get on the plane.

3              MR. DOCHERTY:  Sure.  He was stopped.  You are

4    correct, it started with the tip from the passport office,

5    but then it was fleshed out by at least some and perhaps all

6    of the evidence that I've tried to summarize here today,

7    which is the behavior on the 5th of May, the behavior on the

8    28th of May, and potentially, but I don't want to

9    overemphasize it, the knowledge of the cash deposits.

10             I'd also say that the record that we have today is

11   of course fuller than what we had on the 28th of May because

12   now we definitely do have the cash deposits and we have the

13   fact that the buddy in the Volkswagen Jetta --

14             THE COURT:  I'm going to let you go on with your

15   presentation.  I just -- I was just trying to figure out,

16   you know, if I look the wrong way, you mean I can be stopped

17   from getting on a plane?

18             MR. DOCHERTY:  No.

19             THE COURT:  I'm just trying to --

20             MR. DOCHERTY:  I want to be emphatic about that.

21   No, the way that you look is not going to factor into it,

22   but what we have here is behavior and I believe -- I hope

23   that I have appropriately stressed that this is a

24   behavior-driven decision from the get-go and that here

25   today -- while the decision of the FBI to speak to the

1     defendant and to deny him boarding on May the 28th was based

2     on behavior, that what we have here today is that behavior,

3     plus the $1,500 in cash that was deposited, plus the buddy

4     leaving the next day going to Turkey and then, as Your Honor

5     has seen, sending back Facebook and Twitter messages about

6     being with the brothers, fighting or being in al-Sham.  All

7     of that, as is spelled out in the complaint, language that

8     indicates that the defendant is with -- not the defendant,

9     that the -- well, he is a defendant -- the co-defendant,

10    Abdi Nur, is with ISIL.

11          So all of that, Your Honor, is information we have

12    over and above what the FBI had on the 28th of May.  And I

13    would defend what the agents did on the 28th of May.  I

14    don't see anything in the complaint, and if Your Honor does,

15    I would be --

16          THE COURT:  This --

17          MR. DOCHERTY:  -- that this was based on anything

18    but behavior.

19          THE COURT:  It raised a question to me because it

20    was emphatic in the transcript saying that he wasn't going

21    to get on the plane.  I was trying to figure it out.  He

22    didn't have to talk to them, talk to the FBI.  He had a

23    ticket and he was going to a NATO country and for the life

24    of me -- if you're a Lonely Planet traveler, you know,

25    you're going to find a place to stay when you get there.

1    You know, that happens -- isn't that what traveling is all

2    about?

3              MR. DOCHERTY:  That is what traveling is all

4    about, absolutely.  And if the defendant had simply turned

5    up at the airport with a ticket and a passport and wanted to

6    fly away, I don't know how on earth he could have been

7    stopped.

8              But after seeing the behavior on the 5th of May,

9    after seeing the behavior on the 28th of May -- I mean, I

10   don't know Lonely Planet travelers who wait until their

11   parents are gone, then pick up their luggage at a nearby

12   mosque, luggage that they didn't have when they were dropped

13   off by their parents, then change clothes at the side of the

14   road, transfer clothing from a red duffle bag into a black

15   duffle bag, then go on to the airport.

16             Again, Your Honor, I understand that the agents

17   did not have all the information that we have here this

18   morning and that the information we have here this morning,

19   I would respectfully submit to this Court, makes even

20   clearer, with the benefit of hindsight, that the agents were

21   correct in the decision that they made on the morning of the

22   28th of May.

23             But even without that, my view is, with all

24   respect, that this was absolutely, positively not based on

25   appearance, it was based on behavior, and that it was the

1    correct decision even given the limited information

2    available to the agents, the relatively limited information

3    available to the agents that morning.

4           THE COURT:  Continue.

5           MR. DOCHERTY:  Your Honor, it's also -- and this

6    is in our papers, but I want to flesh it out a little bit.

7    The defendant has obviously had assistance in what he has

8    been trying to do.

9           His friend has made it, apparently, all the way to

10    either Iraq or to Syria.  I am speaking of Mr. Abdi Nur.

11           The defendant obtained $1,500 and deposited it in

12    cash from a person or persons unknown, deposited it in cash

13    into his newly-opened Wells Fargo Bank account.

14           There was a person who called Heritage Academy on

15    the morning of May the 5th when the defendant stood outside

16    and waited until his father had gone before he left.  There

17    was a person who called the defendant in sick that day, and

18    it wasn't his parents and it wasn't the defendant.

19           So the defendant is part -- this is part of a

20    group exercise, if you will, Your Honor.

21           In addition, Your Honor, another factor in favor

22    of detention at this time is that the defendant -- the

23    defense emphasizes, and I understand why, that since the

24    28th of May the defendant has behaved himself impeccably.

25    He has been at home or he has been at school.  He has not

1    committed any crimes.  He has not tried to run away.

