```
 1                  UNITED STATES DISTRICT COURT
                      DISTRICT OF MINNESOTA
 2
    ------------------------------------------------------------
 3                                   )
    United States of America,        )  File No. 15-CR-46
 4                                   )              (MJD)
              Plaintiff,             )
 5                                   )
    vs.                              )  Minneapolis, Minnesota
 6                                   )  September 20, 2016
    Abdullahi Mohamud Yusuf,         )  9:33 a.m.
 7                                   )
              Defendant.             )  VOLUME I
 8                                   )
    ------------------------------------------------------------
 9  ------------------------------------------------------------
                                     )
10  United States of America,        )  File No. 15-CR-49
                                     )              (MJD/FLN)
11            Plaintiff,             )
                                     )
12  vs.                              )
                                     )
13  (1) Hamza Naj Ahmed,             )
    (3) Adnan Abdihamid Farah,       )
14  (5) Zacharia Yusuf Abdurahman,   )
    (6) Hanad Mustafe Musse,         )
15
16            Defendants.
    ------------------------------------------------------------
17  ------------------------------------------------------------
                                     )
18  United States of America,        )  File No. 16-CR-37
                                     )              (MJD)
19            Plaintiff,             )
                                     )
20  vs.                              )
                                     )
21  Abdirizak Mohamed Warsame,       )
                                     )
22            Defendant.             )
                                     )
23  ------------------------------------------------------------
24                  BEFORE THE HONORABLE
                    MICHAEL J. DAVIS
25          UNITED STATES DISTRICT COURT JUDGE
                   (EVIDENTIARY HEARING)
```

```
 1      APPEARANCES
        For the Plaintiff:       UNITED STATES ATTORNEY'S OFFICE
 2                               John F. Docherty, AUSA
                                 Andrew R. Winter, AUSA
 3                               Julie E. Allyn, AUSA
                                 600 U.S. Courthouse
 4                               300 South Fourth Street
                                 Minneapolis, MN 55415
 5
        For the Defendant        OFFICE OF THE FEDERAL DEFENDER
 6      Abdullahi Yusuf:         Manvir K. Atwal, ESQ.
                                 300 South Fourth Street
 7                               Suite 107
                                 Minneapolis, MN 55415
 8
                                 BRANDL LAW, LLC
 9                               Jean M. Brandl, ESQ.
                                 310 Fourth Avenue South
10                               Suite 5010
                                 Minneapolis, MN 55415
11
        For the Defendant Hamza  MURRAY LAW, LLC
12      Ahmed:                   JaneAnne Murray, ESQ.
                                 220 South Sixth Street
13                               Suite 1225
                                 Minneapolis, MN 55402
14
        For the Defendant Adnan  KENNETH UDOIBOK, P.A.
15      Farah:                   Kenneth U. Udoibok, ESQ.
                                 The Flour Exchange, Suite 5010
16                               310 Fourth Avenue South
                                 Minneapolis, MN 55415
17
        For the Defendant        FELHABER LARSON
18      Zacharia Abdurahman:     Jon M. Hopeman, ESQ.
                                 Marnie E. Fearon, ESQ.
19                               220 South Sixth Street
                                 Suite 2200
20                               Minneapolis, MN 55402
21      For the Defendant Hanad  GASKINS BENNETT BIRRELL
        Musse:                   SCHUPP, LLP
22                               Paul C. Dworak, ESQ.
                                 Ian S. Birrell, ESQ.
23                               333 South Seventh Street
                                 Suite 3000
24                               Minneapolis, MN 55402
25
```

```
 1      For the Defendant        SICOLI LAW, LTD.
        Abdirizak Mohamed        Robert D. Sicoli
 2      Warsame:                 333 South Seventh Street
                                 Suite 2350
 3                               Minneapolis, MN 55402

 4      Court Reporter:          STACI A. HEICHERT,
                                 RDR, CRR, CRC
 5                               1005 U.S. Courthouse
                                 300 South Fourth Street
 6                               Minneapolis, Minnesota 55415

 7          Proceedings recorded by mechanical stenography;
        transcript produced by computer.
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        **P R O C E E D I N G S**

2        **IN OPEN COURT**

3            THE COURT:  Let's call this matter.

4            THE COURTROOM DEPUTY:  The United States of

5    America versus Abdullahi Mohamud Yusuf, Criminal Case No.

6    15-CR-46; the United States of America versus Hamza Naj

7    Ahmed, Criminal Case No. 15-CR-49; United States of America

8    versus Adnan Abdihamid Farah, Criminal Case No. 15-CR-49;

9    United States of America versus Zacharia Yusuf Abdurahman,

10   Criminal Case No. 15-CR-49; United States of America versus

11   Hanad Mustafe Musse, Criminal Case No. 15-CR-49; and the

12   United States of America versus Abdirizak Mohamed Warsame,

13   criminal Case No. 16-CR-47.

14           Counsel, please state your appearances for the

15   record.

16           MR. DOCHERTY:  Good morning, Your Honor.

17   Assistants U.S. Attorneys John Docherty, Julie Allyn, and

18   Andrew Winter for the United States.

19           THE COURT:  Good morning.

20           MS. MURRAY:  Good morning, Your Honor.  JaneAnne

21   Murray for Hamza Ahmed.

22           THE COURT:  Good morning.

23           MS. ATWAL:  Good morning, Your Honor.  Manny

24   Atwal -- excuse me.  Good morning, Your Honor.  Manny Atwal

25   and Jean Brandl on behalf of Abudllahi Yusuf who is sitting

1       next to me.

2                   THE COURT:  Good morning.

3                   MS. FEARON:  Good morning, Your Honor.  Marnie

4       Fearon and Jon Hopeman on behalf of Zacharia Abdurahman.

5                   THE COURT:  Good morning.

6                   MR. DWOARK:  Good morning, Your Honor.  Paul

7       Dworak and Ian Birrell on behalf of Hanad Musse.

8                   THE COURT:  Good Morning.

9                   MR. UDOIBOK:  Good morning, Your Honor, my name is

10      Kenneth Udoibok on behalf of Adnan Farah.

11                  THE COURT:  Good morning.

12                  MR. SICOLI:  Good morning, Your Honor.  Robert

13      Sicoli on behalf of Mr. Warsame.

14                  THE COURT:  All right.  All right.  The

15      preliminary presentence -- well, let's back up.  All the

16      defendants have pled guilty to conspiracy to provide

17      material support to a designated foreign terrorist

18      organization in violation of Title 18, United States Code,

19      Section 2339B(a)(1).  The statutory provisions in -- for

20      that crime is a maximum penalty of 15 years in prison and a

21      $25,000 fine.  It's a Class C felony.

22                  The advisory guideline calculations for

23      essentially all the six defendants that are here are as

24      follows:

25                  The defendants are subject to a statutory maximum

1     sentence of 15 years in prison based on the conviction as I

2     have read it to you.  During -- due to the base offense

3     level of 26, the 12-level terrorism adjustment and the

4     criminal history category of 6, all these defendants have a

5     guideline range of 188 -- or 180 months' imprisonment, even

6     with a three-level reduction for acceptance of

7     responsibility.  There's 26 plus 12 minus 3 equals 35.  A

8     Category 6, the range is 292 to 365 months but it's capped

9     at 180 months because of the statutory maximum.

10          And just for illustration, even if the Court

11    departed to a criminal history category of 1 pursuant to the

12    United States Sentencing Guidelines 4A1.3 for overstated

13    criminal history, the guideline range of imprisonment would

14    still be 168 to 180 months in prison.  The guidelines and

15    the statute are that way because Congress has designated

16    terrorism activities and crimes of being extremely important

17    and should be punished.

18          The circuit courts have followed that and have

19    stated terrorists, even those with no prior criminal

20    behavior, are unique among criminals and the likelihood of

21    recidivism, the difficulty of rehabilitation, and the need

22    for incapacitation.

23          The Court set down this hearing because of a

24    number of things.  One, the presentence investigation

25    reports were ordered when the defendants pled guilty to the

1    most serious counts, and the series of events that will

2    occur because of the presentence investigation report are as

3    follows:

4           The preliminary presentence investigation report

5    with Daniel Koehler's report addendum has been distributed

6    to all the six defendants and their attorneys.

7           Objections to the preliminary presentence

8    investigation report are due on October 5th, 2016.

9           The final presentence investigation report will be

10   distributed to the parties on or before October 20th, 2016.

11   All position papers of the parties are due to this Court on

12   November 3rd, 2016.

13          And I have set three days for sentencing:

14   November 14th, 15th and 16, and I believe counsel has the

15   order of the sentencings.

16          Also at the time that the

17   presentence investigation -- the ordering of the presentence

18   investigation report, the Court sometime later filed an

19   order for the defendants to be evaluated by Daniel Koehler,

20   and in that order, the defendants had ten days to object to

21   whether or not they wished to have that evaluation done or

22   object to anything about that, and none of the defendants

23   objected and Mr. Koehler did the six evaluations.  And all

24   counsel have received the individual evaluations for their

25   client.

1          I have stated the statutory penalties and advisory

2     guideline calculations, but it does not end there.  The

3     Court, under Title 18, United States Code, Section 3553(a),

4     directs district courts to impose a sentence sufficient, but

5     not greater than necessary, to comply with the following

6     sentencing purposes:

7          One, to reflect the seriousness of the offense, to

8     promote respect for the law, and to provide just punishment

9     for the offense; two, to afford adequate deterrence to

10    future criminal conduct; three, to protect the public from

11    further crimes of the defendant; and four, to provide the

12    defendant with needed educational or vocational training,

13    medical care, or other correctional treatment in the most

14    effective manner.

15         Section 3553(a) also requires the Court to

16    consider the following factors:

17         One, the nature and circumstances of the offense

18    and the history and characteristics of the defendant; two,

19    the kinds of sentences available; three, the need to avoid

20    unwarranted sentencing disparities among defendants with

21    similar records who have been found guilty of similar

22    conduct; and four, the need to pay restitution to victims of

23    the offense.

24         In addition to these statutory factors, courts are

25    required to take into account the applicable United States

1    Sentencing Guideline range and the pertinent Sentencing

2    Commission policy statements when imposing sentence.

3           The Court has also ordered the government to file

4    with the Court all the recent sentencings of individuals

5    that have been convicted of material support violations

6    under Title 18, United States Code, Section 3339B(a)(i).

7    And the government has done that, and I believe counsel has

8    received that, and they have docket numbers.  If they don't,

9    it allows counsel to go to the pertinent case docket and to

10   look at the sentencing memorandums and plea negotiations

11   that those individuals have gone in, and I'm certain and I

12   know counsel knows that I'm looking at them so they should

13   be looking at them.

14          The average, I believe, sentence -- sentences that

15   have been imposed for the last three years is between nine

16   and ten years.  Is that correct, Mr. Docherty?

17          MR. DOCHERTY:  Your Honor, I wouldn't want to give

18   an average off the top of my head, but there were a number

19   of them that were at the statutory maximum and --

20          THE COURT:  That's true.  That's true.  Counsel

21   have a sheet and so they know exactly what the sentences

22   were.

23          Finally, after considering the factors under

24   3553(a), finally, the Court must consider whether the

25   defendant has provided substantial assistance to the

1    government in investigation or prosecution of another person

2    who has committed an offense.  In such cases, the government

3    files a motion for downward departure pursuant to Section

4    5K1.1 of the Sentencing Guidelines which provides the Court

5    may depart from the applicable guideline range based on the

6    Court's evaluation of the significance and usefulness of the

7    defendant's assistance, whether the defendant provided

8    truthful, complete, and reliable information, and whether

9    the defendant suffered any injury or was put in danger of

10   risk of injury because of his assistance.

11          The consideration of all of these factors is

12   necessary before the sentencing scheme mandated, by law, in

13   the United States requires the Court to look at the

14   defendant as an individual in addition to the crime for

15   which he was convicted.

16          And I would ask counsel to take a look at the

17   *United States of America versus Shelton Thomas Bell*, the

18   United States District Court in the Northern District of

19   Florida, Jacksonville.  The judge provided a lengthy

20   sentencing memorandum order, and I think he qualified

21   what -- what the courts are trying to do here in dealing

22   with these types of cases.  We are trying to figure out who

23   these individuals are and how to sentence them.

24          And so there -- I have given the

25   defendant -- defense counsel and also the prosecution a list

1    of cases that I've handled, I think close to 12 cases,

2    dealing with al-Shabaab terrorism cases.  And certainly they

3    can look up my sentencing regimen and my orders and so you

4    have a background of that -- of this Court dealing with

5    sentencing.  And you'll see this Court sentenced each

6    defendant as an individual.

7          So with that, we will hear from Daniel Koehler who

8    was hired by the Court through the pre-trial probation

9    office to evaluate the six defendants and also train the

10   probation and pre-trial services office officers in

11   evaluating terrorism defendants.  This began many moons ago.

12   It really began dealing with al-Shabaab cases and the Court

13   did not have all of the sufficient information it needed in

14   sentencing defendants.  There was something that was

15   missing.

16         Dealing with one of the defendants here, a

17   proposal was presented to the Court.  We -- the Court took a

18   chance on that proposal.  The defendant was taken to a

19   halfway house, and there was a violation at the halfway

20   house, and I ended up revoking him and taking him back into

21   custody.  But that did not end the inquiry of what do we do

22   and how do we handle these type of cases.

23         I believe I was chief judge at the time, met with

24   the chief probation officer, Kevin Lowry, and requested that

25   he do an evaluation of all the programs around the world

1        that may be pertinent to the use in this district in

2        handling these types of cases.  He did his evaluation, made

3        the recommendations, I was not chief, so we had to go to

4        Chief Judge Tunheim to get authorization for Kevin Lowry to

5        go to Europe to look at a number of programs, and one of the

6        programs was run by Daniel Koehler.

7               After, along with Kevin Lowry, the chief federal

8        defender sent their top assistant federal defender who

9        handled al-Shabaab cases and also was involved in one of

10       these ISIL cases to Europe to look at the same programs.

11              When they both came back, they submitted reports,

12       at least I know I got one from Mr. Lowry, I don't know I got

13       one from you, Ms. Atwal?  I did, and they both recommended I

14       take a look at the program run by Daniel Koehler.

15              At the Court's own expense, the Court flew to

16       Germany in December of last year to meet with Mr. Koehler.

17       And at the end of the conversation, I told Mr. Koehler if I

18       can find money, I was going to hire him.

19              After he was hired, he came to Minnesota and did

20       the evaluations.  And again in July of this year, on my own

21       dime, I went to -- I was in Germany and I again met with

22       Mr. Koehler and we discussed the case.

23              Written reports were made and submitted to

24       counsel, and we're ready to hear what Mr. Koehler has to

25       say.

1        Let's swear Mr. Koehler in, please.

2     (The witness is sworn.)

3        THE COURT:  I need you to pull that microphone up

4  close to you and speak loudly.  Could you state your true

5  and correct name for the record, please, and spelling it for

6  the record?

7        THE WITNESS:  My name is Daniel Koehler.  Last

8  name is spelled K-O-E-H-L-E-R.

9                          **EXAMINATION**

10  BY THE COURT:

11  Q.  And, Mr. Koehler, will you please tell us where you

12  reside and then go through your educational background and

13  then your professional background?  And please go into

14  detail.

15  A.  I'm very pleased, Your Honor.  I currently reside in

16  Stuttgart, Germany, where I work with the German Institute

17  on Radicalization and De-radicalization Studies.  My

18  educational background is I have a Magister Artium, which is

19  a master of arts in the old German educational system, in

20  religion, political science, and economics.  I have a master

21  of arts in peace and security studies.  I also studied at

22  Princeton University as a Fulbright scholar where I focussed

23  on religion, political science, and economics.

24        I am working as a scientific advisor in

25  de-radicalization for far-right extremism, white

1    supremacists, and neo-Nazis in Germany in Germany since

2    2010.

3              Since early in 2012, I was working as a family

4    counselor for relatives and families of Islamic extremists,

5    Jihadis, or foreign fighters in Germany as part of a

6    nationwide counseling network in Germany which is run by the

7    Federal Office for Migration and Refugee Affairs.

8              Since last year, I'm also a fellow at George

9    Washington University's Program on Extremism.

10             And I trained counselors in de-radicalization,

11   family counseling work in several countries; for example,

12   the Netherlands, Canada, the U.K.

13             In Germany, I've also advised governments in

14   building, structuring, and designing counter-radicalization,

15   de-radicalization family counseling programs; for example,

16   also in Canada and the Netherlands and France and the U.K.

17   and in Germany.

18             Since January this year, I'm also a scientific

19   advisor on Counter-Terrorism and Counter-Radicalization for

20   the Ministry of the Interior in the German state of

21   Baden-Württemberg.

22   Q.  All right.  Why don't you explain to us what those

23   certificates mean.

24   A.  Well, I'm basically these positions and certificates in

25   my university studies were focussed on counter-terrorism and

1    counter-radicalization.  So what I studied was how

2    individuals and groups radicalize to a point that they ere

3    willing to use violence and force to advance religious or

4    political goals.  And I focussed on the Middle Eastern

5    conflict but also on far-right extremist, neo-Nazis, and

6    white supremacist in Germany and studied process of

7    involvement, so how people got into these groups, how they

8    developed their ideologies and their convictions and their

9    commitments, how these groups work, how they recruit, and

10   eventually how people can get out of these groups, how they

11   can be reintegrated or rehabilitated into the mainstream

12   society.

13   Q.  All right.  Now, you have worked with the neo-Nazi white

14   supremacists.  Why don't you, I think the -- there may be a

15   difference between the two or similarities of the two

16   between Germany and the United States, so why don't you

17   explain exactly what white supremacy is in Germany and what

18   you have done dealing with your work.

19   A.  So when I talk about far-right extremism or white

20   supremacy, I mean from a German or European perspective.  I

21   mean those militant, hardcore violent groups that would

22   define themselves by two essential aspects: first, that they

23   devaluate individuals, human beings, as part of a specific

24   ethnicity or race.  They would think that human beings have

25   a different value or different rights to live or exercise

1    certain rights in a specific country; and second, they

2    believe that violence is an essential, legitimate part of

3    politics in human life.  They think that life is essentially

4    a violent struggle and that they think that only the

5    toughest, the fittest, the strongest person or society is

6    entitled to survive and they are supposed to rule over other

7    societies and ethnicities that they have defined as inferior

8    to their own race or ethnicity.  So when I talk about

9    far-right extremism, I talk about these kind of groups in

10   Germany that we typically would define as neo-Nazis or white

11   supremacists.  In Germany -- sorry.

12   Q.  Go ahead.

13   A.  Germany currently has an estimated number of 21, 25,000

14   hardcore militant neo-Nazis.  These are estimations from the

15   Federal Domestic Intelligence Service and the criminal

16   police.  About half of them are ready to commit violence at

17   any time.  We see in Germany about two to three violent hate

18   crimes committed every day per year.  And we have seen since

19   1990 when Germany reunified and the Cold War or the Iron

20   Curtain came down in Germany, we saw about something between

21   70 and 150 persons killed on a racist or white supremacist

22   motive.  So Germany has a long history of violent far-right

23   or white supremacies.  We have a long history of right-wing

24   terrorism in Germany which started essentially after the end

25   of the Second World War.

1          Germany, after 1990, experienced a massive upsurge

2     in far-right extremist violence, arson attacks against the

3     homes, persons being killed on the street because of their

4     race or ethnicity by neo-Nazi gangs.  And the first response

5     of the German government at that time was to step up their

6     oppression and quickly filled up the prisons with mostly

7     juvenile and adolescent offenders.  And so the government

8     recognized that they had to do something in terms of

9     counseling, prevention work or counter-radicalization work,

10     so they started the first -- in Germany the first nationwide

11     prevention projects, funding schemes with civil society

12     organizations in the mid 90s to work with these youngsters

13     to get them out of neo-Nazi groups or prevent them from

14     ending up in these neo-Nazi gangs which led, in the end, to

15     the creation of the first de-radicalization or, at that

16     point they were called a dropout, programs for neo-Nazis

17     early 2000's.  And they were using a Scandinavian model from

18     Norway and Sweden that had been started in the late 1990s to

19     help individuals who wanted to get out of the neo-Nazi

20     environment to reintegrate them into the society and help to

21     bring down their ideological commitments.

22     Q.  All right.

23     A.  Uhm --

24     Q.  Go ahead.

25     A.  In 2000, starting in the year 2000, a wave of these

1    programs were created in Germany.  By now, Germany has at

2    least 17 designated de-radicalization programs for

3    neo-Nazis.  About 14 of them are under government agencies,

4    mostly intelligence or criminal police agencies, some by

5    social services and social ministries.

6            But that does not end there.  In the last couple

7    of years, German civil society organizations have used this

8    government funding to create a vast variety of prevention

9    and counseling projects aimed at adolescents, juveniles,

10   families for every type of violent extremism, including

11   Islamic extremism.  And you have to see that Islamic

12   extremism, Jihadism, is more or less a recent, a new

13   phenomenon in Germany which the first Salafi preachers, the

14   first Jihadists really entered Germany in a wide scale in

15   about 2004, 2005, started to recruit, proselytize others and

16   start movement.

17           And since the outbreak of the Syrian Civil War,

18   Germany has experienced one of the highest numbers of

19   western foreign terrorist fighters going to Syria and Iraq

20   and joining the terrorist organizations there.  So end of

21   2011, early 2012, the German government decided to use that

22   experience from these many different NGOs and government

23   programs that were developed in the far-right field and

24   translated or tried to translate it to Islamic extremism.

25   And the first start was in early 2012, in January 2012, when

1     the nationwide family counseling network was started by the

2     German government.

3            And since then, almost every German state has

4     created its own prevention network, as they are called,

5     which are usually public/private partnerships between

6     government ministries, usually of the interior or social

7     affairs and justice, together with NGOs, to provide

8     hotlines, family counseling on a voluntary basis but also to

9     provide de-radicalization services for individuals.  So in

10    total, we right now have an estimated number of about 770

11    designated CVE, countering violent extremism, programs in

12    Germany, and about half of them are run by the government.

13    Q.  All right.  And you've worked in both, is that correct,

14    in white supremacists and Islamic extremists?

15    A.  That's correct, Your Honor.

16    Q.  All right.  Let's go back to your work with the white

17    supremacists.  Why don't you tell us what you've done there.

18    A.  Okay.  Since 2010, I was involved in a civil society

19    project working with neo-Nazis who want to leave the

20    neo-Nazi environment.  And a typology, I would say it's a

21    passive program so they run kind of a hotline.  They were

22    approached by those individuals who actively want to get out

23    of the movement, and I can later on explain a little more

24    about different types of these programs.

25           At the time I started as an scientific advisor,

1   providing background analysis, research and assistant

2   services as a case manager or for other case managers, and

3   that started in 2010.  20 -- end of 2011 I was tasked with

4   developing a new counseling family project for relatives of

5   Jihadists where I used available evidence from family

6   counseling projects that have been run in the country for

7   relatives of neo-Nazis.

8   Q.  And what ethnic groups dealing with the Jihadists were

9   you dealing with?

10  A.  Could you repeat that?

11  Q.  What ethnic groups were you dealing with dealing with

12  the Jihadists?

13  A.  When we started the counseling network, we were

14  expecting that mostly families from Turkish or North African

15  or Arabic descent would contact the hotline, but it turned

16  out that about 50 percent of them had a German ethnicity or

17  a non-Muslim background.  And we saw that those families who

18  contacted the hotline came from all potential background,

19  including Somali families, including African families,

20  Asian, eastern European families, so all of these families

21  that had been impacted by Jihadi radicalization or Salafi

22  radicalization in Germany.

23  Q.  Now, you said that you have been an advisor to

24  governments and NGOs, and NGOs means what?

25  A.  NGOs means nongovernmental organizations, civil society

1    organizations that are partially funded by government

2    subsidies or completely independent of government money.

3    Q.  Okay.  Now, you said that you were an advisor to for

4    de-radicalization policies for Canada, France, Netherlands,

5    United Kingdom, Denmark, Belgium, and the United States.  So

6    let's go through each one.  Tell us what you've done for

7    each country.

8    A.  Okay.  So starting in Germany, I'm working for the

9    Ministry of the Interior in Baden-Württemberg where I steer,

10   guide and help to improve the statewide prevention network

11   against Salafism or Islamic extremism which is currently

12   being enlarged to cover the fields of right-wing extremism

13   and other forms of violent extremism as well.

14         In the Netherlands, I was called to help design a

15   nationwide family counseling program and exit program.  It's

16   a two-pillar program by the NCTV which is the National

17   Counter-terrorism Coordinator, in the ministry or the

18   Department of Justice, and for that, I advised them how to

19   design, how to structure such a project, how I would

20   actually train and train the staff and build the project.

21   They brought me in a number of times to train the family

22   counselors, to train the staff, to oversight -- to oversee

23   the development of the project.

24         In the -- in Canada, I was brought in to advise

25   the RCMP, the Royal Canadian Mounted Police, on a number of

1    individual cases but also trained two NGOs which is the

2    Islamic Social Services Association in Winnipeg and the IR

3    Family Support Foundation in Calgary.

4         I worked with parents of deceased foreign

5    fighters, part of a global network that I helped to create

6    which is called the Mothers for Life initiative which is

7    currently active in 11 countries.  It's, to my knowledge,

8    the only network that brings together parents of deceased

9    and killed foreign fighters.  I've trained a number of these

10   parents to set up their own initiatives, their own programs

11   in their home countries; for example, in Denmark where I

12   helped a mother of a deceased foreign fighter to create her

13   own association to help parents and other families.

14        In the United Kingdom I have also worked with

15   government and nongovernmental organizations to brief them

16   on family support and family counseling projects.  I worked

17   with the Association of Chief Police Officers to develop a

18   training, modular training system for staffers and experts

19   in the field of counter-radicalization which is responsible

20   for the module on intervention techniques against violent

21   radicalization.  I briefed nongovernmental organizations and

22   trained staff.

23        And I think in Belgium we had the same like in

24   Denmark where I helped a mother to set up a support program

25   for families, as the Belgium government currently does not

1    have a real counter-radicalization strategy.

2    Q.  Now, you have a teaching position?

3    A.  That is correct.  At the University of Göttingen in

4    Germany I teach future teachers in the fields of education,

5    political science, and religion and philosophy, how to spot

6    neo-Nazi and Islamic radicalization, Islamic extremist

7    radicalization in the classroom and how to intervene and

8    interact with other service providers to bring these kids

9    back from their path of violent radicalization.

10   Q.  All right.  You told us that you're the -- with

11   the -- working with the Ministry of the Interior in

12   Baden-Württemberg.  Now, you're also director of the German

13   Institute on Radicalization and De-radicalization Studies,

14   GIRDS.  So is that just -- why don't you tell us about that

15   organization.

16   A.  My pleasure.  So GIRDS is a nonprofit organization.

17   It's a network of experts both from the academia and from

18   the practitioner field which I created in late 2014.  It is

19   basically a network of individuals from currently seven

20   countries that I think are the top experts in their field.

21   They do either research, they have teaching assignments, or

22   they are practitioners working in NGOs with families or

23   individuals in prison or families advising governments and

24   advising other NGOs around their own projects.

25           And GIRDS is completely nonprofit and nonpartisan,

1    so it does not have any economic or political affiliation in

2    Germany.  It's completely -- everyone involved is completely

3    voluntary in there and brought together on a case by case

4    basis when their services are requested.  They provide

5    advice to governments.  They come together or help in

6    research projects, mostly European Union research projects

7    where you can commission Latin finance research projects.

8              And GIRDS, one of the most important projects, of

9    course, is the Mothers for Life network which I explained is

10   currently the only support, self-support network of parents,

11   mostly mothers, of deceased and killed foreign fighters in

12   Syria and Iraq.

13   Q.  And you said that you're a cofounder and editor in chief

14   of a journal.  Is that correct?

15   A.  That is correct.  I'm currently the editor in chief of

16   the only existing peer-reviewed academic and open access

17   journal on the practice and theory of de-radicalization.

18   Q.  All right.  And what's that called?

19   A.  JD, Journal for De-radicalization.

20   Q.  All right.  What is the head of Subgroup on

21   De-radicalization, European Expert Network on Terrorism?

22   What is that?

23   A.  The European Expert Network on Terrorism is a network

24   created and run by the German Federal Criminal Police in

25   cooperation with other European police forces and

1   universities.  It is European Commission funded, European

2   wide project, and has several working groups, subgroups of

3   specific interest for law enforcement agencies, intelligence

4   agencies, academic experts and practitioners across Europe,

5   and I am the head of the subgroup on the topic of

6   de-radicalization.

7   Q.  Now, you're a fellow at the Program for Extremism,

8   Center on Cyber & Homeland Security, George Washington

9   University.  What is that about and tell us a little bit

10  about that, the center.

11  A.  The Program on Extremism, the Program on Extremism at

12  George Washington University was created last year; that is,

13  to my knowledge, the first and currently only academic

14  institute or think tank on the issues of violent extremism

15  and countering violent extremism and provides analysis,

16  scientific analysis and counseling advice to governments and

17  NGOs how to stem the problem or how to work against violent

18  extremism.  And I was involved from the beginning on, as a

19  fellow, was asked by the director of that Program on

20  Extremism to join the team of experts and with a specific

21  focus on community-based countering violent extremism

22  projects.

23  Q.  And you've been to Washington, D.C. to participate and

24  speak or give papers?

25  A.  That is correct.  One of my main tasks for the Program

1    on Extremism is to give specific talks or workshops on that

2    topic.  Last time I did that was in December last year when

3    I went to Washington and Boston.  In Washington I worked

4    with the Brookings Institute and briefed the Department of

5    Justice and a certain task force they have on alternatives,

6    alternative methods in prosecution.  And I talked to them

7    about family counseling and rehabilitation,

8    de-radicalization.  In Boston I worked with the attorney's

9    office to talk about European experiences in countering

10   violent extremism.

11   Q.  Anything else dealing with your director duties that you

12   want to talk about?

13   A.  Well, my main director duties are basically what I'm

14   doing now.  I'm giving assessment and advice on either

15   individual cases about radicalization process, about

16   potential openings for de-radicalization or reintegration.

17   I help to call in on research projects and oversee the

18   development of CVE programs to help evaluate the impact of

19   such projects and to bring specific expertise and knowledge

20   in the form of expert training to staff and those who are in

21   need of specific knowledge, for example, police officers,

22   intelligence officers but also prison staff, probation staff

23   or NGO staff, that wants to know more or needs to know more

24   how the psychology of radicalization works, how a group like

25   ISIL recruits, how you can intercept and intervene in that

1    process, how you can work with families and communities to

2    prevent that from happening.

3    Q.  Now, this is not the first time that you've done

4    assessments in the United States.  Is that correct?

5    A.  That is correct.  I was asked by a parent to provide

6    assessment on their cases for their defense lawyers.

7    Q.  And how many of those, do you remember?

8    A.  That I completed before this case, one, because usually

9    I decline to give only reports and assessments for defense

10   lawyers when I cannot bring in training for officers,

11   probation officers or experts who could conduct the

12   counseling or the mentoring that I suggest.

13   Q.  Okay.  Do you remember what jurisdiction that was, that

14   case was?  And at some point you're going to have to tell us

15   the name so both the government and defense knows what the

16   name of the case was.

17   A.  That was in California.

18   Q.  Anything else that you -- well, let's talk about how

19   many expert workshops have you put on?

20   A.  During the last six years, since I've been active in

21   that field, I have conducted more than 150 expert workshops,

22   training sessions, talks and conferences for

23   counter-terrorism personnel, for academic experts, lectures,

24   including lectures at universities and for policymakers, for

25   example, for European or international policy conferences on

1    the topic of violent radicalization, violent extremism and

2    counter-radicalization.

3    Q.  And you were hired by Kevin Lowry or Chief United States

4    Probation and Pre-trial Services officer to provide training

5    for the District of Minnesota's Probation and Pre-trial

6    Services Office.  Is that correct?

7    A.  That's correct.

8    Q.  And how many days did you spend in Minnesota training

9    them?

10   A.  In total I spent in April about two weeks in Minnesota.

11   I spent one week on conducting the evaluation interviews and

12   one week training a select group of probation officers in

13   coordinating counter-radicalization interventions, planning,

14   designing these interventions and assessing their impact.

15   Q.  And how many cases, counseling cases, have you worked

16   with in the last six years?

17   A.  In the last six years, only looking at family counseling

18   cases, individual cases from the field of Islamic extremism

19   or Jihadism, close to 200 cases.

20   Q.  And when you talk about family counseling, why don't you

21   give us a general picture of what that means.

22   A.  Family counseling is a specific method or tool in

23   counter-radicalization or de-radicalization work.  You have

24   to differentiate, in general, when a country has to choose a

25   specific tool or strategy to fight terrorism, to combat

1    radicalization, violent radicalization or violent extremism,

2    they have three different types of tools.  The first tool is

3    prevention, to prevent individuals, their own citizens, to

4    end up in violent extremist groups.  Second is repression,

5    to contain an active violent extremist group or terrorist

6    group, to prevent it from spreading to law enforcement, to

7    punish that group or to actually destroy that group, if

8    possible.  And then, thirdly, you have intervention

9    techniques.  Those tools and methods were designed at

10   bringing those back who are already on the path of violent

11   radicalization or active members of these groups, and you

12   can actually work with part of these individuals, not all of

13   them, but some of them who are experiencing doubt in the

14   ideology, want to get out, you can help them to get out.

