```
 1                  UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
 2
     ------------------------------------------------------------
 3                               )
     United States of America,   )  File No. 15-CR-46
 4                               )            (MJD)
             Plaintiff,          )
 5                               )
     vs.                         )  Minneapolis, Minnesota
 6                               )  September 21, 2016
     Abdullahi Mohamud Yusuf,    )  9:48 a.m.
 7                               )
             Defendant.          )  VOLUME II
 8                               )
     ------------------------------------------------------------
 9                               )
                                 )
10   United States of America,   )  File No. 15-CR-49
                                 )            (MJD/FLN)
11           Plaintiff,          )
                                 )
12   vs.                         )
                                 )
13   (1) Hamza Naj Ahmed,        )
     (3) Adnan Abdihamid Farah,  )
14   (5) Zacharia Yusuf Abdurahman, )
     (6) Hanad Mustafe Musse,    )
15
16           Defendants.
     ------------------------------------------------------------
17   ------------------------------------------------------------
                                 )
18   United States of America,   )  File No. 16-CR-37
                                 )            (MJD)
19           Plaintiff,          )
                                 )
20   vs.                         )
                                 )
21   Abdirizak Mohamed Warsame,  )
                                 )
22           Defendant.          )
                                 )
23   ------------------------------------------------------------
24                 BEFORE THE HONORABLE
                     MICHAEL J. DAVIS
25        UNITED STATES DISTRICT COURT JUDGE
                  (EVIDENTIARY HEARING)
```

```
 1      APPEARANCES
         For the Plaintiff:        UNITED STATES ATTORNEY'S OFFICE
 2                                 John F. Docherty, AUSA
                                   Andrew R. Winter, AUSA
 3                                 Julie E. Allyn, AUSA
                                   600 U.S. Courthouse
 4                                 300 South Fourth Street
                                   Minneapolis, MN 55415
 5
         For the Defendant        BRANDL LAW, LLC
 6       Abdullahi Yusuf:          Jean M. Brandl, ESQ.
                                   310 Fourth Avenue South
 7                                 Suite 5010
                                   Minneapolis, MN 55415
 8
         For the Defendant Hamza  MURRAY LAW, LLC
 9       Ahmed:                    JaneAnne Murray, ESQ.
                                   220 South Sixth Street
10                                 Suite 1225
                                   Minneapolis, MN 55402
11
         For the Defendant Adnan  KENNETH UDOIBOK, P.A.
12       Farah:                    Kenneth U. Udoibok, ESQ.
                                   The Flour Exchange, Suite 5010
13                                 310 Fourth Avenue South
                                   Minneapolis, MN 55415
14
         For the Defendant        FELHABER LARSON
15       Zacharia Abdurahman:      Jon M. Hopeman, ESQ.
                                   Marnie E. Fearon, ESQ.
16                                 220 South Sixth Street
                                   Suite 2200
17                                 Minneapolis, MN 55402
18       For the Defendant Hanad  GASKINS BENNETT BIRRELL
         Musse:                    SCHUPP, LLP
19                                 Paul C. Dworak, ESQ.
                                   Ian S. Birrell, ESQ.
20                                 333 South Seventh Street
                                   Suite 3000
21                                 Minneapolis, MN 55402
22       For the Defendant        SICOLI LAW, LTD.
         Abdirizak Mohamed         Robert D. Sicoli
23       Warsame:                  333 South Seventh Street
                                   Suite 2350
24                                 Minneapolis, MN 55402
25
```

1      Court Reporter:              STACI A. HEICHERT,
                                    RDR, CRR, CRC
2                                   1005 U.S. Courthouse
                                    300 South Fourth Street
3                                   Minneapolis, Minnesota 55415

4          Proceedings recorded by mechanical stenography;
       transcript produced by computer.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                       IN OPEN COURT

 3              THE COURT:  Let's continue.  Who is up next?  Good

 4    morning.

 5              MR. DWORAK:  Good morning, Your Honor.

 6                        EXAMINATION

 7    BY MR. DWORAK:

 8    Q.  Good morning, Mr. Koehler.

 9    A.  Good morning.

10    Q.  Welcome back.

11    A.  Thank you.

12    Q.  I want to start by following up just briefly on a couple

13    of the things that you testified to yesterday.

14    A.  Okay.

15    Q.  Yesterday you testified that these terror organizations

16    are very sophisticated in their recruiting?

17    A.  That is correct.

18    Q.  And that they put out propaganda and propaganda that's

19    targeted at young people.  Is that correct?

