UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 15-046 (MJD)

United States of America,

               Plaintiff,              DEFENDANT'S POSITION WITH
                                          REGARD TO SENTENCING AND
v.                                    MOTION FOR A DOWNWARD
                                          VARIANCE

Abdullahi Mohamud Yusuf,

               Defendant.

> "Today [Abdullahi] lives within the Twin Cities. I visit him. I help him. The whole family helps him," his father tells the group. "Because he was stopped, because he was arrested, that is why he is alive today." [1]

      On May 30, 2014, Abdullahi Yusuf hugged his father goodbye for what he believed would be the last time.  Hours later he strode purposefully toward an airline gate that would take him to Istanbul as a fighter for ISIL in Syria. Why would a just-turned eighteen-year old be willing to give up everything he knew and loved for an almost guaranteed death?  The reasons are myriad, but when boiled down to its essence, the root cause was his search for belonging and meaning in a world that did not appear to include him.  Unfortunately, ISIL recruiters, though social media, provided concrete answers to

---

[1] Taken from Reporter Dina Temple-Raston's article "Parents Speak Out, Say FBI Arrest Saved Son on Verge of Joining ISIS."
http://www.npr.org/sections/parallels/2016/09/28/495804670/parents-speak-out-say-fbi-arrest-saved-son-on-verge-of-joining-isis.

Mr. Yusuf's father, mother, and aunt spoke at a community event hosted by the United States Attorney Office on September 28, 2016.

his complex identity questions and Abdullahi was convinced.  Since then, sometimes on his own and sometimes with the help of mentors, he has grappled with his identity in the context of being a Minnesotan, a Muslim, a Somali and an American. When he was in the fifth grade he was asked about his ethnicity and was given the choices of African American, Hispanic, Asian, Caucasian, African or Middle Eastern.[2] He chose "African American."



A month following his arrest in this case, in late December 2014, he began working with mentors from Heartland Democracy, a non-profit organization which helps disenfranchised youth find positive identity within the American context through reading, writing, discussion, and self-examination. Abdullahi's goals now are to not only improve himself, but someday help change the lives of other people.  However, he recognizes that he has much more to discover and learn before he can impart his growth on others. Within this humility lives a glimpse of his emerging wisdom.

The young man who will stand before this Court on November 14th, 2016 is not the teen who went to the airport on May 28, 2014 to join a terrorist organization in Syria. Abdullahi Yusuf's advisory guideline range is well above the statutory maximum of 15

---

[2] It appears from comparing handwriting, his teacher wrote the options of African and Middle Eastern.

years,[3] but because of his rehabilitation work with Heartland Democracy, his cooperation with the United States Government, and his over 18 months of incarceration at the Anoka County Jail, we respectfully request a sentence of time served followed by ten years of supervised release.

## ABDULLAHI YUSUF'S STORY

Abdullahi Yusuf was born in a Kenyan refugee camp where he lived for three years with his mother, Sahra, and his father, Sadiik.  Abdullahi does not remember much about his time in the camp except that the conditions were bleak and that he had his tonsils removed by a fellow refugee while wide awake and without pain killers.  When Abdullahi was three years old, he and his pregnant mother moved to Minnesota while his father remained in Kenya due to visa issues - he did not join them for five more years.

When they first arrived in Minnesota, Sahra and Abdullahi lived with Sahra's father and 15 other family members in a small single-story house.  For 18 months, Sahra, Abdullahi, and his new baby brother, Abdirahman, shared a tiny bedroom.  Sahra did not speak English and had difficulty finding high-paying work.  She eventually found a job with long hours as a janitor.  She saved money until she could afford a small one-bedroom apartment in North Minneapolis on her own.  There were many other Somalis in the neighborhood and they created a community for themselves.

---

3 We have no objections to the Final PSR that was provided on October 18, 2016 and we withdraw our objection to paragraph 171 of that document.



During the five years before Abdullahi's father arrived in the United States, Abdullahi's life was insecure and sometimes even dangerous. Sahra did not have a car, so she had to take two buses each way to the grocery store and three buses each way to work. When Sahra was away, a neighbor woman watched Abdullahi and his brother, but she was not particularly attentive and six-year old Abdullahi essentially had to take care of his two-year old brother by himself.

Although there was a basketball court next door, he could not play there because the gangs had taken it over to sell drugs. Instead, he played soccer with other Somali kids on a fenced-in patch of dirt near the apartment complex. There



was no grass, no formal goals or lines, and new balls were a rarity, but at least they were somewhat safer because the gangs did not hang out there.

Abdullahi began kindergarten at Pillsbury Elementary School, a Minneapolis public school. Many of his American classmates, both white and black, were hostile to Somali kids and Abdullahi was subjected to daily negative verbal comments about being Somali and Muslim. Abdullahi remembers a day in second grade when a non-Somali

boy tried to pull a hijab off the head of a Somali girl and Abdullahi ended up in a fight with the boy to protect the girl.

When Abdullahi was seven years old, his mother moved them to a two-bedroom apartment in the same neighborhood in anticipation of Sadiik's arrival.  A year later, his father finally arrived in the United States.  Abdullahi has very happy memories of that summer when Sadiik was home with the boys, hanging out and playing soccer with them. That fall Sadiik found minimum wage employment in a factory where he had to work for two years in order to obtain his green card.  Thereafter, he became a taxi driver and earned more money.  A year after Sadiik's arrival, Sahra injured her back at work and had to stop working. The family did not have much money, but they had each other.  One of the hardest things about this case for Abdullahi is how much pain he caused his parents and his younger brother. When Abdullahi was in fifth grade, he entered the Minnesota Twins Father of Year Essay Contest. His opening line was as follows:

[4]

---

[4] ¨My father means a lot to me. When he young he used to play for a soccer team he was a very good soccer player I saw pictures of him playing. Now I play a soccer team¨



He was awarded a certificate for his efforts.