2         The defendant at those times was facing the

3    theoretical possibility that he might get charged.  That has

4    now ripened into an actual charge, a real charge.  It's not

5    theoretical anymore, and that in psychological terms is

6    significant to the point of being a game-changer.  The

7    defendant now has every motive to try and either elude

8    coming back to court or to commit further crimes.

9         And on that point, Your Honor, I would point out

10   that on December the 1st, the day before yesterday, all

11   three major networks, ABC, CBS, and NBC, carried a story

12   indicating that the Department of Defense had urged members

13   of the armed forces to closely monitor their social media

14   postings to see what those postings revealed about those

15   members of the armed forces and that this was done because

16   ISIL was exhorting its sympathizers in the United States to

17   engage in lone wolf attacks.

18        So for all of these reasons, Your Honor, the

19   defendant's behavior, the fact that the parents should not

20   be put in the position of having to choose between trying to

21   monitor the defendant and the defendant's incarceration, and

22   the fact that the defendant has been able to hide his

23   activities successfully from his parents in the past,

24   because of the fact that this is now a real charge and not a

25   theoretical charge, because of the extreme risk to public

1     safety that ISIL as an organization poses, and because this

2     is a rebuttable presumption case, the United States

3     respectfully renews its motion for detention and asks that

4     this Court, following a *de novo* review of the record below,

5     revoke the magistrate judge's order releasing the defendant

6     and order the defendant detained pending trial in this case.

7              Thank you, Your Honor.

8              THE COURT:  Thank you.

9              Counsel.

10             MS. BRANDL:  Thank you, Your Honor.  Your Honor,

11    as the Court is well aware, I filed two memoranda in support

12    of my client's position that he be released from custody

13    today and supporting Magistrate Judge Mayeron's decision to

14    release him from custody.  I'm not normally one to repeat

15    every one of my arguments that I have already written, but I

16    would like to touch on the main issues, knowing that this

17    Court has already read everything.

18             I think when the Court looks at -- as I stated in

19    my papers, if this was a situation where my client under

20    some of the similar situations was going to join or alleged

21    to be going to join ISIL after the atrocities of August,

22    this might be a bit different situation.

23             My understanding from the complaint and from the

24    testimony of the FBI agent at the hearing last week is that

25    ISIL was not designated a terrorist organization and their

1    actions were not -- and this is what the officer -- the

2    agent testified to -- is that they were not widely known as

3    a violent group that was performing atrocities, this

4    particular branch of whatever organization it is, until

5    June, July, and August.

6          So I don't believe -- I believe there's a tenuous

7    connection and it's pretty long and I'm not sure -- I

8    certainly don't believe it would pass a beyond a reasonable

9    doubt standard to prove that my client was aiding or even

10   part of ISIL.

11         But in any case -- just to respond to the

12   government's position that it was a dangerous terrorist

13   organization in May of 2014, I don't believe that the facts

14   would support that.

15         But in any case, the main argument is not about

16   that, but the main argument -- and I do want to address one

17   other thing as far as the parents.  As I wrote in my papers,

18   there was no obligation for my client's parents to have any

19   supervising capacity over an 18-year-old young man in May of

20   2014.

21              THE COURT:  Why is that?

22              MS. BRANDL:  Well, number one, he was 18 years

23   old, so he gets to decide his own --

24              THE COURT:  Where was he living?

25              MS. BRANDL:  I'm sorry?

1          THE COURT:  Where was he living?

2          MS. BRANDL:  He was living with his parents, Your

3     Honor, but I don't believe that they had any understanding

4     they were supposed to be supervising him.  I believe they

5     dropped him off at school.  I think what's --

6          THE COURT:  I guess that's the paradox of your

7     argument to me.  You're saying that -- you didn't say

8     anything about he's paying rent or he's renting a room and

9     he's coming and going when he wants to.  No one has

10    testified to that.  Now you're saying, oh, now his parents

11    are going to supervise him.

12         MS. BRANDL:  Your Honor, I don't believe it's a

13    paradox and here's why.  Number one --

14         THE COURT:  I do because, you know, if he's doing

15    whatever he wants to do, why is his parents dropping him off

16    at school?

17         MS. BRANDL:  I think there are a couple of issues

18    here.  First of all --

19         THE COURT:  So you're going to have to convince

20    me.  You can't just say that he could come and go as he

21    wants.  You can say it, but it doesn't follow through with

22    common sense of a household and especially a Somali

23    household that he could come and go as he pleased.

24              And so if you want to put the parents on and

25    they're going to testify that they had no control over him

1    whether or not he went to school, whether or not he worked,

2    he had a room and whether or not he paid for it, let me hear

3    it.  But I don't want to hear it from you.

4         MS. BRANDL:  I hadn't prepared them for that, but

5    I am certainly willing to put them on the stand.

6         THE COURT:  Do you see what I am saying?  I don't

7    need you to tell me that he could come and go without having

8    the parents tell me that.