15        These three tools or types of tools can work on

16   three different levels of scale.  First is the macro social

17   scale which is looking at the nationwide, the whole country,

18   be the national law enforcement infrastructure or

19   counter-narrative nationwide, international

20   counter-narrative projects.

21        And then you have the meso social scale of these

22   tools which is community level or family social, the

23   so-called effect of social environment, family, friends or,

24   as they are called in academia, the effective gatekeepers.

25        And, thirdly, you have the micro social level

1    which are individually based tools that work with

2    individuals either to incarcerate them, to do house

3    searchings or do individual workshops in schools with a

4    former neo-Nazi or former Jihadi to prevent individuals from

5    ending up in a certain violent extremist group or to help an

6    individual to leave a violent extremist group.

7         And when we talk about family counseling, we're

8    looking at the meso social intervention technique which is

9    designed to work with family, friends, community members,

10   colleagues, teachers, anyone who has a social relationship

11   and access to a certain person that is currently on the path

12   of violent radicalization to slow down and stop that

13   process.  Ideally, that would lead to that person making the

14   decision, the voluntary decision, to leave completely the

15   radical environment and then you would shift to individual

16   de-radicalization or counseling process.

17        Now, the idea here is that together with family

18   and friends and these gatekeepers, we could detect a violent

19   radicalization process as early as possible.  And we know

20   from research in lone act of terrorism but also in other

21   forms of crime, be it school shooters or mass murderers or

22   other forms of crime, that there is something called leakage

23   as a phenomenon that the vast majority of individuals

24   involved in different types of crime, criminal behavior, but

25   also extremism in the pre-criminal space, that they send

1    information about their intents, about their process, about

2    their thoughts to those close to them, especially when you

3    think about a political or religious radicalization process,

4    whether it's about changing the society, where it's been

5    adopting certain beliefs and attitudes, it does not make

6    sense to not tell your closest friends, to not talk with

7    your family about it.

8          Later on in the process, obviously these groups

9    encourage their fellows not to talk about certain aspects in

10   order not to raise any suspicion from the family or law

11   enforcement.  In the beginning, the vast majority of them

12   talks about these processes, at least show sign of change.

13   The vast majority of parents, we're talking about 60 to

14   70 percent of the parents, in these cases could, afterwards,

15   name specific aspects of change in the life courses where

16   you could have prevented and identified this specific

17   process.

18         So the idea is to help communities, have families,

19   parents, family members to recognize these signs and work

20   with the social environment and the strong positive social

21   network to prevent that family member or that friend from

22   going further down the road.

23         And what that this process can also, this tool of

24   family counseling, can also work with more advanced cases of

25   violent radicalization.  In Germany and Europe we've been

1    working with returnees from Syria that have pleaded guilty

2    or convicted of being active members of ISIL with combat

3    experience.  We have been working with neo-Nazis who were

4    been convicted of murder and came out of prison.  We have

5    worked with these families to reintegrate, rehabilitate or

6    at least attempt that with these individuals.

7         So from my own personal experience, there's

8    virtually no limit on where you cannot involve the families

9    and communities.  Actually, successful reintegration,

10   successful counter-radicalization always has to include the

11   family perspective, the community perspective.  It does not

12   work without that.

13   Q.  Now, before we get into your methodology and your

14   interview protocols, you're from across the pond, you're

15   from Germany and here we're in the United States.  How do

16   you think you can translate what you've been doing to what

17   is happening in the United States?

18   A.  First of all, I would think that the experience in

19   comparing white supremacists, far-right extremists, violent

20   radicalization with the Jihadi's Salafi violent

21   radicalization is one aspect that we need to look at to see

22   that psychology behind violent radicalization process.  The

23   mechanism that drives individuals towards the use of

24   violence to advance political and religious goals, that

25   psychological mechanism is the same in all of these forms of

1    violent extremism.  The ideologies are very different and

2    there are differences in the pace and in the symptoms that

3    lie behind these processes but the psychological process,

4    which is, in essence, a process of de-prioritization of

5    political values and ideals, it is a shrinking or a

6    narrowing down world view and an increasing intolerance for

7    opposing political or religious opinions, combined with an

8    increasing level of ideology and indoctrination that brings

9    together a certain problem definition, a certain solution, a

10   future vision.  That together, combined, that creates a

11   decrease in the alternatives that these individuals see to

12   solve their own problems, their own problems in their own

13   lives, which are usually connected to global problems behind

14   these movements and the ideology; for example, the preserved

15   global struggle against Islam by the infidels, the force of

16   evil, or the destruction of the pure Aryan race through

17   immigration.  And these problems are connected through the

18   movement, through the ideology with their own problems in

19   their lives, be it struggles in school, their job

20   environment or in the families.  They think that these

21   ideological problems are connected to their own and that

22   their own problems are symptoms of proof of that global

23   struggle, that global problem.

24          And these movements offer the solution and future

25   vision.  They say there's only one way or very few ways to

1    solve their problem which is to do the hijrah and perform

2    jihad or which is to fight back and drive the immigrants out

3    of the country and protect our race, for example, and the

4    future vision would be, for example, would be to re-erect a

5    caliphate or to create a racially purified society and then

6    all of these problems would go away in this vision.

7           Now, if you see that these alternatives, they are

8    just narrowing down and the problem stays the same, so in

9    the end, you see the suffering of women and children in

10   Syria.  You see or you think you see that your comrades

11   don't get jobs and the families are breaking apart in your

12   movement.  And you think that all the -- all the things you

13   have tried calling or doing dawah and teaching or telling

14   others about these problems and help the society to awaken

15   and recognize these issues, they don't work, so they narrow

16   down, they're zeroing in, by the help of these groups and

17   ideology, to come to the only true conclusion which is, in

18   the end, violence, so violence becomes the necessary

19   solution for that.

20          So that is the first part that, through my

21   research and my experience, having worked with families from

22   other countries across Europe, that these processes are the

23   same, these psychological processes, the driving factors.

24   The driving factors can be different, but the mechanism

25   behind them are always the same.

1           Second is that before, Your Honor, we got in

2      touch, I was contacted by families from the United States,

3      from Canada, from families from Mexico and other countries

4      who asked me for helping to get their sons and daughters out

5      of violent extremism, prevent them from going further down

6      the road, and I realized that these families, their stories

7      of the radicalization process and their problems, their

8      experiences, were very much the same.  They were very, very

9      alike.  And afterwards, after I've done the assessment

10     interviews, I can say that these processes and the driving

11     factors that I have seen are very, very much aligned to

12     those that I have seen with European families and European

13     adolescents in this field.

14     Q.  Well, why don't you give me a little bit of your

15     background dealing with Islam and the Jihadi movement so I

16     can make sure that you have some expert basis to be making

17     these evaluations.

18     A.  First of all, I studied religious studies in Berlin at

19     the Free University and at Princeton University and focused

20     on different forms of extremism, religious extremism.  I

21     looked into different forms of violence, religious sects and

22     cults, but also obviously Islamism extremism, Salafism, and

23     Jihadism.  And since I started in 2012 as a family

24     counselor, I had a lot of experience in looking into the

25     details of these families from different ethnical

1    backgrounds, but usually they shared, the relatives of these

2    families shared to be ideologically indoctrinated in a

3    Salafi/Jihadi direction which is usually leading them to

4    either join, in the western European cases, either join

5    Al-Qaeda affiliated groups or the so-called Islamic State or

6    ISIL or ISIS, so I had the opportunity to study the

7    different aspects of their ideology firsthand in the family

8    counseling since 2012.

9    Q.  What are the basic elements of Salafi and Jihadi

10   ideology?

11   A.  Salafism --

12   Q.  Why don't you just go through those.

13   A.  Yes, certainly.  I'll bring up the slide.  So the basic

14   tenets of Salafism, which, as an ideology, refers back to

15   the wise elders, the Muslim community at the time of the

16   prophet, and has the goal of changing the society to a way

17   the Salafis believe -- or the community and the religion the

18   way -- back to the way it was practiced and conducted at the

19   time of the prophet.  This is the basic idea behind

20   Salafism.

21          And there are different forms of Salafism.  You

22   cannot just say that Salafis generally are violent or

23   nonviolent.  There's the largest group of Salafis I would

24   call purists.  They are basically very conservative but very

25   also very pious but completely apolitical and nonviolent

1    observant of their faith.  In Germany, you would compare

2    them with, for example, Catholic monks or other very

3    conservative parts of different religions.

4         The second group of those who are political

5    missionaries or political -- politically proselytizing but

6    against any form of violence.  They use their Salafi ideas

7    and their understanding of the Quran and Islam to change the

8    society but they accept the forms of democracy as changing

9    or determining a certain decision, how to deal with certain

10   problems and to change the society.  We've seen that since

11   the Arab Spring began in 2010 that Salafi groups have

12   actually started to participate in the intellectual process,

13   which, in itself, is a very interesting development.

14        The third group of those politically missionary

15   groups in support of violence, they would start by saying,

16   well, we are in a western country but we should obey the

17   laws but in general we have to defend our brothers and

18   sisters to use our violence in a certain case, in certain

19   situation is not only legitimate but is a duty of every true

20   Muslim.

21        And fourthly, we have Jihadi groups that -- that

22   think or see that performing the individual jihad, meaning

23   in a definition a small jihad, the fighting, the military

24   version of jihad, is an individual duty.  From group to

25   group, it's even seen as the most important element of your

1    Muslim identity so you cannot be a true Muslim without

2    performing jihad.  You cannot fulfill your duties that were

3    given to you by Allah which means to fight the forces of

4    evil, to fight the forces of infidel and to spread the realm

5    of Islam across the world which is the core idea behind

6    Jihadi groups.

7           And then there are different sub elements of that

8    theological interpretation.  First would be Tawhid.  Tawhid

9    basically means monotheism or the oneness of God which is a

10   central mainstream concept behind Islam and such.  But

11   Jihadi groups and Salafi groups have enlarged that concept

12   to mean that the oneness of God or God transcends every

13   aspect of human life, he governs every aspect, every action

14   you do from the moment you are born and there's no way at

15   all that human made laws or manmade decisions or ruling of

16   men over men in any way can compete with that, so God's laws

17   and God's decisions transcend everything.

18          And then, of course, there would be a concept

19   called al wala wal bara which means loyalty and disavowal or

20   loving and hating for Allah which is a strong Salafi and

21   Jihadi concept, playing or using the strong collective

22   identity of the spiritual family called the ummah against

23   those who are outside of that community.  The ummah is seen

24   as a global spiritual community of family, hence they call

25   each other brothers and sisters.  And that spiritual family

1    in that ideology goes beyond the biological family.  It is

2    more important.  It is eternal.  It is absolutely more

3    sincere as than your biological bonds.  And that ummah is so

4    empowered in that sense, in that version of al wala wal bara

5    that followers of the Salafi/Jihadi ideology think that they

6    have to completely include love everything to the fullest

7    that's part of the ummah that is defined as the true Muslims

8    and hate, reject, destroy everything that is not part of

9    that ummah that goes against that.

10   Q.  Who are the true Muslims though?

11   A.  The true Muslims by definitions of the Salafi or the

12   Jidahi groups are only those who follow that specific

13   teaching of Salafim or Jihadism to the letter.  And even

14   with these groups there's a lot of debate what letter

15   exactly that means and what kind of rulings they have to

16   obey.  For example, when the so-called Islamic State or ISIS

17   or ISIL split from Al-Qaeda, these groups, each other

18   accused each other of blasphemy and of falling off from the

19   true path of Allah and they decided their civil war and

20   killing each other and they're still mortal enemies, So

21   there is no agreement between these groups.

22           What they agree upon is the basic version, the

23   basic ideology behind every single Jihadi group which, is

24   first of all, the problem that the true Islam is under a

25   global attack by the force of evil and the infidels, Israel,

1    the U.S., Europe, Russia, China, other countries that do not

2    follow the true path of Allah.

3            Secondly, only solutions to that --

4    Q.  What about the Shias?

5    A.  The Shias are not Muslims in that viewpoint.  The Shias

6    are, in Salafism, especially in Jihadism, are not even close

7    to Muslims.  They are considered as apostates and they are

8    supposed, in that thinking, they are supposed to be killed

9    if they do not convert to the true form of Islam.

10   Q.  Okay.  I'm sorry.  I stopped you.  Go ahead.

11   A.  And these groups agree that there is only one solution

12   to that global struggle against Islam which is the

13   individual duty of violent militant Jihad to fight back and

14   conquer these territories that are thought of lying in the

15   house of war or house of unbelief or disbelief and to the

16   future vision and, this is very important, all Jihadi groups

17   share the future vision: the goal to reerect, re-create the

18   caliphate as the home state for all true Muslims.  It is not

19   unlike, it's very close to the state of Israel for the

20   Jewish people.  They want to create the geographical state

21   that has been promised to them, that they think is theirs to

22   rule where the end of days will come and the force of evil

23   will be fought and defeated, and they think that it is their

24   duty to reerect and re-create the caliphate.  Otherwise

25   they --

1          THE COURT:  Let's back up.  Let's stop here and

2     before we get into the caliphate and the end of days, let's

3     all just take a stretch break.

4          (Brief recess taken.)

5     BY THE COURT:

6     Q.  Anything else that you wish to tell me dealing with the

7     Jihadi ideology and -- oh, the -- let's deal with the

8     caliphate.

9     A.  Yes, Your Honor.

10    Q.  You said -- well, there was a caliphate.  There were a

11    number of caliphates.  So let's talk about that, and how

12    does that fit into the -- the ideology of the Jihadi

13    movement?

14    A.  So the Jihadi movement or Jihadi ideology is based on

15    the fact that you cannot separate the spiritual from the

16    real world or this life, so geographically there has to be

17    statehood or a nation governed by Sharia law, governed by

18    Allah, and that is called the caliphate.  And the caliphate

19    -- the last caliphate that was called caliphate was the

20    Ottoman Empire which was abolished after the First World

21    War, and since then, Jihadi thinkers and Salafi thinkers

22    have said that the ummah, the true Muslim spiritual family,

23    is not truly alive, they are asleep, they are not able to

24    perform their lives as true Muslims because they are missing

25    that specific aspect, that nation, the statehood that is

1    purely governed by the Sharia law and by that understanding

2    of how Islam should be lived out and should be interpreted

3    or the Quran should be interpreted.

4         And the caliphate, to re-create and re-establish

5    the caliphate is one of the most important goals of Jihadi

6    groups.  They think it is the most essential aspect to

7    revive the true Muslim community and the ummah, give them

8    back their statehood that they have been granted by Allah

9    and that they deserve, they have to govern over other

10   people, over other religions and ethnicities, they have to,

11   in their minds, spread the interpretation of Muslim by force

12   and conquer other territories and, of course, defeat other

13   blasphemous religions and interpretations of Islam or other

14   religions as such.

15        So the caliphate is close to, in the spiritual

16   meaning, close to what the state of Israel is to the Jewish

17   people.  It has the very significant meaning and essence for

18   what it means to be a Muslim, what it means to be able to

19   live as a true Muslim.  And even though the idea of the

20   caliphate, the concept of that true Muslim state is very,

21   very common amongst almost all Muslims because they know the

22   history, they know that this caliphate existed in its form,

23   the way it is supposed to be created by force is very unique

24   for Jihadi groups, and they share that goal, they want to

25   re-erect the caliphate, and this is something that makes

1    so-called Islamic State or ISIL so unique because all the

2    other Jihadi groups, Al-Qaeda and others, they failed to

3    establish that caliphate or Islamic State.

4    Q.  Well, what you say "caliphate," it's just not anywhere;

5    it's in a certain geographic area?

6    A.  That is correct.

7    Q.  Well, you're dealing with an ignorant district court

8    judge, so let's talk about the area and why Mosul and the

9    other towns, cities, are so important in the Jihadi ideology

10   and why they've taken those cities over.  They may not mean

11   anything to anybody in the United States, but they resonate

12   through the Muslim world, so why don't you explain that.

13   A.  So currently the core territory which is partially

14   controlled by the organization Islamic State or ISIS or ISIL

15   has a spiritual religious significance in and the teachings

16   of the Quran and in the hadith which is the stories or the

17   knowledge that we have from the Prophet Muhammad and his

18   companions.  We know that the end of days, the apocalypse,

19   those events where the forces of evil will be eternally

20   defeated and the Mahdi, the Messiah, will come and bring

21   back basically the ruling for the true Muslims for all of

22   the world.  It will start in that area which is currently

23   Syria and Iraq and northern Iraq.  For example, there is a

24   small town called Dabiq in Syria.  Dabiq, not without

25   incidence or coincidence, was the title of the main Islamic

1   State publication, the magazine called "Dabiq," and that

2   place, which is in northern Syria, there, the forces, the

3   armies of evil and the infidels, will clash with the forces

4   of the true believers, and it is said that the fires, the

5   flames of Dabiq will burn the forces of the infidels and

6   establish the eternal victory of the true Muslims.

7          So this area, this territory, when the Syrian

8   conflict broke out between -- which was seen between western

9   infidel forces, or the forces of Assad and his regime, and

10  to the Muslim forces, also between Shia and Sunni forces,

11  the Jihadi groups and Salafi groups immediately thought to

12  recognize that now this is the final battle that is starting

13  where it was promised it, in that specific geographical

14  area, and which means that all the true Muslims from all

15  around the world are called upon to rush to Sham, to Syria

16  and Iraq, and join their brothers and sisters in that fight

17  against the forces of the infidels.

18  Q.  Also, why don't you talk about Assad, that he's not

19  Muslim.

20  A.  Well, Assad and his background or his I would say clan

21  even belongs to the Shia, and this is why the Assad regime

22  also has been known to suppress, violently suppress, Sunni

23  groups within the Syrian population for decades because his

24  father did that.  They used or they committed mass

25  atrocities.  They used chemical weapons against the civil

1    population.  They used mass shootings and a very, very, very

2    violent form of rule.  They get support from Iran and other

3    Shia malitias.  And similarly, the same, after the U.S.-led

4    coalition brought down the Saddam Hussein regime, the power

5    again shifted back to the Shia which are a minority that

6    took over the rule in Iraq and also started to suppress and

7    sideline Sunni, the Sunni groups in Iraq.  So the whole area

8    is currently in what is seen by the Salafi/Jihadis in a

9    spiritual struggle or internal spiritual struggle between

10   the Shias and the Sunnis.

11   Q.  All right.  But the one last thing dealing with this,

12   the spiritual pull that can be used by the Jihadi dealing

13   with the caliphate is something that's would you say is very

14   strong and very enticing to individuals to come and join?

15   A.  Absolutely, that would be one of the main driving

16   factors, the attraction points why youngsters or adolescents

17   or even adults join the Islamic State or ISIL because, first

18   of all, they think they have a true state.  They have

19   established a real state with a real government with a

20   health system, educational system, with their own license

21   plate, own currency, they control the territory, they have

22   their own taxation system, so they think it is a true state.

23   They have the caliphate.  The others never accomplished

24   that.  That is a very strong attraction point.

25              The second is that the current conflict is Syria

1    and Iraq where coalitions are countries that are seen as the

2    inferior countries, Russia, Iran, the west, come together

3    and support that Shia rule of Assad partially or at least

4    fight the mujahideen, or the true Muslim forces, the same as

5    in Iraq and so they think that right now that caliphate is

6    at the center point of the apocalypse or the final days and

7    they have -- and these true Muslims from all around the

8    world are called upon to join the Islamic State and help to

9    fight against the forces of evil.

10   Q.  And so the caliphate then transcends the national

11   boundaries that a Muslim may have been born in and whether

12   or not Somalia or Libya or in Uzbekistan?

13   A.  Exactly.  That is part of the content of the ummah that

14   biological identities, your family, your ethnicity, your

15   national background, these are concepts of the --

16   nationalism, national boundaries, citizenships is simply a

17   symptom of the infidels, the so-called kuffar countries.

18   It's part of the evil.  It's part of those who do not

19   believe in the unifying concept of the true faith, the true

20   Islam, and it is absolutely something that will be

21   completely abolished and destroyed by the ideal caliphate.

22   Q.  All right.  Let's move to your methodology.  Why don't

23   you go through that.

24   A.  The methodology for the assessment studies, as you know,

25   you ordered me to look into three basic aspects.  So first

1    of all, how and why did the individuals, defendants,

2    radicalize to a point where they were willing to join ISIL,

3    provide material support, travel overseas, so what were the

4    driving factors, how did that process actually happen?

5         Second, to provide you with a risk or

6    radicalization stage assessment, what would be the potential

7    risk if these persons would be released right now regarding

8    recidivism and what would be my assessment of the current

9    radicalization stage?

10        And third, what would be my counseling suggestion

11   if I would be able to advise some specific mentoring and

12   counseling schedules for these defendants?

13        Now, my methodology uses basically a qualitative

14   approach.  So I used every available information that I can

15   get, first of all, most importantly, qualitative narrative

16   and semi-structured interviews with the defendants

17   themselves, their families and other persons of interest;

18   for example, imams that have worked with them or other

19   persons that have had any contact with these individuals and

20   could provide me with the personal opinion on their

21   character, their personality, their involvement, their

22   motivation, potential changes, potential cognitive openings.

23        I reviewed all available documents that were

24   provided to me by the Court, including, of course, their

25   guilty pleas but also records that have been provided to me

1     or partial transcripts of conversations they had within the

2     group.

3          And, lastly, I reviewed open source information

4     like press reports, their social media accounts, all

5     information that was available to me.  And I cross-sectioned

6     that information.  I analyzed it.

7          And based on my individual experience as an

8     expert, my experience working with other cases in that

9     field, I wrote a qualitative report on these three fields.

10    I wanted to understand the driving factors for each and

11    every defendant as best as I could; for example, whether

12    they're more theological, whether they're more driven by

13    other aspects, what actually made them involved in the

14    conspiracy.  I wanted to assess if they have credibly

15    rejected or are in the process of rejecting that specific

16    ideology, if they have distanced themselves from the

17    conspiracy, if they are about to show true remorse and guilt

18    or any form of doubt in ISIL, its goals or the Jihadi

19    movement, if they have specific cognitive openings that

20    could provide for a potential route for a counselor or a

21    mentor or a coordinator, for example, for the coordinators

22    that I've trained in the probation office, and I've provided

23    them, as well as I could, for each defendant potential

24    suggestions for that.

25          These risk stages I used, and for that, I used not

1       -- I don't rely really on structured assessment protocols

2       like the VERA-2 or ERG-22 which are very much used currently

3       in Canada or in the United Kingdom in the probation services

4       or in the nationwide counter-radicalization program because

5       I don't believe that structured assessment protocols provide

6       you much of an understanding why and how an individual's

7       went through that radicalization process.  I don't believe

8       that the mathematical formula can be run through and you

9       come up with an end score and just say we have 70,

10      75 percent of chance of a person committing a violent act of

11      crime in the next six months.  It doesn't give you anything

12      to work with as a counselor.  It doesn't help you to

13      understand the process which is essential to correct or have

14      any kind of understanding how sincere the radicalization

15      process they're in and if they're still on a very high stage

16      of radicalization.  So I use -- obviously I use aspects of

17      these tools to understand certain current situation risk,

18      but these tools, if at all used, and they need to be run

19      regularly as part of the counseling process to figure out if

20      there's an increased --

21      Q.  Let me stop you there for a minute.  You are a

22      counselor?

23      A.  That's correct.

24      Q.  That's what you love and what you do is helping people.

25      Is that correct?

1    A.  That's correct.

2    Q.  Okay.  Now, I could have easily gone to Canada and had

3    their people come down here and do the evaluations, and they

4    would -- that would have got a score?

5    A.  Yeah.

6    Q.  And we could have left it at that and we'd be battling

7    about that and essentially the same with the ERG-22+

8    evaluation, that come out with a score and have a number and

9    I would have to figure out what that meant and how to use

10   that, right?

11   A.  That's correct.

12   Q.  And but as I said in on -- on the *Shelton Thomas Bell*

13   case, the judge there said what the judges are doing or what

14   we're trying to do is we're trying to find out who an

15   individual defendant is, and that's what you do in helping

16   them, if you can, dealing with the issues of

17   de-radicalization.

18   A.  That's correct.  I want to understand the person.  I

19   want to see the person in his or her biography, in the

20   development in their ideas and their values and the process,

21   and just that score does not tell you anything about the

22   person.  It just cranks out the number.  It has a certain

23   score and it tells you certain aspects of these tools that

24   are rated by some counselor in a certain way, but if you

25   want to work with the individuals, if you want to help them

1     in any way, these scores don't help you.  They tell you

2     right now, if nothing changes, if the person just stays

3     where he is, is let out, there is a certain risk of that

4     person going back to crime, even if you, after one day,

5     start with a counseling process, that score completely

6     changes.  And that score does not take into account the

7     process that has led to that person, if it's just one week

8     or three years.

9     Q.  Before we get into your argument with that, let's talk

10    about I ordered you to turn over to defense counsel and also

11    the government the basis and reasons for your opinions and

12    identify the risk assessment models relied upon in

13    supporting validation studies.  Let's talk about that.

14    Let's go through that, what you've turned over, and so

15    that's completely on the record.

16    A.  So the summaries of my reports that were handed over, I

17    believe in the summaries there were, first of all, my

18    overall risk assessment so the grade to risk stage.  I used

19    stages between low, low to medium, medium, medium to high

20    and high stages of risk and radicalization.  Low means that

21    there's advanced stage of disengagement, critical

22    reflection, distancing from the ideology and the group,

23    there's visibly -- there are visibly no more role residuals,

24    meaning that the person does not think or act or talk in a

25    way that would suggest that he or she is still very much

1    convinced of these certain ideological aspects that we

2    talked about that are part Salafi/Jihadi ideology.

3         Low to medium risk stage means that there are

4    still minimal role residuals so that there are still aspects

5    clearly not -- that the person does not have thought

6    through, there's still some need for critical reflection,

7    there's some need for counseling, there's more need for

8    ideological de-radicalization to talk about theological

9    aspects of that.

10        A medium risk stage would mean that there are

11   multiple role residuals, so they are right in between -- or

12   right in the process of disengagement but they have still a

13   number of these ideological aspects active within them.

14        Medium to high means there are strong residuals,

15   role residuals, minimal disengagement, they have not started

16   to credibly distance themselves or shown any remorse or

17   guilt, that they are still very much convinced about the

18   main ideological goals of these groups that we're talking

19   about.

20        And high risk and high radicalization stage means

21   that there are basically, more or less, a convinced member

22   and that they have not to be shown any signs of distancing

23   and disengagement.

24   Q.  Now, in your report you say that your opinions are not

25   based on structured standard assessment protocols but

1    include elements of the VERA-2 and the ERG-22+ and that the

2    assessment is made as an expert based on -- as a caseworker

3    experience and available evidence.

4    A.  That's correct.

5    Q.  All right.  What does that mean?  Here, I'm going to

6    give you this because I want -- we have to go through

7    each -- everything that you've turned over to the attorneys.

8    A.  Okay.

9    Q.  And I'm -- that sentence, what does that paragraph mean?

10   A.  That means that I've looked at certain elements that are

11   included in the ERG-22 or the VERA-2.  Personally I prefer

12   the VERA-2 over the ERG-22.

13   Q.  Let's stop there.  Someone may not know what the VERA-2

14   is.  What is the VERA-2?

15   A.  The VERA-2 stands for Violent Extremist Risk Assessment

16   Protocol.  It's currently available in the second edition.

17   It was designed by Elaine Pressman, a researcher from

18   Canada, originally for the RMCP.  It is a graded, structured

19   grading protocol for risk assessment.  It includes five

20   areas or different factors.  First area is attitudes and

21   beliefs, looks at the ideology, how much and how strong a

22   certain aspect of, for example, Salafi/Jihadi ideology or a

23   neo-Nazi ideology is present in certain statements or in

24   records and, for example, their social media accounts or in

25   the interviews of strong, strong can you identify aspects

1    that relate to an ideology justifying violence or justifying

2    an us versus them thinking, for example.

3           The second --

4    Q.  And is that a verifiable tool and is it used anywhere

5    else other than Canada?

6    A.  To my knowledge, there's only one validation study so

7    far being done, having been done on the VERA-2, which showed

8    positive results, so a high grade of predictability, but one

9    study, of course, is not enough to generalize that.  As far

10   as I know, there are no validation studies for the ERG-22

11   which is one of the reasons I don't rely on structured

12   grading protocols and I use a qualitative assessment.  I can

13   explain in detail how I do that.

14   Q.  Yes.

15   A.  But to continue with the VERA-2 --

16   Q.  And make sure that we come back to the qualitative

17   assessment because you will have to -- I want that

18   explained.

19   A.  Yes.

20   Q.  Go ahead with the -- what we've got here, the

21   theoretical assumptions.

22   A.  So in the VERA-2, the first is attitude and beliefs.

23   The second is the context of intent, if the person has, for

24   example, relatives already active in violent extremist

25   groups or relatives who have already participated in violent

1    jihad and joined terrorist organizations or if the person

2    has had violent experiences in childhood or received any

3    kind of impact, emotional or physical impacts that would

4    create a certain intent to justify violence against certain

5    people and groups.

6         And thirdly, the -- there is this field of history

7    and culpability that the person, for example, receive

8    specific training from power military groups or did the

9    person have any -- does the person have any skills that

10   would be useful in violence against other groups.

11        And then there is commitment and motivation, so

12   the fourth field in the VERA-2 protocol, and talking about

13   how strong the bond between the individual and the group and

14   ideology is and which I find very important in the VERA-2,

15   which is not so strong in the ERG-22.  ERG-22 stands for

16   Extremism Risk Guidance which is majorly used in the United

17   Kingdom in the probation counter-terrorism field, as far as

18   I know, one of the most widely used risk assessment

19   protocols in government forces agencies around the world,

20   mostly western.

21        So what the VERA-2 includes a set of protective

22   factors that mitigate the risk, bring it down again, if the

23   persons participate in a de-radicalization program, if they

24   have changed back from a more rigid violent or a

25   violence-oriented interpretation of Islam to a more

1    mainstream or liberal interpretation, these factors are

2    brought in.

3            Now, the VERA-2 has to be conducted by an expert

4    going through various different sources of information and

5    then it's basically individual assessment.  So I would check

6    if these elements, each factor is weak, medium to strong,

7    and then I add all of these factors, the points for each of

8    these factors, and come up with an end scale that would show

9    me an overall high, medium to low risk of that person.

10           Now, these tools are designed for this, also

11   negative aspect of the VERA-2, they are designed for

12   individuals with previous criminal convictions.  They've

13   never been designed for persons without criminal convictions

14   which makes them more doubtful to be used in general

15   radicalization assessment.

16           I nevertheless used these factors because they

17   provide a good overview and thread through the analysis, but

18   going back to the qualitative assessment, I want to

19   understand why and how these persons ended up, for example,

20   having an ideology justifies violence against an outsider

21   group or thinking that victims, Muslim victims are more

22   important than non-Muslim victims, for example.  I want to

23   understand why that is, if that person had a specific event

24   or experience in his past that would help me understand how

25   he would end up there.  I can conclude from that that

1      there's a potential for counseling or mentoring to address

2      that certain aspect.  So I want to connect, in my

3      methodology, I want to connect the mechanism and

4      understanding of the radicalization process, the hypothesis,

5      with a specific route for counseling and mentoring.

6              And this is absolutely key.  These structured risk

7      assessment protocols, they are a comparatively small part of

8      my assessment because they currently just tell you if

9      nothing else happens, nothing is being done with that

10     person, the current risk is X, Y, Z.  And we need to include

11     in our assessment to understand what happens to these

12     persons once they get back to a society, we need to

13     understand what drove them, what made them consider going to

14     Syria, and how attractive, what parts of the Salafi/Jihadi

15     ideology they found attractive.  And this is not included in

16     either the ERG-22 or the VERA-2.

17     Q.  And the literature you used for your qualitative

18     evaluation, do you want to talk about that?

19     A.  Do you want me to go through the points?  Okay.  So

20     my --

21     Q.  This is -- everything is being taken down, and this is

22     very important for both the defendant, all the defendants,

23     and the government to have a complete record, and so let's

24     talk about your literature that you've used and how you use

25     it.