20    A.  Among other things, yeah.

21    Q.  Men and women I think you said?

22    A.  That is correct.

23    Q.  And they target people like these six defendants here?

24    A.  That's correct.

25    Q.  Now, they do so by appealing to theology?
```

1    A.  Partially but also to other cultural elements like

2    action, adventure, justice, freedom and any aspects of that.

3    Q.  And I've read one of your interviews where you said, in

4    your experience, the majority of the people are not drawn by

5    theology.  Is that correct?

6    A.  That is correct.

7    Q.  ISIS, for example, uses the suffering of women and

8    children in Syria?

9    A.  Among other topics, that's correct, yeah.

10   Q.  Now, you're also a counselor, right?

11   A.  That's correct.

12   Q.  And you help these people?

13   A.  That's correct.

14   Q.  And you help to bring these misguided youth out of the

15   direction of these terror organizations, right?

16   A.  That is correct.

17   Q.  And de-radicalize them?

18   A.  You could say that, yeah.

19   Q.  And that's, you know, at least in part why you're here,

20   right?

21   A.  That's correct.

22   Q.  Now, people can be de-radicalized?

23   A.  Not every single one, but I believe if you work with

24   individuals, if you look at their individual motivations, if

25   you see them as human beings in their own development, I

1    think, I definitely think that people can be de-radicalized,

2    can be reformed and reintegrated.

3    Q.  I mean, you're a highly educated man, right?

4    A.  I wouldn't be able to tell.

5    Q.  I looked at your résumé.  I think you're a highly

6    educated man.  It doesn't strike me like you would be doing

7    something like this or devoting your life's work to it if

8    you didn't think people could change?

9    A.  That's correct.

10   Q.  Now, people can be de-radicalized at all phases, right?

11   A.  Yes, I've seen that work, yes.

12   Q.  So people on the low end?

13   A.  That's correct.

14   Q.  In the middle?

15   A.  That's correct.

16   Q.  And also on the high end?

17   A.  That's correct.

18   Q.  And I read in one of your interviews that it's possible

19   to de-radicalize somebody that hasn't even thought in any

20   way about changing?

21   A.  Well, it is possible to work with a person to develop

22   that doubt and that opening, the cognitive opening we talked

23   about yesterday.  It's difficult, it takes a lot of time,

24   but it is possible.

25   Q.  Takes more time and more resources, but it could be

1    done?

2    A.  That's correct.

3    Q.  Now, if I understand your testimony from yesterday

4    correctly, all things equal, the earlier you start these

5    programs, the more likely they're to succeed?

6    A.  That's correct.

7    Q.  You've been doing this for five or six years.  Is that

8    correct?

9    A.  That is correct.

10   Q.  And I think you gave us a number.  It was a long day.

11   It was probably a longer day for you than it was for me.

12   But was it, like, 200 evaluations?

13   A.  Not evaluations.  I worked with about 200 family

14   counseling cases in the last six years.

15   Q.  And those are neo-Nazis and Jihadists?

16   A.  95 percent Jihadists.

17   Q.  Okay.  Have you ever evaluated somebody that succeeded

18   in joining a terror organization?

19   A.  With evaluation, you mean those persons who had a

20   advanced stage of radicalization?  Is that --

21   Q.  Not quite.  Somebody that actually went out and joined

22   ISIL.

23   A.  Yeah, that's correct.

24   Q.  Have you ever evaluated somebody that fought for a

25   terror organization?

1    A.   That's correct.

2    Q.   Did a violent act for a terror organization?

3    A.   That's correct.

4    Q.   Did you institute any programming for any of these

5    people?

6    A.   That's correct.

7    Q.   Did your program work?

8    A.   The question of evaluating impact of such a program is

9    very, very different and difficult because you have to take

10   the timing into account and to see if the program is

11   actually executed the way it was supposed to be.  There are

12   other influences you cannot foretell at the moment, but I

13   would say at least in those cases I have assisted in

14   developing a program, the radicalization process at least

15   stopped so we were able to mitigate any future development,

16   at that given point.  As you have said, the higher and the

17   later you start, the higher the radicalization stages, the

18   more difficult, the more resources you need, the longer it

19   would take.  But I would say they were at least effective in

20   the sense they were able to stop the radicalization process.

21   Q.   Okay.  And you believe in second chances?

22   A.   I do.

23   Q.   Second chances are the core principle in a democratic,

24   pluralistic society?

25   A.   That's correct.

1    Q.  Mr. Musse is 20 years old.  You understand that?

2    A.  I understand that.

3    Q.  He was 19 when he was arrested?

4    A.  Yeah, that's correct.

5    Q.  He never fought for ISIL?

6    A.  That's correct.

7    Q.  And he never committed a violent act for the terror

8    organization?

9    A.  That's correct.

10   Q.  He's had no history of violent acts?

11   A.  That's correct.

12   Q.  In fact, he's got no criminal history whatsoever?

13   A.  Except the fact that he did something to be arrested

14   right now.

15   Q.  No prior criminal history?

16   A.  Correct.

17   Q.  Okay.  Not even a misdemeanor?

18   A.  Correct.

19   Q.  He doesn't own any weapons?

20   A.  As far as I know.

21   Q.  Never spent any time in Syria?

22   A.  As far as I know.

23   Q.  He never spent any time in Iraq?

24   A.  As far as I know, no.

25   Q.  And he wasn't one of the emirs in this group?

1    A.  No.

2    Q.  Now, you've interviewed him?

3    A.  That's correct.

4    Q.  Was it -- it was for an hour?  Hour and a half?

5    Something like that?

6    A.  About an hour and half, yeah.

7    Q.  And that was in April of this past year?

8    A.  That is correct.

9    Q.  And that was about three weeks before three of his

10   co-defendants went to trial?

11   A.  Yeah, about, correct.

12   Q.  And during that interview he didn't tell you the truth?

13   A.  He did not.

14   Q.  And he talked about himself as though he acted alone?

15   A.  Correct.

16   Q.  And not part of a group?

17   A.  That's correct.

18   Q.  He wrote you a letter afterwards?

19   A.  That's correct.

20   Q.  And in that letter, he apologized for the interview?

21   A.  That's correct.

22   Q.  He told you that he didn't want to say anything that

23   would hurt his friends who were awaiting trial?

24   A.  That is correct.

25   Q.  He asked to meet with you again?

```
 1    A.  That's correct.

 2    Q.  He told you he wanted to tell you more about his

 3    situation?

 4    A.  That is correct.

 5    Q.  Give you some insight into him?

 6    A.  Correct.

 7    Q.  He also said that he was looking to turn a new page?

 8    A.  Correct.

 9    Q.  And to fix his wrongs?

10    A.  Correct.

11    Q.  And to pay back his family for all the stupid mistakes

12    he made?

13    A.  Correct.

14    Q.  He wrote that letter to you in August, right?

15    A.  Sounds about right.

16    Q.  And that was before you issued your report?

17    A.  Correct.

18    Q.  So before he learned what you had to say about him?

19    A.  Well, I spoke to him and I took that into account and I

20    took that letter into account, but it was before I had

21    issued the report.