Abdullahi always felt very loved by his family.  Both of his parents were strict, but kind.  He was expected to help out in the household by cleaning up after himself, taking out the trash, vacuuming, and watching his brother; and he would occasionally help his grandfather with yardwork.  Abdullahi's family was not devoutly Muslim, but Abdullahi attended weekend school or "Dugsi" at his local mosque, where he was taught the basic tenets of Islam.

His mother and father both governed the household as equals even though their roles appeared traditionally patriarchal as Sadiik worked outside the home and Sahra maintained the household.  Abdullahi grew up believing women were strong and intelligent both because she shared power with his father and because she held a job and ran a household on her own for five years.  Abdullahi's mother was and is very connected to a worldwide network of Somali women who participate in a group phone call every night.  Women air their difficulties and other women offer advice.  This has been a great source of comfort to her during the difficulties of the past two years.



In fourth grade, Abdullahi's parents moved him to the Minnesota International Elementary, a Somali charter school in North Minneapolis where he shared the same values and culture with his classmates.  While there, he did not encounter many people who were not Somali and lived a somewhat sheltered life, other than the crime and poverty surrounding him.  He had learned to speak English by watching T.V. and was more at ease with the language.  He felt very comfortable at the charter school and was dismayed when his parents qualified for section eight housing and moved the family to the suburb of Burnsville when Abdullahi was in eighth grade.

Abdullahi went from an impoverished urban ghetto, surrounded by other Somalis, to a middle class suburban neighborhood where most of the other residents were white and Christian.  His first day of school was a culture shock because it was so different from his Minneapolis school and neighborhood.  He felt like he had entered the "set of a movie;" television was the only place he had ever seen wealthy kids wearing varsity jackets before. He was not happy about the move and over the next couple of years he struggled to find his place in Burnsville.

Abdullahi describes three kinds of Somali kids in Burnsville:  those who remained dedicated to their Somali values and customs and did not mingle with Western kids; those who rejected their Somali roots and became secularized and Westernized; and those who were fairly well-liked by everyone and tried to fit into Western culture, but who maintained their cultural values and religious practices.  Abdullahi identified with the

7

third group, the "in between group," as he calls it. He felt like the kids who chose only the Western or only the Somali groups seemed happier in general. He himself felt unhappy because he was torn between the two worlds – he was expected to be Somali and Muslim at home, but at school he was expected to be Western. In both locations he was expected to reject the values of the other. He never fully felt he fit in with his Western friends and did not trust that they accepted him for who he really was. If he received a slight from them, he wondered if it was because he was Somali or Muslim. Home was the only place where he felt he could truly be himself, and yet he did not fully fit in there either.

In eighth and ninth grade he felt unmoored and got into trouble, but in the fall of tenth grade he started playing football. Being on the team helped him feel like he belonged somewhere and it kept him focused. When the season ended, the boys went their separate ways and Abdullahi's feeling of belonging slipped away. He sought to recreate that camaraderie and in the latter part of his sophomore year he became friends with a group of social outcasts made up of Mexican-American, African-American, and Somali-American boys. They participated in petty crimes, occasionally stole cars, smoked marijuana, and skipped school.

At some point in the summer before Abdullahi's senior year, his father became fed up with his delinquency and poor grades and moved the family to Inver Grove Heights in hopes that Abdullahi could make up his credits and graduate from high school. Abdullahi enrolled in Simley High School as a senior. He did not want to disappoint his

father and buckled down in school.  If he did everything right, he hoped he could

complete his credits and graduate in June 2014.

In September of 2013, when his teacher assigned each student a particular country

to study, Abdullahi was randomly given Syria.  As he researched the country he learned

about the horrific atrocities committed by the current President of Syria, Bashir al-Assad,

on his people.  He watched atrocities such as chemical warfare against government

protesters.  The U.N. found evidence to implicate Assad in war crimes and crimes against

humanity and in 2011 the United States urged President Assad to step aside.  Abdullahi

became more and more interested in the conflict and felt strongly like something had to

be done.

In October of 2014, Abdullahi realized he did not have enough credits to graduate

if he stayed at Simley.  He decided to transfer to the Minnesota Transition School (MTS)

because they offered school from 7:00 in the morning until 7:00 at night for kids who

needed credit recovery.

After moving to MTS, Abdullahi began talking about Syria with his friend Hanad

Mohallim. Abdullahi began to notice a difference in Hanad's appearance and demeanor.

Hanad was becoming very serious and wearing more traditional Muslim clothing like a

Pakistani (knee-length robe) and a Kufi (skull cap).

The two boys spent many hours discussing Syria and the options for stopping

Assad's reign of terror.  They discussed it from a current event perspective, not from the

viewpoint of actually doing something themselves.  Abdullahi says that at the time he did

not know he could personally do anything to help the Syrian situation; he was learning

about Syria from the mainstream news and was unfamiliar with the radical media sources and recruitment videos.