9         MS. BRANDL:  Understood, Your Honor.  I think the

10   more important issue here is he was a vibrant part of the

11   family.  This wasn't a renting situation.  He lived with his

12   family.  He was a member of that family.

13        The only issue -- the reason I mention the coming

14   and going is that my client at 18 chose to do something that

15   he did not want to tell his parents about and I wanted to

16   distinguish -- what the government is trying to argue is

17   that he's, quote, eluding his parents.

18        I think there's a sense of eluding in that they

19   were monitoring his every move and by doing that that they

20   were watching him to make sure he didn't do something.  The

21   fact is they trusted him.  He obviously betrayed their trust

22   by trying to get on a plane and flying somewhere.

23        There's no question he's being charged with a

24   crime here.

25        THE COURT:  Let me -- let's back up.  You're

1    saying that -- I've got the transcript in front of me.

2    You're saying he's a vibrant member of the family, but he's

3    not eluding when he's getting a passport and getting on a

4    plane to go.  Now, how does that make sense?

5              MS. BRANDL:  I just -- I'm objecting to the word

6    "eluding" as if they were watching him to make sure he

7    doesn't do something.  Like if police were watching

8    somebody --

9              THE COURT:  Use a different word, then.  What word

10   do you want to use?

11             MS. BRANDL:  He withheld information from his

12   parents, there's no question about that.

13             THE COURT:  What's the big deal about eluding?

14   I'm trying to figure that out.

15             MS. BRANDL:  I think the government is trying to

16   paint him as some sophisticated criminal who has got a

17   master plan in place and some very sophisticated plan and

18   he's eluding his parents that are watching him.

19             The fact is he didn't tell them he was going to do

20   this.  He has numerous reasons, which at this point it's not

21   relevant what his reasons were, but the fact is that he

22   chose not to tell his parents.  I think there are young

23   people who choose to travel without telling their parents

24   for a variety of reasons and the fact is that one of the

25   things that he did publicly express --

1          THE COURT:  I've handled ten terrorism cases,

2    young adults leaving this city to go to Somalia, and there's

3    a pattern that is similar to this, whether or not you want

4    to call it eluding or not.

5          So that's within my common sense, my knowledge,

6    that there is this type of -- not telling the parents, that

7    the Somali parents are very strong, the family ties are very

8    knit -- very tight, and that they know about their children.

9          If you want to bring the parents up and say we're

10   different, we don't know what our son is doing, we don't

11   care what he's doing, he just has a room and he comes and

12   goes, then that's what you need.

13         But my knowledge is based on a number of cases

14   that have been before me with testimony about how the

15   families work.  So it's not like I'm some person that

16   doesn't know anything about the Somali community.

17         And so when you say these things, put somebody up

18   so they can tell me that so I can ask some questions.

19         MS. BRANDL:  Judge, let me clarify something.  I

20   agree with you.  I am not in any way arguing that this

21   family was not supporting their son and that they are not a

22   tight-knit family who knows -- and that the parents don't

23   know what he's doing.

24         What I was simply arguing is, for the sake of

25   detention only, that Mr. Yusuf, Abdullahi Yusuf, chose not

1    to tell his family, for what reasons is not relevant before

2    this Court at this time, but the fact is that does not

3    necessarily equate that he was committing a crime.  There

4    are all sorts of reasons 18-year-olds don't tell their

5    parents that they're leaving the country.

6            The government has established probable cause that

7    my client was leaving to assist a terrorist organization.

8    The issue here is whether these parents back in May who --

9    he managed to tell a mistruth or he omitted information and

10   left for the airport without telling them, so we're clear on

11   that.  What the issue is here is can these parents supervise

12   him now.

13           And the reason I bring up that a young man can

14   choose not to tell his parents things is that back then

15   there was no legal stricture upon him to tell his parents

16   the truth.  There was certainly cultural pressure, I'm sure,

17   but the fact is what I'm asking this Court to decide --

18           THE COURT:  Stop there.  The cultural pressure is

19   probably stronger than any legal stricture that I could ever

20   put on this defendant.

21           MS. BRANDL:  The Court --

22           THE COURT:  The Somali community and their

23   families are very tight and one of the clear pictures that

24   have been painted is the reason why there's elusion, eluding

25   of the parents, is because the parents don't want them to go

1          off and die.

2                    MS. BRANDL:  Absolutely, Your Honor, and I don't

3          know a parent on this planet who would watch their child go

4          off and die.  And I think children who think that they're

5          doing the right thing who don't want their parents to be

6          scared for them lie to their parents.  I think that's all

7          very clear on the record.

8                    What I want to establish here and which I think is

9          relevant for detention is that this is a family that does

10         care deeply about their son.  In May of 2014 there was no

11         judge, there was no one saying to him you are going to be in

12         serious trouble if you leave your parents again, if you

13         leave this country, if you leave the state even.