```
 1    A.  Mainly I use literature from criminology, psychology and

 2    the emerging field of de-radicalization, radicalization

 3    studies, and the overlappings of these studies, even though

 4    compared with terrorism studies or radicalization studies

 5    it's a very young, emerging field, so most of these works

 6    that I use are theoretical and based upon selective

 7    interview studies with former terrorists in different fields

 8    or from interviews and studies with active terrorist groups

 9    and environments.  But compared to that literature that's

10    available on why individuals end up in these movements, it

11    is still in the early stages, infant stages.  So these are

12    works are, first, theoretical concepts that have been

13    developed in the last couple of years.  One is, for example,

14    here, the first --

15    Q.  Well, would you agree that because it's at the early

16    stages of development that I should be skeptical of what is

17    happening?

18    A.  Well, as a researcher I'm always skeptical about these

19    points because I think we need to work on an individual

20    basis.  I don't think that there are one-size-fits-all

21    solutions, and we need, definitely, every aspect of a

22    de-radicalization process needs much more research behind it

23    to make really a fundamental assessment.  But I still think

24    that from the practical experience that we have gathered in

25    Europe in the last 16 or so or more years that we know
```

1    individuals most, the majority of persons joining terrorist

2    and extremist groups leave these groups at a certain point.

3    That's a fact.  The majority of them does not stay in these

4    groups for the rest of their lives.  So we need -- we know

5    that there are reasons for these people to leave these

6    groups and there are processes leading them out.  So what we

7    are trying to do is to understand how we can foster these

8    processes, how we can support these processes and intervene

9    as early as possible in the recruitment or radicalization

10   processes.  So these studies that I cited and used for the

11   basic theoretical framework are those that I found most

12   fitting to my own practical experiences and where I think

13   that they are well-established, at least in their own

14   empirical basis and their own quality of the research behind

15   them.

16   Q.  All right.  Anything else dealing with your method of

17   methodology?

18   A.  I think it is very important to point out that it's a

19   qualitative assessment and that I point or put the

20   individual, the person, at the center of my assessment and

21   understanding of where they are coming from and what

22   motivated them, what attracted them.

23   Q.  Your interview protocols.

24   A.  Interviewing or conducting these evaluation interviews,

25   for me, is based upon a scientific methodology called

1    grounded theory.

2    Q.   Speak in the microphone so everybody can hear you.

3    A.   These interviews that I conducted with the defendants

4    are based on a scientific methodology called grounded theory

5    which puts the interviews, the data collection, first before

6    you do any research or literature review or look at the

7    documents to assure, as far as you can, objectivity and

8    allow the individuals to tell their stories the way they

9    want.  First of all, I tried, and as best as I could, to put

10   the interviews with the defendants first for the first data

11   collection for my assessment studies or as early as possible

12   where the defendants themselves, if at all, they were

13   preceded by the family members.

14          These interviews were semi-structured, open

15   narratives.  That means I only ask initial questions; for

16   example, like explain to me how you ended up in the

17   conspiracy, please explain what you think is important for

18   me to understand why you wanted to go to Syria, why you did

19   this and that.  Eventually I would ask questions, clarifying

20   questions, if they could go into more depth in a certain

21   area because I felt it was more important to them, but in

22   generally, in general, it is about the defendant and their

23   family to explain to me why they think they ended up at that

24   specific situation I'm seeing.

25          So it is about them telling me their own story.

1    And this is very important.  My role, in that interview, was

2    not to push them to tell the truth or to push them to reveal

3    certain information.  If I had, for example, reviewed

4    certain documents and I knew, just hypothetically speaking,

5    that the person would say something contradictory to what

6    I've read elsewhere, if I would say, now, what about this

7    and that and you stated it something differently at another

8    point in another situation, I would actually interact with

9    the person and change the narrative.  So I want to hear what

10   is important to them and how they want to -- how they phrase

11   it and what the elements, what memories they bring up to

12   explain the situation.

13          Afterwards I conduct more interviews, family

14   members, relatives and friends and persons of interest,

15   anyone who wants to talk to me.  I look at the documents.

16   And then I compare the information I can find afterwards to

17   what I was told in these assessment interviews, and then

18   there you have different levels of fact checking or

19   checking.  First of all, are there any facts that were

20   misstated or completely left out in the interviews?  Second,

21   is there anything that is completely contradictory?  Is

22   there anything else that helps me to explain other facts and

23   aspects that I come across later on?  And, of course, as I'm

24   looking into the way they're speaking, the language they're

25   using, the self-narratives, the explanatory narratives they

1    use to explain to me why that happened, if that includes a

2    wide array of factors, if it includes a self-critical

3    reflection, if it includes actually factors that they bring

4    up out of their own thinking and not just because they are

5    telling me a well narrated story, for example.  These are

6    things that go into my assessment.

7         And for -- for the protocol, all defendants were

8    accompanied by the defense attorneys.  They could interact

9    with them at any time.  They could tell their story as long

10   as they wanted.  I had no timeframe.  I didn't cut off at

11   any point.  They -- I always asked them if there's anything

12   else they want to tell me.  Some did.  Some others said this

13   was all I wanted to tell you.  So in the end, they could

14   always send additional information to me afterwards if they

15   felt that something was missing.  And, yeah, that was the

16   main protocol for the interviews.

17   Q.  And then how did you interview the family and friends?

18   A.  Well, they were also, as the defendants, they were

19   invited to the probation office here in Minneapolis, and I

20   sat down, except for one defendant when I was out of time

21   constraints in Germany and interviewed that person and the

22   family members through Skype and telephone.  The others I

23   met physically in a room and they could tell their story to

24   me personally.

25   Q.  Okay.  Before I turn the questioning over to the

```
1    attorneys, let's, dealing with what you're doing in Germany,

2    are there anything that would be a model or be similar to

3    any of the de-radicalization programs that are taking place

4    in Europe and specifically in Germany that you know about in

5    the United States?

6    A.  I have to say no.  There's nothing even closely similar

7    to what is being done in Western Europe.  I would say that

8    the United States is currently lagging behind about 16 to

9    20 years of countering violent extremism radicalization

10   programs, developing these programs, designing them, setting

11   standards, working standards, developing legal or practical

12   protocols for that.  There's virtually nothing in the United

13   States to debate about how to counter violent extremism and

14   violent radicalization is currently emerging in the United

15   States.  There is no coherent family support structure in

16   the field of CVE and counter-radicalization.  There are no,

17   except the probation officers of the District of Minnesota,

18   no trained experts in de-radicalization,

19   counter-radicalization that I know of currently in the

20   United States.

21           And although here in the United States there are

22   some of the world's leading academic experts in their field

23   that write books and analysis of these projects that are

24   active here, the practical experience in planning and

25   conducting active programs, working with individuals,
```

1    working with families is virtually absent.  There is, as I

2    said, no legal procedures.

3            There is a very strong controversy about even the

4    term "de-radicalization" and CVE, should we call it

5    rehabilitation, reintegration.  Personally I think that when

6    we talk about radicalization, we have to talk about

7    de-radicalization.  I understand that many communities in

8    the U.S. are very afraid of being criminalized about CVE

9    being used by government institutions to spy on them or to

10   flag them as potential risk.  And my experience in Europe is

11   that there are so many different types of CVE programs

12   working with different audiences being conducted by

13   different actors, from government to nongovernmental

14   agencies, that, from my experience, CVE, or whatever you

15   want to call it, is essentially empowering families and

16   communities.  It's giving back to them tools that they need

17   to prevent their family members, their community members

18   from getting to a point where law enforcement automatically

19   has to step in.  It gives them back that opportunity to do

20   something about recruitment of very sophisticated violent

21   extremist groups that have been doing this for a long time.

22   I've studied the recruitment handbook of groups like ISIL

23   which is so sophisticated that I would say families do not

24   have any chance in this situation without having expert

25   support.

1    Q.  Well, let's stop there, because there's two -- that's

2    the problem that I think everyone is confused about except

3    for me.  My job is to make sure the community is safe.  And

4    whether or not I send someone to prison for 15 years,

5    20 years or 5 years, they're going to be coming out of

6    prison.  They're going to be in prison, and we'll talk about

7    that in a few minutes, and then they're going to be coming

8    out of prison and they're going to be on supervised release.

9    And so people -- and so people understand what -- and in the

10   federal system, supervised release, it's like parole, so

11   it's -- but our term is supervised release.  And that's

12   where my probation officers will have to monitor and control

13   the behavior to make sure the community is safe and so

14   that's why I've had you train our probation officers because

15   I have 12 al-Shabaab terrorists and some of them are getting

16   out, and I want to make sure that my probation officers are

17   prepared to handle them when they come into the community so

18   the community is safe.  And so whether or not they go from

19   al-Shabaab to ISIL, I want to make sure that that doesn't

20   occur and they will be able to -- the probation officers

21   will be able to monitor them in the appropriate fashion.

22          So there is the what we have in the community

23   programs being started, and that's a lot of -- I'm not

24   involved in that.  I'm telling the community I'm not

25   involved in that.  But I'm telling them I've got control of

1    the body, of the individual, when they go to prison and when

2    they get out, and when they get out, I have to make sure the

3    community is safe, and so we do have to have some type, I'm

4    thinking, some type of program so we keep our community

5    safe.

6         And then also on the other side, what you're

7    involved in, is keeping people out of the criminal justice

8    system.  I'm not involved in that.  They're in the criminal

9    justice system.  They're not out of it.  And they have to

10   understand they've been convicted of extremely, and I

11   underline, extremely serious offenses.  This is not a

12   misdemeanor traffic ticket that they can pay and walk out

13   and go play basketball.  So they -- people should get that

14   out of their mind.  And that's why I've given the numbers

15   across the country of the maximum sentence of 15 years,

16   unless they're -- there's been substantial assistance.  So

17   and I have to make sure that I don't do something that is

18   out of the realm of the norm because I'll be reversed, and

19   judges have been reversed because they've given lenient

20   sentences.

21        So but in any event, my job is to make sure the

22   security of the community is safe.  And when people are

23   coming out of prison and our probation office has to

24   supervise them, I want to make sure they have the

25   appropriate tools, okay?

1          Now, let's talk -- continue on about the U.S.

2    models, if there is none, they're essentially -- well, there

3    is nothing in the United States so we don't have to go into

4    that any further.  And that's why -- that's why you're here.

5    If there was something in the United States, I would have

6    brought that in.

7          Now, when I sent the al-Shabaab defendants off to

8    prison and if I have to send these defendants off to prison,

9    what's the U.S. prison system got to offer to help keep them

10   from being -- continuing the radicalization or help them

11   become de-radicalized?

12   A.  Well, from my experience and from what I've seen so far,

13   really, not much.  There are three pillars of countering

14   radicalization, and we touched upon this, first of all,

15   obviously keeping them out of the judicial system, the

16   prevention aspect of it before they cross the legal

17   boundaries or the offering of the program in that direction.

18         Then you have prison-based programs, if they are

19   incarcerated, to do something with them that they either do

20   not spread the ideology in prison, radicalize others, or

21   become more radicalized, come out and either rejoin the

22   conspiracy, do what they had planed to do, or conduct a

23   potential terrorist attack or anything like that.

24         And third, probation, once they get out, how do we

25   help them to find their way back to --

1    Q.  Use the term "parole" or "supervised release."  When you

2    say "probation," everyone will be jumping up, oh, they're

3    going to walk out of jail.

4    A.  Supervised parole.

5    Q.  Supervised release.

6    A.  Supervised release, I'm sorry.

7    Q.  Yeah.

8    A.  In prison, I'm not aware that there's currently any

9    prison-based counter-radicalization program in the federal

10   U.S. prisons.  There is definitely a lack of trained staff

11   and experts in de-radicalization and countering

12   radicalization in prison, and there's a lack of adequate

13   facilities and protocols; for example, the question if

14   prisons group extremist offenders or separate them from each

15   other.  There are pros and cons for each approach, and that

16   needs to be debated.  These prisons need to have a protocol,

17   why they are doing something.  They need to do some basic

18   research of how they handle their extremist population,

19   their --

20   Q.  Well, I can tell you our prisons have gangs, and they

21   know how to handle those issues.  They have people that are

22   involved in assisting the government, and they have to

23   handle those people.  So I am going to cut you off there,

24   because I think the prison system, if -- if they get a spark

25   and understanding that there is going to be a number of

1    people going to prison and that there will be -- there

2    should be some type of activity in the prison that will help

3    those individuals transition out when they get out of

4    prison.  Would that be accurate?

5    A.  Absolutely.  We've seen that in all western European

6    countries where there was a high influx of violent

7    extremists, terrorists who behave very differently in prison

8    than typical prison gangs.  Usually the prisons only look at

9    violent behavior in prison.  Usually that is absent from

10   violent extremists or ideological radical offenders where

11   they behave according to the prison rules, and when there is

12   nothing, no counseling in place, no psychologists or prison

13   imams or anyone who can challenge the beliefs or even assess

14   the radicalization stage, there's nothing, there's nothing

15   that actually prevents them from spreading their thoughts.

16   Q.  Okay.  So I stand corrected.  If they're not violent and

17   they're following the rules, that's good enough for the

18   prison.

19   A.  Well, but I think that there is something else here and

20   not just the violence that they act out in prison so the

21   awareness of prison-based radicalization, the thoughts that

22   can be spread and the ideology.  As far as I know, most U.S.

23   federal prisons, there are no prison imams that provide even

24   the basic religious services.  And for me as a counselor or

25   as an expert providing these assessments, there is this

1    predicament.  If I say a person right now has high stage of

2    radicalization but shows a credible remorse and cognitive

3    opening so that I could say we could start counseling the

4    person right now, there's a very good chance with three,

5    four, five years of work to bring that person back, that

6    person has to go to prison for reduced sentence, maybe, and

7    what is being done with that person in prison?  That changes

8    my whole assessment.  If nothing is being done with that

9    person for five years or ten years and then, only then, the

10   counseling starts, these five years in prison, they are a

11   black box that I would assess as a potential additional risk

12   that raises the radicalization rate, So this is why it is

13   essential to have that prison-based counseling available

14   once you deal with that issue.

15           THE COURT:  All right.  Let's take a -- another

16   stretch break and then I'll turn it over to the attorneys.

17           Bathroom break.  Let's take a 15-minute break.

18       (Recess taken from 11:30 through 11:47 a.m.)

19           THE COURT:  Ms. Atwal.

20           MS. ATWAL:  Thank you, Your Honor.

21                          **EXAMINATION**

22   BY MS. ATWAL:

23   Q.  Good morning, Mr. Koehler.

24   A.  Good morning.

25   Q.  Sir, what I'm going to do is I want to talk about three

1     different areas.  First, I want to just get some general

2     background, follow-up questions from the Court.  Second, I

3     want to talk a little bit about the training that you

4     provided to probation.  And third, I want to find out a

5     little bit more about your findings that relates to

6     Mr. Yusuf.  Okay, so just in general, can you tell me what

7     the definition of "radicalization," what it actually means?

8     A.  Radicalization is a process of de-prioritization of

9     political ideas and values.

10    Q.  Does it necessarily equate to violence?

11    A.  No.

12    Q.  How about "de-radicalization," how would you define

13    that?

14    A.  De-radicalization is a process of decrease in

15    commitment, psychologically or physically, to an extremist

16    or radical group or environment or ideology.

17    Q.  How about the definition of "disengagement"?

18    A.  Disengagement, by a standard academic definition, only

19    covers a physical role change, leaving a certain radical

20    extremist environment, changing, for example, your behavior,

21    your outfit, your appearance, without necessarily touching

22    upon your ideas, values or ideological convictions.

23    Q.  So at the end of the day, what your programs that you've

24    done in Germany, what the training you've done in other

25    countries, at the end of the day, you're assisting in

1    getting the person who has extremist views separated from

2    the ideology?

3    A.  That, and separate from the group and the radical

4    extremist environment.

5    Q.  And have an individual begin to live within their

6    community and make sure that community is safe.  Is that

7    true also?

8    A.  That's correct.

9    Q.  Okay.  So when you started looking at your programming,

10   one of the things you wanted to do was make sure that the

11   people that are running your program were trained.  Is that

12   true?

13   A.  That's correct.

14   Q.  And so you came here for a week where you spent time

15   with the probation officer training them, correct?

16   A.  That's correct.

17   Q.  How many people did you train?

18   A.  To my recollection, about 20 to 25 people were in that

19   training session.

20   Q.  And Mr. Koehler, can you explain to me what the training

21   entailed?

22   A.  The training is a concept that includes about 15 to 20

23   modules, starting from the basic ideas behind the psychology

24   of radicalization, the ideology of groups like ISIL, how

25   groups like ISIL recruit, how you would work with families

1    and communities to understand different types of

2    de-radicalization programs around the world, the reasons why

3    people end up in radical groups.  Each module included dummy

4    case exercises, real life case exercises so that I could

5    practice with the participants how they would understand the

6    different aspects.  I talked about risk assessment.  I

7    talked about radicalization assessment.  I talked about

8    different aspects of violent extremist views, contrast with

9    society, how radical views interact with our mainstream

10   society, how that process of becoming involved works, and

11   how you could plan, coordinate and assess an intervention

12   program, how would you find specific service providers,

13   mentors, how you could work with community, with civil

14   society organizations to bring in certain services for your

15   counseling plan.

16   Q.  During the five days of that training, were you able to

17   train any counselors or mentors or any coaches?

18   A.  There were mentors present, although that was not the

19   main focus of that training.  The training was focussed on

20   probation officers.

21   Q.  And was part of it that you also wanted to teach the

22   probation officers how to do the assessments that you did on

23   the defendants that are here in the courtroom today?

24   A.  Partially, but that will also include another set of

25   training hopefully in this week.

1    Q.  Okay.  All right.  Next I want to move on to kind of the

2    process, and by that, I mean the recruitment, the

3    de-radicalization, those types of questions.  First I want

4    to talk to you about the recruitment process.  As you

5    alluded to earlier, ISIS actually has a manual that they use

6    to recruit individuals.  Is that right?

7    A.  That's correct.

8    Q.  They have usually a five-step process?

9    A.  That's correct.

10   Q.  One of the processes, they kind of target people that

11   have perhaps identity issues or low self-confidence.  Would

12   you agree with that?

13   A.  Well, that would be one potential target group, although

14   not the only.  It is really about a radicalization recipe

15   that brings together positive and negative aspects every

16   person has.  So these lack of integration factors or these

17   frustration factors can be used by a recruiter or by a group

18   or by a certain ideology, but if we look back and if we

19   think that only these frustration factors lead to

20   radicalization, we would be very much mistaken.  Every

21   person, every single one that ends up in a radical or

22   extremist violent group, has also positive motivation, quest

23   for justice, freedom, honor, to defend women and children,

24   to help their brothers and sisters, to fulfil your own

25   ideals and values.

1           And these mix -- and these recruitments,

2     recruitment guides or the recruiters, the groups, they

3     develop a very dynamic and sophisticated way of projecting

4     their ideology to the individual, biographical situation of

5     each and every potential recruit.  So it is possible, and I

6     have dealt with these cases of young individuals with

7     university degrees in philosophy, coming from well familles

8     -- well off families from all different spheres of the

9     society, so it is actually not only about identity issues.

10    That can be one aspect, yes.

11    Q.  Right.  And some of the material that you referred to

12    that you relied on your assessment, some of that material

13    discussed the issues of wanting to address injustice, such

14    as the Assad regime and their atonicities in the country,

15    right?

16    A.  That's correct.

17    Q.  That could be somebody that perhaps ISIS wants to

18    target, somebody who has that type of motivation?

19    A.  That's correct.

20    Q.  And so along with that, along with needing to find

21    identity, maybe even a sense of adventure, group influence,

22    those are the type of things that ISIS kind of looks for

23    when they recruit.  Would you agree?  Some of the things?

24    A.  Some of the things.  In the beginning, they would look

25    at young adults potentially going to college or high school,

1    living at least a little bit distance from their families

2    because these persons are unlikely to be spies and they are

3    full with hopes and ideals so they are the prime candidates

4    and they would find out exactly these issues like are they

5    looking for justice and do they have a strong feeling of --

6    or suffering of the injustice that they perceive.

7    Q.  The manual, the ISIS recruitment manual, then speaks

8    about how once you find what it is that is going to attract

9    that particular individual, you got to build on that, right?

10   A.  Yes.  You have to build a personal relationship, find

11   out everything you can from that or about that person to

12   develop a friendship, to support that person, listen to that

13   person, really get close to that person.

14   Q.  Mr. Koehler, you and I have discussed this before, but

15   it's similar to sometimes gang mentality, bringing in

16   somebody into a gang.  Would you agree?

17   A.  Well, you could make the comparison.  There are

18   fundamental differences, but some of the aspects are the

19   same, right.

20   Q.  What aspects would you think are the same?

21   A.  Well, I think that it's about companionship and loyalty

22   and the personal relationships and contexts.  Very, very

23   rarely, extremely rare, that a person only is radicalized

24   on-line or self-radicalized through on-line material and

25   then on his or her own decides to conduct an attack or

```
 1    travel to Syria.  The group mentality, the group hype, the

 2    group dynamic is very important to be part of that group.

 3    They understand, young Jihadis and Salafis understand

 4    themselves to be a part of a elite warrior cast, so they

 5    want to be with brothers and sisters, they seek out, and

 6    this is part of the recruiting manual, this is part of the

 7    steps they follow, they seek out like-minded individuals,

 8    they form these groups that they call building the brigade,

 9    they call it building the brigade, and this is part of the

10    radicalization process.

11    Q.  It also sounds like they're building that individual's

12    confidence level or giving them some type of an identity.

13    Is that right?

14    A.  Exactly.  They would, if the person does not already

15    have a strong identity, they would rebuild it or build a new

16    form of identity.  If there is already a strong identity,

17    and many of these adolescents have strong convictions, they

18    know that they have a strong feeling of justice and they

19    know what justice means, at least in their minds and their

20    ideas, and you can easily connect an ideology that's based

21    upon defending the weak and defending the evil Assad regime

22    and protecting your brothers and sisters, could easily

23    attach that to an identity that is based upon justice and

24    honor.

25    Q.  Do you think it's easier to recruit somebody that's
```

1     younger than let's say somebody in their 30's or 40's versus

2     somebody who is, you know, we've seen recruits as young as

3     ten but let's say somebody from age 14 to 20, are they

4     easily -- more easily recruited than somebody older?

5     A.  I think it depends on individual case if someone is easy

6     or not easy recruited.  But I have to say that the majority

7     of the cases we are dealing with in western countries are

8     between 16 and 25 years old.  That is equally true for

9     western -- or all western countries.  So the lump of these

10    cases is in that age.  And as I said, ISIL, the ISIL

11    recruiting handbook, has identified this group as the prime

12    target.  If you're 15, 16, 17-year-old, you would get into

13    that age where you're physically capable of performing

14    certain duties, for example, fight.  You're psychologically

15    capable of digesting the ideology and learn and being

16    indoctrinated and follow the teachings.

17         If you're getting older, your body also gets older

18    and you're un -- more likely not to be able to perform in

19    the way the group wants you to or you'd be able -- or you'd

20    become actually a spy for another organization or maybe an

21    informant or a trained agent, so it makes sense for these

22    groups to concentrate on these young adults.

23         And psychologically, I would also say that this is

24    the phase where it is -- it comes in parallel with rebellion

25    against your family and trying to define your own life and

1    building a new identity, and you have also very strong

2    ideals and convictions in that phase of your life, so it

3    makes you a good target.

4    Q.  The VERA-2 makes a distinction between a male and a

5    female, saying if you're a male, you are likely to score

6    higher on the mathematical calculations versus a female.  Do

7    you think men, or boys, teenagers, are more vulnerable to

8    ISIS recruitment than females?

9    A.  This is one point where I disagree with the VERA-2.  I

10   don't think that there's actually you should make the

11   judgment.  It is a statistical judgment based on the fact

12   that young men are more likely to end up in violent crimes

13   than women, but in my case, work experience, I've seen equal

14   degrees of highly radicalized, highly committed,

15   indoctrinated young women who are actually were pushing

16   their husbands and their male friends to become fighters.

17   They actually made them to travel to Syria.  They took their

18   children, they got children into Iran/Iraq.  They wanted to

19   become the perfect Jihadi bride.  They want to become

20   fighters as well or the martyrs.  So I think if we zoom in

21   on individual motivations, there's no difference between

22   male and female vulnerability.  It depends on the individual

23   being, his or her history and capabilities of the group and

24   the recruiter, their own motivations, that is important than

25   their gender.

1    Q.  And as you stated earlier, being highly radicalized

2    doesn't equate to being highly violent?

3    A.  Not necessarily, no.

4    Q.  Now, in your writings, you used the word "pop

5    Jihadiism."  Can you explain to me what that means?

6    A.  Yes.  "Pop Jihadiism" is a term referring to a youth

7    subculture circling around the term Jihad identity of

8    becoming a mujahideen or warrior.  They use own slang, own

9    codes and symbols on music, on clothes they produce.  It is

10   actually something that is produced by adolescents for other

11   adolescents.  It is something that we have seen in Germany

12   and other western European countries since three, four, five

13   years.  So these recruiters get younger and younger.  They

14   have certain careers like former boxer or former martial

15   artist or former rapper, gangster rapper, so they would use

16   their own street credibility to convince other adolescents

17   of their ideology.

18          And in the end, it is a very vibrant youth

19   movement that basically uses that instant identity of

20   becoming an elite warrior to build up a new identity and

21   refill these political ideals and values, and it is very

22   creative, innovative.  They use social media and every

23   technique that is available to them that they have grown up

24   with using, they're very literate in using all of these

25   techniques, the technological benefits they have, so it is

1    really a youth culture based upon the notion that the elite

2    warriors to mujahideen are, to be blunt, the coolest people

3    on the earth.

4    Q.  And watching some of these videos, it appears that some

5    of these recruiters that are aiming at these kids, show, you

6    know, look at the nice clothes you can have, look at the

7    fancy cars you can have, look at the great food you have,

8    look at all of the beautiful women you have.  Would you

9    agree with me on that?

10   A.  That is one aspect of it, the so-called five-star jihad,

11   so that some videos show people using PS3 controllers to

12   control machine guns, having their Coca-Cola and Snickers

13   and M&M's and everything that they are used to.  But there

14   are other aspects as well.  For example, the identity behind

15   it and you don't have to go to Syria and Iraq to become a

16   fighter.  You can also produce on-line material.  You can

17   translate videos.  You can spend your whole time as an

18   on-line Jihadi producing Twitter accounts, producing new

19   materials, send it around, produce nasheeds or songs about

20   the jihad to help the movement in whatever way you can but

21   still the essence would be to live out that warrior

22   identity.

23   Q.  Moving on to the assessment, there were parts of the

24   VERA-2 that you did agree with, and that came as related to

25   the protective items.  Is that right?

1   A.  Among others, yes.

2   Q.  Okay.  What other parts of the VERA-2 did you embrace?

3   A.  Overall?

4   Q.  Yes.

5   A.  I think that it is very important to look at the intent,

6   motivation and intent, the ideology, how strong do

7   individuals, for example, justify that, just to name an

8   example, Muslim victims are more important, the suffering of

9   Muslim victims is more important than the suffering of

10  non-Muslim victims, how strong the push and conviction

11  regarding the main ideological tenets, the goals of ISIL,

12  still are, if there's still any justification for violence,

13  if there's any visible de-prioritization in their language,

14  in the way they phrase their own narratives.  So this is

15  something that I found important in the VERA-2.  But again,

16  I need to stress that it is the development, the process

17  that led them to this point.

18  Q.  So out of the five sections of the VERA-2, does that

19  fall into attitude?

20  A.  Attitudes and beliefs is the ideology, and then there's

21  commitment and motivation that would look into the aspects

22  of how they are still bonded with that group, are they, for

23  example, willing to actively distance themselves from the

24  group, cut their ties to the group, do they show anything or

25  voice any dissent with the major goals of the group that

1    would be a commitment and motivation, and the beliefs and

2    attitudes are looking at the ideology.

3    Q.  So somebody that is, say, pleading guilty, that would be

4    a factor to go towards their attitude items?

5    A.  Yes, because pleading guilty is the first sign of a

6    willingness to take all responsibility for your own actions,

7    and that is actually reason why I made the assessment.  That

8    was a requirement for me to come in and assess them.

9    Q.  How about somebody cooperating, working with the United

10   States government to speak out into the group, would that

11   fall under attitude?

12   A.  That is a good example if the person is technically

13   cooperating with the government, providing the minimal basis

14   of information or level of information which already

15   everyone knows or if they voluntarily give more information

16   than is necessary, even information that no one else already

17   had any idea about.  If they fully cooperate in the sense

18   that they help to incriminate their former brothers, if they

19   only focus on themselves, if they, for example, say I will

20   only provide information about myself and not about the

21   others in the group, for example.  So these are the aspects

22   where you need to see that element in the context and the

23   development, how it changes and just is he cooperating or is

24   he not cooperating.

25   Q.  And would you agree with me that cooperation can change?

1    So let's say at the beginning somebody doesn't speak about

2    other people but then does gradually speak about other

3    people, so that attitude section can change?

4    A.  Of course that can change.  Depending on when it

5    changes, it is better or not so good.  If it changes later

6    on, I often -- given all of the other stories that were

7    actually not completely true.

8    Q.  How about somebody that gets up and actually testifies

9    in open court and says that the people in my group were

10   wrong and I'm distancing myself from them and here's why,

11   does that speak more volumes to you than, let's say,

12   somebody who doesn't testify in open court?

13   A.  Yes, that is a strong resistance from the group.  It is,

14   again, one factor out of many.  It is a good start.  And for

15   a counselor or program, that would be a good indicator that

16   the person had started to critically reassess and distance

17   themselves from the group.

18   Q.  The other section we talked about was the protective

19   items, and that's one of the five sections from the VERA-2

20   where it does discuss about significant support or community

21   support.  What do you mean by that?  Or do you know what it

22   means when they discuss that?

23   A.  Well, if there is a strong positive social environment,

24   a network around that person that is against or credibly

25   against the radical ideology or the radical group, if, for

1     example, if there's a community who can provide services

2     like finding a new job or health services, halfway houses,

3     counseling, theological, psychological, educational and

4     social counseling, if there are friends and family members

5     who help to reintegrate the person, but you need to be

6     careful.  For some, and theoretically speaking, for some,

7     that strong controlling environment might have been the

8     reason for the radicalization process.  So if the pressure

9     is too high, if the expectations of the community, of the

10    family are too high on each individual, this can lead to

11    recidivism.  So again, there needs to be qualitative

12    assessment of that community support and that family

13    support.  For example, is there a counter-radicalization

14    program available in the community?  Are community leaders

15    on board?  Are they supportive of the integration process?

16    Is the family receiving any family counseling on how to

17    understand what happened to their son or daughter?  These

18    aspects go into the factor support network or not.

19    Q.  Let me split that up a little bit.  We talk about -- or

20    you talk about family, and, for Mr. Yusuf, that would

21    include his mother and father, his younger brother and then

22    lots of aunts and uncles.  So when you speak about family,

23    is that who you talked about, like who he goes home to or

24    who he chooses to go to for problems, is that the nuclei

25    that we're talking about when you talk about family?

1   A.  Yes, that would be one element.  But, again, if my

2   assessment would come to the conclusion that family or parts

3   of the family were involuntarily participating or pushing an

4   individual in a certain direction, obviously sending a

5   person back to the same environment might not be good.  That

6   depends on the assessment for each person.

7   Q.  And when you speak about community, you talked about

8   leaders, but you also talked about governments such as jobs

9   and benefits.  And so when you talk about community, are you

10  talking about the Somali community, the Minneapolis as a

11  whole, the state of Minnesota or the United States?

12  A.  All of them, because there are issues where all of these

13  institutions and levels of interaction you described

14  actually have some form of responsibility.  Reintegration of

15  terrorists or extremist offender is a task for the whole

16  society, everyone, because the question of sentencing, the

17  question of any kind of supervision, any kind of

18  responsibilities, down to the least community level, if the

19  person is allowed to go to college again, if the person is

20  allowed at any stage to board a plane again, if the person

21  is allowed to finish their education, to go -- what about

22  bills and what about finding a new home, if the community

23  itself is not willing to support the process, if they're

24  actually against that process, saying we don't want that

25  offender, we think he's still a threat or we do not want,

1   hypothetically speaking, we do not want a terrorist living

2   next to our door because we think the person is a threat,

3   you will have much decreased chance of success of

4   reintegration.  So there are many institutions, many people,

5   many levels of governance involved in this successful

6   reintegration process.

7   Q.  Given how many returnees, and by returnees I mean

8   fighters that have left to go overseas and have returned to

9   Germany, there's been quite a few in Germany, how has the

10   community reacted?  Have they said we don't want these

11   terrorists living next to us?  Is that the sentiment of the

12   community?

13   A.  It's very different, from 2011 onwards, about 300

14   individuals have returned to Germany.  About 70 of them,

15   more or less 70, have actually been convicted since, stand

16   on trial or sent to prison.  So for the majority of these

17   individuals, government officials or authorities are not

18   able to provide enough evidence to bring them to court and

19   convict them.  So these individuals spread across Germany.

20   All the federal states have different policies regarding how

21   to deal with them.  Some states have full-fledged

22   reintegration programs.  And some states there is the

23   government authorities like the criminal police or

24   intelligence that take care of these individuals.

25          And there have been instances when communities

```
1    know about these persons coming back, like they pop up in

2    school and have gunshot wounds and tell their teacher they

3    have been to Syria.  There have been instances where the

4    communities have reacted violently, aggressively against

5    these persons, usually far-right neo-Nazi groups protesting

6    against these individuals, protesting against the fact that

7    there's any type of government money spent on their

8    reintegration, they should be locked up, they should be, you

9    know, not even allowed to come back.  In European countries

10   it is custom to renounce citizenship, not allowing them

11   re-entry.  It's a very controversial debate.