22    Q.  You didn't meet with him again?

23    A.  No.

24    Q.  Was that your decision?

25    A.  I gave an opinion to Judge Davis, because Judge Davis
```

1    also received that letter, and we discussed it, and my

2    opinion was that at that point in time it wouldn't be a good

3    idea to meet with him again.

4    Q.  Now, in your qualitative model, talking to -- or I guess

5    rather listening to the subject is the most important part,

6    right?

7    A.  That's correct.

8    Q.  Would you agree that sitting in jail can be a formative

9    experience for a young person?

10   A.  It can be.

11   Q.  There's a lot of time to self-reflect?

12   A.  I wouldn't know about that, but I guess so.

13   Q.  Now, one of the bases, in your report, for your high

14   risk assessment of my client is his family situation, right?

15   A.  That is correct.

16   Q.  And you understand that he's an American citizen, born

17   in the United States?

18   A.  I do.

19   Q.  And he was born here in Minnesota?

20   A.  I do.

21   Q.  And that his parents are divorced and were divorced or

22   separated when he was two?

23   A.  I do.

24   Q.  And that his mom now lives in Kenya?

25   A.  I do.

1    Q.  And his father lives here?

2    A.  I do.

3    Q.  You understand that he lived with his mom most of his

4    life?

5    A.  I do.

6    Q.  He lived with her in the United States, and then when

7    she got remarried and moved to Kenya he went with?

8    A.  I know.

9    Q.  And he ultimately came back to the U.S., in part for the

10   education?

11   A.  That's correct.

12   Q.  And then later when his mom got diagnosed with cancer,

13   he went back to live with her?

14   A.  That's correct.

15   Q.  And he took care of her and the siblings while she

16   underwent treatment?

17   A.  That's correct.

18   Q.  And then he ultimately returned here to continue with

19   his education?

20   A.  That's correct.

21   Q.  You never interviewed his mother?

22   A.  That was not possible, no.

23   Q.  Well, I understand your travel situations didn't align?

24   A.  I don't know what the reason was, but it was not

25   possible to interview her.  We tried to arrange that.

1    Q.  Well, did you -- did you ever offer to interview her

2    over the phone or by Skype?

3    A.  Of course.

4    Q.  Did you --

5    A.  We tried to organize that through the probation office.

6    Q.  Was that ever conveyed to myself or one of the

7    other -- Mr. Musse's other counsel?

8    A.  The fact that I was willing to talk on the phone --

9    Q.  Yes.

10   A.  -- to his mother?  I didn't tell you in person as far as

11   I can recollect, but I have done telephone and Skype

12   interviews with other defendants and families, so that was

13   always an option.

14   Q.  But as far as you know, was that ever conveyed to me?

15   A.  Did you talk with the probation office about arranging

16   these interviews?  The probation office was in charge of

17   organizing the interviews.

18   Q.  Okay.  So you don't know, you can't say whether or not

19   that was conveyed to me?

20   A.  I cannot say anything how you communicated with the

21   probation office about that.

22   Q.  Now, mothers are important in a young person's life,

23   right?

24   A.  That is correct.

25   Q.  And they're also very important in your particular line

1    of work, right?

2    A.  That is correct.

3    Q.  I saw that you wrote an opinion piece titled "Who Can

4    Stop a Jihadi, Try his Mother"?

5    A.  That is correct.

6    Q.  And you also run that program you were talking about

7    yesterday, Mothers for Life?

8    A.  That is correct.

9    Q.  One of the other bases for your assessment of my client

10   in your report is lack of cognitive opening?

11   A.  That is correct, based on the fact that he misstated a

12   number of facts that contributed to his own guilty plea,

13   even upon multiple questions if he was sure that his

14   statement is what he wanted to give me, and he reiterated

15   his statements.

16   Q.  That was -- it was based on, in part or in large part,

17   on that interview, right?

18   A.  That is correct.

19   Q.  And you understand that seven of these defendants were

20   indicted together?

21   A.  That is correct.

22   Q.  And four of those defendants ultimately pled guilty?

23   A.  Correct.

24   Q.  Do you know the order in which the defendants pled

25   guilty?

1   A.  No.

2   Q.  Mr. Musse was the first to plead guilty out of those

3   seven?

4   A.  Okay.

5   Q.  And two others followed shortly thereafter?

6   A.  Okay.

7   Q.  And is it fair to say, then, that you didn't take that

8   into consideration?

9   A.  I took into consideration that he pled guilty but he did

10  not choose to cooperate, for example.

11  Q.  But you didn't take the order of the guilty pleas into

12  consideration?

13  A.  No.

14  Q.  And you read through the guilty plea?

15  A.  Yes.

16  Q.  And you see it contains a lengthy factual basis?

17  A.  Yes.

18  Q.  It says what he did and who he did it with, right?

19  A.  Yes.

20  Q.  Are you aware that that becomes a public document?

21  A.  Of course.

22  Q.  And the whole world can see it?

23  A.  That's right.

24  Q.  Now, you understand that in the United States criminal

25  justice system, a plea agreement is not enough, right?

1    A.  Enough for what?

2    Q.  Well, to enter a guilty plea, you have to actually show

3    up to court and have a plea hearing?

4    A.  Okay.

5    Q.  You understand that?

6    A.  Yeah.

7    Q.  You weren't retained at that time, right?

8    A.  Could you elaborate?

9    Q.  Yeah.  My client pled guilty back in September of 2015.

10   You weren't retained at that time?

11   A.  No.

12   Q.  Right?  So you didn't attend that plea hearing?

13   A.  No.

14   Q.  Did you review a transcript of his plea hearing?

15   A.  Yes.

16   Q.  So you understood that he stood up in the court, just

17   like this?

18   A.  Yes.

19   Q.  And told the judge what he did?

20   A.  Yes.

21   Q.  Who he did it with?

22   A.  Yes.

23   Q.  And why he did it?

24   A.  Yes.

25   Q.  And he answered all of the Court's questions?

1    A.  As far as I know.

2    Q.  And he answered all of the prosecutor's questions?

3    A.  As far as I know.

4    Q.  And he did it in front of the world media?

5    A.  That is correct.

6    Q.  And he did it before any of his co-defendants that were

7    indicted with him?

8    A.  Okay.

9         MR. DWORAK:  I have no further questions.  Thank

10   you, Mr. Koehler.

11        THE WITNESS:  Thank you.

12                        **EXAMINATION**

13   BY MR. WINTER:

14   Q.  Good morning, Mr. Koehler.