While he was attending MTS, Abdullahi spent most of his time studying or playing basketball. He was finished with delinquent behavior and had stopped smoking marijuana. One night in early March of 2014 Abdullahi heard there was an open basketball night at Dar Al Farooq Mosque in Bloomington. He went with three friends, including Hanad. Later in the night, while Abdullahi was playing basketball, Hanad approached him several times, saying he needed to talk. Each time, Abdullahi told him he was busy playing and they could talk later. Eventually Hanad left and that was the last time Abdullahi saw him.

Over the next couple of days, numerous people contacted him to find out where Hanad had gone and Abdullahi had no idea. Eventually, he pieced enough of the story together to figure out that Hanad had gone to Syria. Abdullahi was hurt and disappointed that Hanad never told him he was leaving because the two had grown close.

A couple days after Hanad left, Abdullahi was approached by Defendants Guled Omar and Adnan Farah. They asked if he wanted to go to dinner and he agreed. He had known both of them from Minnesota International Elementary School. They were acquainted, but not close friends. Over dinner they talked about Hanad and why he had left. This was all new to Abdullahi, but it appealed to him because he felt something should have been done about what was going on in Syria. Adnan invited Abdullahi to go to the Dar Al Farooq Mosque with them after dinner and Abdullahi agreed. He felt connected to them because they were all on the same page about Syria.

When he was at the mosque that night, he felt like he was part of something important.  The young men around him were discussing serious issues and they seemed to want to involve him.  He had hungered for inclusion and this helped fill the void that was created when Hanad left.  The other young men showed him video clips of work that ISIL was doing in Syria and talked about why it was important to fight against the Assad regime.  They stayed at mosque until about 2:00 the next morning, after which Abdi Nur drove Abdullahi to his grandfather's house.  Abdullahi stayed up for a couple more hours reading Black Flags from the East, a treatise about the Middle East and ISIL. At this point, Abdullahi had not even thought of traveling overseas.

The next morning, his new friends picked him up to go to the Minneapolis convention center to hear a Muslim teacher, Ahmed Gibril, speak.  He was invited to be an usher.  One of his new friends, Defendant Abdirizak Warsame, had memorized a portion of the Koran and recited it on stage.  Over the next weeks, Abdullahi spent most of his waking hours with these young men.  They listened to Hadiths (stories from the Koran), they discussed the meaning of the Prophet Mohamed's teachings, they watched videos of fighters in Syria, and they debated the moral imperative of going to Syria to fight.

Finally, in early April of 2014, Guled Omar approached him and said they were going on a long and difficult journey and that there would be no hard feelings if he did not want to go, but he was either in or out.   Abdullahi said that he was "in" and his life changed drastically.  From then on, he was included in plans to travel to Syria and he spent most of his time strategizing with the others about leaving the country to go fight.

Around the time Abdullahi was planning to go, ISIL was still just one of the many groups fighting the Al Assad regime. Abdullahi did not realize until July of 2014 that there was more to ISIL than just defeating the Assad regime, or that there was talk of a caliphate.

Within days of turning 18 years old, Abdullahi applied for his first U.S. passport. Members of the group had given him money to pay for the passport, along with clothing, and an airline ticket to Istanbul. The group briefed him on how to get to the airport without attracting attention and what to say to law enforcement if confronted. On May 28, 2014, he made it to his departing gate at MSP Airport before being stopped and confronted by law enforcement. After brief questioning he was allowed to leave.

He arrived home to very angry parents, who had just been questioned by the FBI. Abdullahi realized he needed to change direction. He had deeply wounded his parents and had critically damaged his relationship with them. He enrolled in community college at Inver Hills and mostly avoided the young men who had been planning to travel to Syria. He made new friends who were not radicalized; none of whom are linked to this case in any way. He spent his time studying, playing basketball, and hanging out at home with his family. In late summer, the boys in the radicalized group started making concerted overtures to him. Though he did occasionally communicate with them and played paintball with them one time in August, he wanted to distance himself from the people who supported the caliphate-driven ISIL.

Following the violent shift in ISIL, Abdullahi knew the ideology was flawed, but he still believed it was his duty as a Muslim to fight against the Assad regime. He felt confused about how to move forward because he had believed so strongly in what ISIL

initially purported to stand for.  He describes himself as having felt "frozen."  When asked to explain what he means by this, Abdullahi likened it as follows: lawyers and judges support and believe in their own legal system, but what if the rules changed and the system became violent and corrupt?  Would they support the system believing in its inherent goodness because they hoped eventually it would be good again?  Would they reject the entire system as completely broken?  Or would they freeze in confusion about what to do next?  Abdullahi indicates that after the declaration of the Caliphate and the start of the beheadings in July of 2014 he was horrified, but it took him some time to register that the organization he believed would end the Assad regime had become so corrupt and violent that he needed to step away from it completely.

After playing paintball in August, Abdullahi realized his friends were still fully supporting ISIL despite the atrocities, and he determined not hang out with them again. When they asked him to "join the caravan," he did not respond. He knew he was finished with ISIL and he did not plan to travel again, but he did not have a goal or purpose other than to finish school and get a job.  He felt his actions were mechanical and his life did not have the power and resonance it had when he was involved in the plot.  At the time, he did not have a replacement ideology and he felt lost.  His education through Heartland Democracy has allowed him to understand his confusion. He strongly believes if he had been involved in the programming right after his initial encounter with law enforcement, he would be in a better place today.

In the fall of 2014, when he had started to believe there would be no consequences for his May actions, he received a text from his previous attorney telling him he would be

arrested soon.  Other members of the conspiracy had discussed how they had been questioned by the FBI and nothing happened to them. He fully believed that if he kept his nose clean, he would not be charged with a crime. After being told otherwise, he panicked and sought out the friends who had helped him into this predicament.  When he showed them the text, they encouraged him to leave the country to avoid arrest and conviction.  At the time, he felt persecuted by the U.S. government and wanted to leave, but did not know where he would be accepted.  He did not want to spend the rest of his life as a fugitive, so he briefly reconsidered going to Syria.