14                   At this time -- and there are two points I want to

15         make on that.  At this time Judge Mayeron ordered the family

16         to supervise him.  And I understand what you're saying, that

17         the Somali culture is stronger than the court, but I think

18         the court -- knowing that there's even more time over

19         Mr. Yusuf's head if he doesn't obey the court is certainly

20         as powerful as family pressure, but I also want the Court to

21         look at the fact that Mr. Yusuf never made a promise to the

22         court back then.

23                   THE COURT:  I would quarrel with that because, as

24         you well know, and you're a very experienced criminal

25         defense lawyer, that when you start talking to a defendant

1    about serving 15 years in prison, they don't have the

2    slightest idea about that.  He's only lived 18 years, so he

3    doesn't even understand that.  And so it's not going to

4    scare him because he has no framework for knowing how long

5    that time period means in his life.

6            MS. BRANDL:  And supports why he should be

7    released from custody.

8            I think the critical factor here, Your Honor, if

9    we look at the main issue is that he was released from

10   custody on May 28th -- not custody.  He was released with

11   his passport on May 28th.  And I do believe this is the most

12   powerful argument.  Actually, there's two.  He was released

13   on that day.  He received a target letter in June of 2014.

14   So for five and a half months he knew he was facing time.

15   Understood that you're saying that he doesn't understand,

16   then he doesn't understand now any better than that, but if

17   he were going to leave the country, that would have been a

18   darn good time to leave.  If he was dedicated to some sort

19   of Islamist jihadist regime, that would have been a good

20   time to leave.  He could have skipped over either border and

21   flown out with his U.S. passport from another country and

22   gone over and joined this.

23           The fact is we don't know what decision he made or

24   why on May 28th, but the bottom line is that since that time

25   he has done everything right.  There is no sign of phone

1    calls, social media contacts, e-mails, anything where he has

2    talked about any kind of thing where he's supporting a

3    terrorist regime.  He has not talked about leaving.  He's

4    not talked about hurting anyone or supporting anyone who

5    hurts anyone.  He's lived with his family during that time.

6    He's living with his family now.  And he has not made an

7    attempt to leave or hurt anyone.

8           I think the fact that -- Exhibit A is that he is

9    sitting right here in this court.  He knew exactly what

10   could happen here today.  He knew that this Court can put

11   him in custody for the duration of his case or longer and he

12   is here today to face that.  If that doesn't speak volumes

13   about the fact -- the fact that he's here, it does speak

14   volumes of the fact that he knows what he is facing, yet he

15   is here in court.  His family is here in court.  They're

16   supporting him.

17          I think you and I can quibble over Somali culture

18   versus the legal pressures, but I think when you look at the

19   big picture, there are no new facts since either May or

20   early June that the government has presented to show that

21   he's a danger or that he is a flight risk.  If they think he

22   is such a big flight risk and danger, why wasn't he put in

23   custody in June, why wasn't he put in custody on May 28th?

24          The reason he should be kept out of custody is

25   very unusual.  I understand the presumption is that for

1          someone charged with a terrorist crime that they should be

2          put in custody, but Abdullahi Yusuf is an exception to this

3          for so many reasons.  I have filled two pages with notes as

4          to why and I have written something like 15 pages of

5          memoranda why this is an exception.

6               And I believe Judge Mayeron made the right

7          decision in letting him out of custody and, again, him being

8          here today shows that that was the right decision because

9          one of the main government arguments is he's not going to

10         show up in court.  Well, guess what, Your Honor?  Here he is

11         and he is here facing the music knowing full well that

12         there's a chance that you will put him in custody, but he

13         walked into this courtroom, no one dragged him here.

14               I think it's very important to look at the

15         distinctions between this case and many other types of cases

16         similar to this and I'd like to know why has the last eight

17         days changed Mr. Yusuf into a flight risk and a danger.

18         Again, five and a half months since he got his target

19         letter, six months since he was in custody, but now suddenly

20         eight days later the U.S. government, I cannot imagine how

21         many hours they've spent with clerks and themselves writing

22         motions and making sure that he goes back into custody.

23         It's beyond my comprehension that he has changed in eight

24         days to this incredible danger and this incredible flight

25         risk.  There are more things in place right now --

1          THE COURT:  I'm not following you with that.  They

2     didn't change their position eight days ago.  They had the

3     same position they have now.

4          MS. BRANDL:  That's what I mean.  Eight days ago

5     it changed.  This is what I don't understand.

6          THE COURT:  Eight days ago?

7          MS. BRANDL:  Eight days ago he was arrested.

8     Eight days ago he was switched from being --

9          THE COURT:  Again, you are a very experienced

10    criminal defense lawyer and you know that indictments or

11    informations can come down much later than the time period

12    of the alleged criminal activity.  That's nothing new.

13         MS. BRANDL:  No, of course not, Your Honor.  I'm

14    not saying it's anything new, but I'm saying that the

15    arguments the government is using as to why he has to go

16    into custody are the same arguments that could have been

17    used on May 28th as to why he could have gone into custody

18    then.  Two weeks later when he got his target letter, they

19    could have used the same argument then.  They could have

20    arrested him at that point.  Nothing new has come out.