12           But mostly the community does not even learn about

13   that because Germany has very tough privacy and data

14   protection relations and it would be illegal to give any

15   personal information to practically everyone in the

16   community if that person is returning or living there.  It's

17   not -- he or she is not actually saying to the community to

18   disclose to social leaders that they have been there.

19   Q.  For the large part, have the returnees been able to live

20   amongst their community?

21   A.  There are no statistics on that.  And from my

22   experience, in the cases that I know, that has depended,

23   it's very much dependent on the form of counseling they're

24   receiving.  If there is community support, if there's a

25   coordinator at any program that helps to develop a plan,
```

1    individual plan for that individual to make an assessment,

2    that person is actually a higher threat after coming back

3    from Syria, or if they come back disillusioned, shocked and

4    traumatized, and for various reasons I would say the

5    majority of these persons came back traumatized, shocked and

6    disillusioned so they wanted to get out and they wanted to

7    get back a normal life.  They've done terrible things,

8    they've been forced to do terrible things, and they want to

9    go back to a normal life so they seek out that kind of help.

10          So if there is some structure, help with trained

11   experts, my experience is that they have a good chance of

12   living a normal life again.  It takes years.  It's a long

13   time, resource intense process.  If not, if they're on their

14   own, you have the same instances people just coming back,

15   not seeking out any help, the government not even knowing

16   that they were gone in the first place and they went back to

17   their old mosque, they went back to their former groups of

18   friends, very quickly in their old habits, were cheered as

19   heros, they were experts in jihad and they were starting to

20   recruit others.  And, you know, we've seen that in Western

21   Europe and France and Belgium and Denmark and Netherlands

22   and U.K. where returnees quickly re-radicalized and

23   conducted terrorist attacks.

24   Q.  Have you done assessments on any returnees?

25   A.  I have worked with returnees, but there has not been any

```
 1     quantitative study so far.  From what I know, there has been
 2     one attempt by the authorities to look at the returnees, and
 3     they think that the majority is still active in their Muslim
 4     communities, in going back to the former groups, but that's,
 5     as I said, has to be connected to the question of if they
 6     receive any counseling or not.  And so far, not -- I don't
 7     think there has been any assessment study being done in
 8     determining evaluation.
 9     Q.  When you talk about counseling, what does that entail?
10     A.  The counseling I'm referring to is a multidisciplinary
11     approach to target the driving factors of the radicalization
12     process to figure out, first of all, why a person wanted to
13     join a certain group or has become a member of a certain
14     group, why they have been willing to travel to Syria, have
15     traveled to Syria.  It takes into account that
16     radicalization recipe that I was talking about, the mixture
17     of the positive and negative aspects, takes into account
18     obviously roles of family, the community that tries to
19     identify the radicalization driver, and then it connects a
20     specific mechanism of social work support to each factor.
21            From experience in studying other programs, there
22     are -- majorly there are four main fields: theological,
23     psychological, educational and social.  So wherever the
24     motivations of these individuals lie, if they're more social
25     oriented, educational oriented, or theological/religious
```

1     oriented, you need to detect some form of tool, mechanism

2     to these motivations.  It could be to bring them in touch

3     with an educational counselor to focus on a specific college

4     education, job education, vocational training, to combine

5     that with, for example, psychological counseling when they

6     come back from Syria, almost all of them have PTSD, have

7     very, very significant trauma done, and they need to be

8     counseled on that.  And so the counseling is really a

9     comprehensive approach of bringing in multiple mentors,

10    having someone at the top coordinating that intervention to

11    take out the driving factors, neutralize the driving

12    factors, but offer, equally important, offer positive

13    alternatives to what that group, the extremist group, has

14    offered to that person.  And these alternatives, they have

15    to be equally attractive.  They have to address the same

16    motivations, ideals, values that the person had, otherwise

17    it will not be effective.

18    Q.  Mr. Koehler, it sounds like you're saying the counseling

19    should be made up of multiple mentors, almost like a team?

20    A.  That is correct.

21    Q.  And who would those people be?  Are we talking law

22    enforcement?  Are we talking psychologists?  Who would you

23    suggest they be?

24    A.  That depends on the individual and his or her

25    radicalization process.  What's -- what I find most

1     important is that there is someone coordinating their team,

2     with a plan, with a strategic perspective on that person

3     saying, okay, I think the client needs psychological and

4     social mentoring more than educational or theological

5     counseling, and so in the end, who is involved in this

6     mentoring depends on the coordinator.  In my experience, if

7     you have just one mentor, everything is relying on that

8     one-to-one mentorship between these two persons.  If there's

9     even the slightest miscommunication, if the chemistry does

10    not work out between the two persons, you can lose the whole

11    approach.  They just don't agree with each other, something

12    happening, they get in an argument and then you lose the

13    whole access to the person.  So it needs to be based on the

14    multidisciplinary team of experts.  Can be, as a matter of

15    fact, many teams have former retired law enforcement,

16    psychologists, former retired journalists, they have

17    educational professionals, they have social entrepreneurs,

18    they have many different people with different backgrounds.

19    Q.  As a part of your study on Mr. Yusuf, did you come up

20    with a counseling plan for him?

21    A.  I came up with a counseling plan for every defendant.

22    Q.  Okay.  And we'll get to that in just a moment.  So at

23    the end of the day, you're hoping this team of people will

24    be able to dismantle the person's ideology that's an extreme

25    ideology and make sure that they're open to it or get them

1    to start talking about what their driving factors were?

2    A.   That is correct.  If they have not already done so and

3    disclosed and in a credible way what was driving them,

4    there's usually always something that these individuals were

5    not even aware and through the counseling, through the

6    mentoring, through the debates and discussions and

7    relationships, they develop a new insight and a new

8    reflection upon what was really attracting them.  It is a

9    dynamic and flexible process that takes time, and some start

10   with already an advanced stage of reflection and others need

11   to develop that through counseling.

12   Q.   And this is going to be a unusual question, and it may

13   be difficult to answer, but on average, how long would you

14   think that counseling process takes for an average person?

15   A.   Well, that is a actually a very, very difficult question

16   because --

17   Q.   I did warn you it's difficult.

18   A.   Yeah, I know.  So it really depends on if the person was

19   responding to the counseling.  If the counseling is designed

20   properly, if the team is trained adequately, if

21   there's -- if there are regular assessments, case

22   conferences, but as a rule of thumb, and just from my own

23   experience, it is about triple the time the person took for

24   the radicalization process.  So if we have a person with one

25   year radicalization process, I would say at least three

1    years of counseling process, and this is just a rule of

2    thumb.  It depends very much on the responsiveness of the

3    person and the affect of the counseling.  Some programs are

4    so ill designed without trained experts, without trained

5    staff so they don't even have a way to figure out if the

6    program is working or not, they just work with mandatory or

7    standard timeframes, half a year, a year, then we cut off

8    because we don't have any funding anymore, so that really is

9    not the goal here.

10   Q.  Aside from talking about the individual one-on-one, what

11   else would the counseling entail?  Would it entail writing

12   assignments or reading or community work?  What other things

13   would be included?

14   A.  These elements you just mentioned are classical tools

15   for the mentors to use.  It could be vocational elements.

16   It could be teach them a certain profession that is of

17   interest.  It could be, of course, reading assignments in

18   the educational field.  It could be many different aspects

19   that are aimed to create the critical self-reflection, the

20   learning process, the widening of their own understanding of

21   themselves, their identities, their involvement in this that

22   is supposed to foster taking all responsibility and, of

23   course, developing an understanding tolerance for human life

24   and tolerance for other opinions and obviously also to

25   reject violence as legitimate goal to advance your own

1    thoughts and ideas.

2    Q.  Given my experience with working with clients charged

3    with terrorism cases, I see identity is always an issue that

4    somebody is having problems living in a western world when

5    at home they may have Eastern values that they have to

6    follow.  Would your counseling also entail some type of

7    identity counseling for the person to figure out who they

8    are and how they fit into this world?

9    A.  Well, obviously talking about identity, if the person

10   has shown identity struggles as a main reason for the

11   radicalization process, that would be very important.  And

12   there are many different layers of identity and how you

13   could talk about identity, but I think the most important

14   thing is to get the person into contact with plurality of

15   identities that can co-exist peacefully with each other

16   without the need to enforce a certain understanding of

17   identity to the others with violence.  So this is one aspect

18   of it.

19   Q.  Going along with that, the mentors or the

20   counselors -- and the mentoring team that's part of the

21   counseling team, would you agree that it's helpful to have

22   somebody that understands the individuals, such as somebody

23   maybe from the Somali community, for our clients that are

24   charged and convicted here?

25   A.  Obviously that can be helpful, but I would always

1    suggest a mixed team of professionals and mentors, because

2    there are also other elements.  And you have to think that

3    you want to reintegrate the person into a certain community.

4    So there are persons who understand the other side, and

5    there are also elements of, let's say, if you talk about

6    honor of justice, it could be very helpful to put that

7    person in touch with a firefighter, former firefighter or

8    EMT or a retired police officer to talk about these aspects

9    of honor of justice, without having necessarily a person

10   that shares the same religion, shares the same ethnicity or

11   cultural background, to bring that person in touch with a

12   plurality of identities that share the same values as you.

13   Q.  But do you think it's helpful to have, as a part of the

14   team, someone like that?  Not necessarily just that person

15   but --

16   A.  Yes.

17   Q.  -- a group of different --

18   A.  Yes.

19   Q.  You talk about decreasing commitment --

20          THE COURT:  Well, I -- let's go back to that last

21   point.  That's you're talking about integration into the

22   society.

23          THE WITNESS:  That's correct.

24          THE COURT:  And any group that is here understands

25   that -- well, for that value to be able to understand the

1    shared values of the community, the larger community, you

2    have to integrate into the community?

3                THE WITNESS:  That's correct.  You have to

4    participate in the community.  You have to accept the values

5    of the community.  You have to share the values of the

6    community.  And for that, you have to learn these values.

7    You have to understand them in a mutual, positive,

8    reenforcing relationship with community members.  It does

9    not work without out a social environment that supports you

10   but that you also embrace.

11   BY MS. ATWAL:

12   Q.  In your material, you discussed is it Rusbelt's

13   Investment Model?

14   A.  Rusbelt.

15   Q.  Yes.  Sorry.

16   A.  I don't know how you pronounce it but yes.

17   Q.  And in that model they talk about offering individuals

18   credible alternatives to, let's say, if somebody is angry at

19   the Assad regime, give them an alternative, instead of going

20   over there and fighting, give them an alternative to maybe

21   raise money for human rights violations or some organization

22   like that.  Can you tell me a little bit about that model

23   and how you incorporated it into your program?

24   A.  Well, the model is one, I would say, advanced tool to

25   understand how individuals make that cost benefit

1    calculation for themselves, to make a decision, basically,

2    if they join a certain group, if they got on a certain path,

3    or if they refrained from doing so, if they have, basically,

4    if they have to invest certain things, resources, time,

5    their life and what they think they get out of it that is

6    equally important to them or equally valuable to them, they

7    make a certain decision, and it is just a small aspect of

8    the model.

9         And you are absolutely correct in saying that we

10   need to offer the alternative that goes -- that targets the

11   same motivation.  We cannot debate, we should not debate the

12   fact that there's injustice and terrible, terrible suffering

13   in Syria and Iraq and that women, children are dying and

14   suffering every day.  This is beyond question, beyond doubt.

15   So if we do not tackle that issue for these individuals,

16   help them with their suffering of injustice and they

17   perceive that as the suffering because they see themselves

18   as part of the large community, they think that their

19   brothers and sisters are dying every day and they are

20   helpless, they can't do anything about it.  So the problem

21   is sincere.  We have to take it seriously.  So we need to

22   offer alternative solutions that do not include killing more

23   people or attacking governments that are trying to solve the

24   problem or going there and destroying even more lives and

25   becoming part of an organization that is based on the

1      premise that killing others in horrible ways is absolutely

2      illegitimate and isn't in any way solving their problem.

3      Q.  Do you think, as a --

4                THE COURT:  Well, before we go on, I understand

5      that you want to ask all these questions.  I've asked the

6      question.  Mr. Koehler, you've done the risk assessment of

7      these individuals.  Is that correct?

8                THE WITNESS:  That's correct.

9                THE COURT:  All right.  And then also I asked you

10     to do a recommendation of intervention needs and for

11     de-radicalization.  Is that right?

12               THE WITNESS:  That's correct.

13               THE COURT:  But the key question is, Minnesota and

14     the United States, there is no programs.

15               THE WITNESS:  That's correct.

16               THE COURT:  We could sit here and talk about the

17     theories of the programs and all of that sort of thing.

18     It's not going to do me any good.  So you can spend your

19     time on -- outside of the courtroom talking to him about it,

20     but it has nothing to do with how I'm going to be

21     sentencing.

22               MS. ATWAL:  Okay.  I'll move on, Your Honor.

23               THE COURT:  All right.

24     BY MS. ATWAL:

25     Q.  Let's just go right to the findings.  Your finding with

 1    Mr. Yusuf is that you found him to be medium to low risk of

 2    future offending.

 3    A.   That's correct.

 4    Q.   And that means that he's second to the lowest, right?

 5    A.   That's correct.

 6    Q.   Okay.  And medium to low risk of re-offending means he

 7    has minimal role residuals?

 8    A.   From what I've seen, yes.

 9    Q.   What does that mean?

10    A.   That means that there were still certain elements in the

11    assessment where I could see aspects of the ideology being

12    active and working for him; for example, elements he left

13    out in the assessment or he stated differently than in other

14    interviews he gave on other, for example, in the court

15    testimony, and these things, the way how he stated his own

16    involvement, the reasons for his own involvement led me to

17    believe that there are still need for specific counseling,

18    specific areas that he has not yet been 100 percent

19    de-radicalized, but there's already a very advanced stage of

20    disengagement and critical reflection.

21    Q.   You talked about there was things that he left out in

22    your opinion.  Can you tell me what those were?

23    A.   Specifically, there were aspects, for example, about his

24    friendship with another co-conspirator, Abdiwalli Nur, for

25    example.  For me it was very clear that he had a very close,

 1    important, mutual relationship, friendship with that person.

 2    It was very important for the radicalization process which

 3    he did not touch upon in his own narrative.  He also did not

 4    equally strong stated that specific recruitment night after

 5    he had learned that his friend Hanad Mohallim had left.  He

 6    then, in court, in his testimony, he had said that this was

 7    the night he was recruited, and in the interview with me, he

 8    left that out.  He did not really touch upon that issue.  He

 9    just said that he learned from the others that he had --

10    that Hanad Mohallim had left.  So it was not equally strong

11    in those two narratives.  And this is an event that I would

12    say, I would think that is very important and you'd stress

13    that out.

14         Other aspects I can remember, for example, he had

15    said that he did not watch certain videos or did not

16    participate in certain actions, but these are the most

17    important things that I think need more clarification and

18    counseling for your client.

19    Q.  You do also suggest an early release to a structured

20    counseling program?

21    A.  If there would be available, yes, that would be my

22    suggestion.  And all of these suggestions are under the

23    premise, and I'm talking hypothetically, I would do this and

24    that, I would suggest this and that, if it's not available,

25    if there's nothing there, obviously this is null and void

1   because you cannot send your client just to any program that

2   has no experience, no training whatsoever, it's not a

3   structured counseling program, does not have any experience

4   in that, so this is an ideal suggestion.

5   Q.  You, aside from saying he is in advanced stage of

6   disengagement, you also said he has a high degree of

7   cognitive opening to intervention and counseling, and that

8   was based on your interview with him along with his family?

9   A.  That's correct.

10  Q.  And his family, as you may not know, has been

11  speaking -- had spoken at a community event recently about

12  the issues they have gone through.  Do you think that plays

13  a role in Mr. Yusuf's de-radicalization?

14  A.  I think the engagement of his family has definitely

15  played a role.  I think, from my assessment, it was really a

16  great deal of his disengagement was his own reflection and

17  his own willingness to take all responsibility at that point

18  I met him, at that point I made the assessment, so I

19  wouldn't be able to tell a lot about the interaction between

20  the family, that the family has very positive effect on him.

21  But from what I've seen, what is more important for me is

22  his own reflection and his own willingness to take all

23  responsibility.

24          MS. ATWAL:  Thank you.  I have nothing further.

25          ///

1                    **EXAMINATION**

2     BY MR. DOCHERTY:

3     Q.  Hello, Mr. Koehler.

4     A.  Hello.

5     Q.  Hello.  Most of my questions have, at this point, been

6     asked and answered, but inevitably a few remain, so bear

7     with me.  In the passage that my colleague, Ms. Atwal, was

8     just asking you about, about a high degree of opening to

9     intervention and counseling, you actually talk about a high

10    degree of cognitive opening, and perhaps you explained this

11    earlier and I missed it, but could you explain what you mean

12    by cognitive opening?

13    A.  Cognitive opening basically means a psychological

14    opening, a process of critical self-reflection, reassessment

15    of your own past, your own involvements, your own narratives

16    and also the willingness to take all responsibility, and you

17    also show credible points, access points where a counselor

18    could start working with potential interests, potential

19    motivational factors, your radicalization process.  These

20    openings give you a material to work with as the counselor

21    or project coordinator.

22    Q.  To put it -- to give it back to you in my own terms, and

23    correct me if I misstate it, a cognitive opening means that

24    when a counselor walks into the room for the first time, the

25    counselor has got something to talk about with the person?

1    A.  That would be an aspect of it, a part of it.  If the

2    person is not responding, if is not giving answers to the

3    questions, is not providing any material information or any

4    substantial information on why the person radicalized or

5    what the person actually thinks about certain issues, that

6    decreases the level of cognitive opening.

7    Q.  Thank you.  You also used the term "role residual," and

8    as I understand it, the more role residuals one has, the

9    higher risk one is at of re-offending or the higher the

10   level of radicalization.  Is that a fair statement?

11   A.  That's correct.

12   Q.  Could you explain to us, please, what you mean by this

13   term "role residual"?

14   A.  If a person develops a certain identity in a certain

15   collective or certain group, and we know that individuals

16   have different layers of identity, there's a major role,

17   there's secondary roles, secondary identities, and persons

18   redefine themselves on a constant basis.  Radical extremist

19   groups, they have, as a main mechanism, they tend to

20   override other roles and other identities.

21         To give you an example, we have a role as a

22   husband, as a government employee or as law enforcement

23   officer, as a friend, or if we are a community member and

24   play soccer, we have a role on a soccer team, so all of

25   these different roles, they compete continuously with each

1    other.  And if you end up in the violent extremist or

2    radical group, these other roles are either pushed aside or

3    completely taken over and sucked into that major role, that

4    major identity, in this case it would be the mujahideen

5    warrior or a Jihadi warrior.  And these roles define with

6    their elements all of the other roles if they're not

7    completely erased.  So this would mean stop listening to

8    music or stop meeting with non-Muslim friends, do not shake

9    the hands of a woman, do not look them directly in the eye,

10   for example, prepare for go for doing the hijrah, so these

11   can even up new roles like doing martial arts, preparing for

12   performing jihad, and if the role, the -- if the role has

13   certain behavioral and psychological elements that define

14   that role that make that role working for you in your life,

15   if you go out, if you leave that role, certain elements of

16   that role might still be active, how you perceive the world.

17   You might come out a Jihadi group and still not be able to

18   listen to music because you have been taught and become

19   accustomed to the fact that music is blasphemous and it is a

20   barrier between you and God.  Even if you're not -- even if

21   you do not condone the actual political/religious roles of

22   the group anymore, it could still be that you're not able to

23   listen to music.  Just one example.

24            And the more role residuals you take with you, the

25   higher the risk that you do not find your place in a new

1    environment and you feel alien, you feel just not welcome,

2    not possible to live in that community anymore so you would

3    automatically seek out new groups and environments, or the

4    old one, that fit with your role understanding and how you

5    feel in your life, how you understand the world around you.

6    And the role, the residual, is determined basically the

7    level of possibility of reintegration.

8    Q.  Okay.  I want to continue for a couple of minutes yet on

9    how you go about assessing risk of re-offending and how you

10   go about assessing degree of radicalization.  And as I

11   understand it from what you've said so far in this hearing,

12   there are two main tools that are in use: the VERA-2, the

13   Violent Extremism Risk Assessment, Second Edition, and the

14   ERG-22+, the Extremist Risk Guidelines.  You do not use

15   either of those in their pure form.  Is that accurate?

16   A.  That's accurate.

17   Q.  You pick and choose from the factors in the VERA-2 and

18   the ERG-22+ for each person that you assess.  Is that

19   correct?

20   A.  Not for each person.  I use a selection of these

21   elements in my overall assessment which is the same in the

22   methodology, the same for each person.

23   Q.  That was going to be my next question was were all six

24   of these defendants assessed using the same factors or did

25   you change them because, in your professional opinion, it

1    was important with this one particular defendant to bring in

2    another factor and talk about that or was it uniform across

3    all six of them?

4    A.   Uniform across all six of them because I wanted to look

5    all the factors that I found important to understand their

6    radicalization process and their stage of radicalization.

7    Q.   When we talk about risk, a lot of your discussion today,

8    understandably, has been risk in the sense of traveling to

9    Syria and traveling to Iraq, but risk would also include the

10   risk of violent acts without traveling?

11   A.   Of course.

12   Q.   And, in fact, you know, probably better than anyone else

13   in the courtroom, that terrorist groups, including ISIL,

14   encourage people to commit violent acts where they are if

15   they find themselves unable to make hijrah to what they call

16   Sham.  Is that correct?

17   A.   That's correct.

18   Q.   And that risk is, so when you assign a high or a medium

19   to high risk assessment to a particular defendant, you are

20   not talking just about the risk of travel but also about the

21   risk that if, on early release, they could commit violence

22   inside the United States?

23   A.   That's correct.

24   Q.   You, in answer to some questions from Ms. Atwal, you

25   identified cooperation in the abstract as a form of

1    distancing from a terrorist organization, correct?

2    A.   That is a way you could understand cooperation, right.

3    Q.   You seemed, and correct me if I'm wrong, but you seemed,

4    when answering her questions, to say that how you would

5    factor cooperation into an overall risk assessment would

6    depend upon the quality of the cooperation.  Is that --

7    A.   That's correct.

8    Q.   Okay.  What steps, if a defendant that you assessed, if

9    one of these six had cooperated, what did you do to assess

10   the quality of the cooperation?  How did you, as someone

11   coming in from Germany, make a decision as to how good that

12   cooperation had been?

13   A.   I asked you.

14   Q.   Okay.  All right.  I remember some of those

15   conversations, yes.  All right.  Some of those

16   conversations, however, took place before a trial which

17   occurred in this case in May and June of this year.  Do you

18   intend to revisit that issue or is the risk assessment that

19   you have written and that we all have seen, is that now a

20   closed chapter?

21   A.   I had access to the transcripts of the testimonies, and

22   I reviewed them when I was in the process of writing the

23   reports, so they were going into my assessment.

24   Q.   All right.  And finally, you said that you had prepared

25   a counseling plan for each defendant?

1          THE COURT:  I want the government to understand

2     and defense to understand, giving substantial assistance to

3     the government under 5K1.1 is a whole other major factor on

4     reducing a sentence, and as you all know, that's trumped a

5     lot of activities of those defendants that have been given a

6     5K.  So that's why I emphasized it and underlined it in my

7     order, because let's not get hung up on Mr. Koehler's

8     evaluation dealing with substantial assistance because that

9     will come from the government, and that will be the letter

10    to me from -- that I will read and that the defense will

11    submit something and that I will make a evaluation on that.

12    That's a -- that really is not going to -- his

13    interpretation of and incorporation is not going to impact

14    upon the 5K1.

15          MR. DOCHERTY:  Thank you, Your Honor.  And for

16    purposes of clarity of the record, I was trying to determine

17    what role cooperation played in a risk assessment.  I

18    certainly would not -- was not asking Mr. Koehler, and I

19    hope I wasn't understood that way, to be talking about the

20    5K process but rather about how cooperation factored into a

21    risk assessment.

22          THE COURT:  Okay.

23          MR. DOCHERTY:  But I appreciate the record being

24    cleared up in that way.  If I could have one moment, Your

25    Honor.

1          THE COURT:  You may.

2          MR. DOCHERTY:  Thank you, Your Honor.  Nothing

3    further.

4          THE COURT:  Ms. Atwal, any further questions?

5          MS. ATWAL:  No, Your Honor.

6          THE COURT:  All right.  We'll recess for lunch.

7    We will start up at 1:30.  1:30.

8        (Lunch recess taken at 12:44 p.m.)

9                    *    *    *    *    *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (1:31 p.m.)

2                              **IN OPEN COURT**

3                 THE COURT:  Who is up next?

4                 MR. SICOLI:  I am, Your Honor.

5                 THE COURT:  Good afternoon.

6                 MR. SICOLI:  Good afternoon, Your Honor.

7                 THE COURT:  We've got the speakers.  Can you hear

8     in the back row now?  Can you?

9                 MS. BRANDL:  Your Honor, I had raised an issue

10    that this speaker was hard to hear, the one coming from the

11    podium, so I haven't heard that one yet.

12                MR. SICOLI:  Can you hear me?

13                MS. BRANDL:  Oh, yeah, that's much better.  Thank

14    you.  That's great.  Thank you, Your Honor.

15                THE COURT:  You may inquire.

16                MR. SICOLI:  Thank you, Your Honor.

17                             **EXAMINATION**

18    BY MR. SICOLI:

19    Q.  Good afternoon, Mr. Koehler.

20    A.  Good afternoon.

21    Q.  Now, at the outset, I just want to make clear, your

22    expertise has to do with de-radicalization and

23    radicalization process.  Is that correct?

24    A.  That's correct.

25    Q.  It doesn't have anything to do with the court system and

1    whether there's certain conditions the judge can put on that

2    would give the public safety.  Is that correct?

3    A.  That's correct.

4    Q.  And that's without -- and the judge has made clear that

5    today that's without -- that's not your expertise, right?

6    A.  That's correct.

7    Q.  Okay.  Now, I want to talk to you a little bit about

8    Mr. Warsame's report and talk about some of the facts that

9    are in there, but before I start with that, isn't it true

10   that Mr. Warsame was the only defendant out of the people

11   that you interviewed, the defendants that you interviewed,

12   that did not try to travel to Syria.  Is that correct?

13   A.  That's correct.

14   Q.  Okay.  And that, I would assume, is a significant

15   factor.  Obviously somebody who tries to travel to Syria

16   probably has more radicalization than somebody that doesn't.

17   Isn't that correct?

18   A.  That's not correct.

19   Q.  Okay.  Well, I guess we can disagree on that.

20   A.  Well, Mr. Docherty just said that the fact that you want

21   to travel is one aspect of radicalization; the other is if

22   you're willing to perform a certain act of violence, if you

23   stay in the country, if you build more brigade, if you

24   recruit for others and spread the ideology, so that is just

25   one aspect of it.

1    Q.  Fair enough.  Fair enough.  Do you have any evidence

2    that Mr. Warsame did anything of violence in the United

3    States?

4    A.  I'm not looking at any other acts of crime but that what

5    was reported to me, the interviews, the documents that I got

6    and his radicalization stage and radicalization process.

7    Q.  Well, let's even make it blunter than that.  You looked

8    at some reports as well, and you know that Mr. Warsame has

9    never even fired a gun.  Is that correct?

10   A.  As far as I know that's correct.

11   Q.  Yeah.  That was stated in his plea agreement when he

12   came and testified before the Court in open court.  Is that

13   right?

14   A.  That's correct.

15   Q.  All right.  And in fact, he's never left the United

16   States, other than when he was born outside of the United

17   States, he's always been in the United States since six

18   months old.  Is that correct?

19   A.  Yes.  But that has nothing to do with the radicalization

20   process.

21   Q.  Understood.  And we'll get to some of your -- some of

22   the facts in your -- or some of the interview.  And in

23   addition to the fact that he was the only person that you

24   interviewed that did not try to travel to Syria, he is only

25   one of two defendants who actually cooperated with the

1   government.  Is that correct?

2   A.  To a very minimal level.  He did provide information

3   but, as I would say, on a technical basis and he did not

4   provide, at least what I saw, substantial new evidence and

5   information that equally to, for example, Mr. Yusuf.

6   Q.  All right.  Well, let me ask you this.  I didn't see in

7   your report of Mr. Warsame that you actually looked at any

8   of the FBI statements on his proffers to the government, his

9   statements to the government?

10  A.  The documents that I was provided with from the court

11  include transcripts of conversations, for example, with

12  co-defendants and all of the evidential material that was

13  provided together.

14  Q.  Well, let me stop you there, though.  What I'm asking

15  you for is that do you know that Mr. Warsame actually met

16  with the government prosecutors and FBI agents over six

17  times to prepare and to provide evidence to them?

18  A.  I was told so.

19  Q.  Okay.  You did not review any of the statements to the

20  FBI, is that correct, to the government?

21  A.  But I interviewed the prosecutors on that case.

22  Q.  Okay.  But my question to you is, I just want a yes or

23  no, you did not review any of the FBI statements.  Is that

24  correct?

25  A.  That's correct.  But I saw the testimony he gave in

1    court, and I compared it with the information he gave to me.

2    Q.  All right.  And we'll talk about that in a second, but

3    correct me if I'm wrong, his testimony was over a two-day

4    period.  Is that correct?

5    A.  As far as I know, yeah.

6    Q.  All right.  And it was over five hours long.  Is that

7    correct?

8    A.  As far as I know.  As far as I remember.

9    Q.  Well, did you look at that or not?

10   A.  I did.  I got the transcript and I looked at it.

11   Q.  All right.  But let me ask you a couple of questions.

12   Now, you -- you wrote up a report on this -- on my client

13   and it's six pages long.  Is that correct?

14   A.  It sounds about right.

15   Q.  All right.  And the first page is basically who you

16   talked to, correct?

17   A.  It gives an overview about the information sources,

18   that's correct.

19   Q.  And then the second page and into the third page just

20   talks about what was in the presentence investigation

21   report, just some of the facts.  Is that correct?

22   A.  The biography.

23   Q.  All right.  So the actual substance of the

24   radicalization process and whether my guy is a risk, that

25   was basically four pages long.  Is that correct?

1    A.  That was the end result of the month long evaluation

2    process, including very, very extensive interviews,

3    documents and additional information, including his own

4    social media accounts, including press reports, so that was

5    the end result, the end report.

6    Q.  Well, let's talk a little bit about his interview.  You

7    mentioned that he had as much time as he could to talk to

8    you.  Is that correct?

9    A.  That's correct.

10   Q.  Now, it was actually you interviewed him one time.  Is

11   that correct?

12   A.  That's correct.

13   Q.  And that was on April 14th of 2006.  Is that correct?

14   A.  Yes.

15   Q.  Or '16, I'm sorry.

16   A.  That's correct.

17   Q.  And so that was approximately a month, a little bit a

18   over a month before he testified.  Is that correct?

19   A.  That's correct.

20   Q.  All right.  And you didn't have any follow-up

21   conversations with him after that point.  Is that correct?

22   A.  As I didn't have with any of the other defendants, no.

23   Q.  All right.  And let me ask you this question.  You

24   mentioned that the way that you do it is you basically just

25   ask them an open-ended question, you know, what did you do,

1   and then he's going to be evaluated on what his response is

2   to that.  Is that correct?

3   A.  That's the standard definition of a semi-structured open

4   narrative interview, that's correct.

5   Q.  Okay.  Are you aware of any other discipline where

6   that's actually done?

7   A.  That's being done in social sciences.

8   Q.  Okay.

9   A.  And that's being done to evaluate how the narrative, the

10  self-explanatory narratives of a person regarding his or her

11  past have developed and are currently being assessed, so if

12  the person is able to voice his own opinions in the way he

13  or she wants to and elaborate on all of the aspects that he

14  or she finds important, that tells me about exactly what

15  that person thinks is important to understand his or her

16  life, compare it to other evidence and information I can

17  get, and that is called cross-sectioning.  And these

18  semi-structured interviews are exactly being done in the way

19  so that I do not lead any information and I do not convince

20  or push a person a certain direction and just allow the

21  person to state what he finds important for me to know to

22  assess his or her past.

23  Q.  And that's part of the qualitative approach.  Is that

24  correct?

25  A.  That is correct.

1   Q.  And what qualitative, just in simple terms, means is it

2   is basically subjective.  Is that correct?

3   A.  Qualitative means based on my expert experience,

4   research and own opinions on that specific assessment.

5   Q.  Right.  It's your opinion.  It's subjective?

6   A.  It's the reason I'm sitting here because I'm an expert

7   on this field and so I was asked about my specific opinion

8   on each of the six defendants after reviewing the

9   information.

10  Q.  But you would agree with Judge Davis's question that he

11  should be somewhat skeptical about it because it's

12  qualitative?

13  A.  As a researcher I'm skeptical myself, but this is my

14  experience and this is my methodology and this is why Judge

15  Davis asked me to give my additional opinion to any other

16  reports and opinions that he has collected on this case.

17  Q.  Let me ask ask you this question, remember when you

18  answer this question, I was there, is that correct?  I was

19  at the interview?

20  A.  Yep.

21  Q.  Did you tell Mr. Warsame that he had to be -- he had to

22  say a bunch of stuff that you wanted him to say, that it was

23  being judged on whether it was complete or not?  Did you

24  tell him that?

25  A.  I asked him if he was -- if he was already briefed on my

1   role and basically my task in this whole process, who I am,

2   what my background is.  You replied positively.  You had any

3   opportunity to interact with him, to correct him on

4   anything, to give him advice.  He could consult you at any

5   point.  So he -- I made sure that he understood who I was

6   and what I was doing.  And I told him from the beginning and

7   at the end that it is about understanding his involvement in

8   this conspiracy, what made him to consider going to or

9   planning thinking about going to Syria, being part of the

10  conspiracy, and this is actually what explains, during the

11  interview a couple of times afterwards or during the end of

12  the interview, I gave him ample chance to give more

13  information, tell me more what he wants to know -- me to

14  know, so that was the background.

15  Q.  Well, that was a long answer, but you didn't tell him

16  that you were judging him based upon whether it was

17  complete, in your eyes?

18  A.  I told him that --

19  Q.  Did you?

20  A.  -- his interview will be the baseline of an evaluation

21  report about his radicalization process, involvement in the

22  conspiracy and that his information would be one of the main

23  sources of information.

24  Q.  Okay.  And did you talk to me about whether we wanted to

25  add anything?  Did you actually direct any questions to me

1    during the process?

2    A.  No.  Because you were supporting the defendant, and you

3    could have interacted at any time.  I addressed to you both

4    at the end of the interview if anyone has anything to add or

5    anything that they want me to know.

6    Q.  Now, you realize that even though I've been doing this

7    30 years, this is the first I've done this as well because

8    this hasn't been going on in this district.  So --

9    A.  This is the first time in the United States.

10   Q.  Right.  So you didn't bother to tell us what we could

11   and could not do during the interview.  Is that correct?

12   A.  There were no boundaries what you could and could not

13   do.  There's basically completely based on your opinion as a

14   defense lawyer or the decision of Mr. Warsame what he wants

15   to tell me or what not.  And the point of this

16   semi-structured open narrative interview that you tell me

17   what you want to tell me and if there's anything you do not

18   want to tell me, that is your decision.  It was completely

19   voluntary.  The goal of the assessment was laid out by the

20   Court in the order, so it was absolutely known what my goal

21   of the assessment is, and semi-structured, open-ended

22   interview leaves you the freedom of information what you

23   give me and what you do not give me.

24   Q.  Now, the interview was about an hour and a half.  Is

25   that correct?

1    A.  Yeah, about an hour and a half.

2    Q.  And in fact, it was actually a little bit less than that

3    because my client actually broke down and cried at one

4    point.  Is that correct?

5    A.  At the end he cried, yep, that's correct.

6    Q.  And we took about a ten-minute break as a result of

7    that.  Is that correct?

8    A.  Not really a break but we stopped the interview.

9    Q.  Yeah.  And do you recall what -- what he broke down

10   about?

11   A.  Because he thought it could be him that could have been

12   killed.

13   Q.  Do you also remember that he actually broke down when he

14   said that he talked to his father when he was in Chicago and

15   his father told him how would you feel if you went into a

16   restaurant and got blown up by a suicide bomber and he

17   started to realize at that point this is really something

18   we're hurting innocent people.  Do you remember that at all?

19   A.  No, he talked about that it could have been him, him

20   dying, that was the point where he started crying.

21   Q.  Right.  And he was -- he was expressing to you that he

22   had changed his mind.  Is that correct?  Changed his heart?

23   A.  Well, all of the defendants said that they had changed

24   their heart and that they are reconsidering.  That is a

25   statement.  And I am supposed to, as an expert, to evaluate

1    that statement.

2    Q.  Well, let me ask you this question, though.  You never

3    asked him any questions about how he feels then?  In other

4    words, you didn't ask him questions what's your viewpoint

5    now?

6    A.  I exactly asked that question.  I asked him what he is

7    thinking now, what he wants to do with his life now, if he

8    gets --

9    Q.  Now, remember when you answer that question, I was there

10   as well.  Is that what your answer is that you actually

11   asked him questions like that?

12   A.  I asked him what he's thinking now.

13   Q.  Okay.  I guess I don't remember that, but maybe we can

14   disagree on what was asked, and it's not in my notes, sir.

15   Did you -- and then you didn't have any follow-up interviews

16   with him to find out where he is now?  In other words, like

17   you've come into court today to say what -- and you've given

18   a report on what his radicalization is and what your risk

19   assessment is, but you don't know, as we sit here today,

20   what he's thinking at this point, do you?

21   A.  My assessment gave the situation assessment at that

22   point when I met your client, and I took in every evidence,

23   and I tried to find potential roots for intervention and

24   counseling, and that has to be done, if anyone's willing and

25   capable to do it, and obviously there is a development of

1   process depending on the sentencing, and obviously you would

2   need to have as part of counseling, you would need to

3   follow-up with more assessment and work with your client.

4   But I was asked to give that assessment, a situational

5   assessment.

6   Q.  Okay.  But why wouldn't you, if you're coming into court

7   in September of 2016, why wouldn't you try and get an

8   updated assessment because I think you've testified that

9   people change, correct?

10  A.  That is -- that people change is the basic premise

11  behind de-radicalization and countering violent extremist

12  programs.

13  Q.  Right.  So why wouldn't you interview him A, after he's

14  testified to the government; and B, closer to the time that

15  you come in to give the report to the judge?

16  A.  Well, there are logistical constraints where you have to

17  organize these interviews and to write the reports and these

18  reports have to go into sentencing and you have to obey the

19  deadlines and the processes.  And obviously if you go into

20  and look into the development of people, you could do that

21  every day, you could do that every week and look into how

22  these people change, but my task was to evaluate the person

23  at that specific stage.  And afterwards, obviously there's a

24  process that continues with these persons, but my report of

25  that day and bringing in available information, for example,

1    like the testimony in court and others, provides the basis

2    for my evaluation assessment and that is the basis for

3    potential suggestion of counseling which is also included.

4    Q.  So you don't think five months is too long of a time

5    between the time that you actually interviewed him and now?

6    A.  Well, it depends on the person.  For some persons, in

7    five months, nothing happens.  For some persons, it's quite

8    long.

9    Q.  And you didn't -- did you not have any time to come back

10   from Germany in, like, the summer to interview him?

11   A.  The basic premise was that each person delivers an

12   interview with me, one interview, and I review all the

13   available documentation and all -- the other persons,

14   interview the persons, and then I write the report.  Because

15   assessment -- or expert interviews and expert assessments

16   obviously need to make decision at a certain point that can

17   go into the sentencing, so I could, in an ideal world, I

18   could do this every day, I could do this every week and

19   deliver new reports and assess -- during counseling you

20   would do this at least once a week or at least once a month

21   to have a case conference and assess how the case proceeds,

22   which is done by probation officers or other officers in law

23   enforcement to see how the case progresses, but I was asked

24   to give an opinion at a certain stage and I delivered that

25   assessment for a specific stage.  What happens afterwards

1   depends on the sentencing and on the counseling, if it is

2   being done or not being done.

3   Q.  Now, you -- you -- I think you testified to the Court

4   that people had as much time as they needed to talk with

5   you.  Is that correct?

6   A.  That's correct.

7   Q.  And you ended up talking with some family members of my

8   client.  Is that correct?

9   A.  That's correct.

10  Q.  Now, you're aware, aren't you, that we provided ten

11  names of people that wanted to talk to you and the probation

12  said you didn't have the time to talk to ten people and we

13  had to cut it down.  Did -- are you aware of that?

14  A.  Yeah, I selected the most important people.

15  Q.  So you don't even know these people.  How can you select

16  the most important people if you don't know them?

17  A.  It's family members.  I selected the close family

18  members, the parents and siblings.

19  Q.  All right.  You also mentioned the imams, there could be

20  other people out in the community?

21  A.  I talked --

22  Q.  But you didn't take that into account?

23  A.  I talked to other imams for other defendants.

24  Q.  All right.  In fact, there was also another person, you

25  talked to his mother, correct?

1    A.  That's correct.

2    Q.  You talked to one of his uncles, correct?

3    A.  Yeah, that's correct.

4    Q.  You talked to his stepfather, correct?

5    A.  That's correct.

6    Q.  But there was another person there named Mohamed Farah,

7    who is not related to the defendant involved in this case,

8    who was the last person that wanted to interview, and you

9    said you didn't have time to interview him.  Do you remember

10   that?

11   A.  Well, I remember that he was on the list, yeah.

12   Q.  And you -- he was ready to interview with you, and you

13   didn't interview him, correct?

14   A.  I didn't interview him, that's correct.

15   Q.  So, and, in fact, Mohamed Farah, he's actually somebody

16   that's been working with Andy Luger at the U.S. Attorney's

17   Office and the assistant U.S. attorneys to develop programs

18   to de-radicalize people and to keep young people away from

19   this.  Is that correct?

20   A.  I don't know.

21   Q.  But I thought you said that you were able to evaluate

22   all these people and decide who were the most relevant

23   people to talk to?

24   A.  Yeah, and these are the family members.

25   Q.  And he was not relevant, even though he had that

1    experience?

2    A.   I wanted to talk to the family members first.

3    Q.   Well, he is a family member, though, isn't he?

4    A.   I want to talk to the parents and the siblings first.

5    Q.   Okay.  So a stepfather, you put a stepfather above the

6    uncle who has actually dealt with these issues?

7    A.   Because the stepfather played a significant role in the

8    process, and I knew that from his interview.

9    Q.   All right.  Well, let's get to the report a little bit

10   here so we can talk about it.  First of all, I wanted to

11   talk about some issues and see whether you agree with me

12   that there's some factual errors in the report, okay?  Is

13   that okay if we go over that?

14   A.   Yeah, sure.

15   Q.   All right.  You mentioned in the report and sort of the

16   radicalization process that Mr. Warsame told you that he

17   wasn't serious about going to Syria and that a lot of the

18   other people were not serious.  Do you remember putting that

19   in the report?

20   A.   Could you elaborate on that?

21   Q.   Sure.  In your report, you state that Mr. Warsame told

22   you that he was not really serious about going to Syria and

23   a lot of the other co-defendants were not serious.  Is that

24   correct?  You put that in the report?

25   A.   Yeah.