15   A.  Good morning.

16   Q.  Just a small point, and I think when Mr. Dworak was

17   asking about the order of guilty pleas, he inadvertently

18   omitted the fact that Abdullahi Yusuf was actually the first

19   person to plead guilty out of this case.  Is that your

20   understanding?

21   A.  Okay, yeah.

22   Q.  Okay.  And I think he was referring to the group that

23   was in the indictment later on, Mr. Musse was the first of

24   that particular group, but I just wanted you and everyone to

25   understand that that's your understanding?

1    A.  Understood.

2    Q.  That Yusuf pled first?

3    A.  Okay.

4    Q.  Okay.  Now, I think from your testimony, it sounds as

5    if, and this is not a surprise, it takes more time and more

6    resources to de-radicalize someone who is assessed at a high

7    level, correct?

8    A.  That is correct.

9    Q.  A high level of risk.  And that is really where you've

10   placed Mr. Musse.  Is that correct?

11   A.  That is correct.

12   Q.  Now, Mr. Dworak asked about the time for reflection

13   while in jail pending sentencing, and I think you noted that

14   sitting in jail can be a good time for reflection.  Can we

15   agree on that?

16   A.  It can be, that's correct.

17   Q.  And is it your understanding that Mr. Musse was arrested

18   in April of 2015?

19   A.  That is correct.

20   Q.  And your interview with him was in was it August of

21   2016?

22   A.  That was also in April.

23   Q.  April of 2016.

24   A.  Yeah.

25   Q.  Okay.  So he had a full year of reflection prior to

1    sitting down with you.  Is that accurate?

2    A.   That is accurate.

3    Q.   And then when he did sit down with you, he lied

4    repeatedly about his role in this offense, didn't he?

5    A.   That is correct.

6    Q.   Okay.  And he did not cooperate in this case?

7    A.   As far as I know, no.

8    Q.   Okay.  And one of the things he said to you was, in the

9    letter, was that he was protecting his, essentially, and I'm

10   paraphrasing a little bit, but he was saying that he was

11   protecting his coconspirators?

12   A.   That's correct.

13   Q.   When he talked to you?

14   A.   That is correct.

15          MR. WINTER:  Okay.  I have nothing further, Your

16   Honor.

17          MR. DWORAK:  No further questions, Your Honor.

18   Thank you.

19          MR. UDOIBOK:  May I proceed, Your Honor?

20          THE COURT:  Yes.  Good morning.

21          MR. UDOIBOK:  Good morning, Your Honor.

22          THE WITNESS:  Good morning.

23                          **EXAMINATION**

24   BY MR. UDOIBOK:

25   Q.   Mr. Koehler, my name is Kenneth Udobiok, and I represent

1    Adnan Farah.  You remember me, right?

2    A.  I do.

3    Q.  The reason I ask you that question is the -- when we

4    first met, that meeting was a -- would you consider it

5    testy?

6    A.  Could you elaborate?

7    Q.  Was it stressful?

8    A.  For me or for your client?

9    Q.  For me.

10   A.  I guess so.

11   Q.  I told you it was stressful?

12   A.  Yeah.

13   Q.  Yes.  Now, after reading your report, would it surprise

14   you that I agree with the majority of your statements?

15   A.  No.

16   Q.  Why do you say that?

17   A.  Because I feel that during the interview that we both

18   saw a lot of aspects and your client was very forthcoming

19   about his radicalization process and his ideas, and I would

20   think that from his position and your position that he would

21   be content with that.

22   Q.  And there are some assumptions that I've made.  Your

23   report is not as detailed as some of the reports that we

24   commonly receive.  I'm not saying those reports are better

25   than yours, but we are used to receiving a lot more data.

1     But nonetheless, is it because this area, de-radicalization

2     area, is new, it's a new endeavor?  Is that why we don't

3     have a lot of data?

4     A.  That is correct.  There's really not a lot of data on

5     this, but I also would like to say that there was a

6     confidential recommendation part of that report.

7     Q.  I realize that.  We lawyers are commonly curious about

8     what that recommendation is.  But let me -- there are a few

9     things I want to sort of explore a bit to clarify things.

10    You see, in this entire process, there's only one person who

11    is a neutral, and you can guess that's the Honorable Judge

12    Davis.  The rest of us are advocates.  The government here

13    have three lawyers, they're pretty good, and they may look

14    smart but they pack a heavy punch, and they are good

15    advocates, and I am one too.  So at that meeting with you,

16    it was -- we didn't know -- I didn't know how to guide my

17    client through the process.  And some of your questions,

18    though, towards the middle part of the conversation we got

19    to have some understanding of what the process was.  But

20    after we left, though, you weren't able to convince me, or

21    my client, as to what -- how your recommendation is going to

22    impact him after his sentence.  Do you remember we talked

23    about the Black Panther movement?

24    A.  I do.

25    Q.  Yes.  So is it -- is it your position that all of the

1  defendants, every single one of them, will benefit from

2  counseling?

3  A.  That depends on the structure of counseling, on the

4  program, on the training of the counselors, the training of

5  the coordinators and ultimately what happens with them in

6  prison.  I cannot foretell the future and say that

7  counseling for everyone will be effective.  I believe that

8  every single of the defendants should be made or should have

9  availability of the counseling program or some sort of

10  program, which I outlined in the reports and confidential

11  recommendation letters, and that, in the end, is to be

12  decided by the Court.

13  Q.  Your conclusion that I -- that you can tell that I

14  agree.  You recommend a reduced prison sentence or halfway

15  house.

16  A.  That is correct, a specific form of halfway house.

17  Q.  Yes.  And the reason for your recommending that is you

18  don't -- let me back up for a bit.  And there's another

19  phrase you use in your report that Mr. Farah -- I'll use

20  Adnan Farah because he's got a older brother in this case.

21  A.  I know.

22  Q.  Yeah.  Adnan Farah is at a turning point?

23  A.  That is correct.

24  Q.  Correct me if I'm wrong, by that -- let me illustrate it

25  as if you -- well, do you skateboard?

1    A.  No.

2    Q.  Now, if you skateboarded up a hill and you get to a

3    point where the force will not take you beyond a point

4    you -- at a point where you're going to regress, is that the