He met with the other young men a total of three times (during an approximately ten-day period) to discuss the logistics of leaving.  But he knew in his gut that fighting for ISIL was wrong, and that the only right thing to do was to talk to his family.  He initially approached his uncle, who strongly urged him to stay and face the consequences of his actions.  He then spoke with his father who, after a lengthy lecture, told him to do the right thing and stay.

Abdullahi met with the group of travelers one last time to announce that he was not leaving.  The others asked him to give them all of his money so someone else could travel, but Abdullahi refused.  They were angry with him and one of them stole his cell phone during that meeting.  He never spoke with them again, except when Guled Omar called him in November of 2014 to say that four of his friends had been stopped at JFK Airport.

Abdullahi continued going to school and working and, on November 23, 2014, he was arrested by the FBI on his way to school.  Over the next few weeks he met with his

attorneys and very quickly was asked to cooperate with the government.  This was an extremely difficult decision for him.  He was willing to face the consequences for himself, but he felt it was wrong to point his finger at the others.  He thought they were his friends and he did not want to be responsible for their legal peril.  He agreed to meet with the FBI and tried to come clean about his own involvement while minimizing the involvement of other young men who were still in the United States.

Following these meetings, he was released to a halfway house where he began ruminating about his failure to disclose everything.  He started working with Heartland Democracy mentors and realized more and more the foolishness of his dedication to the other conspirators.  The withheld information began to weigh heavily on him, but he had no idea how to come clean.  He became more and more depressed and when asked by his attorneys what was bothering him, he was too ashamed to tell them.  He thought it was too late and simply waited for the consequences.

And the consequences came.  Abdullahi was incarcerated in jail and the government let his attorneys know he had not been fully truthful with them.  Abdullahi was confronted about this and immediately admitted what he had done.  In the three months after he had initially met with the government, his work with Heartland helped him see he needed to completely distance himself from his co-conspirators.  He said then, and says now, that he was immensely relieved to have the situation out in the open and to have been given one more chance to tell the entire truth.

When he met with the government again, he looked the prosecutors and agents in the eye and apologized for not being fully honest.  Thereafter, he gave them the complete

truth and, in fact, frequently contacted his attorneys to let law enforcement know of things he remembered. One of those was an incident where he had spray-painted the word ISIS on a wall. The government would never have known he was involved with that if he had not come clean. There is no indication that since May of 2015 he has been anything but completely forthcoming with the government.

Abdullahi testified for the government against three of his co-conspirators. He knew it was the right thing to do, but it was still difficult to have to testify before a suspicious Somali community. His steadfastness was sorely tested during his testimony when someone sitting behind his mother in the courtroom accused him loudly of being a liar. There was a verbal disruption in the back of the courtroom, during which time Sahra and several young men were removed from the courtroom. The situation was very tense and after everything was explained to this Court, Sahra was allowed to return to the courtroom. Throughout this situation, Abdullahi remained calmly seated on the stand, albeit with tears in his eyes. He stated later that every fiber of his body wanted to run to the back of the room to protect his mother. Despite the difficulties of testifying, Abdullahi has never wavered in his belief that he did the right thing and he indicates he would do it again if need be. His family continues to support his cooperation.

As he looks back on 2014, Abdullahi now wonders how he could have been so entranced by the words he was hearing at the time. He says he realizes now that part of his incentive to belong to ISIL stemmed from the aftermath of living in two worlds. He felt there was no hope for him in the United States: he came from a poor family and there were no members of his family who could be defined as "successful" within the

understanding of the American mainstream.  He was encouraged to do well in school, but felt defeated about his ability to accomplish anything with that education.  He felt that if he maintained his Somali culture and values he would never amount to anything in America.  But when he contemplated joining the mainstream to become successful within that context, he felt discouraged because he thought he would have to completely reject his Somali and Muslim heritage.  He thought he had no options in Minnesota.

In reflecting back, he realizes he also wanted meaning in his life.  He wanted to belong to something important, to matter, to make a difference.  His recruiters recognized this desire and offered him excitement, adventure, meaning, and belonging.  He would be part of something greater than himself and he would make a difference.  He was not thinking of money or women or other types of rewards, he was thinking of living a life with purpose.

His idealism and drive for meaning are exactly why he has done so well within the structure, curriculum, and philosophical ideals of the Heartland Democracy program. Heartland was designed to provide a positive identity to disenfranchised Minnesota youth and adults who feel disconnected, disengaged, and often without a path or healthy prospects. Prior to working with Abdullahi, the organization had partnered frequently with other programs in the Twin Cities, assisting people dealing with a variety of issues, including homelessness, criminal activity, substance abuse, poverty, and family disruption.  Heartland's program had been incorporated into a Somali teen youth program as well.

The goal of Heartland is to engage and empower youth within their communities. Through reading, discussions, and written assignments the young people are supported (often for the first time in their lives) in better articulating their own thoughts and identities, describing how they see themselves and how they think the world sees them, and what promise they hold toward shaping their own futures. They are taught to think about themselves differently with respect to their role in their community. They begin to see, through their own work, that active citizens and engaged community members are *made* not born, and that they themselves have the power to make changes and improvements. They are encouraged to think critically and they are challenged to question notions (their own and those of others) of culture, community, power, and self. The program is called Empowering U because that is exactly what they do – empower youth to believe they can make a difference.