21         And I understand -- again, I understand it takes a

22    while for the complaint, but the government can come up with

23    complaints quite quickly.  This is not an indictment.  This

24    is a complaint.  It could have been written in a day and

25    sent out and he could have been arrested the next day in

1    June or July or August or September or October.  But, no, it

2    was waited until November and then suddenly all these

3    arguments that are being made.  Nothing has changed in the

4    six months that he's been out.  It doesn't make sense that

5    he would now have to go into custody pending trial.

6         I also think this is a weak connection.  I don't

7    think it's going to be a slam dunk for the U.S. Attorney as

8    far as a conviction in this case.  I think they've got a

9    long way to go before they can even be prepared for trial,

10   if at all.

11        The fact is Mr. Yusuf should be allowed to stay

12   out of custody pending trial because, number one, he has

13   proved himself not to be a flight risk with passport in

14   hand; number two, he's here today facing this Court knowing

15   that detention is possible; three, his parents have made a

16   promise to the court and he has made a promise to the court

17   that he will stay in the United States, he will make no

18   attempt to leave.

19        He has shown no words or actions of violence.

20   He's shown no allegiance to ISIL at all.  There is no link

21   directly between him and ISIL or any of their beliefs or

22   actions.

23        And I think it's also important that Pretrial

24   Services analyzed this case and determined that he should be

25   able to stay out.

1          The fact is the reason to keep him in custody is

2     if he's a flight risk or a danger, and I don't believe the

3     government has proven that.  Not do I not believe it.  The

4     government has not proven it.  I believe that they are

5     really stretching to find reasons to keep him in custody and

6     this is an unusual case where he should be released.

7          You know, quite frankly, we could talk all day

8     about whether the parents are going to keep him here.  I

9     don't even think the parents are necessary.  I think he

10    could be released on his own -- on the monitor to his own

11    apartment.  He's not going to.  He's going to be living with

12    his parents as ordered.

13         But he's got a strong community support.  Look

14    back there.  Look at all those people here to make sure that

15    he stays in town, here to make sure he comes to court.

16    There are a ton --

17         THE COURT:  I don't know why they're here and you

18    don't either.

19         MS. BRANDL:  They are community support.  They are

20    here to support him to show --

21         THE COURT:  You do not know that.

22         MS. BRANDL:  This is a good, young man.  This is a

23    young man who has been a model member of the community

24    who -- there's no showing he's ever committed any crime.

25    The one thing that was stated in the Pretrial Services

1     report later turned out not to be him.

2              The fact is this is an unusual case and I'm asking

3     this Court to find that the presumption for detention in

4     this case has been rebutted by all the facts stated in all

5     of my documents and Magistrate Judge Mayeron's decision was

6     appropriate and I don't believe that her decision should be

7     overturned.

8              I just want to make sure all of my arguments were

9     made.

10         (Pause.)

11              MS. BRANDL:  If the Court wants to hear from the

12    parents, both of them are here and there is an interpreter

13    present if the Court would like to establish anything that

14    has not been resolved.

15              With that, I submit, Your Honor.

16              THE COURT:  All right.  Thank you.

17              Anything further for the government?

18              MR. DOCHERTY:  No, Your Honor.  We've made our

19    arguments.  Thank you.

20              THE COURT:  All right.  Let's put the father on.

21              MS. BRANDL:  Your Honor, this is Sadiik Yusuf.

22         (Witness sworn and testified through interpreter.)

23                           **EXAMINATION**

24    BY THE COURT:

25    Q.  Good afternoon, sir.

```
 1    A.   Good afternoon.

 2    Q.   And are you the father of Abdullahi?

 3    A.   Yes.

 4    Q.   And are you employed, sir?

 5    A.   Yes.

 6    Q.   And where are you employed?

 7    A.   I work in transportation industry.  I work as a driver.

 8    Q.   All right.  And does your wife work outside the home?

 9    A.   No.

10    Q.   And do you have any other children?

11    A.   Yes.

12    Q.   How many?

13    A.   One other son.

14    Q.   And how old is he?

15    A.   15.

16    Q.   And do you understand why you're here?

17    A.   Yes.

18    Q.   And during the time period of April of this year, 2014,

19    through the present was your son living with you at your

20    house?

21    A.   Yes.

22    Q.   All right.  And was he paying rent?

23    A.   No.

24    Q.   And were you his primary caretaker?  By that I mean were

25    you taking care of his clothes, feeding him, and having a
```

1    roof over his head?

2    A.  Over the last two months he had been working and he had

3    promised to me that he will help us out or help me out with

4    the living expenses.

5    Q.  Prior to that?

6    A.  Yes, I was responsible for him prior to that.

7    Q.  And did you have rules and regulations for him to follow

8    when he was living with you?