```
1    Q.  Isn't it true that he told you that initially they were

2    not serious but that changed, especially when Nur was going

3    to go?  Didn't he tell you that?

4    A.  Well, we talked, of course, we talked about the role of

5    Abdi Nur and other persons.

6    Q.  Right.  But my question to you is, you write it like

7    he's acting like he was not serious about going to Syria.

8    That's not what he told you, though, correct?

9    A.  Well, I can't answer the question.  It sounds like you

10   are about to tell me what he wanted to tell me.  This is the

11   information that he gave me and how I assessed it, how I

12   interpreted it as an expert, and I looked at, for example,

13   his social media interaction with people like Guled Omar,

14   and I'd be happy to bring up my slides and interpretation

15   about your client and take you through my report but --

16   Q.  My simple question, though, sir, if you could answer the

17   question, my simple question to you is, in the report, the

18   way you write it, you act like Mr. Warsame was saying he

19   wasn't serious about traveling to Syria, and my only

20   question to you, that was early in the process he told you

21   that but then he got serious about going to Syria.  Isn't

22   that what he told you?

23   A.  Well, he pleaded guilty about that fact, so he developed

24   from a stage where it was not serious going to Syria to

25   serious going to Syria, and in the meantime and we just said
```

1    and you just said that traveling to Syria is just one aspect

2    of the radicalization process.  So when we look at his

3    specific Salafi/Jihadi ideology that is visible through

4    other aspects and through things that he deliberately left

5    out in his interview which were more telling, for example,

6    his own leadership role, that he was second in hierarchy and

7    elected --

8    Q.  And we'll get to that in a second.

9    A.  -- emir after Guled Omar left and if we look at some

10   specific social media stuff for him and what he posted and

11   that he basically used even Jihadi terminology in the

12   interview, like --

13   Q.  You're not answering the question now, so I'm going to

14   cut you off here at this point because you're going off.

15   We'll get into some of these other things.  But my point to

16   you is implying in the report that he -- that he wasn't

17   serious throughout the whole process, you don't think that

18   that was misleading to Judge Davis?

19   A.  In which way, misleading?

20   Q.  Well, misleading in that, yes, he did think he was

21   serious about going to Syria.  That's my only question, yes

22   or no.

23   A.  Well, he was, at the end, he was thinking about going to

24   Syria.

25   Q.  Okay.  All right.  You also state in there that

1    Mr. Warsame said that he didn't have a passport, right?

2    A.  Yeah, he said that.

3    Q.  And you never mentioned to the -- in the report that he

4    did obtain a passport in August --

5    A.  I mentioned that.

6    Q.  -- in 2014?

7    A.  I mentioned that.  There is a confidential part in the

8    reports, and I had mentioned that.  There's an analysis of

9    his part.  And what I stated in the main version of the

10   report is that the version that he gave me, his own account

11   of the process.

12   Q.  All right.

13   A.  Of course I know that he obtained a passport.

14   Q.  All right.  But that's not in the report that I

15   received.  Is that correct?

16   A.  That's part of the confidential part, yep.

17   Q.  So the answer to that is it's not in the report that I

18   received?

19   A.  That's correct.

20   Q.  Okay.  Let's talk a little bit about his leadership role

21   because that seems to be a big -- would you acknowledge that

22   that's a big focus of what you think -- why you think he

23   might be in the category that he's in?

24   A.  That's one of the aspects, yeah.

25   Q.  Okay.  And so he was voted in as the emir.  Is that

1    correct?

2    A.   As the second in command after Guled Omar left.

3    Q.   Yeah, and when was that?

4    A.   That was after Guled Omar started his travel attempt.

5    Q.   And that would have been May of 2014.  Is that correct?

6    A.   Yeah, that sounds about right.

7    Q.   All right.  And Mr. Omar never went, right?  He never

8    left?

9    A.   No, he was stopped.

10   Q.   He was stopped?

11   A.   Yeah.

12   Q.   All right.  So can you tell the Court what Mr. Warsame

13   did as the leader of the group?

14   A.   You have to understand for that, the role of the emir,

15   of a Jihadi/Salafi is a very, very specific task that is not

16   only tasked with logistical aspects such as organizing

17   travel, for example, organizing money, handing out funds or

18   providing guidance, spiritual guidance to individual

19   members, for example, proselytizing individual members or

20   helping them to make decisions whether or not to join a

21   specific group, to go to a specific country, its status in

22   the hierarchy that provides you with not only the practical

23   leadership of the group but also the spiritual leadership of

24   the group.  It --

25   Q.   I'm not --

1    A.  It is suffice that your client, after Guled Omar, the

2    status of this most sophisticated in the Salafi ideology and

3    charismatic to lead the group.

4    Q.  I don't know if I heard in there what he actually did.

5    What did he do?

6    A.  For example, he proselytized the use of Jannah to join

7    ISIL and not al-Shabaab.  That was one aspect.  He provided

8    spiritual guidance.  He helped to answer spiritual

9    questions.

10   Q.  Did he give any orders to anybody?

11   A.  That is close to an order.

12   Q.  Well, did everybody give encouragement to people?

13   Everybody, including Guled Omar, including my client, did

14   everybody give encouragement to everybody?

15   A.  It's typical in these groups to encourage each other,

16   but there is the specific role of the emir that is elected

17   so each and everyone chooses to trust that specific person

18   with a leadership role and spiritual guidance.  So with a

19   specific religious questions, for example, they would turn

20   to that person and they would trust that person to make a

21   decision of logistical questions.

22   Q.  And I assume Guled Omar was still the leader since he

23   didn't leave?

24   A.  After the fact that he left and made your client the

25   next emir, that would place him in charge of the group.

1    Q.  All right.  Well, let's talk a little bit about this.

2    So -- so he's the leader for a short period of time.  He

3    ends up leaving Minnesota, is that correct, Mr. Warsame?

4    A.  Mr. --

5    Q.  He leaves -- Mr. Warsame leaves Minnesota?

6    A.  When he went to live with his father in Chicago are you

7    talking about?

8    Q.  Yeah, he went to live in Chicago in the summer, July --

9    late July, early August of 2014?

10   A.  Yep.

11   Q.  Do you have any indication of him doing anything in

12   Chicago that would be part of the group dynamics or

13   encouraging people to go anywhere?

14   A.  Yeah, he met with other coconspirators, he conferred

15   with them on the phone regularly, and he stated in his

16   testimony that he was not really distancing from the

17   conspiracy.  He also stated in his interview with me that he

18   still wanted to go, that something in him --

19   Q.  Right.  Let me ask you the question --

20   A.  -- still --

21   Q.  -- though.  I realize --

22             THE COURT:  Excuse me, counsel.

23             THE WITNESS:  I --

24             THE COURT:  Counsel.

25             MR. SICOLI:  Well, he's --

```
 1              THE COURT:  Excuse me.

 2              MR. SICOLI:  He's going way off, Your Honor.

 3              THE COURT:  No.  You asked him the question.  He

 4     knows because he has a -- he got the transcript.  So let him

 5     tell you what's in the transcript and then you can impeach

 6     him on that.  Finish.

 7     BY MR. SICOLI:

 8     Q.  Do you have anything else to say, sir?

 9     A.  Well, it was confirmed with other individuals at that

10     time he told me in the interview that he felt very much

11     connected to the group; that something in him still wanted

12     to go to Syria.  That was the point.

13     Q.  Okay.  Did he try and leave to go to Syria during the

14     summer?

15     A.  Not during the summer, no.

16     Q.  Did he try and leave any time?

17     A.  Well, he prepared and planned for it, yeah.  He

18     applied --

19     Q.  Okay.  We'll talk --

20     A.  -- for a passport.

21     Q.  We'll talk about the plan in a second.  But he got his

22     passport in August of 2014 and didn't try to leave.  Is that

23     correct?

24     A.  Well, that's correct, yes.  But he got -- he got

25     obviously talking about this with his family members and he
```

1    decided not to use it at that point.

2    Q.  All right.  And we'll get back to that in a second.  But

3    the other thing that happened is that in November of 2014

4    some people did try to leave.  Is that correct?

5    A.  That is correct.

6    Q.  And how did Mr. Warsame find out about that?  Do you

7    remember?

8    A.  Well, he was told by the others.  He was involved in the

9    planning, so he knew that others would make the attempt.

10   Q.  He was involved in the planning?  Where in the

11   transcript or anywhere else is there an indication that he

12   was involved in the planning?  Can you show us?

13   A.  There are transcripts of conversations with him and the

14   coconspirators and obviously he as an emir was involved very

15   closely with Guled Omar and he knew that the others would

16   try to make the attempt.  Others actually met with him on

17   the way when he was in Chicago.

18   Q.  Can you -- can you show me anywhere in a transcript, can

19   you point to anything in a transcript in November of 2014 or

20   earlier than that in which there's any discussion about

21   going to Syria in November of 2014?

22   A.  The group talked about going to Syria all the time in

23   the early -- in the first half of 2014.  It was the major

24   issue, the major topic, and in conversations they talked

25   continuously about doing hijrah, about joining the brothers

1    and sisters.  That was the main topic in that group.

2    Q.  Isn't it true, sir, that the testimony would show and

3    the transcript would show that Mr. Warsame was informed

4    about the November trip when he got a -- like a Skype call

5    from Mohamed Farah the day before Mohamed Farah was leaving?

6    Isn't that when he found out about it?  Isn't that what the

7    testimony showed?

8    A.  No, not in the interview with me, and I don't recall

9    that's the only instance where he learned about that.

10   Q.  Do you have notes of the interview, or do you --

11   A.  Of course.

12   Q.  -- have a tape recorded?  Because I don't know anywhere

13   that he said that he received information before that.

14   A.  I have notes about the interview.  I didn't record it,

15   but I have my own notes.

16   Q.  But you're making that up, sir?  He did not say in the

17   interview that he knew about the -- them traveling well

18   before the call from Mohamed Farah.  You're making that up,

19   aren't you?

20   A.  I'm not making up anything.  I'm just saying that I

21   looked at other evidence, for example, transcripts of

22   conversations with other conspiracy members, and they

23   explicitly talked about traveling to Syria.

24   Q.  There aren't -- are there any transcripts of

25   conversations with my client before April of 2016?  Or 2015?

```
1     I'm sorry.  Are there any conversations with my guy on them

2     before that time?

3     A.  Well, I would -- I would need to look up where I -- when

4     exactly these conversations were, but the point is that at

5     this topic, the conspiracy in the first half of 2014 was

6     majorly concerned with going to Syria and he, as having the

7     second role or a leadership role after Guled Omar, is very,

8     very telling and shows that he was involved in giving

9     logistical advice.  And when, for example, he convinced

10    Yusuf Jama to join ISIL and not al-Shabaab, this means that

11    he had specific viewpoint on legitimacy of ISIL or ISIS as

12    the more legitimate Jihadi group.

13    Q.  So if the evidence would show that the first time that

14    Mr. Warsame learned about the other four individuals

15    traveling to New York to go to Syria was the day before they

16    were boarding a bus, would that change your viewpoint?