5    same analogy with the radicalization of Adnan Farah?  That

6    he's at a point where, with some intervention, he'll go back

7    to normalcy?

8    A.  Well, to stay with your analogy, he's right now at the

9    top of a hill and he's at the point of either he goes

10   further up or further down.

11   Q.  Correct.

12   A.  So it is a critical turning point, right.

13   Q.  It's a critical turning point, and that critical turning

14   point, what will help you to opine whether he'll go

15   backwards to normalcy would be his public confession, so to

16   speak, right?

17   A.  That could be one potential tool.  I would not recommend

18   this at that point, to be honest.  Later on, down the road,

19   as your client said he would be willing to work with kids to

20   work against this issue of radicalization, but I also state

21   in the report that he still has a high degree of

22   radicalization, there's still a lot of radical ideology

23   active within him, so that has to come down the road

24   potentially, but it shouldn't be the start of any

25   counseling.

1    Q.  But nonetheless, though, this is what he told you that

2    he would -- he would want to go publically to tell everyone

3    that he has disavowed ISIS?

4    A.  That's correct.

5    Q.  And that it was a wrong ideology?

6    A.  Well, we -- we need to talk about that.  He's definitely

7    disavowing ISIS, but he has definitely some aspects of this

8    ideology behind ISIS --

9    Q.  Well, yes, we agree with that.  We agree because he had

10   some ideology, otherwise the government would not have

11   indicted him?

12   A.  That is correct.

13   Q.  Yes.  Okay.  But my point is by the time we spoke with

14   you, it was shortly after he changed his plea.  Remember it

15   was a few days?

16   A.  Okay, yeah.

17   Q.  And from your testimony, it sounds like you've read all

18   the transcripts of the change of plea hearing?

19   A.  Yeah.

20   Q.  You read Adnan Farah's?

21   A.  Yeah.

22   Q.  And did you get a sense from that transcript the

23   enormity of the moment for Adnan Farah, what it took for him

24   to change his plea, considering that his older brother was a

25   member of a -- is a co-defendant?

1    A.  I think I do, and I took into account the very

2    significant fact that he changed his decision against the

3    opinion of his family, against his brother, and this had a

4    huge impact on my assessment.

5    Q.  Thank you.  And that's significant regarding

6    disengagement, right?

7    A.  That is correct.

8    Q.  And you wrote -- I believe you wrote a piece in 2005

9    about, let me just make sure, de-radicalization,

10   disengagement program.  Do you remember that piece?

11   A.  Where was it?

12   Q.  It's a Institute of -- Institute for the Study of

13   Radical Movement?

14   A.  Okay.

15   Q.  And do you remember that article, though?

16   A.  Yeah.

17   Q.  Okay.

18   A.  It was a long time ago.

19   Q.  Yeah.  You are quite a prolific writer, I must say.

20   That's a compliment.

21   A.  Thank you.

22   Q.  Now, you provided three, I believe you talked about it a

23   bit here earlier, you provided three categories, that is,

24   the macro level, the meso level and the micro level?

25   A.  Four types of de-radicalization or counterterrorism

1    tools, yes.

2    Q.  And one was prevention, repression and integration,

3    correct?

4    A.  These are the types of tools you can have to combat

5    radicalization, terrorism, and these three types of tools

6    work with three different scales, which is macro, meso and

7    micro social.

8    Q.  And did you take those into account when you made your

9    recommendations?

10   A.  Of course.

11   Q.  Okay.  You also wrote an article for the *Journal for*

12   *De-radicalization* I believe in the winter of 2004, 2005?

13   A.  No, that's way early.  That would be winter 2014.

14   Q.  Oh, sorry.  2014.

15   A.  Yeah.

16   Q.  And you -- the emphasis on that piece was on

17   de-radicalization -- or radicalization by internet, on-line?

18   A.  That is correct.  Based on interviews with former German

19   neo-Nazis.

20   Q.  And Adnan told you he viewed quite a lot of on-line

21   publications, right?

22   A.  That is correct.

23   Q.  And also you know that the Jihadi movement used the

24   internet in order to recruit particularly adolescents?

25   A.  That is correct.

1    Q.  Now, what age do you consider adolescents, based on your

2    training?

3    A.  Between 16 and 22.

4    Q.  16 and 22.  And have you -- are you familiar with the

5    fact that at 22 the male frontal lobe is not completely

6    developed?

7    A.  I'm not a biologist.  But if you say so, I take it as a

8    fact right now.

9    Q.  But you haven't read anything regarding the maturity of

10   how teenagers react to information?

11   A.  Not enough that I would be able to give a qualitative

12   comment on that.

13   Q.  All right.  And based on your experience, did you find

14   that teenagers were easier to influence with radical

15   thoughts than adults?

16   A.  Like we discussed in the question yesterday, I think it

17   depends on the individual in a situation.  I have seen very

18   easily impressed grown adults, even imams, fathers, mothers,

19   the oldest case I was working with was 65 years old, I

20   worked with the family of that person, the youngest case was

21   12 years old, so it can happen in between.  It's really

22   about the attraction points, the radicalization recipe, what

23   makes you drawn to that specific ideology movement but also,

24   that being said, ISIL itself, in its own recruitment manual,

25   targets young adults for specific reasons.

1    Q.  I believe in your article that the winter 2014 article,

2    the average age sample was 26 and a half years?

3    A.  That is correct, because these former neo-Nazis had to

4    get out of the movement and to be de-radicalized, went

5    through the program, so and that program was also targeting

6    more high ranking individuals, so they worked with

7    individuals that already had jumped up the ranks.

8    Q.  But generally, would you agree with me, though, that a

9    child is easier to influence than an adult because they have

10   not accumulated enough experience, life experiences, to

11   desegregate what is right or wrong?

12   A.  I wouldn't generalize on that.  It depends on the

13   person.

14   Q.  All right.  In the case of Adnan, he consumed a lot of

15   these videos, correct?

16   A.  That is correct.

17   Q.  And there was something else I wanted to clarify.  You

18   used the phrase Jihadi movement, Jihadism, and jihad.  Can