What makes Empowering U different from other similar programs is the academic component and the use of individual mentors, some of whom have experiences similar to the youth with whom they are working. Many young men, like Abdullahi, do not have adults within their community whom they can approach with serious questions about their identity in the United States. Abdullahi's parents and other adult family members had undergone famine, refugee camps and war; they would have thought his problems were insignificant, unworthy of attention. "Identity" was not discussed in traditional Somali culture and there is not even a word for it in the Somali language. Abdullahi felt his American teachers could not provide support because they would not understand what it felt like to be a religious, cultural, and racial outsider. And the Imams were of little

help because their role was similar to that of a grandfather or an all-knowing teacher, not as one who was there to answer questions of identity confusion or frustration.

When Abdullahi was seeking identity and meaning, the people who offered him concrete answers were the recruiters and the young men involved in this conspiracy. They told him that his true identity was in neither Western nor Somali cultures. The extremists in ISIL taught him that Western culture was not Muslim and was therefore completely wrong, but even Somali culture was deemed only a watered-down version of Islam.  Not "pure" enough.  The message from ISIL via social media and news was that his true identity lay with the nation of Islam and it was his duty to join and fight for the cause. The ISIL recruitment manual, "A Course in the Art of Recruiting," specifically targets high school students. Page 12 of the manual reads in part:

> The Students above 15 years old; I mean you have to cultivate the idea of jihad inside of them. If you ask me, "what can this young student do?" I will reply to you, "they can do the same thing as Muadh and Mu'awadh did." This is because today they are young but tomorrow they will be adults, so if you don't give them da'wa someone else will (but it will be for materialistic goals). However, don't be in a hurry because haste in this

A Course in the Art of Recruiting

Collected and Organized by
Abu Amru Al Qa'idy

A graded, practical program for recruiting via individual da'wa.

matter might destroy the da'wa. The merits of this sector: Often they have pure minds.[5]

Through social media, ISIL targeted young people like Abdullahi and it worked.

When asked to explain why the ideology of ISIL was appealing to him, Abdullahi explains it as follows:  When President Obama was seeking his own identity as a young man he rejected the white portion of his selfness and embraced his African American identity.  He defined himself in relation to his oppressors, whites, and sought his own blackness in its purest form.  Similarly, Abdullahi embraced Islam in its purest form in opposition to Westerners who seemed to want to eradicate Islam; and in contrast to American Somalis who were not "ten toes in" and were weakening true Islam.

Abdullahi explains that he was welcomed into a fold and he was mesmerized because his questions about identity were being answered.  He could be successful and make a difference as the member of the greater Islamic community.  By joining ISIL, he could live a life with purpose.  The rules were straightforward and unyielding.  Abdullahi had a simple answer and no longer had to grapple with complex questions about his identity and the meaning of his life.

By contrast, Empowering U also answers identity questions, but the answers are complex and nuanced and Abdullahi must work to come up with answers.  He must read books that present the views of writers, thinkers and artists trying to discover their own identities.  He must answer tough questions about how he is similar to or different from

---

[5] "A Course in the Art of Recruiting" by Abu Amru Al Qu'idy, page 12, 13.  Da'wa refers to "the Candidate."

the people he is reading about.  And he must create theses to support his beliefs and contentions.  He cannot recite dogma, he must prove that he is thinking and analyzing, not regurgitating.

Abdullahi has welcomed and embraced his work with Heartland Democracy.  He has studied his own religion, other religions, history, anthropology, politics, current events, family dynamics, how terrorist recruitment works, and conflict resolution, among other things.  The Empowering U program gives him a forum for asking the serious questions he has in his head.  But he must find the answers for himself, with guidance from his mentors.  Empowering U has provided meaning in his life.  The path he sought in 2014 has been replaced by the intellectual and emotional rigor presented by Heartland Democracy.

Over the past two years, Abdullahi has slowly and steadily matured and developed, both intellectually and emotionally.  He has earned the trust of most of the guards in the Anoka jail, one of whom said he would happily set his gun belt aside and sit with Abdullahi for a game of cards or a meal. Numerous guards smile when they talk about Abdullahi and have said to his attorneys that they wish every prisoner was like him. The guards can often be heard laughing with Abdullahi when they escort him to the interview area.  He never loses his temper and always finds the positive, even in onerous situations.

It may be difficult to imagine that this young terrorist-to-be is now a thoughtful, insightful, intellectual young man who has easily read and discussed 100 books (see reading list, attached) and can cite Plato, Homer, and Frankl, along with Martin Luther

King or Alexander Hamilton, and raise questions from his own discovered readings in
Rolling Stone or the Star-Tribune.  He is truly thoughtful about his situation and sees
himself as having a bright future when he is released from custody.  He has no idea what



he will do nor how he will do it, but he knows his
journey involves a political science degree and
using his knowledge and experience to help make
a difference in the lives of other young people.  It
is not difficult to imagine him as a professor.

More than anything, it has been interesting to watch Abdullahi's intellect develop.
He has a broad understanding of different ideas and he is able to apply them.  One of his
quotes is: "We know how many miles away the sun is, but we humans have difficulty
figuring out who we are."  Abdullahi sees himself now as a Somali, a Muslim, and an
American. Through his mentoring and counseling he is learning how to embrace all parts
of himself into one.