9    A.  Very well.

10   Q.  And could you tell me in general terms what those rules

11   and regulations were?

12   A.  Yes.

13   Q.  Could you tell me what rules that you had your son

14   follow?

15   A.  One of the rules were because, you know, he was

16   attending school, there was a certain time that he needed to

17   go to bed.  One of the other rules were to get the homework

18   done at night.  One of the other rules for him to obey was

19   to participate in household chores, including his own

20   household chores and as well as the other household chores

21   that he shared with the rest of the family.  There was other

22   additional things that we would share beyond those things

23   that I just mentioned.  For example, if he needed to buy

24   things, go out for shopping and things like that, he will

25   have to get permission for him to do certain things.

1    Q.  Did he -- did you have a time that he had to be in the

2    house in the evening time?

3    A.  Nowadays he had been attending college.  After he's done

4    with college classes, he goes to work and we pick him up

5    from work.  And after we pick him up from work, from that

6    point on he stays at home.

7    Q.  Was that because of what you said or could he have

8    stayed out all night long?

9    A.  That was not his nature.  It was not his nature for him

10   to stay away or stay away at night.  You know, we live in a

11   faraway town or neighborhood and for him, you know, it was

12   common for him to come home and not really hang out with

13   someone else or outside in the evening.

14   Q.  Would you have said anything if he did not come home?

15   A.  Yes.  Yes, I would.

16   Q.  And what would you have said?

17   A.  I would admonish him from staying out.  I would tell him

18   that, you know, everything has a certain amount of time that

19   it needs to be accomplished, that he should be home at

20   certain times to get things done and, you know, those kind

21   of things.

22   Q.  Were you aware that he had a passport?

23   A.  No.

24   Q.  Were you aware that he was skipping school?

25   A.  Yes, at times there was some complaints about attendance

1    at school, but most of the time he would go to school, but

2    there has been some complaints in the past about the

3    attendance issue.

4    Q.  And when he had problems attending school, what did you

5    do?  What conversations or what punishments or what sort of

6    things did you do to your son?

7    A.  Yes, I would talk to him and I would admonish him, you

8    know, for doing those things.  At times I would get

9    involved, you know, family elders who are here, some of them

10   today, clan elders that would sit together and talk about

11   those issues.

12            Secondly, I would go to the school to show to him

13   that I was in touch with the school and the school and I

14   were communicating about these issues.  I have also been

15   talking to the school principals.  When he was in high

16   school I have been communicating with the school principals.

17   When we were attending school in Burnsville, that's when he

18   was attending the high school that he graduated from.  Both

19   schools I had made sure that I talk to the school principal

20   to ensure that he knew that I was in touch with the school

21   principals.

22   Q.  Are you religious, sir?

23   A.  Yes.  Yes, I am someone of Muslim faith.

24   Q.  And do you go to a mosque?

25   A.  Yes.

```
1    Q.  Which one?

2    A.  Mostly I work, but I just go to whatever mosque that's

3    nearby whenever I'm out working.

4    Q.  And what mosque is that?

5    A.  Mostly the one at 24th.

6    Q.  What's the name of it?

7    A.  It's part of the 24th mall.  So I don't think it has any

8    specific name, but it's called the 24th mall mosque.

9    Q.  In May of this year would your son have had $1,500 in

10   cash?

11   A.  I did not know that.

12   Q.  Do you go to the Dar al-Farooq mosque?

13   A.  Sometimes.  Sometimes I go there.  I don't go there for

14   any other purposes other than to pray.

15   Q.  Have you heard of al-Shabaab?

16   A.  Yes, I have.

17   Q.  What clan are you with?

18   A.  I belong to the Darod clan, sub-clan Ogaden.

19   Q.  And when did you escape from Somalia to go to Kenya?

20   A.  In the early '90s.

21   Q.  How long were you in the camps in Kenya?

22   A.  I have been there since -- up until 2004.

23   Q.  Have you become a U.S. citizen?

24   A.  Yes.

25   Q.  Can you tell me what you are going to be doing
```

1    differently than what you were doing before to keep track of

2    your son so he doesn't get into trouble?

3    A.  One of the common issues that Somali community usually

4    is accused of or is blamed for is the fact that men do not

5    get involved with their children and they do not know what

6    their children are up to.  So one of those things that I

7    want to address and that's something that I intend to do.

8    What I will do is I would work with the community members as

9    well as the government.

10   Q.  Now, you work, is that correct, and how many hours a

11   week do you work?

12   A.  40 hours.

13   Q.  And does your wife work outside the home?  I asked you

14   that question.  I can't remember.

15   A.  She does not work.

16   Q.  What did you think when you heard your son may have been

17   wanting to go to Turkey and Syria?

18   A.  We were just as victims as anyone else.  We felt the

19   same pain that the other families had felt.

20   Q.  Do you have any -- do you have extended family, do you

21   have brothers and sisters, does your wife have brothers and

22   sisters here?