17    A.  No, as we have discussed, traveling to Syria is but one

18    aspect of a radicalization process, and here, we have seen

19    that he has, for a long period of time, since 2011, I'd be

20    happy to bring up the slides and take you through the

21    interview and what he presented to me and what the other

22    evidence says, so there's a long history of a radicalization

23    process, a Salafi/Jihadi-oriented radicalization process,

24    and traveling is one aspect of building the brigade and

25    forming that group.  There's also spiritual guidance,
```

1    recruitment and other aspects of that.  So focussing on this

2    travel aspect is but one --

3    Q.  Well, let me ask you this question.  If someone is the

4    emir or the leader and hasn't disengaged from the group or

5    at least tried to distance themselves from it, wouldn't he

6    know about people traveling to Syria rather than knowing

7    about it the day before?

8    A.  Well, it depends on the tactical arrangements that the

9    group has made, but as I have said, it is clear, also from

10   the statements of the others, that the group more or less

11   continuously thought about going to Syria, and it was a

12   topic that was continuously discussed in the meetings, in

13   the group where also your client was present, so he knew

14   about the general idea.

15   Q.  He was present when he was in Chicago?

16   A.  No, he was present before that, before he went to

17   Chicago and before -- and when he met --

18   Q.  Let me ask you this question.  If Mr. Warsame was

19   involved in the November trip to Syria, how come -- do you

20   know why he didn't go?

21   A.  Because he felt he got his life back together in

22   Chicago.  This is what he -- what he stated in the

23   interview.

24   Q.  He had his passport at that time, right?

25   A.  He got his passport later on, I think in August you said

1     that.

2     Q.  August of 2014.  So in November of 2014 he had his

3     passport, right?

4     A.  Correct.

5     Q.  And he didn't hop on a bus with them to go to New York.

6     Is that correct?

7     A.  That's correct.

8     Q.  In fact, the only thing he did is that Mohamed Farah

9     said to him, "I'm coming through Chicago and we're

10    transferring busses to go to New York.  Do you have time

11    just to meet and have lunch with me?"  Isn't that all that

12    happened on that -- when they came -- when he came over to

13    Chicago in November of 2014?

14    A.  Well, that is certainly what they did, what they

15    practically did, they met and had lunch.  But other -- other

16    evidence points to the fact that they much discussed

17    this -- their involvement and their travel plans.

18    Q.  Now, after that November trip that Mr. Warsame did not

19    go on, is there any indication before the end of the year

20    that he had done anything else?  In other words, anything

21    else to support the conspiracy at that point?

22    A.  Except being the emir of the group, which is very much a

23    supportive role --

24    Q.  So you're making him the emir for all-time even though

25    he's not even there.  Is that what you're saying?

1    A.  Well, he is the emir.  He was elected emir, appointed

2    emir after Guled Omar left.  That is indicative of his

3    position, his status within the group.

4    Q.  Guled Omar did not leave.  Is that true, sir?

5    A.  That's true.

6    Q.  You said he left.  He didn't leave?

7    A.  He made an attempt.

8    Q.  Okay.

9    A.  He tried to travel.

10   Q.  All right.  Let's just get on.  Then after the -- after

11   we turn to 2015, you know that the other defendants, several

12   of the other defendants, got arrested in April.  Is that

13   correct?

14   A.  Some got arrested in April.

15   Q.  Right.  And that's because several of them tried to

16   leave again to go to Syria.  Is that correct?

17   A.  That's correct.

18   Q.  And Mr. Warsame did have conversations about them going

19   to Syria.  Is that correct?

20   A.  As far as, I know that's correct.

21   Q.  Okay.  And he even encouraged Guled Omar to go to Syria.

22   Is that correct?

23   A.  He was supportive in that fact.

24   Q.  Okay.

25   A.  As his role would indicate as a second in command,

1    obviously he would be chosen to leave -- to be left behind.

2    So usually these groups travel in waves, so people --

3    Q.  The --

4    A.  -- who are at a certain stage attempt or make the

5    attempt to travel while others are left behind to organize

6    the next group.

7    Q.  So do you have any evidence that he was staying behind

8    to organize the next group?  Do you have any evidence of

9    that?

10   A.  My evidence is his radicalization stage and my

11   assessment that I've made about his ideological convictions.

12   And, again, I'm happy to take you through his interview and

13   his stated events, plus the analysis, taking into account

14   other information.  And, for example, the fact that he

15   deliberately chose to down-play his own role in the group is

16   telling for me as an expert this is what --

17             THE COURT:  Okay.  Let's go through these slides.

18             THE WITNESS:  Okay.  So here's the version

19   Mr. Warsame presented to me.  This is based on the notes

20   that I've taken from the interview with him.  Can everyone

21   see it?  Is it on the --

22             So in essence, Mr. Warsame described to me an

23   identity crisis that --

24             Okay.  So Mr. Warsame described to me an identity

25   crisis he was experiencing in the year 2011, especially

1    between his Somali identity and the western culture he was

2    living in, so he wanted to discover his Muslim roots, and he

3    chose to go down a more conservative Muslim education and he

4    really started listening to Anwar al-Awlaki sermons.  Anwar

5    al-Awlaki was one of the main recruiters and theological

6    thinkers for Al-Qaeda.  He was killed in 2011 by a drone

7    strike, and he was a U.S. citizen, so his sermons are

8    believed to be one of the most serious recruitment material

9    up until the point that the Islamic State started producing

10   much more intensive audio/visual material.  So Mr. Warsame

11   described to me that he started to be fascinated by Anwar

12   al-Awlaki, his way of speaking, that he made him more

13   convinced about wanting to fight for Allah and to fight the

14   enemies of Islam.

15        First of all he thought about going to al-Shabaab

16   and then he -- he recognized that ISIL or ISIS was the more

17   legitimate group because their caliphate was, in his words,

18   real, it was a real entity, a real state that they were able

19   to create, so that made him convinced that he would want to

20   join ISIL and not al-Shabaab, which is something that he

21   also transported to other individuals like Yusuf Jama.

22        He described that the two main things he was

23   seeking from the involvement in this Salafi/Jihadi ideology

24   or the conspiracy was forgiveness from God for previous sins

25   and a sinful life, a non-Muslim life; and, second, that he

1    went with a flood, that he was influenced by the group

2    dynamics and others in the group which he knew from -- many

3    of the others which he knew from high school.

4         He also stated that the CHS, the informant from

5    the government, established a contact to ISIL for him and

6    that he only had a marginal role in the group.  And if I

7    remember correctly, he said that "they say that I was the

8    emir, but we all had more or less the same role in that

9    group."

10        You know my risk assessment which is high risk

11   still, because, in my analysis, that I do acknowledge that

12   in 2011 he did make the decision to become more religious

13   and he went to specific Salafi preachers and Salafi mosques

14   and he actively participated in that.

15        There's ample evidence on exchanges, social media

16   exchanges between him and other individuals like Guled Omar

17   that he very quickly developed a thorough Salafi/Jihadi

18   identity and knowledge.  He -- his motivation in the

19   involvement of the conspiracy was mainly religiously driven,

20   so he wanted to support ISIL and the caliphate by, for

21   example, building the brigade and building spiritual

22   knowledge and discipline in that group.

23        This superior morality that he showed through his

24   on-line conversations, the fact that he developed a very

25   narrow sense of honor, fight for justice, that's obviously

1    helped him to overcome that cultural identity struggle, and

2    it effectively neutralized it.

3          And when he actively participated in, for example,

4    meetings with preachers like Ahmad Jebril, it showed that he

5    actively went out and not just passively took over certain

6    elements of that ideology but he actively developed and took

7    them, and he exchanged, for example, also on these issues on

8    Facebook very much so with persons like Guled Omar, and

9    that's very early on since 2011, and that shows that he

10   built, next to Guled Omar, he built up that role and

11   knowledge of a spiritual leader and a well knowledgeable

12   person.

13         He still uses terms or used in the interview with

14   me terms like the jahiliyyah, or the place where there is

15   jihad, indicating that he's still, at least that point,

16   thinking about a geographically located understanding of

17   jihad, something that can only be performed in a certain

18   place.  That would indicate an understanding of the minor

19   jihad, the defensive Jihad that is performed against a

20   certain enemy, in defense of a certain territory, in terms

21   of jahiliyya, for example, the ignorance that is being used

22   by Salafi scholars to determine when or not you have found

23   the true meaning of Islam.  If you were a true Muslim or

24   not, you would say that I've broken the jahiliyyah, I've

25   left the stage of the state of jahiliyyah, meaning that

1    you're found the perfect truth, and he still used that terms

2    in the interview.

3           And when we look at, for example, some of his

4    social media profiles that, for the Facebook pages, for

5    example, I have some pictures here on your right, so using

6    pictures, reposting pictures, for example, that were posted

7    by Abdiwalli Nur, pictures that indicate his understanding

8    of the caliphate as the true empire.  The lion on the top,

9    for example, is a symbol for Jihadi warriors.  We see on the

10   right the shahada finger and the clothes signifying his

11   Salafi identity.

12          So that is a long process.  It's not just it

13   started a half a year or a year before the conspiracy.  It

14   had enough time to develop that Salafi identity and

15   understand.  And he did not at all touch upon that.  He did

16   not touch upon that issues in the interview.  He completely

17   left it out.  He completely left out his role in the group,

18   down-played it.  He wanted -- he didn't want to talk about

19   the role of Guled Omar or others which indicates to me that

20   actually he -- he did not credibly distance himself from the

21   group or reflect upon his involvement or the role of the

22   others, also meaning that he wanted to protect the others in

23   the interview and not really touch upon these --

24   BY MR. SICOLI:

25   Q.  Did you ask him questions about the other individuals?

1    A.  I asked him if -- if it's true that he was the emir, and

2    he said, "They say I was the emir after Guled Omar".

3    Q.  That's not my --

4    A.  But he said in the group everyone was more or less on

5    the same stage and they did not really have any hierarchy

6    which is contrary to other evidence.

7    Q.  All right.  Now, you're aware that he testified, right?

8    A.  I'm aware of that.

9    Q.  All right.  And he testified to all of that.  Is that

10   correct?

11   A.  He testified to the basics of that, yes.

12   Q.  The basics of that.  He testified for five -- over five

13   hours?

14   A.  Yes.

15   Q.  I mean, he testified to that?

16   A.  Yes, I read it.

17   Q.  All right.  And so he admitted to all of that.  And one

18   of the things that you say in your report, if I'm reading

19   your report correct, is that he didn't mention a lot of this

20   stuff to you in your interview, correct, the same stuff that

21   he testified to?

22   A.  That's correct.

23   Q.  Your interview was an hour and a half long, correct?

24   A.  That's correct.

25   Q.  His testimony was over five hours long, correct?

1    A.  That's correct.

2    Q.  Ms. Allyn was asking him questions that he answered.  Is

3    that correct?

4    A.  That's correct.

5    Q.  You did not ask him questions?

6    A.  No, that's the point of semi-structured narrative

7    interview so he can give me his own account, and if he's

8    asked questions leading him to give certain answers, that is

9    not the point of my assessment.  And I explained that in the

10   morning that it is actually that I want to know how he

11   phrases and frames his own involvement, and if he's not

12   willingly, without being pointed to the fact, without being

13   asked for it, if he's not saying, for example, that he was

14   the emir or that the others had a certain influence, a

15   certain status, that there was a certain group hierarchy,

16   that is indicative or very strong, strongly telling me that

17   he does not have as critically reflective upon these issues.

18   Q.  You also mentioned that he -- that he didn't listen to

19   music for a period of time.  Is that correct?

20   A.  That's correct.  He --

21   Q.  And that's part of the Salafi philosophy.  Is that

22   correct?

23   A.  Yeah.  They believe that music is blasphemy, at least

24   certain aspects or certain parts or styles of music, and he

25   explained to me that music made him feel distanced from God,

1    it was annoying to him at a certain point.  This is

2    something that his environment, his friends and family

3    actually recognized, and they saw that he was changing.

4    They asked him about it.  They obviously talked with his

5    father when he was in Chicago, they talked to him about it,

6    and they warned him about the Salafi radicalization of his

7    son.  And so this was something that immediately came up and

8    described to me how.  I asked him and was curious about that

9    point.  I asked him why -- how it could happen that it's

10   something like music that was important to him before became

11   more -- less and less important, and he explained to me that

12   it had become through that process very much annoying to him

13   and made him feel distanced from God.

14   Q.  And everything he's telling you is the way he felt when

15   he was involved in this conspiracy, correct?  Because he's

16   telling you, you're not asking him about how do you feel

17   now, you're asking him about what happened in the

18   conspiracy, so he's telling you what he did during that

19   timeframe, correct?

20   A.  Right.  That was the point.  That's part of the

21   interview, at the end we talked about what he's thinking now

22   about it.

23   Q.  Well, I have my notes, and I don't remember any of that

24   conversation, sir, so maybe your notes are better than mine.

25   But in any event, he told you that he actually started

1    listening to music again, didn't he?

2    A.  No, he didn't tell me that.

3    Q.  He never told you that when he went to Chicago he

4    started listening to music in --

5    A.  He told me that he's writing poems but he's still not

6    feeling really comfortable with music.

7    Q.  Okay.  Now, I want to talk a little bit, and I'm almost

8    done here, but I want to talk about what you said about I

9    think you called it distancing himself from the ideology and

10   that that's one thing that you look at when somebody's sort

11   of in a low risk category.  Is that correct?

12   A.  No, I look at it at all the categories.

13   Q.  Sure.

14   A.  How far the person has distanced themselves not only

15   from the group structures but also from the main beliefs.

16   In this point, for example, as Jahiliyyah, like in

17   geographical located concept and understanding of jihad,

18   about doing Ttakfirism and practicing Takfirism, about doing

19   dawah, about understanding specific Salafi elements or not.

20   Q.  Well, and of course, you mentioned that he talked to you

21   about that in the interview, but, again, he was telling you

22   about what he thought at that time, correct?  So he was

23   using the terms that would have been used when he had that

24   ideology, correct?

25   A.  Well, as I said, in the first part we talked about that

1    time, but if you still use the same wordings, the same

2    concepts while talking about yourself in the third person

3    and describing a situation and you do not explain the term,

4    you do not get involved in any way saying, well, at that

5    point I was thinking that Jahiliyyah was this and that but

6    you just say, well, I left Jahiliyyah or I was thinking

7    about Jahiliyyah, that means that you still use the concept,

8    that you still actively use the concept in framing and

9    phrasing your own past.  In criminology that's called

10   explanatory self-narratives, how you use words and concepts

11   to describe yourself and explain your past.  That's a

12   well-established concept in criminology to establish primary

13   or secondary existence.

14   Q.  Let's talk a little bit then about after the other

15   people got arrested in April of 2015.  Mr. Warsame wasn't

16   arrested until December 9th of 2015.  Is that correct?

17   A.  That's correct.

18   Q.  All right.  So we're talking about eight months after

19   that.  Is that correct?

20   A.  Very well, yeah.

21   Q.  Do you know what Mr. Warsame was doing during those

22   eight-month period?

23   A.  He went back to Minneapolis and rejoined his family, his

24   mother.

25   Q.  And he was working, right?

1    A.  Yeah, he was working.

2    Q.  Going to school?

3    A.  Going to school.

4    Q.  All stuff that would be, at least -- I realize it's not

5    the end of the story, but that's something to say that the

6    person is getting back into their life.  Is that correct?

7    A.  Well, they did that before as well.  They went to

8    college and they were involved in job education --

9    Q.  Right.  Do you have any indication -- the difference

10   here, do you have any indication that he did any sort of

11   Jihadist activity during that eight-month period?

12   A.  Well, he told me in the interview that even while he was

13   in Chicago he was still feeling that he wanted to go.

14   Q.  You're not -- with all due respect, if you could just

15   answer the question.  What I'm asking you is after everybody

16   was arrested in April of 2015, between that time and

17   December of 2015 when he got arrested, do you have any

18   indication of Jihadist activity?  That's all I'm asking you.

19   A.  Of ideological activity, yes.  At that time, for

20   example, he could have easily changed his main Facebook

21   profile, just to give you one example.  There's still a big

22   lion on top of that Facebook page.  And that big lion, in

23   the context, is a very, very strong, telling symbol to

24   everyone watching at that point, to his coconspirators, to

25   other members of the community, and I could ask the question

1    why didn't he change?  Why didn't he change back and take

2    out these Salafi/Jihadi elements that he built up at that

3    point?

4    Q.  Do you have any indication --

5    A.  That -- sorry, that indicates to me a tactical calming

6    down at that point.

7    Q.  Do you have any indication that he did any activities?

8    I'm talking about actual activities.  I'm not talking about

9    ideology, even, or anything like that.  Do you have any

10   information that he did anything like trying to go to Syria,

11   talking to people about going to Syria, anything like that?

12   That's my question.

13   A.  As I said, traveling to Syria is but one aspect.  I'm

14   looking at radicalization process and radicalization stages.

15   I'm not focussing on individual elements like traveling

16   plans.  These are a number, these are one element of a

17   number of aspects and facts.  And I'm looking at his

18   radicalization stage.  I'm looking at the fact that he did

19   not change, for example, the statements and the symbols that

20   he actively took in and communicated to the whole world, he

21   did not change that when he went back.  And this is, for me,

22   more telling than if he continued to plan to travel after

23   others had been arrested, which technically make sense that

24   you stop and calm down for the moment.

25   Q.  So the answer to my question, though, is no, right?  I

1   mean, that's the answer to my question, the question I posed

2   to you, is no?

3   A.  Well, at that point I have no indication that he

4   continued with travel plans because --

5   Q.  So the answer is no?

6   A.  No.

7   Q.  All right.  Now, let's talk about after he was arrested

8   in December 9th, 2015, he starts cooperating with the

9   government almost immediately.  Isn't that correct?

10  A.  Yeah, as far as I know.

11  Q.  And in fact, the first interview he had with the

12  government, FBI agents and the prosecutors was January 22nd

13  of 2016.  Is that correct?

14  A.  That sounds about right.

15  Q.  All right.  And then he had, you -- you haven't reviewed

16  any of these, but he had several other meetings, then, with

17  the government.  Is that correct?

18  A.  That's correct.

19  Q.  All right.  But you didn't review any of the substance

20  of what he told them?

21  A.  I talked to the prosecutors, but that's the only access

22  I got.

23  Q.  Not any documents?

24  A.  No.  Not regarding these statements because obviously

25  they are confidential and the Court has to make the decision

1    if the information was substantial or not, but from what I

2    was able to acquire was that his cooperation was very basic

3    and did not actually provide a lot of new information.

4    Q.  So if the government makes a motion for a downward

5    departure and disagrees with you, are you saying they

6    changed their mind?

7    A.  No, I'm not able to assess that.  I'm just saying that I

8    took in the information, and it's for the Court to decide if

9    that's the -- if the statements and the information provided

10   was substantial or not.

11   Q.  And which prosecutor told you that his assistance was on

12   the surface kind of thing?

13   A.  Well, I interviewed Mr. Docherty, and obviously I looked

14   at the testimony in court, and I compared the information

15   with the interview that he gave to me.  But, again, as we've

16   touched upon, the question if the cooperation was

17   substantial or not is for the Court to decide.

18   Q.  But we are looking at whether he was distancing himself,

19   that's one of the issues that you look at, right, is whether

20   he's distanced himself?  And one of the things I think you

21   testified to is that cooperating with the government can be

22   a factor that you take into account as far as his distancing

23   from the conspiracy.  Is that correct?

24   A.  I did take that into account.

25          THE COURT:  Counsel, let me stop you here.  Just

1    as I told Ms. Atwal, substantial assistance under 5K1.1 is a

2    very important aspect that the government will give me, and

3    you will see the evidence that they give me, and some of

4    that evidence is never disclosed to the world and so we

5    don't have to get into that.  That's why I underlined it, to

6    give you the bright light to say, to understand where I'm

7    coming from dealing with a 5K1.1, because I will receive

8    information that may not have to do with any of these trials

9    that was important to the government, and you know that, and

10   this witness would not know that.

11          And that's why it's a separate category, and it's

12   an important category.  And so let's -- that's one aspect

13   that, for sentencing, for you to make sure that the

14   government gives me an accurate picture of what your client

15   has done in substantial assistance, if he gets one, and I'm

16   assuming that he will.  But, again, to the question this

17   witness about things that the government has no reason to

18   disclose to him doesn't make any sense.

19   BY MR. SICOLI:

20   Q.  Would it be fair to say, though, without going into

21   substantial assistance, sir, would it be fair to say that if

22   someone is a devoted Jihadist that it sort of is not

23   appropriate to be helping the western government?  Would

24   that be a fair statement, just generally speaking?  Not

25   specifically on Mr. Warsame but generally speaking.

1   A.  No, that's not generally fair to say.  There are cases

2   where it has been appropriate to provide technical

3   information, that is not something new, just in order to

4   receive a lower sentence or to get out, to get on probation

5   or the supervised parole, whatever, so it is absolutely

6   possible from a technical prospective to talk to the

7   government and provide information, given the fact that

8   maybe, just speaking hypothetically here, that the person

9   giving this statement already knows that certain information

10  is clear from the others, from the arrests, so how far you

11  can go is actually a tactical question.  It is --

12  Q.  And do you have any clue, though, on what the Somali

13  community is like in Minnesota?

14  A.  Well, beyond the fact that I interviewed the family

15  members and did background research, obviously not, no.

16  Q.  And I assume on your interview of the family members,

17  you know that the family has been threatened as a result of

18  the cooperation?

19  A.  No, I did not know that.

20          MR. SICOLI:  All right.  Thank you.  I have no

21  further questions.

22          MS. ALLYN:  I have no questions from the

23  government for Mr. Warsame's evaluation.  Thank you.

24          THE COURT:  Who is up next?

25          ///

1    **EXAMINATION**

2    BY MS. FEARON:

3    Q.  Good afternoon, Mr. Koehler.

4    A.  Good afternoon.

5    Q.  You'll recall we met before.  My name is Marnie Fearon.

6    I represent Zacharia Abdurahman.  I have a question for you

7    about you were describing in response to Judge Davis's

8    questions early on about your experience with evaluating

9    other defendants in the United States, and you said you had

10   performed one similar assessment previously in California,

11   correct?

12   A.  That's correct.

13   Q.  Did you -- did you rate that defendant on this -- on a

14   similar scale to the one you used in this case?

15   A.  Yes, similar, not the same model because I had less

16   information but roughly, yes.  I also looked at the

17   radicalization process and the risk and potential roots for

18   counseling and intervention.

19   Q.  And ultimately did you assign that defendant a risk

20   of -- a risk level?

21   A.  I did.  But in that report, which was special because I

22   only had very selective information, so I included that my

23   risk assessment was very, very basic and has definitely need

24   to be followed up by a more extensive study.

25   Q.  Did you create a written report in that case that was

1     filed with the Court to your knowledge?

2     A.   To my knowledge, it was filed with the Court.

3     Q.   Okay.  Can you provide us with the name of the defendant

4     in that case?

5     A.   Mr. Adam Shafi.

6     Q.   Shafi?

7     A.   Shafi, S-H-A-F-I.  And I worked with his father, Sal

8     Shafi.

9     Q.   Was that -- when did you perform that evaluation?  What

10    year?

11    A.   That was 2015.  End of 2015.  But --

12    Q.   Have you --

13    A.   -- can I add?

14    Q.   Oh, I'm sorry.

15    A.   I'm not sure if the report was actually filed because

16    the defense lawyer I was working with and providing the

17    report to, he, I think, was -- he was let down or he quit

18    his job, so I'm not sure if he actually made the report go

19    into his documents.

20    Q.   Okay.  I appreciate that.  We certainly can take a look

21    on-line and see if it's available.  Have you performed any

22    similar assessments outside of the United States?  So have

23    you performed evaluations outside of the United States where

24    you have assigned individuals a risk based on this -- on a

25    similar scale?

1    A.  In Germany, yes.

2    Q.  Okay.  And are those defendants -- or are those

3    individuals, I should say, Jihadists?

4    A.  Yes.

5    Q.  Okay.  When you -- am I correct, though, in my

6    understanding that you don't have any empirical data to

7    support a level of recidivism, correct?

8    A.  That's correct.  There are conflicting initial studies

9    about recidivism as a measurement in de-radicalization and

10   CVE work.  So this is why I use VERA-2 and ERG-22 only as a

11   very marginal tool.  So my understanding of potential risk

12   for recidivism is based the radicalization stage, the

13   process, how long did it take, how sincere was the

14   radicalization process, what kind of ideological elements

15   could I find, what kind of cognitive opening could I find.

16   So if I would see in an interview that the person is, for

17   example, still very much convinced about certain aspects of

18   the goals of ISIL or Jihadi movement or still uses these

19   role residuals or ideological elements, for me it's very

20   likely that the person, without any counseling, would, after

21   release, go back to that former way of thinking to that

22   specific group and be involved in the same activities again.

23   Q.  Sure.  And so for you it's a -- it's a bit of a --

24   trying to foretell the future without really empirical data

25   to support a recidivism rate, correct?

1    A.  The empirical data comes from the interviewees, from the

2    documents and are based on my radicalization assessment, so

3    as any assessment about the future has to take into

4    potential things that could happen, that are likely to

5    happen if nothing else is being done.  The importance here

6    is that I include a specific root for counseling that could

7    mitigate that risk.

8    Q.  Sure.  And I want to get to that in a second.  But I

9    guess my inquiry is you do not have -- you don't have

10   empirical data to support a recidivism rate, correct?

11   A.  Well, there's not enough base rate information for

12   terrorist populations or extremist populations.

13   Q.  Right.  So that's correct, right?  You don't have the

14   empirical data to support recidivism rate, right?

15   A.  In general, for all research that's being done

16   currently, no, that is correct.

17   Q.  Okay.  So this assessment that you give, a low to medium

18   to high, you use it largely to inform on what type of a

19   program you're going to recommend, right?

20   A.  No, that's not correct.  These stages I use to describe

21   the level of radicalization and the existing level of

22   cognitive opening to potential intervention, meaning how I

23   would, as an expert, think how much -- how likely is it

24   that, A, if no counseling is being done and the person is

25   released right away, how likely it is that the person

1    directly goes back to former behavior and former group and

2    former ideas; and B, how likely is the success of an

3    intervention, meaning if there's a cognitive opening, is

4    this a critical reassessment.  So these two aspects are

5    reflected upon these levels.

6    Q.  Okay.  Sure.  And so in my mind, and maybe it's just a

7    little bit of a disconnect between you and I, in my mind,

8    that is a similar concept.  In other words, you're using a

9    rating to sort of assess an individual and decide whether

10   they need sort of immediate counseling, whether they're open

11   to counseling, what type of counseling you're going to give,

12   maybe the intensity of it.  Is that correct?

13   A.  That is correct.

14   Q.  Okay.  I'm taking a look here at your slide on interview

15   protocols.  I just have a -- I don't think you need to pull

16   it up unless you want to.  But I have a couple of questions

17   about it.  Your goal is to meet with the defendants first,

18   correct?

19   A.  That's the goal, right.

20   Q.  Is the purpose of meeting with the defendants first to

21   sort of so that you walk in with an open mind and you're

22   able to assess a defendant without any other influences?

23   A.  That is correct.

24   Q.  In this case I'm talking about Mr. Abdurahman

25   specifically, you met with his family prior to meeting with

1    him, correct?

2    A.  Correct.

3    Q.  And you actually had some information from the

4    government or other sources prior to meeting with him as

5    well, didn't you?

6    A.  I was given the documents but did not review them

7    beforehand.

8    Q.  Well, you actually asked Mr. Abdurahman's family a

9    specific question about whether or not he had gotten into

10   fights, I believe it was, in high school.  Is that correct?

11   A.  Yes, because obviously I looked at his biography, and I

12   wanted -- from the family I wanted to know background

13   information.

14   Q.  Sure.  So you had obtained some information about

15   Mr. Abdurahman prior to interviewing him or his family,

16   correct?

17   A.  That is correct.  I familiarized myself with his basic

18   story.

19   Q.  So when you walk into Mr. Abdurahman's interview, you

20   didn't have the ideal, clean slate, right?

21   A.  Well, from -- it is -- it is correct that in grounded

22   theory that it is virtually impossible to have a complete

23   clean mindset and be 100 percent objective because you have

24   to have that balance between knowing who you are talking to

25   and not having an already made up mindset to judge the

1    person or to ask questions about misleading, which is why,

2    for the family, I could ask specific questions and for

3    Mr. -- for your client it was actually more important to

4    have an open narrative style.  But I agree that certain

5    elements that are important for his biography to know who he

6    is without looking into the government documents, I did

7    that.

8    Q.  Who provided you with his biography?

9    A.  Oh, I looked -- looked him up in press reports.  I

10   wanted to know basically who he is.

11   Q.  Okay.  So you reviewed some newspaper articles about

12   Mr. Abdurahman prior to meeting with him?

13   A.  That's correct.

14   Q.  Anything else that you looked at before meeting with

15   Mr. Abdurahman?

16   A.  Well, I had reviewed basic timeline of the arrest and

17   the main aspects of the conspiracy but not the documents

18   pertaining directly about Mr. Abdurahman.

19   Q.  Who prepared those documents?

20   A.  I was given these documents by the probation and

21   pre-trial services.

22   Q.  Okay.  Now, Mr. Abdurahman had a number of people that

23   wished to speak with you about him as well, correct?

24   A.  That is correct.

25   Q.  And you were unable to speak with everybody due to time

1    constraints, right?

2    A.  That is correct.

3    Q.  And he had a number of people that we had inquired about

4    bringing to the interview, I think maybe around 20

5    individuals.  Do you recall that?

6    A.  Yeah, that sounds about right.

7    Q.  And there were a number of individuals actually that

8    came to the probation office for the interview that just

9    simply were not able to meet with you because of time

10   constraints, correct?

11   A.  That's correct.

12   Q.  And you met with Mr. Abdurahman for about roughly

13   90 minutes.  Is that right?

14   A.  Roughly, yep.

15   Q.  And you met with his family prior to that and actually

16   sort of ran out of time to talk to his family, right?  They

17   were giving you a fairly robust discussion about him,

18   particularly his father, correct?

19   A.  That is correct.

20   Q.  I want to back up a little bit.  You -- I think you said

21   you also talked with the government about each of the

22   defendants.  Is that right?

23   A.  That's correct.

24   Q.  When you talked to the government, did you -- was that

25   an interview style conversation?

1    A.  Yeah, that was also more an open narrative style.

2    Q.  That was an open narrative style --

3    A.  Yes.

4    Q.  -- as well?

5    A.  So I had I -- partially I had small questions, but I

6    wanted to give -- to get the government's assessment on

7    their character, their personality, their involvement, their

8    role.

9    Q.  Okay.  I want to turn specifically to Mr. Abdurahman's

10   report, the report that you provided to us.

11   A.  Mm-hmm.

12   Q.  You mentioned in the report that you believe that

13   Mr. Abdurahman's radicalization started early, perhaps in

14   2010, correct?

15   A.  That is correct.

16   Q.  And that's because he -- when -- at the time of the Arab

17   Spring he started doing some reading, correct?

18   A.  Now you're talking about the version he provided me with

19   in his interview.

20   Q.  Sure.

21   A.  Are you -- are you referring to my analysis or to the

22   version that he provided me with?

23   Q.  I'm referring to the information that you provided in

24   here regarding why you believe that his radicalization

25   started in December of 2010, about how it all can be traced

1      back to early 2010.

2      A.   Mm-hmm.

3      Q.   And --

4      A.   The Arab Spring started in 2010.

5      Q.   Right.  In late 2010, correct?

6      A.   Yeah.

7      Q.   So in the report that you provide, you say that his

8      radicalization can be traced back to the time of the Arab

9      Spring or to late 2010, and then you describe his

10     communication with you about the Arab Spring, correct?

11     A.   That's correct.

12     Q.   And you indicate that he had started doing some reading

13     about that at that time and -- correct?

14     A.   And in his interview he started with that aspect, that

15     the Arab Spring made him more interested in seeking more

16     information about that conflict, that's correct.

17     Q.   Sure.  But he didn't differentiate between any of the

18     various groups at that time; he was just doing some reading,

19     correct?

20     A.   That's correct.  And he stated that he was introduced to

21     ISIL through the CHS that made him actually aware, he said,

22     he stated that the CHS made him aware of groups like ISIS.

23     Q.   Sure.  But the CHS came along much later, correct?

24     A.   Yeah, that's right.

25     Q.   Is it your contention that simply doing some reading is

1   the beginning of a radicalization process?

2   A.  It can be the starting point.  What I want to

3   understand, at that point, that is not radical, obviously,

4   so there's no judgment of this activity at that point as

5   being radical, but I want to understand the roots, where the

6   person is coming from, and in the report I even go much,

7   much further down in the history; for example, when there

8   were examples of him being bullied in school because of

9   the -- the Sufi faith of his father which made him more

10  looking into a Salafi-oriented understanding, a Sunni

11  oriented -- or an understanding of Islam and later clashed

12  about that with his father, and that is something already

13  introducing the concept of us -- or the stem thinking about

14  a correct and incorrect interpretation of Islam very early,

15  about cultural identity struggles between --

16  Q.  Can I -- actually, I want to refocus you a little bit,

17  because what I really had asked you, what I really want to

18  know is whether or not it's your contention that simply

19  reading about the Arab Spring is the beginning of a

20  radicalization process?

21  A.  Seeking information about a conflict can be the start of

22  a process that could eventually lead you to be -- to

23  convince that a certain group in that conflict is more

24  legitimate than others if the group is ISIL and in between

25  you have sought out a specific Salafi understanding of

1    Islam, these elements play together.  It's a dynamic

2    process.

3    Q.  Okay.  But it's not reading in and of itself that causes

4    somebody to start a radicalization process?

5    A.  No.

6    Q.  Wouldn't you agree with that?

7    A.  Obviously there's no automatic mechanism that seeking

8    out information would turn you out to be radical.

9    Q.  So there's no evidence in the record that Zach was -- or

10   I'm sorry, that Mr. Abdurahman was Salafi.  Is that right?

11   To your knowledge?

12   A.  Oh, yeah, I think that he developed a Salafi

13   understanding of Islam.

14   Q.  And a Salafi understanding of Islam, that -- you have an

15   opinion that he developed a Salafi understanding of Islam,

16   but is there anybody, including Mr. Abdurahman himself or

17   his family, that indicated to you that he expressed that he

18   was Salafi, that he viewed himself as Salafi?

19   A.  At that point, for example, his social media profile.

20   Q.  No, but --

21   A.  The --

22   Q.  But my question -- well, if you, my question to you,

23   though, was whether Mr. Abdurahman himself or his family

24   indicated to you that Mr. Abdurahman identified himself as

25   Salafi?

```
 1    A.  Still right now?  At what timeframe are we talking
 2    about?
 3    Q.  At the time.
 4    A.  At that time?
 5    Q.  Sure.
 6    A.  When he was seeking out information?
 7    Q.  No, no, at the time of your interview.  I apologize.
 8    A.  At the time of the interview?
 9    Q.  Yes.
10    A.  No.
11    Q.  Okay.  Are you aware of any statements by Mr. Abdurahman
12    supporting the caliphate as it existed in Syria at that
13    time?
14    A.  Which time?
15    Q.  At the time --
16    A.  Of the interview or the time of the information seeking?
17    Q.  At the time of the interview.
18    A.  No.
19    Q.  Okay.  Are you aware of any endorsement by
20    Mr. Abdurahman of Sharia law?
21    A.  At the time of the interview?
22    Q.  Yes.
23    A.  No, not in the interview.
24    Q.  At the time of the interview, are you aware of any
25    belief by Mr. Abdurahman that you can't be a true Muslim
```

1    outside the existence of the caliphate?

2    A.  No.  We --

3    Q.  Are you aware of any evidence that Mr. Abdurahman

4    endorsed creating a caliphate by force?

5    A.  He said that he wanted to participate in the caliphate

6    and become a fighter so that is actually a yes.

7    Q.  Okay.

8    A.  And we're talking here about the interview and his own

9    statements, not about the whole analysis.

10   Q.  Right.  There is no question pending, sir.  Some of the

11   ideological views of ISIL -- of Jihadists we have discussed

12   today or you have discussed today, I should say, and one of

13   those is violence, correct?

14   A.  In the form of performing jihad?

15   Q.  Yes.

16   A.  Yes.

17   Q.  And an intolerance for others unlike one's self?

18   A.  For example, Shiahs which your client stated that was

19   one of the main reasons --

20   Q.  Sure.  I was specifically just asking about an ideology

21   of --

22   A.  Intolerance, violence.

23   Q.  Of a Jihadist, intolerance of others unlike one's self,

24   correct?

25   A.  That's correct.

1    Q.  Okay.  A lack of integration in society, right?  In I

2    should say western society.

3    A.  Not sharing the values of tolerism and tolerance for

4    opposing world views, yes.

5    Q.  Okay.  So some -- when you talk about cognitive openings

6    for various of the defendants, for Mr. Abdurahman in

7    particular, when you see some departure from some of these

8    ideologies, that's where you view some of these cognitive

9    openings.  Is that right?

10   A.  That's part of it, that is right.

11   Q.  And Mr. Abdurahman spoke with you during your interview

12   about conversations that he has started to have with others

13   in custody regarding their religions and their experiences,

14   correct?

15   A.  That's correct.

16   Q.  And he has -- and he expressed to you that he has gotten

17   some value out of these conversations because he's been able

18   to gain an understanding of other individuals, correct?

19   A.  That is correct.  This is why his assessment is medium

20   to high.

21   Q.  Sure.  I just want -- I'm just trying to get an

22   understanding.  So we'll discuss that part.  He also talked

23   to you about -- specifically about ISIS, correct?

24   A.  Could you elaborate?

25   Q.  Sure.  He talked to you about how he -- about his -- how

1    his eyes have been opened to ISIS, correct?  About -- and

2    their methodologies?

3    A.  Yeah.

4    Q.  And that he has not -- he now has an understanding that

5    he can provide help in forms other than joining an

6    organization such as ISIS, correct?

7    A.  He stated that, yes.

8    Q.  In fact, he can help here locally, right?

9    A.  Yes.

10   Q.  He now sees the ability to help people as blessings,

11   correct?

12   A.  This is what he stated, yes.

13   Q.  He -- he described to you that at first it was hard to

14   let go of this, of his commitment to ISIS, correct?

15   A.  Correct.

16   Q.  It took some time and some reflection, and then

17   he -- then he realized that it wasn't what he thought it

18   was, correct?

19   A.  That is correct.

20   Q.  He realized that he did something wrong.  That's what he

21   told you?

22   A.  That's correct.  This is why he pled guilty.

23   Q.  Right.  He --

24            THE COURT:  Why wasn't that -- why wouldn't that

25   be critically reflective?

1            THE WITNESS:  For example, you can reject ISIL as

2       a group and not reject the goals behind the group, behind

3       the Jihadi ideology.  Many of the youngsters I have worked

4       with reject ISIL, very sincerely reject ISIL and don't see

5       them any longer as the true Muslim vanguard, they more now

6       tend to be affiliated Al-Qaeda-oriented groups who are seen

7       more legitimate and more ideological rigid as ISIL which is

8       more and more, through the media or so, known to not

9       discriminate between Muslims and non-Muslims and has

10      not -- has changed his appearance and his interpretation by

11      young Salafi Jihadists so --

12           THE COURT:  Well, he did have -- we -- in your

13      conversation with him, you said that he engaged in

14      interfaith dialogue.  Did you ask what that meant?

15           THE WITNESS:  Yeah, I wanted to know from him what

16      exactly that meant.

17           THE COURT:  I'm sorry, I can't hear you.

18           THE WITNESS:  Yeah, I asked him what this means,

19      and he explained to me that he met with other faith groups

20      in prison, or prisoners/inmates from other faith groups, and

21      they discussed potential similarities or differences between

22      their own religions.

23           THE COURT:  And then he realized that he had been

24      used by ISIL for their own blood and could easily have died

25      for nothing as many other good people have.  Is that right?

 1              THE WITNESS:  That's correct.

 2              THE COURT:  Now, help me out, why isn't that

 3     critical thinking?

 4              THE WITNESS:  That is, that is a start of the

 5     cognitive opening and reflection process, and as I said,

 6     that starting to reject ISIL as a group and expressing that

 7     you're distancing from that group is a start, but there are

 8     underlying ideological motives and goals.  He did not, for

 9     example, say that the whole concept of establishing

10     caliphate or the goals behind ISIL, the reason why he wanted

11     to go and fight for ISIL, that these goals have become

12     invalid and the methods have become invalid.

13              THE COURT:  But that would come later in

14     counseling, right?

15              THE WITNESS:  That is exactly true, and this is

16     why I suggested a specific counseling forms to work on that

17     opening and to increase that opening and to widen that

18     interfaith dialogue.  I included as a specific mentoring

19     route interfaith dialogue and to work with that interest.

20     So this is what I meant with visible cognitive openings,

21     something to work with, for a potential counselor to build

22     upon that and to enlarge that critical reassessment.  And as

23     I said, I've seen that at least initially in the early

24     stages with your client.

25              THE COURT:  Mr. Lowry, I want the probation

1      officer to interview the rest of those people that were

2      lined up for this defendant and continue the assessment.

3              All right.  Continue.

4              MS. FEARON:  Thank you, Your Honor.

5      BY MS. FEARON:

6      Q.  One of the things you just mentioned in response to one

7      of the judge's questions is that Mr. Abdurahman hasn't

8      rejected one of the -- some of the things that caused him to

9      be interested in the conflict in the first place.  Did I

10     understand you correctly?

11     A.  That's correct.

12     Q.  Aren't some of the things that caused him to be

13     interested in the conflict in the first place the oppression

14     of the Assad regime?

15     A.  And also a Shia/Sunni conflict.

16     Q.  Just to be clear, do you -- do you expect, in order for

17     Mr. Abdurahman to have demonstrated sufficient critical

18     thinking or assessment -- or rejection, I should say, of

19     ISIL that he must abandon his, I would say, concern for the

20     -- what the Assad regime is doing?

21     A.  No, of course not.

22     Q.  Okay.

23     A.  It's not about -- as I said, it is not about getting

24     away with or deleting an understanding of injustice and

25     what's being done to helpless individual civilians in Syria

1    and Iraq or by the Assad regime; it's about solutions to

2    future vision.  And there were aspects in his biography that

3    led him to this point that he left out in the interview that

4    were clearly visible through the evidence from others that

5    he did not touch upon and that need to be reflected.

6    Q.  Yeah.  I -- and I understand that, and I guess what I

7    was specifically referring to is what you had told Judge

8    Davis about not rejecting what had drawn him in the first

9    place which was the oppression of the Assad regime which I

10   think that is universally viewed as a concern?

11   A.  Yes.

12   Q.  Okay.  Now, Mr. Abdurahman also explained to you that he

13   has started doing some reading.  Isn't that correct?

14   A.  That's correct.

15   Q.  In fact, he had requested to review literature about

16   other individuals who had gone -- who had joined terrorist

17   organizations and since left those organizations and resumed

18   and reintegrated into western society and wanted to

19   know -- wanted to review those -- those types of books and

20   those types of stories.  Isn't that right?

21   A.  That's correct.

22   Q.  In fact, I think the one in particular, and I may not

23   have the title right, but I think you're familiar with it, I

24   think it's called "Radical" about a -- an Egyptian

25   individual that joined a terrorist organization and then --

1    and since rejected those ideals.  Is that right?

2    A.  That's correct.

3    Q.  And you're aware that Mr. Abdurahman had read that book

4    prior to meeting with you, correct?

5    A.  That's what he told me, yeah.

6    Q.  Okay.  Do you have any reason to doubt that that's the

7    case?

8    A.  No.

9    Q.  He also expressed to you that he has a desire to mentor

10   youth and keep others from following in his path.  Isn't

11   that right?

12   A.  That's correct.

13   Q.  You had a chance to talk both with Mr. Abdurahman and I

14   think three or four members of his family, correct?

15   A.  That's correct.

16   Q.  And you're aware that Mr. Abdurahman's

17   family -- involvement with his family is significant,

18   correct?

19   A.  That's correct.

20   Q.  And, in fact, are you -- are you aware that

21   Mr. Abdurahman's family, not only is their involvement with

22   him significant but their involvement with the community is

23   also significant?

24   A.  That is correct.  Which is, in the qualitative

25   assessment, even more important that he made the decision to

1   try to travel and leave behind his family.

2   Q.  Sure.  Sure.  So I want you to, if you could, just

3   answer the question that I ask.  I think it will move along

4   a little -- a little faster if you just focus on what I'm

5   asking you.  Are you aware that Mr. Abdurahman's family has

6   spoken out against ISIS and against terrorism to the

7   community at large in the city?

8   A.  Yes, that's correct.

9   Q.  And they did so with Mr. Abdurahman's encouragement.

10  Are you aware of that?

11  A.  Yeah, that's correct.

12  Q.  I want to talk a little bit about his family

13  involvement.  Now, are you aware that they make weekly

14  visits to him and have since his arrest?

15  A.  I'm aware of that.

16  Q.  And that continues.  You're -- is it your belief that

17  Mr. Abdurahman currently cares what his family thinks?

18  A.  Very much so.

19  Q.  He believes that he betrayed his parents?

20  A.  Absolutely, yeah.

21  Q.  And his family currently is a positive influence and

22  factor for him?

23  A.  I agree.

24  Q.  And you believe, as a result of your study and your work

25  and your expertise, that the involvement of family is

1    critical and without that, there can't be success.  Is that

2    right?

3    A.  That's correct.

4    Q.  Are you aware that since you have spoken with

5    Mr. Abdurahman, the community put on a basketball tournament

6    event in an effort, an outreach event.  Are you aware of

7    that event?

8    A.  No.

9    Q.  It was recent.  Are you aware that Mr. -- so if you're

10   not aware of the event, you're not aware that

11   Mr. Abdurahman's father spoke out at the event, again,

12   against terrorism and warned families to watch out for their

13   kids?

14   A.  I'm not aware of that.

15   Q.  And that Mr. Abdurahman was aware of this event in its

16   planning and supported the event as well.  You're not aware

17   of that?

18   A.  No.

19   Q.  And this was done without the knowledge of or

20   involvement of counsel or the government or the U.S.

21   Attorney's Office.  Are you aware of that?

22   A.  No.

23   Q.  Is it significant to you that Mr. Abdurahman continues

24   to take steps along those lines without being prompted to by

25   the government or by probation or by the U.S. attorney or

```
1    his own lawyers?