19   you have -- can one participate in jihad without violence?

20   A.  It depends on the understanding of the term "jihad."

21   There's obviously a greater and lesser jihad, and I know

22   that you are familiar with these concepts.

23   Q.  Yes.

24   A.  But to participate in lesser jihad without violence is

25   not possible and it is a key concept of the Jihadi movement,

1    the Jihadi environment, the militant groups that we talk

2    about, terrorist organizations, that performing the lesser

3    jihad exactly meaning taking up arms and using violence to

4    fight the infidels is an essential part of a Muslim

5    identity, that is what they believe.  So they think you

6    cannot be a true Muslim if you do not perform a lesser

7    jihad.  And this is what I talk about when I saw the Jihadi

8    movement or Jihadi.  Obviously this is leaving out the fact

9    that there is a different understanding of Jihadists.  I

10   know that, absolutely.

11   Q.  And isn't it true, though, that at some point when Adnan

12   was speaking to you, he was describing some internal

13   religious development, piety and spiritual jihad, so to

14   speak.  Isn't that -- do you recall that's --

15   A.  Well, he did talk about the spiritual jihad.

16   Q.  Yes.

17   A.  We didn't talk about the concept of the jihad, but we

18   did talk about this identity struggle that he was going

19   through.

20   Q.  But I want to understand, though, that you are not

21   saying that all jihad or all spiritual jihad experience is

22   wrong?

23   A.  Of course not.

24   Q.  Okay.  Now, and you're not saying that being a Shiah is

25   necessarily a bad thing?

1    A.  Of course not.

2    Q.  You're not saying being a Sunni is a bad thing?

3    A.  Of course not.

4    Q.  Now, let's talk about caliphate.  You're not also saying

5    that those Muslims that believe in the caliphate is

6    necessarily a wrong ideology?

7    A.  Not necessarily, but if you believe in the caliphate of

8    ISIS, the way it is established and how it is being done,

9    that is a different caliphate.

10   Q.  No, I'm -- that's not -- yeah, that's not what I'm -- I

11   just wanted to understand that the concept of caliphate

12   within Islam is not wrong.  You're not saying that's wrong?

13   A.  No.

14   Q.  Because it -- you -- you equated the caliphate with the

15   state of Israel?

16   A.  That is correct.  It is a very mainstream fundamental

17   concept of Islam.

18   Q.  Okay.  Now, if a child develops religious piety and

19   hopes for the caliphate, that is not necessarily that this

20   child has been radicalized?

21   A.  No.

22   Q.  Now, what is the equivalent of a caliphate for

23   Christians?

24   A.  I don't think there is an equivalent because mainstream

25   Christianity there is this differential separation between

1    the spiritual and the earthly realm, so basically after

2    reformation, church and state were separated and since then

3    there is no concept any longer of a religiously founded or

4    based political entity from the side of Christianity, so I

5    don't think there would be an equal concept any longer.

6    Q.  So what about the Millennial Reign?

7    A.  That is a spiritual, like a spiritual state.

8    Q.  All right.  I want to talk about the concept of implicit

9    bias and explicit bias.  Are you familiar with that?

10   A.  Yeah.

11   Q.  Because the Court -- I can tell the Court has respect

12   for your opinion and your experience, and I do too, I want

13   to know to what extent you have any bias.  You believe,

14   though, that we all have some biases, correct?

15   A.  Well, I'm a human being who has an opinion, but in the

16   end, we are, in our professions, asked to have neutral

17   opinions and to act in our profession according to our

18   standards and guidelines and ethical principles.

19   Q.  Yes.  Now, when you spoke with the government, did you

20   get any sense when talking with them that they were

21   advocating facts to persuade you about the culpability of

22   Adnan Farah?

23   A.  No, I don't.  They stated their opinions.  They were

24   very explicit about not having subjective opinions.  They

25   just stated the facts.  They answered my question honestly

1    and truthfully to the extent they could, and they -- at some

2    points they actually said, "I do not want to issue a

3    personal opinion on these questions."

4    Q.  That's --

5    A.  They were very direct.

6    Q.  That's good to know.  Now, did you take into

7    consideration that Adnan Farah is the youngest of all the

8    defendants?

9    A.  I took that into account.

10   Q.  And did you take into consideration that prior to his

11   indictment Adnan has no criminal history?

12   A.  Of course.

13   Q.  Is it -- did you take into consideration that other than

14   his involvement with on-line communication or looking up

15   Facebook and researching certain areas within the Jihadi

16   movement that he never took specific steps such as entering

17   a plane to go to Syria?

18   A.  He did not enter that plane, but he actively

19   participated in the planning of that travel and was very

20   active in that.  And the time and intensity of the

21   expression of Jihadi ideology was extraordinary for

22   Mr. Farah, and it's -- he did it a long time, he did it very

23   extensively, he showed a lot of commitment, he explained and

24   stated many of the ideological factors that we talked about

25   yesterday.

1     Q.  Yes.

2     A.  So, yeah, he was, ideologically spoken, well down the

3     road.

4     Q.  Well, I realize that.  Look, the government would not

5     have indicted my client if there was not -- he didn't do

6     anything at all.

7     A.  I hope so.

8     Q.  That's not our position.  My position is did he take

9     steps, i.e., getting to a plane, arriving in Syria, joining

10    a group out of the country, he didn't do any of those?

11    A.  Not the things you mentioned, but he actively

12    participated in planning these travel attempts.

13    Q.  Yes.  I'm not arguing with you.  I'm agreeing with you

14    on this.

15    A.  Okay.

16    Q.  Now, but did he -- did he at any time describe that he

17    intended to harm any American citizen here?  I mean in the

18    U.S.

19    A.  No, he didn't.  But his statements, his statements on,

20    for example, Facebook were indicating direct violence.

21    Q.  In Syria?

22    A.  No, he just had pictures, for example, of a sniper on

23    the top of his Facebook page.  That is the statement

24    indicating the use of weapons, for example.  But where

25    locally --