## ADDITIONAL SENTENCING FACTORS

### De-radicalization

Governments throughout the world use De-Radicalization programs to prevent
increased support of the activities of neo-Nazis, far right militants, narcoterrorists, and
Islamist terrorists.  Based on her experiences creating a De-Radicalization program for
26,000 Iraqis held at Camps Bucca and Cropper, and working with both Riyadh's Care
Rehabilitation Center and a youth center supported by the Muslim Contact Unit, Jessica
Stern concluded that "any rehabilitation effort must be based on a clear understanding of

what drives people to terrorism in the first place" because "the reasons that people become terrorists are as varied as the reasons that others choose their professions: market conditions, social networks, education, individual preferences." Stern noted that while some terrorists claim to be motivated by religion, very few have extensive knowledge of Islam.

On December 3, 2014, this Court held a hearing on this case and ended by stating the following:

> If there is a plan that can be put in place that can have the Somali community elders and other leaders assist the Court in the supervision of this young man, I will take a look at releasing him. But at this point the Somali community has to step forward to help the family and the Court monitor his whereabouts and his actions.

From the Court's Order, a program was developed through Heartland Democracy (Heartland). The program was formed with the input and assistance of counsel, community members and the Executive Director of Heartland. The outline of the program was provided to Court. (Docket #41). Since that time, the program has continued to develop. As stated above, it is because of the program that Mr. Yusuf has progressed and changed so dramatically for the better.

Beginning in January of 2015 and literally through today's date,[6] Mr. Yusuf has met with Heartland Democracy on an almost weekly basis. Exhibits A, B, and C provide more detail about the program. It is important to note that in January 2015 there was no known de-radicalization program in the United States. Based on prior experiences with

---

6 Mr. Yusuf met with and received a new assignment from his mentor on November 2, 2016.

terrorism cases and research, counsel asked Heartland Democracy to come up with a program that would allow Mr. Yusuf to focus on his decision-making, his identity, and his education.

On March 2, 2016, the Court ordered Mr. Yusuf to participate in a study to evaluate risk assessment and potential intervention needs for de-radicalization. (Docket #73). Daniel Koehler, Director of the German Institute of Radicalization and De-Radicalization Studies (GRIDS), interviewed Mr. Yusuf, his parents, and his brother. He submitted a report to the Court.  On September 20, 2016, he testified about his findings.

Of significance, Mr. Koehler remarked upon the importance of Mr. Yusuf turning to his family in November of 2014 and following their wise advice.  He also noted the importance of strong family support.  Mr. Yusuf distanced himself physically from the group in the summer 2014, which Mr. Koehler defined as "tactical disengagement."  Mr. Koehler pointed out that the physical disengagement did not address Mr. Yusuf's acceptance or rejection of the ideology of the group; however, Mr. Koehler did indicate that Mr. Yusuf's decision not to leave with the group in November of 2014, and his choice not to give them his money are positive factors.

Mr. Koehler recommended early release to a structured program.  Understanding that Mr. Koehler opined that Heartland Democracy's Program is not enough for Mr. Yusuf, it is important to note that the program, which was developed in January 2014 and continues to develop, has helped make significant positive changes in Mr. Yusuf's belief system.  Also, because of limitations and financial restrictions placed on Heartland regarding their project with Mr. Yusuf, certain significant additions were impossible to

add to the program during this pre-sentencing period.  Suggestions, which had been discussed at various stages, included counsel from a qualified Islamic scholar, family group therapy, and structured academic pursuits.  Of note, Mr. Koehler did recognize that because of the programming Mr. Yusuf received, he has shown "a high degree of cognitive opening to intervention and counseling."  Mr. Koehler further observed that Mr. Yusuf has "made the most important first steps in disengagement."   (See PSR Addendum)

Heartland Democracy, which has now participated in partial trainings under Mr. Koehler, has taught Mr. Yusuf to closely examine himself, his community, and the world.

**Psychological Examination**

Mr. Yusuf was evaluated by Dr. Boswell. Dr. Boswell read transcripts, reports, the PSR, and interviewed Mr. Yusuf at least three times. It is Dr. Boswell's professional opinion that based on psychological testing, clinical interviews, and discovery material, Mr. Yusuf's probability of future offending is low. There is no evidence of malingering or mental disorder.  Like Mr. Koehler's analysis of Mr. Yusuf, Dr. Boswell is of the opinion that Mr. Yusuf has a number of cognitive openings that can assist him in his efforts to continue to denounce terrorist beliefs. In his professional opinion, Dr. Boswell stated that there is a "high likelihood that effective treatment would result in a highly efficacious outcome." A copy of the report will be submitted the Court.

**Sentencing Disparities**

The Court has requested that the government provide an on-going list of ISIS-related prosecutions around the country. It is difficult for defense counsel to obtain such

documentation of the case.  The cases listed are different from Mr. Yusuf's case because

of his level of cooperation, his low risk-assessment finding, and his lack of tactical

training.  Moreover, Mr. Yusuf did not post pro-ISIS messages on social media, he did

not possess a weapon, he did not recruit others, and he began programming soon after his

arrest.  Some of the cases are summarized below:

- *Abdifatah Isse, 09-CR-50 (01)(MJD/FLN), and Salah Ahmed, 09-CR-50
  (02)(MJD/FLN)*, were both sentenced to 36 months of imprisonment on May
  29, 2013 for Providing Material Support to Designated Foreign Terrorist
  Organization in violation of 18 U.S.C. §2339A(a).  Their behavior involved
  actual travel. The two went to Somalia, joined al Shabaab, participated in a
  training camp for two and a half months, and then returned to the United
  States. They did not participate in programing prior to sentencing. They have
  been on supervision by the United States and it does not appear there are any
  violations.