23   A.  From my side of the family I don't have any close family

24   members here, like siblings or parents.  But from my wife's

25   side, she has extended family here, including her parents as

1   well as siblings, a number of siblings.  She came from a

2   large family.

3   Q.  Is there anything else that you wish to tell me?

4   A.  Okay.  Yes, he had been living -- since this incident on

5   the 28th, as the parents he appeared to us that he's

6   thinking for his future, that he's doing well.  He had

7   applied for work.  He was hired.  He applied for college.

8   He seemed to be making mends.

9   Q.  Did you know that he had received a letter from the

10  United States Government making him a target for an

11  investigation?

12  A.  He told me that when he was at school he met FBI agents

13  at the school and they gave him a letter stating that he

14  was, in fact, a target of an investigation.

15  Q.  And when was that?

16  A.  That was at the end of the school year.  Probably in

17  June, early June.

18  Q.  Is there anything else that you wish to tell me that

19  would help me make my decision on whether or not your son

20  should come home with you?

21  A.  I just wanted to say that this young man, I have raised

22  him for 18 years.  This is the first time that he has been

23  involved in this or has been in trouble, a mistake of any

24  kind.

25         What I would like to see -- and I understand there

1    may have been some, you know, problems in terms of the

2    connection between us and him and how we didn't really pay

3    attention to what his life was, but what I am asking is to

4    be given a chance and that chance is to make sure that he

5    stays out of trouble.  And when I say that, I'm talking

6    about the community, myself, and the government, we will all

7    work together to ensure that he will not run into any kind

8    of trouble and that's what we're asking for.

9           I've been raising him up until this point and what

10   worries me is that, you know, his future and his education

11   may be at stake at this point.  That's what worries me and

12   that's why I'm requesting this chance.

13          Thank you for your attention.  That's all I have

14   to say.

15   Q.  Thank you.

16          THE COURT:  Any questions?

17          MS. BRANDL:  Yes, Your Honor, just a few.

18          THE COURT:  Go ahead.

19                        **EXAMINATION**

20   BY MS. BRANDL:

21   Q.  Good afternoon, Mr. Yusuf.

22          THE COURT:  I caution you not to mess it up.

23          MS. BRANDL:  Thank you, Your Honor.

24   BY MS. BRANDL:

25   Q.  I just want to know:  Did your son promise you never to

1    try to leave again?

2    A.  Yes.

3    Q.  And what does a promise mean in your family?

4    A.  That they must obey the promise.

5             MS. BRANDL:  I'm going to take your admonition,

6    Your Honor.

7    BY MS. BRANDL:

8    Q.  Did you get a letter from a community member today

9    describing your family as a strong and giving community

10   family?

11   A.  Yes, yes.

12   Q.  Do you still have that on you?  Do you have it on you

13   right now?

14   A.  Yes.

15   Q.  Can you provide a copy to the Court and then --

16            MS. BRANDL:  May I approach to give one to the

17   prosecutor, Your Honor?

18            THE COURT:  You may.

19            MS. BRANDL:  I have nothing further, Your Honor.

20            THE COURT:  For the government?

21            MR. DOCHERTY:  Can I just finish reading the

22   letter, Your Honor, before I respond?

23            THE COURT:  I'm sorry?

24            MR. DOCHERTY:  Can I finish reading the letter?

25            THE COURT:  Oh, yes.

1            MR. DOCHERTY:  Just 30 seconds.

2        (Pause.)

3            MR. DOCHERTY:  Your Honor, we have no questions

4    for the witness.  Thank you.

5            THE COURT:  We'll take a short recess.  I want

6    counsel in chambers.

7            Sir, you may step down.

8        (Recess taken at 4:28 p.m.)

9                        *    *    *    *    *

10       (5:23 p.m.)

11                         **IN OPEN COURT**

12           THE COURT:  Counsel, will you come forward with

13   your client.  Ms. Roe, would you step forward.

14           Because of the complexities of this case, the

15   Court is going to appoint co-counsel on this matter.  Manny

16   Atwal will be the other attorney on this matter.  Ms. Roe,

17   who is the Chief Federal Defender, will transmit that

18   information to Ms. Atwal and she will work with counsel on

19   this matter.

20           All right.  This matter is before the Court on the

21   government's motion to review the release order of

22   Magistrate Judge Janie Mayeron dated November 26, 2014,

23   Docket No. 14.

24           The Court has conducted a *de novo* review by

25   reviewing the parties' submissions and by reviewing a rough

1    draft of the transcript and the tape of the evidentiary

2    hearing held before Magistrate Judge Mayeron on November 26,

3    2014.

4           The defendant has been charged in the complaint

5    with conspiracy to provide material support to a designated

6    terrorist organization and provided material support to a

7    designated foreign terrorist organization, in violation of

8    Title 18, United States Code, Section 2339B.

9           A defendant may be detained pending trial if the

10   court finds that there is no condition or combination of

11   conditions that will reasonably assure the appearance of

12   such person as required and the safety of any other person

13   and the community.