2    A.  Of course, which is the reason why I saw --

3    Q.  Okay.

4    A.  -- a cognitive opening.

5    Q.  Okay.  Mr. Abdurahman reported to you that his history

6    has included volunteering with his father, correct?

7    A.  That's correct.

8    Q.  Volunteering to work with refugees and for Habitat for

9    Humanity?

10   A.  That's correct.

11   Q.  So you're not aware of Mr. Abdurahman ever possessing a

12   weapon, are you?

13   A.  No.

14   Q.  Or firing a gun?

15   A.  No.

16   Q.  You're not aware of any threats that he's made against

17   law enforcement?

18   A.  No.

19   Q.  You're not aware of any threats against the United

20   States domestically, correct?  In other words, you're not

21   aware that he was planning any domestic acts of terrorism?

22   A.  No.

23   Q.  You're not aware of any attempts that he has made to

24   recruit others to the cause, are you?

25   A.  No.
```

1    Q.  He has not -- he did not serve as the emir or a lead

2    -- as the emir to your knowledge?

3    A.  No.

4    Q.  He has no criminal history to your knowledge?

5    A.  No.

6    Q.  He did not send any money abroad to support ISIS?

7    A.  Not that I'm aware of.

8    Q.  He did not send any equipment to ISIS that you're aware

9    of?

10   A.  No.

11   Q.  He did not purchase combat gear, tactical vest, boots or

12   weapons to your knowledge?

13   A.  No.

14   Q.  And he did not pledge allegiance to ISIS to your

15   knowledge, correct?

16   A.  No.

17   Q.  Okay.  What -- are there some -- actually, let me back

18   up a little bit.  So you came up with a counseling plan for

19   each of the defendants, correct?

20   A.  That's correct.

21   Q.  And for -- and for Mr. Abdurahman, what if -- setting

22   aside the fact that -- that any constraints of the prison

23   system in the United States, what would you recommend for

24   Mr. Abdurahman to -- for -- what type of counseling would

25   you recommend for him?

1    A.   Generally speaking, the counseling in this area in CVE

2    de-radicalization roughly covers four fields: religious or

3    theological, psychological, educational or social.  The

4    quality and the intensity of each field, the mentoring in

5    each field, is determined by the coordinator or the project

6    -- the team leader who is in charge, the case manager, for

7    example, and who chooses the mentors and intensity in each

8    field.  That is based on an assessment, hypothesis of the

9    person's radicalization process and the motivations, the

10   driving factors.

11        As for your client, Mr. Abdurahman, for example,

12   it was very important to, at the Shia/Sunni conflict, the

13   interreligious struggle was very important, as well as the

14   struggle within his family that was brought upon him by

15   bullying in school, for example, because of the Sufi beliefs

16   of his father but also helping delivering humanitarian aid

17   or helping defenseless women and children that, combined

18   together, informs the suggestions and obviously talking

19   about the difference between Shia and Sunni.  The Shia/Sunni

20   split within Islam is one important aspect but also

21   educational and social work component that are based on the

22   assessment but have to be fine tuned and steered and guided

23   by those individuals that I --

24   Q.   Sure.  I understand that.  This is a, I would say, in

25   your mind, I'll use my words, more of a preliminary

1    assessment that you've done; that you would expect some

2    project leader to sort of fine tune?

3    A.  Well, I delivered the hypothesis of the radicalization

4    process and suggestions for counseling and mentoring and I

5    delivered my opinion but yeah, they are suggestions.

6    Q.  Okay.  But based on your preliminary suggestions, based

7    on your analysis so far, do you have a particular area that

8    you would have Mr. Abdurahman focus on more heavily than

9    others?

10   A.  Yes, social and theological.

11   Q.  Social and theological.  And what -- would that involve

12   a combination of counseling and reading or group dynamics

13   or, in your mind, how does that look?

14   A.  Basically what you described.  Individual mentoring,

15   participation in practical exercise, reading assignments,

16   active discussions, debates about the reading assignments.

17   Depending on the field, obviously the social field does more

18   involve and participation in social work and learning,

19   conducting these exercises, being assessed by a mentor,

20   doing it together with a mentor, while in the theological or

21   religious aspect or the field, obviously more critical

22   debates, learning, reading and debating these aspects are a

23   little bit more important, but this is, in the end,

24   determined by the mentors and the case manager.

25   Q.  Okay.  And you have assessed Mr. Abdurahman as a medium

1    to high risk, correct?

2    A.  That is correct.

3    Q.  Based on sort of the reasonings that you've been

4    explaining to us this afternoon?

5    A.  That is correct.  Because the critical reflection

6    starting comparatively late, but it was visible.

7    Q.  And you -- there are -- but you do say there are some

8    clearly present and visible cognitive openings, correct?

9    A.  That is correct.

10   Q.  Okay.  Now, are there some -- are there

11   certain -- is -- is a clearly present and visible cognitive

12   opening one of the indicators that -- that you will -- that

13   you may have success with the de-radicalization process you

14   propose?

15   A.  That is correct.

16   Q.  Is another remorse?

17   A.  That is correct.

18   Q.  And is another strong family and community ties?

19   A.  That is correct.

20   Q.  And you found all three of those present for

21   Mr. Abdurahman, correct?

22   A.  With differing degrees.

23   Q.  Sure.

24   A.  That is correct.

25   Q.  If you -- if you or your organization were to work with

1    Mr. Abdurahman, prison system of the United States aside,

2    utilizing your methodology, do you believe you would be

3    successful in de-radicalization with Mr. Abdurahman?

4    A.  Well, that is -- that is -- I cannot foretell the

5    future, but I believe in the case of Mr. Abdurahman, there

6    are enough openings for a good counseling plan, a solid

7    counseling plan, and for mentors to work with, so I believe

8    that there would be an end goal -- there would be a chance

9    of success with enough time and resources.

10          MS. FEARON:  Okay.  Thank you.  Nothing further,

11    Your Honor.

12                      **EXAMINATION:**

13    BY MR. DOCHERTY:

14    Q.  Hello again.

15    A.  Hello.

16    Q.  I have a small number of questions, and they center

17    around the interview you had with defendant Abdurahman.

18    A.  Okay.

19    Q.  Ms. Fearon asked you a number of questions, and when

20    they turned to that interview, you many times gave an answer

21    along the lines of "that's what he said."  Are you aware of

22    what I'm referring to?

23    A.  Yes.

24    Q.  During that interview, you essentially allowed

25    Mr. Abdurahman to tell you what was important to -- he was

1    in control of the narrative flow, correct?

2    A.  That is correct.

3    Q.  And in your assessment of Mr. Abdurahman, you described

4    four statements that he made that I want to hone in on now.

5    First of all, you'll remember that he claimed to have

6    developed the plan to go to Syria and join ISIL all on his

7    own, correct?

8    A.  That is correct.

9    Q.  And it was only when his attorney intervened and told

10   him to correct himself that he altered that false statement,

11   correct?

12   A.  That is correct.

13   Q.  He also told you that he claimed that he had stopped

14   watching ISIL videos and that he had distanced himself from

15   the conspiracy.  Do you remember him saying those things?

16   A.  That is correct.

17   Q.  And in your assessment, you write that both claims have

18   been disproved, don't you?

19   A.  That is correct.

20   Q.  And that is because those claims, in fact, also were

21   not -- were false, correct?

22   A.  That is correct.

23   Q.  He was, as you say, in control of the narrative flow and

24   yet he did not mention to you at all the second travel

25   effort that resulted in April in the arrests of a number of

1    individuals, including himself, correct?

2    A.  That is correct.

3    Q.  And he also said that it was the CHS, the government

4    source, who introduced him to ISIL, correct?

5    A.  That is correct.

6    Q.  He claimed that his main motivation in going to Syria

7    was to deliver humanitarian assistance, did he not?

8    A.  He did.

9    Q.  As part of your assessment, you reviewed the

10   transcripts, the tape recordings that were made when the CHS

11   was wearing the wire, correct?

12   A.  That is correct.

13   Q.  And in those tape recordings, or the transcripts of them

14   that you read, when Mr. Abdurahman did not think anyone was

15   listening, was there any talk of humanitarian assistance or

16   widows or orphans or anything of the sort?

17   A.  No, there was a lot of talk about fighting and guns.

18   Q.  There was a lot of talk about fighting and death?

19   A.  Right.

20   Q.  And does the number of these statements that were made

21   to you during that interview, does that have any spillover

22   effect or does that color how you assess the veracity of the

23   rest of the claims that Mr. Abdurahman made to you?

24   A.  Of course, deliberately leaving out information or

25   misstating facts is, for me, a very important indicator

1    about the rest of the narrative, the rest of the story, so I

2    compare it with other information I find afterwards,

3    including transcripts, and then I come to the conclusion

4    that there is a lot of this substantial lack of critical

5    reflection and honesty.

6    Q.  Speaking of the transcripts, is it important to you in

7    your assessment -- or that was not a good question.  Let me

8    rephrase it.  What role, if any, would it play in your

9    assessment a defendant's own idea of how well or ill-suited

10   they were to a de-radicalization program?

11   A.  That depends on if the person has any correct

12   understanding what that actually means, but I would say

13   that, in general, if a person rejects the validity or the

14   use of a de-radicalization program, the effects of a

15   de-radicalization program, that would, of course, negatively

16   impact my assessment.

17   Q.  And so one of the transcripts that I know you were

18   provided with was one that the recording began on the 15th

19   of March of 2014 and it went on past midnight into the 16th

20   of March, and at that point, speaking about defendant

21   Abdullahi Yusuf, do you remember defendant Abdurahman saying

22   that, "Bones," which is a nickname for Mr. Yusuf, "is going

23   to be in a de-radicalization program"?

24   A.  Yes, I remember that.

25   Q.  And do you remember that what came later was

```
1    Mr. Abdurahman saying, "Even if they give him time, it's not
2    going to be long," time referring to prison?  And then going
3    on to say, "With me, all of us, we're hopeless.  We're not
4    going to be in a program.  We will straight up serve time."
5    Do you remember that?
6    A.  I remember that.
7    Q.  All right.  What role does that pessimism play in your
8    assessment of Mr. Abdurahman?
9    A.  Well, at that point, it shows that he actually had some
10   form of information and thoughts about the potential
11   de-radicalization program and that he excluded himself from
12   being a candidate from that which decreases a potential
13   opening, but we did not -- he did not discuss this issue
14   with me in the interview, and so from my standpoint, it
15   meant that he did not -- he did not expect that anyone would
16   try to make the attempt.  And I thought that his statement
17   was going into the direction, meaning that he thinks others,
18   the government, will assess him as highly radical and
19   irreformable so that no one would actually try that.  And
20   that was my interpretation, and it did -- the fact that he
21   thought about de-radicalization, excluded him from that, is
22   a slight negative impact in the whole assessment, but the
23   fact that he showed remorse and was willing to take all
24   responsibility mitigated that again.
25           MR. DOCHERTY:  All right.  Thank you.
```

1    THE COURT:  Counsel, any redirect?

2    MS. FEARON:  No, Your Honor.

3    THE COURT:  Well, before we get started, let's

4    take a stretch break.

5        (Brief recess taken.)

6                    **EXAMINATION**

7    BY MS. MURRAY:

8    Q.  Good afternoon, Mr. Koehler.

9    A.  Good afternoon.

10   Q.  My name is JaneAnne Murray, and I represent Hamza Ahmed.

11   We met before but not in person.  Is that correct?

12   A.  That's correct.

13   Q.  We met by Skype on August 29th, correct?

14   A.  That's correct.

15   Q.  Just one overall question before we dig in, Mr. Koehler.

16   When you're making the risk assessments for each of the

17   defendants in this case, are you making them as a slice in

18   time at the moment when you're conducting the interview with

19   the defendant or is it -- are you stepping back a little bit

20   and taking a broader picture of, say, the last two years of

21   the individual's life?

22   A.  That is what I try.  I try to understand the background

23   of the process, how that person ended up in that stage, in

24   that situation.

25   Q.  Yes, but my question is more specific.  When you're

1    making a risk assessment, is the risk assessment based on a

2    particular point in time or is it based on a period of time?

3    A.  The assessment which is but one-third of the study that

4    I delivered is only looking at that point.

5    Q.  So the assessment of Mr. Ahmed is your assessment as of

6    August 29th?

7    A.  That's correct.

8    Q.  2016.  Thank you.  Now, earlier on cross-examination by

9    Ms. Atwal or questioning by Ms. Atwal, you talked about the

10   differences between disengagement and de-radicalization.

11   Would it be fair to say disengagement is essentially a

12   physical leaving of an extremist environment but not

13   necessarily leaving of radicalized views?  Would that be a

14   fair definition?

15   A.  That is correct, yeah.

16   Q.  And de-radicalization, on the other hand, is about

17   essentially letting go of radical beliefs and ideologies?

18   A.  That, plus leaving the group physically.

19   Q.  Plus leaving.  So de-radicalization requires

20   disengagement; disengagement doesn't necessarily mean

21   de-radicalization.  Would that be fair to say?

22   A.  That is correct.

23   Q.  And it's also fair to say that disengagement is a step

24   towards de-radicalization.  Would that be fair?

25   A.  Well, people have been known to disengage completely

1    physically from a group but holding the radical ideas and

2    viewpoints, even supporting these radical groups for the

3    rest of their life, so there is absolutely no way to tell if

4    disengagement automatically leads to a de-radicalization.

5    Q.  Disengagement I agree does not automatically lead to

6    de-radicalization but it certainly can lead to that -- to

7    it.  Would that be fair to say?

8    A.  That is correct.

9    Q.  Now, you do not apply the VERA-2 and the ERG-22 scoring

10   mechanisms in your work.  However, you do rely on some of

11   the factors in the VERA test.  Is that correct?

12   A.  That is correct.

13   Q.  And you talked earlier about the protective factors that

14   are listed in that test, correct?

15   A.  That is correct.

16   Q.  And those protective factors relating to

17   de-radicalization and disengagement include -- withdrawn.

18   In the VERA test, there are a series of de-radicalization

19   factors.  Is that right?

20   A.  That is correct.

21   Q.  And they include rejection of rigid ideology, rejection

22   of violence, evidence of replacement of nonviolent goals,

23   motivation to de-radicalize, i.e., openness to counseling

24   and community support for de-radicalization.  Would those --

25   A.  That's correct.

1    Q.  -- be factors about indicating de-radicalization?  And

2    then the factors indicating disengagement in the VERA

3    scoring mechanism include the belief that violence is a

4    failing strategy, disillusionment with spiritual leadership,

5    a shift in ideology, disillusionment with organization

6    experiences and movement away or growing away from the

7    movement?  Fair to say?

8    A.  Well, these factors also point a lot more to

9    de-radicalization.  The VERA-2 does not so much

10   differentiate between disengagement de-radicalization but

11   generally a positive change into a non-violent direction.

12   So disengagement would mean physically leaving the group,

13   disassociating with group members, changing your behavior,

14   abstaining from illegal behavior and anything in that

15   direction.

16   Q.  And it would include things like going back to school,

17   correct?

18   A.  Or, yeah -- correct.

19   Q.  Stopping the use of social media to propagate any kind

20   of potentially radical views, correct?

21   A.  Yes, that is correct.

22   Q.  Pleading guilty if one has been charged, right?

23   A.  That would go into it as well.

24   Q.  Now, cooperation, you noted earlier, could be a factor

25   showing de-radicalization, but it's -- but the absence of

1    cooperation, Mr. Koehler, isn't necessarily indicative of a

2    higher level of radicalization.  Would you agree with that?

3    A.  Not necessarily, but it's definitely a protective factor

4    because it shows their willingness to take all

5    responsibility for your own actions and that, in turn, shows

6    critical self-reflection which is essential for

7    disengagement/de-radicalization process.

8    Q.  But one could be radicalized without cooperating.  Would

9    that be fair to say?

10   A.  That would be possible, but as a person who is

11   de-radicalizing wants to show that, that change to his or

12   her environment, it would be tough not to do that or would

13   be tough to show that without cooperating, without giving

14   information about your own past.  You want to explain to the

15   world, you want to show that you have changed.  If you are

16   just changing in your head and not tell anyone, it is still

17   possible, but it's very hard to work with that.

18   Q.  I should have clarified my terms.  When I talk about

19   cooperating, I mean becoming an actual cooperating witness

20   with the government and testifying in open court against

21   other defendants.

22   A.  Okay.

23   Q.  I -- so defining "cooperation" in that narrow way,

24   Mr. Koehler, would you agree that becoming a cooperating

25   witness isn't necessary for de-radicalization?

1      A.  It is not necessary.

2      Q.  Because, of course, there could be plenty of reasons one

3      would choose not to be a cooperating witness, based on

4      safety issues, loyalty issues, personal issues, correct?

5      A.  That could be the case, but then again, if you're

6      willing to change, if you want to show to the world that you

7      have changed and you're de-radicalizing or you want to leave

8      -- see, if you develop that feeling that this, what you have

9      done, was not right and that group, that ideology, actually

10     creates that sense of guilt or that sense of having been

11     lured into something that you didn't want to or now you see

12     clear, that automatically creates the willingness to

13     disassociate and to tell the others, no, listen, this was

14     wrong and I now realize that this was wrong and I want to

15     tell you about it, I want to tell you about why I think this

16     was wrong, and a very strong aspect of it is if you're

17     willing to provide information, to take responsibility not

18     just for yourself but also for the group where you were a

19     part of and if you're helping and providing information that

20     helps the government to define the responsibility of the

21     group and the group mechanisms.

22     Q.  So, for example, pleading guilty but making a full

23     allocution of your guilt, a full statement of your guilt,

24     where you describe your role, describe other people's roles,

25     that, in itself, which wouldn't be being a cooperating

1    witness, would nonetheless be a step towards the process of

2    de-radicalization.  Is that fair to say?

3    A.  Yes, that would be a step towards that direction.

4    Q.  And willingness to submit to an interview by yourself

5    where one discusses one's past beliefs and motivations for

6    one's behavior, that's another step or factor that would

7    indicate an openness to de-radicalization and a willingness

8    to disengage.  Would that be fair to say?

9    A.  In itself that would be one aspect, but provided that

10   the content of that interview is honest, sincere,

11   comprehensive, it includes important elements, does not

12   leave out or misstate facts, and, that, of course, goes into

13   the qualitative assessment, so if someone is willing to talk

14   to me but gives me a story that does not at all match

15   reality, it's just very easy to find out that aspect of

16   radicalization process that is visible to the world was not

17   included in the interview, I have to conclude that the

18   person was trying to mislead me or was not really honest

19   about -- or not even starting to reflect upon his or her own

20   involvement.

21   Q.  Well, we'll get to the actual interview with Mr. Ahmed

22   in a moment, Mr. Koehler, but first of all, I just want to

23   go back to the reasons why you don't apply the VERA-2

24   directly or the ERG-22.  You stated that they're basically

25   too mechanical and produce a score that doesn't really take

1    account of the full individual.  Is that fair to say?

2    A.  That's correct.

3    Q.  And so you prefer these unstructured interviews which

4    give you a sense of the full human being in front of you,

5    correct?

6    A.  That is correct.

7    Q.  Now, of course, the structured professional judgment

8    protocols like VERA-2 were developed specifically because of

9    concerns about the clinical method, correct?

10   A.  Well, as far as I'm aware about the history of these

11   tools, they were constructed for working with previously

12   convicted individuals and to assess the statistical chance

13   of that person committing an act of violence or crime after

14   release after a certain period of time.

15   Q.  And so rather than being a pure clinical judgment, it

16   would be structured based under factors because of the

17   concern that a purely clinical judgment would be too

18   subjective.  Is that right?

19   A.  Well, that is right, but it is also the reason why these

20   tools are so heatedly debated.

21   Q.  And the concern about a purely subjective assessment is

22   that sometimes implicit biases could come into play,

23   correct?

24   A.  Well, that is correct.  Again, to assess a

25   radicalization process and radicalization stage actually

1     excludes that mathematical structured protocol, because I

2     want to assess the narratives, the explanatory

3     self-narratives of the individuals to get information about

4     how they see themselves and if they actually tell me about

5     events, developments, ideas that they have, how they've

6     changed on their own, willingly, on their own, or if I have

7     to ask them you said this, you said that, this is what you

8     did, now, what is true and what is false, I would actually

9     change their narratives and I would lead them into the

10    direction that I want to.  I'm not a law enforcement officer

11    or investigator, so my goal in this interview was to find

12    out how these defendants see themselves and how they

13    phrase/frame what kind of words they use in their own

14    narratives, how they structure, what kind of information

15    they tell me.

16    Q.  Mr. Koehler, I'll just cut to the chase.  So your goal

17    in these meetings is to determine if the person has credibly

18    rejected or distanced themselves from the radical ideology

19    they may have been connected to.  Is that fair to say?

20    A.  That is correct.

21    Q.  And has the individual, as you said earlier, credibly

22    expressed remorse or guilt.  Is that correct?

23    A.  That is correct and --

24    Q.  And the --

25    A.  Sorry.

1    Q.  Sorry.  And the arbiter of what is credible here is you.

2    Is that right?

3    A.  That is the level of information that they're willing to

4    provide, if they are including essential aspects of their

5    radicalization process, if they are lying to me, if they are

6    leaving out information, misstating facts.  If they provide

7    me with the story that I can clearly verify as scripted, as

8    not really true, that, of course, leads me to conclude that

9    it is not credible, the remorse.  As we've just heard when I

10   was discussing with Mr. Docherty that if I find information

11   that point me to the fact that they've been lying to me or

12   misstating facts, I have to conclude that their remorse was

13   also a tactical move.

14   Q.  Now, you don't conduct any psychological tests to

15   determine if the person is manipulating or deceiving you.

16   Is that right?

17   A.  That is right.

18   Q.  So in the end, just to back up, you are the arbiter of

19   whether the person is speaking credibly or not.  Is that

20   right?

21   A.  As an expert, I make the assessment and bring together

22   the information, cross-section the information, and make the

23   decision based on my experience with other cases and my

24   research if the information indicates to me a truthful,

25   credible opening or not.

1    Q.  And so the -- so you're not applying a polygraph test,

2    but basically your version of a polygraph is this open,

3    structured method of questioning whereby if the defendant

4    does not give you a full disclosure of what you're expecting

5    to hear, you will determine that that person is not being

6    credible.  Is that right?

7    A.  No, it is not right.  It's really simple.  It's one

8    aspect of it to give the defendant a chance to give a full

9    version of his or her story and to point out aspects that

10   are important for his or her involvement that explain the

11   involvement, and then I cross-section that, I compare that

12   story with evidence from documents, from their own social

13   media accounts, from interviews by family members, so I

14   bring together more evidence and information, compare that

15   to that narrative.

16          And if that does not -- you've just given one

17   example of a person not being a hundred percent

18   comprehensive but gives important, honest information that

19   fits in or matches other information I can get, this, of

20   course, the positive aspect, so they, for time constraints

21   or for retrospective bias, they remember things differently,

22   they're in this situation, maybe they think, oh, this aspect

23   is now more important than another aspect, I take that into

24   account, but if they lie, if they misstate facts, if they

25   completely present a different story from what is visible to

1    me from other accounts, other sorts of information, that

2    goes in negatively, obviously.

3    Q.  So you will take into account omissions and you will

4    also take into account aspects of their statements that are

5    directly contradicted by other evidence or other statements?

6    A.  That is correct.

7    Q.  Is that a fair statement?  Now, with respect to the

8    interview of Mr. Ahmed, at no point did you announce in that

9    meeting or beforehand, Mr. Koehler, is this correct, that I

10   expect a full account and if you miss anything, I will take

11   that into account in making my assessment, at any point did

12   you say that to Mr. Ahmed?

13   A.  No, I asked him in the beginning if he knew who I was

14   and if he knew what my role in this was, and obviously the

15   main point is to give him a chance to tell me his story.

16   This is what I told him, this is your chance to tell me a

17   story, why you are involved, why -- how was it that you

18   became involved in the conspiracy.  And to tell him how I

19   make the analysis at that point, to say if you say this or

20   that, if you do not say this or that, I will grade it in

21   this and that way and this would be counterproductive.  I

22   want to hear what he states on his own, willingly, or if he

23   provides a completely scripted story or not, if he lies or

24   not, if he leaves out a fact or not.

25   Q.  And you testified this morning too that in that meeting

1    you are using other interview techniques to get at the truth

2    here by, say, looking at somebody's body language, looking

3    them in the eye, seeing their physical demeanor in the

4    course of the interview.  Would that be fair to say?

5    A.  That would be fair to say.

6    Q.  So there were some technical difficulties when we --

7    A.  That is correct.

8    Q.  -- were having our meeting, Mr. Koehler, right?

9    A.  That is correct.

10   Q.  And so first of all, it only lasted 90 minutes, correct?

11   A.  That is correct.

12   Q.  And, in fact, it had to end at that end -- at that

13   90-minute point because you had a meeting to go to, correct?

14   A.  That's correct.

15   Q.  And we were doing it by Skype, so we had the distance of

16   virtual communication rather than the comfort of an in

17   person meeting, correct?

18   A.  That is correct.

19   Q.  And you would agree, would you, sir, that it is

20   much -- one gets a much better sense from someone and

21   perhaps a greater comfort level in talking to somebody when

22   it is in person rather than over a Skype system?

23   A.  I would agree.

24   Q.  And not only did we do it by Skype but we weren't even

25   able to do it by Skype for the whole meeting.  We only did

1    it by -- for Skype -- by Skype for about 45 minutes.  Is

2    that right?

3    A.  Yes.

4    Q.  And in the end, because we had so many technical

5    difficulties and kept losing you and had to keep calling you

6    back on the Skype mechanism that -- the Skype telephone that

7    we ended up just doing it by audio only, correct?

8    A.  That is correct.  But in the end, I asked your client

9    and you if there's anything else you wanted to state or if

10   there's any additional evidence you want to send me

11   afterwards, any statements, any records, anything, which you

12   did, you did send me stuff afterwards, so I gave you a

13   chance to tell me if there's anything that you were not able

14   to tell me, if there's anything left out, so I gave you at

15   this moment a chance to tell me more or later on to send me

16   any additional information.

17   Q.  Mr. Koehler, you and I may have a different recollection

18   of what that conversation meant, but if I told you that my

19   understanding was that anything I provided I should do so

20   with the permission of the probation officer and do so in a

21   way that was fully transparent, I -- would that change your

22   view as to whether I fully understood that I could literally

23   send you anything after that meeting?

24   A.  This is exactly what I told you, you can send me

25   directly by e-mail any information you want.  I gave you my

1    e-mail address.  I made sure that you understood that.  And

2    you did send me additional information afterwards.

3    Q.  Correct.  I sent you what I had promised you at the

4    meeting in front of the probation officer.  I sent you the

5    mitigation report prepared by Amy Butler, my mitigation

6    specialist, correct?

7    A.  Correct.

8    Q.  Yes.  It was a nine-page single-spaced report where she

9    had analyzed my client's background and interviewed 12 or 14

10   people in connection with demonstrating to you his large

11   family and huge support network, correct?

12   A.  Correct.  But unfortunately that report did not touch

13   upon his radicalization process.

14   Q.  And I also provided with you the bail report that we had

15   submitted to His Honor which was a publically filed

16   document, correct?

17   A.  You did, but that document also did not really touch

18   upon his radicalization process and connect to suggest the

19   tools and methods to the radicalization motivation.

20   Q.  You explained at the beginning of the interview that

21   what your role was, and it would be fair to say Mr. Ahmed

22   understood that you would be making a risk assessment of him

23   which would be provided to the Court and would be used in

24   the context of deciding his sentence in a case where he is

25   facing a maximum of 20 years, correct?

1    A.  It was part of it.  I told him that my role is to

2    understand his radicalization process and his involvement in

3    the conspiracy.  In essence, I told all the defendant that I

4    want to understand why they ended up sitting there where

5    they are sitting now.

6    Q.  And you explained you would be making a risk assessment

7    and providing it to the Court which would be used at his

8    sentencing, correct?

9    A.  I did not say "risk assessment."  I said I write a

10   report that would go into the sentencing.

11   Q.  And Mr. Ahmed is how old?

12   A.  Well, I -- I think he's 21 or 22.

13   Q.  He's 21 years old.  Do you think it's possible that a

14   21-year-old in that context at a Skype interview which later

15   turns into an audio interview during which the phone

16   connection is dropped on multiple occasions, that somebody

17   may fail to say something that he should have said to you?

18   A.  That is possible.  But taking into account the overall

19   information he provided to me and the level of contradiction

20   and disagreement with other information I was able to

21   acquire afterwards, I would say that aspect is comparatively

22   peripheral.

23   Q.  And two days later on the 31st you met with Mr. Ahmed's

24   family, correct?

25   A.  I talked to them, yeah.

1    Q.  Sorry, you met with them via Skype, correct?

2    A.  Correct.

3    Q.  But we had the same technical problems, and we ended up

4    on audio on that one too, correct?

5    A.  That is correct, yep.

6    Q.  And you did receive the bail report that I had filed, so

7    you received the declaration from Sheik Abdisalam Adam who

8    had been visiting and counseling my client while he was in

9    prison.  You were aware of that, correct?

10   A.  Yes, I did.  And I reviewed that document.

11   Q.  Incidentally, Mr. Koehler, is there a larger version of

12   the report and I received a shorter version of it?

13   A.  There's a confidential part of the report.

14   Q.  Is that confidential part of the report the slide,

15   similar to the slide that you showed earlier during the

16   cross-examination by Mr. Warsame's lawyer?

17   A.  No.  These parts that are in there in the slides would

18   be the statement that he provided to me -- oh, yeah, I have

19   to restate.  Parts of my analysis are in the confidential

20   part.

21   Q.  There's a narrative analysis.  Is that correct?

22   A.  Yes, that is correct.

23   Q.  Now, when you met with Mr. -- so -- hang on one second.

24   Now, you talked earlier about the role residuals, correct?

25   A.  That is correct.

1    Q.  Mr. Koehler?  So basically a role residual is residual

2    evidence of one of the roles that an individual might have

3    played in his life, correct?

4    A.  That is correct, and we're talking right now about the

5    major role as a member of the conspiracy group,

6    Salafi/Jihadi role.

7    Q.  Correct.  And but we also have roles in our families, as

8    devoted children or --

9    A.  That's correct.

10   Q.  -- spouses.  We have our roles in the collective, the

11   conspiracy at issue today, but also our role as a member of

12   the community and our role as a student and a member of the

13   student body, correct?

14   A.  That is correct.

15   Q.  So let's go through your report, and clearly,

16   Mr. Koehler, it's your position that there are aspects of

17   the report that you believe Mr. Ahmed failed to reveal to

18   you, so perhaps we could identify those to be sure that

19   there isn't a misunderstanding here, correct?

20   A.  Do you want me to put up the slides and take you

21   through?

22   Q.  Sure.

23   A.  See it?

24   Q.  Yes.

25   A.  So here's my short version of the version that Mr. Ahmed

1    presented to me in the interview.  First of all, he

2    explained to me that he got interested around late 2013

3    through mainstream social media into the Syrian conflict and

4    he came across, again, through mainstream social media,

5    across different opposition groups, journalists,

6    humanitarian aid groups, including ISIL, and he consumed

7    that material.  He explained to me later on that his

8    interest was something extraordinary for him but somehow the

9    topic, the pictures he saw of suffering children, stuck with

10   him and this made him more interested and so he actively

11   sought out more information and he looked for it, and he

12   explained that to be the onset of his involvement in the

13   conspiracy and in the radicalization process.

14          He thought at that point that ISIL or ISIS was

15   delivering humanitarian aid mainly and was a legitimate

16   group.  It seemed more legitimate.  It seemed, as he said,

17   to be more in concordance with his Islamic values.  They had

18   established a caliphate.  Their videos, their propaganda

19   videos seemed to be more legitimate to him, as he explained.

20          He explained also that the CHS was the one

21   introducing him to the others, to the other coconspirators,

22   where in the group he experienced quickly that he would

23   share the same Islamic values which, again, participated or

24   supported his involvement in the group and in the plans to

25   make a travel attempt.

 1          He stated that this specific propaganda, quote,

 2    hijacked his beliefs; that they were altering his

 3    understanding of Islamic values, and so he, more or less,

 4    without any questioning, took in that interpretation of

 5    Islam through ISIL.

 6          A very specific aspect of his version was the

 7    suffering of children, as he was accustomed to take care of

 8    his siblings and very much involved in the family so he

 9    thought that these -- these videos and pictures of suffering

10    children were extremely painful to him and something that he

11    could not really bear.

12          He also stated that he never, ever wanted to

13    commit suicide for the organization, although he did -- he

14    did say, he did state that he would be willing to fight for

15    the organization, so he did acknowledge that.

16          My risk is medium to high risk.  Why is that?  So

17    my analysis is for based on the fact that he left out a

18    number of issues that were very important in his

19    radicalization process.  We talked a little bit about Hanad

20    Mohallim, a close friend.  He got -- when I asked about how

21    close he was a friend of Hanad Mohallim, he got very, let's

22    say, uncertain.  He said, well, we were good friends but not

23    really intimate friends, and there's a difference between a

24    good friend and a real close friend, and he did not really

25    want to talk about Hanad Mohallim.

He did not talk about his brother Shahir who left
the United States between 2011, 2012. We will talk about
this in a minute, that he, in his own social media activity,
in his Tweets, he thought at least that his brother Shahir
went to become a fighter and joined a terrorist
organization, so that impacted him a lot. He stated that
himself to the public that he felt alone, that the event of
his brother leaving made him really develop a little bit of
troubles in school and seeking out, he felt more as a lone
wolf and he wanted really to belong, having a brother figure
and being a part of a group, so he did not at all talk about
that. He did not talk about the trouble in school. He did
not talk about the fact that his parents urged him to go to
a religious school to protect him from these offenses, these
troubles that he more and more got into.

So late August 2013 he started actively, already
actively, voicing strong, extremely strong Salafi/Jihadi
ideological elements. He talked a lot about sins,
redemption, in my analysis, based also on his own statements
and social media accounts, that could either be the fights
in school or sexual desires. He was mixing in Tweets about
desires for girls and young women. And this is something
that in Salafi/Jihadi radicalization is used typically to
develop a feeling of sin and guilty lifestyle that needs to
be redeemed through the true understanding of Islam.

1          He did Tweet a lot about the concept of the ummah

2     and the strong brothers.  He did support explicit support

3     for ISIL.  He did explicitly state on-line that he always

4     wanted to become a martyr and die for the cause.

5          We did not talk about the aspect that his parents

6     split when he was seven.  In my analysis, that created that

7     need to belong to a strong, safe, stable social environment,

8     especially with strong male companion, brother like figure,

9     and that need for collective identity.

10          And we take a look at some of these Tweets here.

11     For example, already, in August 2013, he said, "May allah

12     give me Tawakal to do jihad inshallah," which just means

13     basically may Allah give me strength and courage to perform

14     to do jihad.

15          He said, for example, also in September 2013, "Im

16     sooo jealous of my older brother, when he first left I was

17     jahiliya," meaning I was in ignorance, I didn't know what he

18     was doing, and then, "it finally hit me Subhanallah

19     #Mujahid."  He went to fight.  At least he thought it at

20     that time, and it is something that provided comfort to him.

21          Another statement, "May Allah give me the chance

22     to Help and fight for the Muslims in Syria through you!  I

23     feel as though we've become desensitized to Genocide."

24          Or here, "I've always wanted to be a martyr, I'll

25     Appreciate my time more and not be so eager."

1          Another statement, "Having that 'Only if my

2     parents understand!' Feeling.  Yea I have it 24/7.  Every

3     time I bring up syria, Muslims in prison, etc."  And

4     connected to that, he was talking with his dad about the

5     caliphate, bringing back the khalifa and dad didn't believe

6     it, said, "You're brainwashed."  That means he actually

7     talked, actively talked about this ideology, about ISIL,

8     about the caliphate with his parents, and both sides,

9     especially the parents, said no, we never talked about it

10    and he never brought it up, we never saw anything.

11          And here on the lower right corner, "anyway, team

12    ISIS.  May Allah grant them and ISIS victory!  Ameen.

13    Ameen."

14          So these statements, very early, before he said he

15    got, by coincidence and through social media, interested in

16    the conflict in Syria, show that he actually already

17    expressed in late 2013 a very, very sincere and extreme

18    interpretation of Islam and Salafi/Jihadi ideology.

19          And this is just a selection of many, many Tweets.

20    He actually was extremely active on Tweeting.  I think about

21    30,000 or even 80,000 Tweets he Tweeted at that time.  So

22    they provide a very thorough development of a Salafi

23    ideology.

24          In this, the al wala wal bara is in there, the

25    ummah is in there, the pro ISIS against Al-Qaeda is in

1    there.  The excitement even I would say it is close to

2    excitement for your favorite sports team depending on ISIL

3    versus Al-Qaeda and he was cheering for ISIS.  He was so

4    excited about the caliphate; he was hoping the caliphate was

5    real.  And he talked a lot about dying for the cause and

6    dreaming to be a martyr.  And this is something that was

7    completely, completely left out.  Also the element of sin

8    and redemption was very strong in his statements which was

9    completely left out.

10          So the version that your client provided to me end

11   of 2013 through coincidence through mainstream social media

12   coming across Syria, looking up different sources, then

13   being introduced with by the CHS is also contradictory to

14   the facts while he, on Twitter, actively on his own

15   conversed with ISIL fighters and Tweeted back and forth, so

16   he had direct contacts with that before that point when he

17   was involved.

18          So the suffering of children is in there.  He did

19   actually voice a lot of discomfort with that.  But that was

20   part of the context of a complete, almost closed

21   Salafi/Jihadi ideology.

22   Q.  Mr. Koehler, when you talk about the number of his

23   Tweets, isn't it fair to say that many of them involved

24   discussing being at home baby-sitting and dealing with

25   diapers, that he would Tweet like he would text to friends?

1    A.  Of course.  Because, you know, when an extremist -- or

2    extremist at any point, they have a normal life.  They have

3    families and jobs and they don't go about saying or hating,

4    fighting all the time.  They have normal jobs.  They have

5    normal lives.  It is part of who they are and who they be.

6    They just integrate that ideology and their understanding of

7    why they are doing it and for what they are doing it into

8    their normal life.

9    Q.  Now, Mr. Koehler, you say that the middle Tweet, "Having

10   "Having that 'Only if my parents understand!' Feeling.  Yea

11   I have it 24/7.  Every time I bring up syria, Muslims in

12   prison, etc.," so the -- withdrawn.  Withdrawn.

13       Mr. Koehler, isn't it -- isn't it fair to say that

14   a huge portion of the Tweets involved him expressing concern

15   for the children who were being bombed and left orphaned by

16   Assad's regime?

17   A.  I wouldn't say a large portion because I did a

18   quantitative analysis.  A number of Tweets did express

19   concern about that, obviously, because he did talk a lot

20   about fighting Assad and fighting for justice and defending

21   brothers and sisters, so this element is definitely present,

22   and it was present in his Tweets, yes.

23   Q.  And what was also present in his Tweets was just plain

24   conversations with his friends, planning to meet, making

25   appointments to go out and have basketball, go out and go to

1    dinner, for example?  I mean, his Tweets involved

2    essentially stream of consciousness texting throughout the

3    day.  Fair to say?

4    A.  Of course.

5    Q.  And so some are religious because he is getting more

6    religious and more interested in -- in Islam, but many are

7    just the ordinary yearnings of a young man.  He was 17, 18,

8    19 during these Tweets, correct?

9    A.  That is correct.  By the end of 2013, these Tweets

10   almost completely shifted, gradually, but in the end, it

11   almost completely shifted to the topics of Jihad,

12   Salafi/Jihadi ideology, fighting ISIL, so it more and more

13   determined the amount of his Tweets.  And I would say, of

14   course, some of them got more religious, and the majority of

15   them got more radical and extreme, and obviously they were

16   also, even at the end, normal Tweets saying, for example, do

17   we meet at the mosque or do we do this, do we go to that

18   event.  Obviously that does not contradict anything.

19   Q.  And he told you from the end of 2013 until he got on a

20   plane on November 14th, he was watching ISIL videos and

21   reading ISIL material on the internet which -- which he

22   found very moving and -- and very persuasive to him,

23   correct?

24   A.  That is correct.

25   Q.  And as you said this morning, particularly young men of

1    his age are easy marks for that kind of ISIL propaganda,

2    correct?

3    A.  That could be the case.

4    Q.  And there is plenty of research out there about how

5    powerful the ISIS propaganda was to young Muslim men across

6    the country, particularly young Muslim men who may be first

7    generation immigrants, correct?

8    A.  Oh, yeah, there's plenty of evidence, but just to point

9    out --

10   Q.  Mr. Koehler, it was a yes or no question.  And there's

11   also a lot of research out there about the fact that there

12   weren't counter narratives to that -- that -- to the ISIL

13   propaganda; that, in other words, individuals who found the

14   ISIL propaganda were going to find themselves in a closed

15   world and counter-radicalization measures had not

16   infiltrated that closed world.  Is that fair to say?

17   A.  Well, there were ample statements at that time already

18   of other Muslim groups, of mainstream Muslim scholars

19   debating the legitimacy of ISIL's claims, and I would not

20   say that at that point it was impossible to come across any

21   conflicting narrative.

22   Q.  But there has been a lot of research saying that, in

23   fact, the counter-radicalization measures could have been

24   much stronger and much more effective in the face of the

25   powerful message of ISIL, correct?

1    A.  That is correct.

2    Q.  And, in particular, Mr. Ahmed said to you in his

3    interview during the broken telephone calls that we had with

4    you on August 29th, he talked about how the -- the

5    powerful -- how he was particularly affected by images of

6    children being killed, correct?

7    A.  That is correct.

8    Q.  And ISIL actually cleverly knows that images of children

9    being killed is a particularly motivating portrait to send

10   out to Muslims -- young Muslim men across the world,

11   correct?

12   A.  Correct.  Not only ISIL but other Jihadi groups too.

13   Q.  And it had specific resonance for Mr. Ahmed who, as he

14   said to you, and as his family corroborated, essentially

15   raised his younger siblings, correct?

16   A.  That is correct.

17   Q.  Mom was out working, dad was -- dad and mom were

18   divorced, and there were three young children under the age

19   of 12 at home who Mr. Ahmed would baby-sit, do their

20   homework with them, feed them, collect them from the school

21   bus and put them to bed, correct?

22   A.  That is correct.

23   Q.  And as he said to you, it was a particular resonance for

24   him were these images of children being killed because it

25   reminded him of his siblings, correct?

1    A.  Correct.

2    Q.  Now, he said to you he never wanted to be a suicide

3    bomber, correct?

4    A.  That is correct.

5    Q.  And there is no Tweet in which he says he wants to be a

6    suicide bomber, is there, Mr. Koehler?

7    A.  "I've always wanted to be a martyr," so he said he

8    wanted to die for the cause.

9    Q.  Right.

10   A.  And in that context, saying you want to be a martyr

11   means that you want to be either a suicide bomber or being

12   killed as a fighter for the organization.

13   Q.  Mr. Ahmed was planning to go out to ISIL -- go out to

14   Syria, was willing to join ISIL, was willing to be a fighter

15   if that's what it came to, and he knew that he could die in

16   the process, correct?

17   A.  We touched upon that issue in the interview, and he said

18   that he never actually wanted to lay down his life.  He did

19   not want to go.  So so far he said he acknowledged that

20   eventually he might have to defend himself.  He recognized

21   that.  He said he would be willing to take up arms, but his

22   main idea was to provide humanitarian aid, to help the

23   children, so he was very, very soft on that issue, and he

24   said he was not willing at any point to lay down his life

25   for the organization.

1    Q.  He indicated to you that he had no desire to lay down

2    his life.  He's 19 years old on the day that he flies out,

3    that he plans to fly out, he has no desire to lay his life

4    down, but he understands that he could be killed, correct?

5    A.  Well, he understands that he has to defend himself.  The

6    question is the intent.  If he is actually willing, as a

7    main motivation, to go there and stay there and die there,

8    and one of his own statements is that he has dreamed about

9    being a martyr, meaning he wants to die for the cause.

10   Q.  But one can die for the cause in many different ways and

11   it doesn't mean one is going to become a suicide bomber,

12   correct?

13   A.  If you talk go ISIS and "I hope the caliphate is real

14   and I want to fight the Assad regime and I want to kill the

15   enemies of islah of Allah, and then saying in the context of

16   that I want to be a martyr is exactly meaning that.

17   Q.  He gave you an extensive recitation of how he feels

18   today, correct?

19   A.  I wouldn't be able to tell extensive, but he gave me a

20   good collection of how he thinks today, yeah.

21   Q.  Stepping back for a moment, nowhere in your report do

22   you refer to the fact that Mr. Ahmed was removed from the

23   plane in November 14th, 2014, and at that point disengaged

24   himself from involvement with any of his co-defendants.

25   Your report doesn't mention that, right?