```
 1    Q.  Okay.
 2    A.  But he used pictures of Anwar al-Awlaki.  He referred to
 3    him as the voice of the ummah.  And Anwar al-Awlaki, his
 4    statements and his position as the main spokesperson or
 5    director of Al-Qaeda were directly against, among other
 6    countries, against the United States.
 7    Q.  But do you realize that all of what you just described,
 8    any citizen has a right to have that conversation?  Do you
 9    realize that?
10    A.  I know that, yeah.  I know --
11    Q.  So that --
12    A.  I was asked about the extent -- to assess the extent of
13    the radicalization process, not whether this will be legal
14    or illegal.
15    Q.  Yeah, Mr. Koehler, I'm not -- I don't want you to
16    stretch anything.  Just be straight up with me.  I'm saying
17    that Adnan Farah didn't -- he didn't board a plane.  He
18    didn't get to Syria.  He was a 17-year-old kid, correct?
19    A.  Correct.
20    Q.  And your conclusion, as you said, took those into
21    consideration?
22    A.  That's correct.
23    Q.  All right.  And now Adnan, you testified earlier that
24    he's at a turning point.  That turning point is, with some
25    intervention that the Court is trying to design?
```

1    A.  That is correct.

2    Q.  We can get him back to a mainstream society, correct?

3    A.  I believe so.

4         MR. UDOIBOK:  Thank you.  No further questions,

5    Your Honor.

6                        **EXAMINATION**

7    BY MR. WINTER:

8    Q.  In fact, Mr. Koehler, Adnan Farah is an 18-year-old

9    adult?

10   A.  Okay.

11   Q.  And you understand, obviously, in the American system,

12   at 18 you're considered an adult?

13   A.  Okay.

14   Q.  And is it fair to say that despite, you know, the

15   discussion about the biology of the frontal cortex and the

16   laws of gravity affecting skate boards, you've assessed

17   Mr. Farah as being currently active, having an active

18   radical ideology?

19   A.  That is correct.

20   Q.  He was a fan of Anwar al-Awlaki.  Is that right?

21   A.  That is correct.

22   Q.  In fact, you mentioned that photo on his Facebook page;

23   it's a 50-caliber sniper rifle?

24   A.  That is correct.

25   Q.  And embedded within that photograph of an individual

1    pointing a 50-caliber sniper rifle is an image of Anwar

2    al-Awlaki.  Do you remember that?

3    A.  That is correct.

4    Q.  And remind us what the tenets are that Anwar al-Awlaki

5    preaches or preached prior to his death?

6    A.  He preached for Al-Qaeda basically to declare the

7    militant jihad against the United States, against the west,

8    and to commit acts of terrorism against civilians, against

9    the whole society.

10   Q.  Is it fair to say that Anwar al-Awlaki was not talking

11   about the internal struggle, the internal jihad?

12   A.  No, he didn't.

13   Q.  You mentioned, in your testimony yesterday, about

14   families, family members being gatekeepers?

15   A.  That is correct.

16   Q.  Okay.  No difference here, Mr. Farah's family members

17   would, in your mind, be considered gatekeepers?

18   A.  His brother, for example, I wouldn't consider a positive

19   gatekeeper.

20   Q.  Okay.  And so there's positive and negative gatekeepers?

21   A.  That is correct.

22   Q.  Okay.  And you're aware, because he talked about it and

23   it has been cited in your assessment, that his family or

24   members of his family were against him pleading guilty?

25   A.  That is correct.

1   Q.  And while you credit Mr. Farah for overcoming that in

2   entering a plea of guilty, would you agree that the fact

3   that these gatekeepers around him did not want him to, that

4   presents challenges in the future for Mr. Farah and his

5   de-radicalization?

6   A.  That is correct.

7          MR. WINTER:  Okay.  Thank you.  I have nothing

8   else, Your Honor.

9          THE COURT:  Anything further?

10         MR. UDOIBOK:  Yes, Your Honor.

11                      **RE-EXAMINATION**

12  BY MR. UDOIBOK:

13  Q.  Just two questions.  Adnan Farah told you about the

14  deception of Anwar al-Awlaki, right?

15  A.  We talked about Anwar al-Awlaki, and he told me, during

16  the interview, that he still finds some kind of fascination

17  for him.

18  Q.  I don't recall that, but it would --

19  A.  Well, he said, "It's kind of cool if you look at it."

20  Q.  Kind of cool in the sense of his ability to communicate,

21  not his ideology?

22  A.  His way of thanking and that his lectures, he said,

23  quote, They make him kind of more radical.

24  Q.  True.  He told you that because he realizes he's

25  radicalized by watching his sermons and when he spoke with

1    you now he could tell how powerful an instrument his

2    messages are, albeit wrong, correct?

3    A.  He did not say if they were wrong in the end or not.  He

4    explained to me his fascination, and the way he stated his

5    fascination was still in the present form.

6    Q.  Mr. Koehler, did you read his change of plea transcript?

7    A.  Of course.

8    Q.  Did you see the part where he specifically disavowed

9    Anwar al-Awlaki?

10   A.  Of course.

11   Q.  Okay.  And he never told you he met him before, did he?

12   A.  No.

13   Q.  He read about him and read his messages, correct?

14   A.  Yes.

15   Q.  And disagrees with his messages now?

16   A.  That's what he said in the agreement, but he didn't say

17   that explicitly in the interview, but I took into account

18   that he very much reflected upon the psychological process

19   leading him to that stage.  If I remember correctly, he said

20   if they have access to your heart, they control your mind,

21   and the other way around.  I think that he said access

22   to -- if they have access to your heart, they control your

23   mind?

24   Q.  So that's a compelling narrative for a 19 year-old,

25   correct?