- *Donald Ray Morgan, 14-CR-414 and 14-CR-194 (Middle District of North
  Carolina)* was sentenced on June 5, 2015 to a total of 20 years, 3 months'
  imprisonment for consecutive sentences of Felon in violation of 18 U.S.C.
  §922(g)(1) in Possession of a Firearm and Providing Material Support to
  Designated Foreign Terrorist Organization in violation of 18 U.S.C.
  §2339A(a).  He received 63 months for the gun charge and 180 months for the
  material support charge.  Morgan was extremely active in his social media
  postings about ISIL.  He frequently changed screen names in order to avoid
  detection by law enforcement.  His posts included blatant support for violent
  acts and he expressed anti-western views. He was sent back from Syria after
  heading there from Beirut.  He then returned to the U.S. via New York and was
  arrested at the airport.  It seems unlikely he cooperated with the government.

- *Michael Todd Wolfe, 14-CR-213 (Western District of Texas)* was sentenced to
  82 months of imprisonment on June 9, 2015 for Providing Material Support to
  Designated Foreign Terrorist Organization in violation of 18 U.S.C.
  §2339A(a).  Mr. Wolfe attempted to travel to Syria and was stopped at the
  airport by the FBI.  The government recommended 84 months in prison based
  on a 5K, on Mr. Wolfe's "very thoughtful letters," and because the prosecutor
  thought "highly" of him.  It is unknown the extent of Mr. Wolfe's cooperation
  with the government.

- *Alaa Saadeh, 15-CR-558 (District of New Jersey)* was sentenced to 180 months of imprisonment on May 10, 2016 for Providing Material Support to Designated Foreign Terrorist Organization in violation of 18 U.S.C. §2339A(a).  Mr. Saadeh plotted to leave the country for seven months and the government agreed not to charge any more crimes of providing material support in exchange for his plea.  Very little information is available, but it is unlikely he cooperated with the government.

- *Adam Dandach, 14-CR-109, (Central District of Colorado),* was sentenced to 180 months' imprisonment on July 26, 2016 for Providing Material Support to Designated Foreign Terrorist Organization in violation of 18 U.S.C. §2339A(a).  Mr. Dandach was also sentenced concurrently to 120 months imprisonment for providing a False Statement in Application and Use of Passport, in violation of 18 U.S.C. §1542.  Shortly before he began planning to travel to Syria to fight for ISIL, he weighed over 500 pounds and had gastric bypass surgery to bring his weight down to about 250 pounds.  His frequent, disturbingly violent, posts, letters, and comments were attributed to PTSD from his childhood, but he did not present with any mental illness per se.  He tried twice to leave for Syria.  The first time his family took his passport, so he used false information to apply for a new one.  When he received it, he went to the airport to fly to Turkey, but was stopped by the FBI. He contacted family members from jail to get them to delete incrimination information off his computer (which they did).  And he continued to blatantly support the violent ISIL ideology up through sentencing.

- *Leon Nathan Davis III, 15-CR-59, (Southern District of Georgia)* was sentenced to 180 months' imprisonment on July 28, 2016 for Providing Material Support to Designated Foreign Terrorist Organization terrorists in violation of 18 U.S.C. §2339A(a).  There are few details available in this case, but it appears Mr. Davis was arrested at the Atlanta, Georgia airport attempting to leave for Turkey with the intent of traveling on to Syria to join ISIL.  He agreed to no more than 15 years in custody in his plea and the Court appears to have followed the plea agreement.

- *Jaelyn Young, 15-CR-98 (Northern District of Mississippi)* was sentenced to 144 months of imprisonment on August 17, 2016 for Providing Material Support to Designated Foreign Terrorist Organization in violation of 18 U.S.C. §2339A(a).  She and her boyfriend, Mr. Dakhalla, were arrested at the airport in Columbus, Mississippi as they were trying to leave for Istanbul. She was an Islamic convert and was the more radical of the two and was definitely more dedicated to the ideology of ISIL.  It seems unlikely she cooperated with the government, but that information is unknown.

- *Muhammad Oda Dakhalla, 15-CR-98 (Northern District of Mississippi)* was sentenced to 96 months of imprisonment on August 30, 2016 for Providing Material Support to Designated Foreign Terrorist Organization in violation of 18 U.S.C. §2339A(a). Mr. Dakhalla taught his girlfriend about Islam, but she is essentially the one who pushed the radical extremist ideology by posting information about ISIL on social media.  The two of them were arrested at the airport in Columbus, Mississippi as they attempted to leave for Istanbul, Turkey.  It is unknown if Mr. Dakhalla cooperated with the government, but he might have cooperated against Ms. Young.

- *Ali Shuki Amin, 15-CR-164 (Eastern District of Virginia)* was sentenced to 136 months of imprisonment on August 18, 2015 for Conspiracy to Provide Material Support to Designated Foreign Terrorist Organization in violation of 18 U.S.C. §2339B. Mr. Amin was active on social media with his pro-ISIL messages and assisted in the travel of his co-conspirator.

- *Avis Brown, 14-CR-58 (Eastern District of North Carolina)* was sentenced to 92 months of imprisonment on July 5, 2016 for Conspiracy to Provide Material Support to Designated Foreign Terrorist Organization in violation of 18 U.S.C. §2339A.  There are no additional details as the documents were sealed.