14          Because the defendant has been charged under

15   Title 18, United States Code, Section 2339B and because the

16   magistrate judge found probable cause exists to support this

17   charge, there is a rebuttable presumption that no condition

18   or combination of conditions will reasonably assure the

19   appearance of the defendant and the safety of the community.

20          On review of an appeal order the court must find

21   that the facts used to support detention are supported

22   by clear and convincing evidence.  The court must also

23   take into account the following factors:  The nature and

24   circumstances of the offense charged, including the

25   fact that the crime charged is an offense listed in

1    Section 2332b(g)(5)(B) for which a maximum term of

2    imprisonment of ten years or more is prescribed; the weight

3    of the evidence against the person; the history and

4    characteristics of the person, including the person's

5    character, physical and mental condition, family ties,

6    employment, financial resources, length of residence in the

7    community, community ties, past conduct, history relating to

8    drug and alcohol abuse, criminal history, and record

9    concerning appearance at court appearances and, B, whether

10   at the time of the current offense or arrest the person was

11   on probation or parole or on other release pending trial,

12   sentencing, appeal, or completion of sentence for an offense

13   under federal, state, or local law; and four, the nature and

14   seriousness of the danger to any person or the community

15   that would be posed by the person's release.

16          The Court finds that the government has submitted

17   clear and convincing evidence that demonstrates that no

18   condition or combination of conditions will reasonably

19   assure the appearance of the defendant and the safety of the

20   community.

21          Based on the evidence presented, the Court finds

22   the following:

23          The offense charged is a serious felony that

24   carries a statutory maximum sentence of 15 years.  The

25   offense conduct includes the defendant's attempt to fly to

1    Syria to join ISIL, a designated terrorist organization, on

2    May 28, 2014.

3             On that date the defendant was attending the

4    Heritage Academy Charter School and was living with his

5    parents.  Subsequent interviews with the parents established

6    that the parents had no knowledge of the defendant's travel

7    plans to Turkey.  The defendant obtained a passport without

8    his parents' knowledge.

9             The defendant lied to the FBI after he was

10   detained at the airport.  He told the FBI that his parents

11   knew that he was flying to Turkey when, in fact, the parents

12   had no such knowledge.

13            According to the interviews of the defendant's

14   parents, the defendant obtained a passport, bought an

15   airplane ticket to Turkey, packed his bags, and went to the

16   airport all without the parents' knowledge.

17            The defendant told the FBI that he saved his money

18   to buy an airplane ticket to Turkey, yet he had no job and

19   his parents did not give him the money for the ticket.

20   Therefore, it is unlikely the defendant paid for the ticket

21   with his own money.

22            The defendant also told the FBI during the

23   interview at the airport that he did not tell the passport

24   clerk that he was visiting friends in Turkey, only that he

25   had Facebook friends from Turkey.  A review of the

1    defendant's Facebook page showed no Facebook friends with

2    any connection to Turkey.

3          The Court finds that releasing the defendant to

4    the custody of his parents does not reasonably assure his

5    appearance or the safety of the community given the fact

6    that he engaged in this offense conduct while in the custody

7    of his parents and that he lied to the FBI agent during his

8    interview at the airport.

9          The Court further finds that electronic location

10   monitoring cannot reasonably assure the defendant's

11   appearance since such technology is not infallible and the

12   monitoring equipment can be cut off.

13         In addition, the fact that the defendant

14   surrendered his passport does not reasonably assure the

15   Court that the defendant will not try to obtain an

16   alternative passport.  The Court is aware that the

17   government charged an individual on December 2, 2014 with

18   stealing a passport in order to travel to Syria.

19         The Court finds that the evidence presented by the

20   defendant to rebut the presumption favoring detention, that

21   he has remained in Minnesota despite receiving a target

22   letter from the United States Attorney notifying him that he

23   was a target of an investigation, that he is employed and is

24   attending classes at Inver Grove Heights Community College,

25   does not rebut the presumption that no condition or

1     combination of conditions will reasonably assure his

2     appearance and safety of the community.

3            The defendant is going to be remanded to the

4     custody of the United States Marshal.

5            Now, Ms. Roe, you make sure that Ms. Atwal gets a

6     copy of the transcript -- the partial transcript of my

7     examination of the father.

8            If there is a plan that can be put in place that

9     can have the Somali community elders and other leaders

10    assist the Court in the supervision of this young man, I

11    will take a look at releasing him.  But at this point the

12    Somali community has to step forward to help the family and

13    the Court monitor his whereabouts and his actions.

14            MS. ROE:  I understand, Your Honor.

15            THE COURT:  He's remanded to the custody of the

16    Marshal.

17        (Court adjourned at 5:32 p.m.)

18                          *     *     *

19

20

21

22

23

24

25

I, Lori A. Simpson, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


Certified by:   *s/ Lori A. Simpson*

Lori A. Simpson, RMR-CRR