```
1    A.  No.

2    Q.  But isn't it a fact, Mr. Koehler, that after he got off

3    the plane, he enrolled back in classes at MCTC and started

4    back at those classes in January 2015 and, for the next two

5    months, went to school.  Isn't that a fact, Mr. Koehler?

6    A.  That's a fact, and in exactly my analysis, if you do

7    that without changing your narrative, without changing your

8    view to the world, like these Tweets, you could erase them,

9    you could erase the Twitter account, you could create a new

10   account, you could say no, I've been caught, I really think

11   this was a bad idea, I want to change because this is not

12   how I am anymore, who I am anymore and this did not happen

13   so he changed his behavior at that point.  In the whole

14   assessment, even in the interview with me, he did not touch

15   upon this issue at all.  He did not say, listen, I really

16   Tweeted a lot of stupid stuff and today I'm thinking

17   differently.  No, not at all.  He gave a complete different

18   story.

19   Q.  Mr. Koehler, do you really think that if you asked him

20   in that meeting, didn't you Tweet some -- what do you think

21   of your Tweets?  You Tweeted a lot, Mr. Ahmed.  What do you

22   think of our Tweets?  What do you want to say about your

23   Tweets now, you don't think that you would have been able to

24   get a good, open-ended answer to that question if you asked

25   it?
```

1    A.  I asked him about his social media activities, I could

2    look at his Twitter account if there's anything interesting,

3    and he said, well, it was taken down after he was

4    incarcerated.  So yeah, we talked a little bit, touched

5    about it, but this is exactly the point that I have not the

6    role.  It's a different kind of assessment.

7            And let me clarify you on that.  I do not want to

8    press him into any direction through questions that I want

9    to hear, it specifically affects.  I do not want to say,

10   listen, what do you think about these Tweets, are they not

11   contradictory to what you just told me?  I want to see if

12   the person is giving me on his own or her own willingly

13   information that explains to me the radicalization process

14   and involvement, and the story that he outlined to me very

15   much contradicts from the beginning until the end large

16   portions of what he communicated to the whole world before

17   that.

18   Q.  Mr. Koehler, his Twitter account, there's no secret

19   about his Twitter account.  If you Google Mr. Ahmed's name,

20   it's the first thing that comes up about him.  So what makes

21   you think that Mr. Ahmed was somehow trying to conceal his

22   Tweets from you in that interview?

23   A.  I didn't say he wanted to conceal.  He just didn't talk

24   about it.  And if that's the case, he would have had to know

25   that I would come across these Tweets, so it would have made

1    sense to just talk about them and include them in the

2    narrative.  And all of these elements, the ideological

3    elements, the historical development that he talked with his

4    parents about, I asked him if he talked about these elements

5    like Syria issues, caliphate with anyone in his environment,

6    he said no.  I talked with the parents about it, did at any

7    point you recognize any change, did he talk about Syria, did

8    he talk about a caliphate at any point, they said no.  So

9    these elements are misstated facts.

10   Q.  Mr. Koehler, you received -- the other thing you

11   received from me with the permission of the probation

12   officer was Mr. Ahmed's handwritten statement of

13   responsibility.  Did you review that?

14   A.  Yes.

15   Q.  And in that, he says he -- he expresses -- he states to

16   you, "I was on my way to joining a terrorist organization.

17   I was willing to become a fighter for that organization.  I

18   knew it was an organization that committed atrocities, but I

19   chose to listen only to ISIS's one-sided narrative; that

20   they were the ones that were trying to stand up against

21   injustice, oppression, calling on all the Muslims to unite

22   and to be role models of the world."  Do you think that that

23   is not a straight statement about his perception of ISIS at

24   the time back in November 2014?

25   A.  I do, which is why it is medium to high risk and not

1    completely high risk.

2    Q.  "After seeing the scale of oppression being committed

3    daily by the president in Syria, I felt tired, helpless and

4    hopeless so I convinced myself that ISIS's narrative was

5    true and also the answer to those problems.  It's only after

6    I was taken off the plane to Turkey that I really came to

7    terms with what I was doing.  The advice and love of my

8    family helped me to see the error of my ways.  To be honest,

9    being stopped by the FBI was the best thing that happened to

10   me.  I am sure it saved my life or at least saved me from

11   being part of something horrifying if I made it to Syria.

12   And it helped me see with fresh eyes how lucky I am to have

13   such wonderful parents, uncles, aunts and cousins as well as

14   to live in the United States of America."  Do you not think

15   that that is a heartfelt statement from Mr. Ahmed today or

16   do you think that this is not something credible?

17   A.  I do, and I took it into account, which is why he is a

18   medium high risk assessment.

19   Q.  He goes on, "The more I read articles about ISIS, news

20   coverage of horrible attacks on innocent people and their

21   lack of mercy toward the world, the more I feel so ashamed

22   that I chose to be blinded by their false messages.  During

23   the almost two years since my trip -- during the almost two

24   years since my trip, I want you to know I've done a lot of

25   reading, including books about peaceful leaders."  You

1    didn't mention his reading in your report, did you?

2    A.  I talked about his obviously his starting reconsidering,

3    reflection, but, again, the overall assessment was impacted

4    a lot by this narrative that he gave me, the story that he

5    gave me, which was very, very much contradictory to the

6    overall evidence, and this provided a strong basis for at

7    least being doubtful about these statements.  For example,

8    the fact that he said -- actually he said he never wanted to

9    lay down his life, left out completely his whole process,

10   his brother impacting him, seeking new comrades and new

11   brothers and ending up in this environment and developing

12   this very explicit, complete, detailed Salafi/Jihadi

13   ideology.  So that --

14   Q.  There is no evidence that -- of what his brother did, is

15   there, Mr. Koehler?

16   A.  No, I'm just saying that he thought at that point that

17   his brother went to fight.  This is what he thought.  How he

18   interpreted, how he translated the event to make sense for

19   him, to understand, to come to grasp with it, he was

20   suffering from his older brother leaving, not being there.

21   And he articulated it.  He said I feel like a lone wolf, I

22   feel alone, where's my brother, I miss you, my brother.  And

23   then he says now I understand why you left, because you

24   wanted to be a mujahideen, and that provided relief for him

25   because it provided understanding and it helped him to see

1    it all in context, it made sense for him that you would

2    leave your family behind to become a fighter.

3          At this early stage already where he left out in

4    his statements that he already was very much convinced that

5    it would be a good idea to leave a family behind for being a

6    mujahideen at that point would be a very, very strong and

7    important information, so he completely left that out, some

8    facts he completely misstated, and that is the overall

9    assessment.  And I took into account these statements that

10   he gave about reconsidering, his handwritten reports, and

11   this is the reason why there's the word "medium" in my

12   assessment.

13   Q.  He goes on, "I realize there are better ways I can help

14   myself, my family, my community and people around the world

15   without having to take extreme actions and put my life and

16   other lives in jeopardy, to show that if you want to bring

17   about change in the world, you can do it by knowledge and

18   working together, not force and division.  I'm filled with

19   remorse and sadness of the path I took.  I truly want to

20   make amends to my government, my family and my community.  I

21   never want to take this path again, and I want to help

22   others not to take this path, and I want to hold and hug my

23   parents and my little siblings again so much."

24         Again, Mr. Koehler, do you think that that simply

25   lowers the risk from high to medium to high?

1    A.  Yes.

2    Q.  It doesn't indicate a cognitive opening so big that

3    there is immense hope and faith that this Court can have in

4    Mr. Ahmed's ability to live a law-abiding life?

5    A.  I don't think we should debate how large the cognitive

6    opening is.  It indicates a cognitive opening, and for the

7    sake of the client, I included it and included the medium

8    level because if we compare it to the level of statements

9    that pointed to the other direction, the sincerity, the

10   commitment, the cheering that he did for ISIS to the whole

11   world, the interactions he had, the very explicit supportive

12   interactions and statements for ISIL, for Jihad, for dying

13   as a martyr, for al wala wal bara, for performing Jihad,

14   they ere extensive so over a long period of time.

15        He did not touch upon this in any way in the

16   interview which means that there is, at that point, there

17   was no reflection upon that.  There were contradictory

18   findings.  And this means, for me, that I have to consider

19   the potential, the possibility that these statements you

20   just recited are more or less tactical.  And I did include

21   that they signify a cognitive opening, to start a

22   willingness, to start a willingness, not at all an opening

23   that would supersede and delete all the other evidence and

24   all the other statements that would come down to a low or

25   low to medium risk.  If we look at all of these statements

1    that he did not discuss, that he did not reflect upon, that

2    he did not want to talk about, I have, I have to, as an

3    expert doing this risk assessment, I have to conclude that

4    these statements are not so sincere.

5    Q.  You could have just asked him about his Tweets.  Did you

6    not look at any newspaper articles about him before you sat

7    down with Mr. Ahmed?  Did you not read anything about him

8    before you sat down with him, Mr. Koehler?

9    A.  I read some basic information about it, but I did not

10   look at the Tweets.  I wanted to know from him if it would

11   be okay to look at his Twitter account so I asked him at the

12   end about his Twitter account.  You said to me that his

13   Twitter account was taken down, was deleted, and we did not

14   discuss it any further.  So I gave him a chance to discuss.

15   I asked him about, during the why, I asked him about any

16   ideological elements, and he explained to me that it was the

17   suffering of the children and it was by coincidence, via

18   social media, that he got involved in that.  And he did not

19   talk about these elements that, a couple of months earlier,

20   were so important to him that he Tweeted to the whole world

21   that he was so relieved that his brother, he thinks, was a

22   mujahideen, it was so important to tell the whole world for

23   him that he wanted to die as a martyr.  And these elements,

24   if they are so important to you that you tell the whole

25   world, you could expect if you sincerely have reflected upon

1    them, you could expect and you could actually want this

2    person to on his own talk about this.

3    Q.  Mr. Koehler, the Twitter account was taken down,

4    correct?

5    A.  Yes.

6    Q.  And you never asked me to provide you with the Tweets.

7    You could have asked me, couldn't you?

8    A.  I could have.

9    Q.  And you didn't?

10   A.  No.

11   Q.  Yes.

12   A.  No, I got the Tweets from --

13   Q.  From the government.

14   A.  And open source information, because the Tweets, the

15   Tweets were just archived.

16   Q.  Now, Mr. Koehler, are you aware that shortly after his

17   arrest in this case, Mr. Ahmed expressed a willingness to

18   undergo counseling with a high school counselor one-on-one

19   at the Sherburne jail?  Are you aware of that?

20   A.  No.

21   Q.  And are you aware that the only reason it didn't proceed

22   is because the jail refused to let there be one-on-one in

23   person counseling, the jail required it to be video

24   counseling.  Are you aware of that?

25   A.  No.

1    Q.  But you're -- but he -- are you aware -- and you are

2    aware that he did meet with Sheik Abdisalam Adam who had put

3    in an affidavit in support of Mr. Ahmed's bail application?

4    A.  Yeah.

5    Q.  Correct?

6    A.  Yes.

7    Q.  So, again, we could call that a cognitive opening,

8    couldn't we?

9    A.  Yes.  And I took that into account.

10   Q.  And you're aware that after November 14th, he did not

11   participate in the second attempt to leave the United

12   States.  You're aware of that, correct?

13   A.  Yes.

14   Q.  You're aware of that, correct?

15   A.  Yes.

16   Q.  And is that a factor you took into account, because we

17   have one attempt to leave the country, not a recidivist

18   attempt.  Did you take that into account in your report?

19   A.  Of course I took that into account, and as I've said

20   multiple times, the event to travel is but one aspect of a

21   radicalization process, a radicalization stage.

22   Q.  But you admit a second attempt to try to leave would

23   show a significant commitment?

24   A.  Yes.

25   Q.  Whereas Mr. Ahmed did not engage in a second attempt to

1    leave?

2    A.   That is correct.

3    Q.   In fact, he was surveilled by FBI agents at his MCTC in

4    January and February going to class and sitting in lecture

5    theaters?

6    A.   Yeah.

7    Q.   And, in fact, on one occasion was surveilled in the

8    presence of Hanad Musse and neither of the two acknowledged

9    each other.  Are you aware of that?

10   A.   I am.

11   Q.   So he had totally disengaged himself from the group.  He

12   had disengaged himself from social media, he had stopped

13   Tweeting, and he was now focussed on looking after his

14   siblings and his studies, correct?

15   A.   That is not correct.  That's not correct that he totally

16   disengaged from the group.  It is actually the fact that he

17   stated in the interview that he would like to continue

18   having contact with coconspirators.  It is also not true

19   that he stopped his social media activity.  He could have

20   easily erased that, deleted it on his own and started to

21   Tweet out contradictory or other new statements saying I've

22   changed my mind, I was stopped, anything like that, anything

23   that would be indicative of a mental change process.

24   Q.   Mr. Koehler, I totally agree with you, but he's 19 years

25   old and sometimes 19 years old don't necessarily make the

1    best decisions, right?

2    A.  Obviously.

3    Q.  Yes.  Now, you assigned a risk score to defendants in

4    Germany.  Is that correct?  You've done this --

5    A.  That is correct.

6    Q.  -- assessment of defendants in Germany.  Did you ever

7    assess several defendants in one case?

8    A.  Like in one group conspiracy?

9    Q.  Yes.

10   A.  No.

11   Q.  I'm just on my last set of questions.  Sorry.  The goal

12   in conducting a risk assessment is to determine the

13   likelihood of recidivism.  Is that right?

14   A.  That is correct.

15   Q.  And you say you can't foretell the future, right?

16   A.  Obviously.

17   Q.  But that's really what this process is about, trying to

18   foretell the future, isn't it?

19   A.  I can give an expert assessment on the likelihood and an

20   assessment what I think would likely happen if certain

21   things happen or do not happen, like counseling or no

22   counseling, and that is one-third of my assessment.  The

23   first half or the first third is the radicalization process,

24   analysis of the narrative of the interviews and the

25   evidence, and the third aspect is I suggest potential roots

1  for counseling, with ideas, suggestions for coordinators,

2  project managers, probation officers who would eventually,

3  if the sentencing allows, to work with your client and

4  enlarge that, as I said, existing and visible cognitive

5  openings.

6  Q.  Now, are you counseling individuals right now as part of

7  your role with GIRDS?

8  A.  Yes, I am.

9  Q.  And when you worked with Hayat in Exit-Deutschland, you

10  also counseled individuals who had either expressed neo-Nazi

11  views or Jihadi views, correct?

12  A.  I worked as a family counselor for relatives of Jihadis

13  between January 2012 and October 2014 as part of the

14  nationwide counseling -- family counseling network run by

15  the Federal Office of Migration and Refugee Affairs, and I

16  worked as a case manager and a scientific advisor before

17  that for the Exit program.

18  Q.  And the -- and an important factor in evaluating these

19  de-radicalization programs is their recidivism rate.  Is

20  that fair to say?

21  A.  Well, the recidivism rate is hard to determine.  It is

22  actually in a dynamic process on evaluating the impact of

23  the counseling tools and methods, so you use regularly risk

24  assessments to find out if the risk score is going down or

25  if it is increasing, but that is only a indicator for your

1    own work.  So you need to find out if, as you said, the

2    person's gone back to school, listening to music again,

3    meeting with non-Muslim friends, if the person is responding

4    to that kind of counseling tools.  And that, these risk

5    assessments, I find them way too static and way too

6    exclusive, and I do not believe you can run a human being

7    through a mathematical score and do that to determine the

8    way of the counseling.

9    Q.  If you give a risk assessment that's too low for one of

10   these individuals and somehow it turns out to be wrong, it

11   would be fair to say that you could be held responsible for

12   that, Mr. Koehler, right?

13   A.  I don't know about that.  I provide an expert

14   perspective and opinion based on selective information that

15   I've collected and I provide that to the Court.  The Court

16   is responsible for taking all of the reports and assessments

17   into account, make the decision.  So I'm -- I do not know if

18   I will be legally responsible for a wrong assessment under

19   U.S. laws and --

20          THE COURT:  She knows that I'm the one that's

21   making -- doing the sentencing and I'm the one that's

22   responsible and so you would not be responsible.

23   BY MS. MURRAY:

24   Q.  Mr. Koehler --

25          THE COURT:  That's a stupid question.

1    BY MS. MURRAY:

2    Q.  Last question.  Mr. Koehler, if you get -- if you get a

3    high risk assessment wrong, there's no way of proving that,

4    right?  There's no way of testing that?

5    A.  Could you elaborate on that?

6    Q.  If you say that somebody is high risk and, in fact,

7    they're not and there was no reason to say they're high

8    risk, we're never going to know if that's accurate, there's

9    no way of testing it?

10   A.  Well, the assessment, the high risk assessment is based

11   on evidence like contradictions, lies, misstatements,

12   leaving out of facts, giving a wrong story or do not show

13   any significant cognitive openings, so the negative to high

14   risk is based on these assessments, on these elements, these

15   evidence that I could find that prove to the contrary that

16   he did not yet distance himself credibly enough.

17             MS. MURRAY:  No further questions.  Thank you.

18             MS. ALLYN:  Your Honor, the government has no

19   questions of this witness for this defendant.  Thank you.

20             THE COURT:  All right.  We'll recess until 9:30

21   tomorrow morning and we'll take up the last two defendants.

22        (Proceedings concluded at 4:15 p.m.)

23                        *    *    *

24

25

**I N D E X**

DANIEL KOEHLER                                                    PAGE

By the Court                                     13
Examination by Ms. Atwal                         70
Examination by Mr. Docherty                     103
Examination by Mr. Sicoli                       111
Examination by Ms. Fearon                       157
Examination by Mr. Docherty                     186
Examination by Ms. Murray                       190

1        **C E R T I F I C A T E**

2            I, Staci A. Heichert, certify that the foregoing is

3    a correct transcript from the record of proceedings in the

4    above-entitled matter.

5

6            Certified by:   *s/ Staci A. Heichert*

7                            Staci A. Heichert,
                             RDR, CRR, CRC
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25