```
1    A.  That is correct.

2           MR. UDOIBOK:  No further questions.

3                    RE-EXAMINATION

4    BY MR. WINTER:

5    Q.  Just one question.  There was discussion about what he

6    didn't do as part of his participation in this case, but

7    you're aware that he actually did purchase a fake passport

8    in order to get into Syria to join ISIS?

9    A.  Yeah.

10   Q.  And you factored that in, right?

11   A.  That is correct.

12          MR. WINTER:  Okay.  Thank you.

13          THE WITNESS:  Thank you.

14          THE COURT:  Let me go over some things that might

15   be helpful to both sides.  I'm assuming that youth will be

16   brought up in all and the age of the defendants will be

17   brought out in your position papers.  And not that it's on

18   the point, but at least it will give you some idea of how

19   I've dealt with that issue because I had to resentence a

20   defendant that was a juvenile at the time of the crime and I

21   sentenced him to life imprisonment, then Mills versus

22   Alabama came down by the United States Supreme Court and I

23   had to resentence Robert James Jefferson.  The court file

24   No. Is 97-CR-276-4.  And you can read my order in that.  So

25   that will give you some idea of the Court's analysis dealing
```

1    with youth.  And if you are really dealing with these issues

2    with the youth, you better take a look at *Mills versus*

3    *Alabama* and the detail that the Supreme Court went into and

4    the amicus briefs that were filed in that Supreme Court

5    case.

6              Now, I want to -- I've got to keep everybody on

7    track here.  The defendants have all pled guilty to a

8    2339B(a)(1) conspiracy count to provide material support,

9    and because it's a terrorism conviction, understand where

10   the Court has to start from.  Terrorists, even those with no

11   prior criminal behavior, are unique among criminals in the

12   likelihood of recidivism, the difficulty of rehabilitation

13   and the need for incapacitation.  That has -- that is the

14   circuit law.  That is the statute and the Sentencing

15   Guidelines.  And so this is not like a regular criminal case

16   where we can just talk about X, Y, and Z and then go from

17   there.  Terrorism is a different animal, and I want to make

18   sure that everybody understands where the Court is coming

19   from.  And so making arguments like it would be a standard

20   criminal case is not going to be helpful for the Court in

21   making its decision on sentencing.

22             The next matter is dealing with I believe there

23   were three programs that you reviewed.  There were

24   submissions of, I haven't seen them yet, I haven't -- I

25   won't until the final position papers, but Heartland and

1     then there's a mitigation report, nine pages, so

2     let's -- you are and your expertise is in developing

3     programs.  You've had a quick look at these programs.  And

4     what I will want you to do is we'll get copies of those

5     proposals to you and then I would want you to critique them

6     and we'll file that.  But from what you can remember and

7     what is in your notes, if you have any, let's talk about the

8     Heartland case, and that's Yusuf's, right?

9           THE WITNESS:  From the top of my head, what I can

10    remember is that the proposal on the program that had been

11    started is so far the most advanced in terms of detail and

12    different levels and elements that were included.  However,

13    I found that there were no elements or mechanism theory

14    connected to the radicalization process.

15          The most important element here is to connect

16    counseling tools to the things you bring in, the kinds of

17    mentors, what you suggest, for example, meeting with

18    psychologists, meeting with imams, doing social work, has to

19    be connected to individual driving factors of that person.

20    If that person was not at all driven towards ISIL, for

21    example, by theological/religious issues, it would not make

22    sense to bring that person necessarily in touch with a imam,

23    for example.  So you have to address the individual driving

24    factors.  So I did not see that in either of the three

25    reports.

1          I did not see in the Heartland democracy proposal

2     specifically trained experts that have been -- have been

3     helped develop a skill set of, for example, risk assessment,

4     psychology of radicalization, ISIL ideology, so these things

5     were not in there as well.  This is what I can remember off

6     the top of my head before reviewing the report in detail.

7          The third proposal that I've seen, the mitigation

8     report, was very brief and did not at all touch upon the

9     radicalization process, as with the first proposal, so it

10    was, from my perspective, a more or less general collection

11    of standard things like working, doing social work in a

12    mosque, a community with an imam, without actually

13    addressing that to any potential driving factors or

14    motivational factors of the client.

15          And the third report that I received is part of

16    the -- the documents, I believe, talked about sending your

17    client to a Sufi mosque to receive religious counseling and

18    support, and I believe in that case the bullying of that

19    person in his teenage years because of the Sufi beliefs of

20    his father were one initial starting point that created or

21    let down later on the radicalization process, and understand

22    that for that person, the father was well connected in Sufi

23    community and obviously the connection to the mosque came

24    from the father, and I realized that, I took that into

25    account, but it would not be good advice to actually use

1    that as a counseling tool because it would enforce that

2    understanding for that person that I think the person still

3    has an understanding that Sufis are not necessarily true

4    Muslims, so I definitely would not advise that.

5            And so these are the things that I can remember

6    off the top of my head.

7            THE COURT:  Now --

8            THE WITNESS:  I have yet to write detailed --

9            THE COURT:  I'm sorry.  Go ahead.

10           THE WITNESS:  I have yet to write detailed

11   assessments.

12           THE COURT:  Yes, please write a

13   detailed assessment.

14           THE WITNESS:  Okay.

15           THE COURT:  Let's do this as quick as possible so

16   we can get it to counsel so they can make their adjustments

17   if they can make adjustments.

18           I want to make it clear to everyone, and you know

19   I've made it clear to you, that I don't have to read

20   anything that you've said.

21           THE WITNESS:  That is correct.

22           THE COURT:  I've told you that from the start.

23           THE WITNESS:  That is correct.

24           THE COURT:  And in dealing with, I think it was

25   touched upon by the last counsel, we're finding our way

1    dealing with these types of issues.  Would that be correct?

2              THE WITNESS:  That is correct.

3              THE COURT:  And even the outside counseling that

4    you do, not connected to any court system, it would be

5    accurate, the fail rate is great?

6              THE WITNESS:  That is correct.

7              THE COURT:  The training that you've been giving

8    the United States District Court Probation and Pre-trial

9    Services Office is educational and also gives them tools to

10   better supervise individuals that are on supervised release,

11   that usually means that they're coming from prison.

12             THE WITNESS:  That is correct, and to coordinate a

13   plan, design, intervention programs to assess their impact.

14             THE COURT:  And that helps the probation office in

15   their mission in making sure that, one, community is safe.

16             THE WITNESS:  I hope so.  That is the main goal.

17             THE COURT:  And, two, to make sure that the person

18   coming out of prison can stay out of trouble and not -- and

19   have a crime-free existence?

20             THE WITNESS:  That is correct.

21             THE COURT:  Now, dealing with our training with

22   our Probation and Pre-trial Services Office and dealing with

23   the court system, does Germany or the other European nations

24   have that type of program going on or is this even a new

25   thing?

 1              THE WITNESS:  This is, from my perspective, a

 2      completely new model, what is being done here.

 3              THE COURT:  All right.  And that's what we sat

 4      down and talked about?

 5              THE WITNESS:  That is correct.

 6              THE COURT:  We talked about what we had to do to

 7      keep the community safe?

 8              THE WITNESS:  That is correct.

 9              THE COURT:  Okay.  Thank you.

10              THE WITNESS:  Thank you, Your Honor.

11              THE COURT:  One final thing, counsel.  Again,

12      reread my last order.  There are many factors under 3553(a)

13      that you can possibly apply in your individual defendant's

14      case.  Make sure it's detailed.

15              Understand that you are the ones that have

16      received all of the discovery in this case.  With these six

17      defendants, other than the plea of guilty and other than

18      those who testified at trial, there -- I may know very

19      little about your defendants, and so don't assume that I

20      know a lot about them.  I don't.  I don't know what is in

21      the discovery because it is never turned over to me unless

22      it's part of the trial or part of the plea negotiation.

23              And please do not spend a lot of time trying to

24      discredit this portion of the hearing.  This is just a small

25      portion of how I'm going to -- the factors I'm going to be

1    using for sentencing, and for you to focus in on and try and

2    write a 20- or 30- or 40-page brief discrediting Mr. Koehler

3    is not going to help your defendant.  This is not that large

4    of a factor, if it is a factor at all, in my sentencing.  I

5    need you to advocate and give me the tools based on the

6    cases that we're seeing around the country and prior

7    material support cases that I've handled.  So that's what I

8    need.

9          And then the government, you have the discovery,

10   and you have to make sure the Court has a full picture of

11   each defendant.

12         Those that are receiving the 5K1.1 motions by the

13   government, both sides, make sure that those are full and

14   complete so I know exactly what the substantial assistance

15   to the government is.  So your position papers are going to

16   be quite important.

17         And, again, to give you an idea of how the Court

18   will be handling the sentencings, please look at the Amina

19   Ali sentencing because we had a two- or three-hour

20   sentencing where I asked quite a few questions, and, of

21   course, check the Eighth Circuit opinion affirming my -- the

22   trial and then also my sentencings on those two women, so

23   you have an idea of what sort of thing you'll be coming into

24   dealing with the sentencing hearing, because questions will

25   be asked, and that will help me make my final decision.  And

1    I think most of you know that I don't make my final decision

2    until I have heard from the defendant and from counsel, both

3    the government and defense.

4         Well, thank you.  One just one final comment, I'll

5    say it again and then we'll adjourn, dealing with the 5K's,

6    they can supersede quite a bit of, if it's really

7    substantial assistance, if it's nothing, but reciting extra

8    stuff that the government already knew and it's not helpful

9    to the government, it's not going to be that helpful.  But

10   if -- if you testified and other information, at least you

11   can check out my previous sentencings, that's very

12   important, to have a significant report from the government

13   and from the defense.  And if there's items that have to be

14   off the record, we can meet in chambers and discuss those.

15        All right?  Anything further for the government?

16        MR. WINTER:  No, Your Honor.  Thank you.

17        THE COURT:  For the defense?  Thank you.

18   (Proceedings concluded at 10:56 a.m.)

19                          *   *   *

20

21

22

23

24

25

1                          **I N D E X**

2    DANIEL KOEHLER                                    PAGE

3        Examination by Mr. Dworak                     240
         Examination by Mr. Winter                     254
4        Examination by Mr. Udoibok                    256
         Examination by Mr. Winter                     272
5        Re-examination by Mr. Udoibok                 274
         Re-examination by Mr. Winter                  276

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2          I, Staci A. Heichert, certify that the foregoing is

3    a correct transcript from the record of proceedings in the

4    above-entitled matter.

5

6                Certified by:   *s/ Staci A. Heichert*

7                                Staci A. Heichert,
                                 RDR, CRR, CRC
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25