- *Akba Jihad Jordan, 14-CR-58 (Eastern District of North Carolina)* was sentenced to 108 months of imprisonment on July 5, 2016 for Conspiracy to Provide Material Support to Designated Foreign Terrorist Organization in violation of 18 U.S.C. §2339A. Mr. Jordon was a physical fitness trainer and a tactics instructor to his co-defendant. He was arrested with an AK-47 and a Mini-14 assault rifle.

- *Joseph Farrokh, 16-CR-20  (Eastern District of Virginia)* was sentenced to 102 months of imprisonment on July 5, 2016 for Conspiracy to Provide Material Support to Designated Foreign Terrorist Organization in violation of 18 U.S.C. §2339B.  Mr. Farrokh used many tactics to cover his steps before attempting to leave the United States to join ISIS. He cooperated with the government. The documents are sealed.

- *Mufid A. Elfgeeh, 14-CR-6147 (Western District of New York)* was sentenced to 270 months of imprisonment on July 5, 2016 for  two counts of Attempting to Provide Material Support to Designated Foreign Terrorist Organization in violation of 18 U.S.C. §2339B.  Mr. Elfgeeh recruited another, gave money to a potential traveler, and purchased two firearms and silencers. The sentence was joint recommendation from the parties.

- *Nader Salem Elhuzayel, 15-CR-60 (Central District of California)* was sentenced to 360 months of imprisonment on July 5, 2016 for Conspiracy and Attempt to Provide Material Support to Designated Foreign Terrorist Organization in violation of 18 U.S.C. §2339B and 25 counts of bank fraud. Mr. Elhuzayel made ISIL related videos, was active on social media showing his support for ISIL. He was arrested at an airport with a USB port containing personal data of U.S. Defense Department employees.

- *Nicholas Michael Teausant, 14-CR-87 (Eastern District of California)* was sentenced to 144 months of imprisonment on July 5, 2016 for Attempting to Provide Material Support to Designated Foreign Terrorist Organization in violation of 18 U.S.C. §2339B.  Mr. Teausant was arrested after he many discussions with an FBI informant. It does not appear he cooperated.

- *Shannon Maureen Conley, 14-CR-163 (District of Colorado)* was sentenced to 48 months of imprisonment on July 5, 2016 for Conspiracy to Provide Material Support to Designated Foreign Terrorist Organization in violation of 18 U.S.C. §2339B and 371.  The FBI interviewed Ms. Conley where she stated she supported Jihad. She was placed under surveillance. She was told to obtain training before going the Syria and she joined the U.S. Army Explorers to obtain training in firearms and U.S. Military tactics.

## CONCLUSION

Respectfully, Abdullahi Yusuf asks this Court to sentence him to credit for time served and to impose a ten-year term of supervision because:

1. The cooperation involved was significant, timely, and substantial.

2. His 22 months of counseling with Heartland Democracy is strongly suggestive of his remorse, his dedication to better himself, and the fact that the public is protected from Mr. Yusuf.

3. De-radicalization expert Daniel Koehler deems that Mr. Yusuf's risk of future offending is medium to low.

4. Mr. Koehler also finds that Mr. Yusuf is in an advanced stage of disengagement and that providing early release with structured programming is appropriate.

5. Mr. Yusuf was seventeen years old when he was recruited and, based on scientific data, his brain was not fully developed at the time.

6. Mr. Yusuf has strong family support as is evidenced in the PSR and by his family's willingness to speak to the community about their son's illegal actions.

7. Dr. Boswell, based on testing and clinical interviews, concludes that Mr. Yusuf is at a low risk of reoffending.

8. There are no other known ISIS defendants in the United States who have participated in a program like Heartland Democracy.  Mr. Yusuf  is unlike other ISIL defendants because he has made significant intellectual and emotional shifts that can be credited to the influence of Heartland.

9. Mr. Yusuf's role in this offense did not involve recruiting others or any type of leadership. Mr. Yusuf voluntarily withdrew from the conspiracy in November of 2014.

10. Mr. Yusuf has earned the respect of virtually everyone who has met him over the past two years.  This includes law enforcement and the Heartland staff.  Even Mr. Koehler was so pleasantly surprised by Mr. Yusuf's insight and erudition that he asked Mr. Yusuf if he would mind writing him an essay as part of the analysis.

Abdullahi Yusuf is anything but a typical terrorist.  Because of the Heartland Democracy program, he has become a wise, thoughtful, kind, patient, insightful young man.  He has a strong sense of self and hope for his future as a successful Somali Muslim American. He has no need for barriers between his various identities because he has learned to integrate all of who he is into a healthy whole person.  He is not a danger to the public and in fact his release from custody would allow him to serve his country in a manner that enhances the lives of everyone he encounters.

Giving Mr. Yusuf credit for time served of 18-months in a local jail and placing him on supervision for the next ten years of his life is a sentence that is "sufficient, but not greater than necessary" considering all relevant factors set forth in 18 U.S.C. § 3553(a) and (e) and U.S.S.G. § 5K1.1.

Respectfully Submitted,

OFFICE OF THE FEDERAL DEFENDER          BRANDL LAW, LLC


By: */s Manny K. Atwal*          By: *s/Jean M. Brandl*
Manny K. Atwal (#282029)          Jean M. Brandl  (#387260)
Attorney for Defendant          Attorney for Defendant
300 S. Fourth St., Ste. 107          310 Fourth Ave. S., Ste. 5010
Minneapolis, MN 55415          Minneapolis, MN 55415
Manny_atwal@fd.org          jean@brandllaw.com
612.664.5858          612.206.3773