UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 15-46 (MJD/FLN)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **SENTENCING POSITION OF THE** |
| v. | ) | **UNITED STATES OF AMERICA** |
| | ) | |
| ABDULLAHI MOHAMED YUSUF, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Assistant United States Attorneys John Docherty, Andrew R. Winter, and Julie E. Allyn, respectfully submits its Sentencing Position in this case. The starting point for determining an appropriate sentence in this case is consideration of all the facts of the case, as well as the United States Sentencing Guidelines (hereinafter referred to as the "U.S.S.G."), and the factors set forth at Title 18, United States Code, Section 3553(a). The United States will be making a motion, pursuant to U.S.S.G. § 5K1.1, for a downward departure on the grounds of substantial assistance, and will be seeking a significant reduction from the advisory guidelines sentence of fifteen years' imprisonment. The government respectfully represents that a sentence of 42 months' imprisonment would be a just sentence in this case.

The 42-month duration is derived from sentences imposed on cooperating defendants in earlier material support prosecutions before this Court. Following the trial of *United States v. Mahamud Said Omar* in 2012-2013, cooperating defendants Saleh

Ahmed and Abdifatah Isse were each sentenced to 36 months in prison by this Court. The government sees defendant Abdullahi Yusuf as roughly equal to those defendants in that earlier case, with three important differences: First, neither Saleh nor Isse were untruthful with the government after they had made the decision to cooperate (although Saleh did lie to FBI Agents when they interviewed him, before Saleh had agreed to cooperate, he was fully truthful from the point of a cooperation agreement onward); Second, the government views ISIL as a significantly more dangerous terrorist organization than ISIL. While life under al Shabaab is probably as unpleasant as life under ISIL, ISIL poses a far greater danger of attacks against the United States. The government premises this conclusion on the mass casualty terror attacks that ISIL has perpetrated in Paris, Nice, Brussels, Beirut, and, most tellingly, San Bernardino. Al Shabaab has never attacked the United States. Third and finally, it is true that both Saleh and Isse traveled to Somalia (before al Shabaab was designated by the Department of State as a foreign terrorist organization) where they lived for a time in an al Shabaab safe house in Marka, and later traveled south to Kamsuma for further training. However, both Saleh and Isse escaped from the Kamsuma camp almost immediately and made their way back to the United States. The government therefore does not place much weight on this third factor.

In all, the government believes that under the specific facts of this case, imposing a six-month penalty for being untruthful, and for trying to join a terrorist group that is more dangerous than al Shabaab is appropriate.

## I.      INTRODUCTION

On May 28, 2014, eighteen-year old defendant Abdullahi Yusuf was denied boarding of a flight at Minneapolis – Saint Paul International Airport.  Yusuf was on his way to New York, then on to Moscow, and then to Istanbul.  In Istanbul, he would make contact with the designated terrorist organization the Islamic State in Iraq and the Levant, or "ISIL" and be conveyed over the Turkish-Syrian border to become an ISIL fighter.  After being denied boarding, defendant Yusuf was interviewed by two FBI Agents.  He lied to them, falsely stating that he was on his way to Istanbul for a vacation, and that the agents were profiling him because of his race and religion.  Yusuf then returned to his parents' home in Inver Grove Heights.

Being turned around at the airport that day in May more than two years ago almost certainly saved defendant Yusuf's life.  Instead of going to Syria, to kill, be killed, or both, he was arrested, on November 25, 2014, on a criminal complaint charging him with conspiracy to provide material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B.  On February 12, 2015, he was charged by Information with the same crime, and on February 26, 2015 he entered a plea of guilty to that Information.  Even before his plea of guilty, Yusuf had begun cooperating with the government.  The details of Yusuf's cooperation are more fully discussed elsewhere.  For purposes of this Sentencing Position, suffice it to say that the cooperation relationship got off to a rocky start, as on some points Yusuf withheld important information while on others he lied.  Once Yusuf's coconspirators were arrested on April 19, 2015, Yusuf began cooperating in earnest.  His assistance was important to the case, and Yusuf testified

3

truthfully for two full days at the May and June, 2016 jury trial of codefendants Guled
Omar, Abdirahman Daud, and Mohamed Farah.  All three of those defendants were
convicted following trial.

## II.    THE CASE AGAINST DEFENDANT ABDULLAHI YUSUF

Defendant Yusuf spoke at length about his own criminal behavior when he testified
at the trial of this case.  In the government's view, his testimony was candid and believable.

Yusuf's best friend was Hanad Mohallim. (Yusuf Tr. 5/13/16, p. 22).[1]  The two met
in ninth grade.  During the summer between their junior and senior years, Mohallim went
to visit his cousins, the Kariye family, who had formerly lived in San Diego, California but
by the summer of 2013 lived in Edmonton, Alberta, Canada.  (Bashir Tr. 5/19/16 p. 31).
Eventually two of the Kariyes, Hamsa and Hersi, traveled to Syria, joined ISIL, and were
killed, together with Hanad Mohallim, fighting at the battle of Kobane.  (Yusuf Tr. 5/16/16
pp. 13-14; Bashir Tr. 5/19/16 pp. 115-119).

When Mohallim returned from Edmonton and began his senior year, Yusuf noticed
that his friend, once outgoing, even somewhat flashy (Mohallim had always dressed in the
latest fashions) had become socially withdrawn, was deeply religious, had cut himself off

---

[1] Cites to the trial transcript are to the .txt files prepared during trial by the court reporter.
The testimony of only a few witnesses was transcribed.  When there is a transcript, the cite
is formatted with the name of the witness, followed by the date of testimony, and then the
transcript page number.  For example, the transcript cite that accompanies this footnote,
"Yusuf Tr. 5/13/16, p. 22" is a cite to page 22 of the transcript of the testimony given on
May 13, 2016 by witness Abdullahi Yusuf.  The testimony of only a few trial witnesses
has been transcribed as of the writing of this Sentencing Position.  Therefore, not all factual
assertions in this pleading are accompanied by transcript cites.  Those assertions are
supported by the collective memory of the prosecutors and FBI Agents who were at the
trial.

4

from many of his friends, and garbed himself in conservative Islamic clothing.  (Yusuf 5/13/16 Tr. pp. 25-27; *see also* Bashir Tr. 5/18/16 p. 32).

At the beginning of his senior year at Simley High School, Yusuf's history teacher assigned Yusuf to write a report on Syria.  (Yusuf Tr. 5/13/16 p. 21).  Yusuf began researching Syria and was appalled by what he learned of the atrocities and cruelty of the regime of President Bashar al-Assad.  (Yusuf Tr. 5/13/16 p. 23).  After only about one month at Simley, Yusuf had to withdraw because, due to the way credits transfer between school districts, Yusuf would not have graduated if he remained at Simley.  (Yusuf Tr. 5/13/16 p. 8).  Yusuf joined his friend Hanad Mohallim at Minnesota Transitions School ("MTS"), a charter school for students who are behind in school and trying to make up credits.  (Yusuf Tr. 5/13/16 pp. 7-8).  Even after he had left Simley, however, defendant Yusuf continued his interest in Syria, reading widely about the country, and discussing Syrian issues with his friends.  (Yusuf Tr. 5/13/16 pp. 22-23).  At MTS, Yusuf's dislike of Syrian President Bashar al-Assad became strong enough that Yusuf at one point wrote a Facebook post saying that "Bashar al-Assad don't deserve to live."  (Yusuf Tr. 5/13/16 p. 24).

Hanad Mohallim's road to an early death in Kobane began in March of 2014, when he stopped coming to school.  After a few days, Yusuf got worried and started looking for his friend.  One day, he learned that Mohallim's passport was missing, and that Mohallim's mother had flown to Turkey. (Yusuf Tr. 5/13/16 p. 39).  Upon hearing this, defendant Adnan Farah, who was apparently within earshot, told Yusuf that Mohallim was "chasing Jannah [heaven]" and not to worry about him. (Yusuf Tr. 5/13/16 p. 40).

Later that day, defendant Guled Ali Omar took defendant Yusuf and defendant Adnan Farah out to dinner at the Kaah Restaurant, an establishment that serves Somali cuisine, inside the "24 Mall" (so named because it is on 24th Street in Minneapolis). (Yusuf Tr. 5/13/16 p. 42). Defendant Omar paid for the meal, which lasted at least an hour. (Yusuf Tr. 5/13/16 p. 44). Over dinner that evening, the three men talked about where Hanad could be; the Syrian conflict; and defendant Omar's past experiences being stopped by law enforcement at the airport. (Yusuf Tr. 5/13/16 p. 44). After dinner the three men, at the suggestion of defendant Adnan Farah, went to the Dar al-Farooq Youth and Family Center in Bloomington, where they met more men, played basketball, and watched videos until the wee hours. (Yusuf Tr. 5/13/16 pp. 47-49). Looking back on the evening, Yusuf said he now realized that he was being "recruited" to join a group that planned to go to Syria and fight for ISIL. (Yusuf Tr. 5/13/16 pp. 68-69).

At Dar al-Farooq, Yusuf found defendants Zacharia Abdurahman, Abdirahman Daud, Abdi Nur, and Abdirizak Warsame, as well as defendants Guled Omar and Adnan Farah, with whom Yusuf had arrived. (Yusuf Tr. 5/13/16 p. 47). Yusuf characterized the videos as ISIL propaganda, and said these videos were about the situation in Syria. Most of the videos were short, three to four minutes in length, and found on a YouTube channel called "Enter the Truth." (Yusuf Tr. 5/13/16 p. 50).

The group continued meeting about three times per week, but no criminal activity was planned, at least at first. In the first set of meetings that defendant Yusuf attended, nothing was discussed that went beyond current events in Syria. The group also watched videos about the Syrian situation. (Yusuf Tr. 5/13/16 pp. 74-75). Some time later, however,

6

defendant Yusuf and defendant Guled Omar had a serious conversation on the sidewalk in front of Dar al-Farooq Bloomington.

That day, Yusuf arrived at Dar al-Farooq in a car with several other men, went inside, and said his prayers.  When defendant Yusuf came back out of the mosque, he found defendants Guled Omar, Abdirizak Warsame, Adnan Farah, and Zacharia Abdurahman still in the car.  Abdi Nur and Abdirahman Daud arrived in a separate car.  As the group walked up and down on the sidewalk in front of the mosque, defendant Omar told defendant Yusuf that the group was about to go on a long and hard journey, and that if defendant Yusuf wanted to walk away, there would be no hard feelings.  Defendant Omar then told defendant Yusuf that the group was trying to get to Syria and fight, and that if defendant Yusuf wanted to be a part of that, he could.  Yusuf replied that he wanted to be part of the plan.  (Yusuf Tr. 5/13/16 pp. 78-79).

On that day, the group's meetings that defendant Yusuf attended ceased being current events discussion meetings, and became, instead, conspiratorial meetings devoted to the nuts and bolts of getting to Syria and joining ISIL – raising money, obtaining passports, researching routes, and other logistical matters.  (Yusuf Tr. 5/13/16 p. 79).

Yusuf received funds from Yusuf Jama for his travel.  (Yusuf Tr. 5/13/16 p. 136). Yusuf was taken to the passport office in downtown Minneapolis, where he applied for an expedited U.S. passport. (Yusuf Tr. 5/13/16 pp. 113-115; Government Exhibit 12, p. 4). Although Yusuf had been coached on how to respond to the passport specialist's potential questions, he was insufficiently prepared.  He was unable to name the "friend" he had met online that he was going to Turkey to meet, he was unable to name the hotel in Istanbul

7

where he would be staying, and he was unable to name any tourist sights in Istanbul except, ironically, the Blue Mosque (ironic because the Blue Mosque was the rendezvous point at which Yusuf would have met ISIL facilitators had he actually traveled). The passport specialist notified his supervisor of the odd interaction he had had with Yusuf; the supervisor alerted the FBI; and when Yusuf returned to the passport office on May 5, 2014 to pick up his passport, he was under FBI surveillance.

Yusuf was, as noted above, denied boarding on May 28, 2014 at MSP. He lied to the agents who intercepted him at the airport. Had Yusuf been truthful and forthcoming in response to the agents' questions, Abdi Nur would probably have been denied boarding the next day, May 29, 2014. Instead, Abdi Nur, who was not at the time known to law enforcement, left the United States and reached Syria. Abdi Nur is now presumed dead.

From that point until the Fall, Yusuf had almost no interaction with the other conspirators. However, in October of 2014, Yusuf received a text message from the lawyer who represented him at the time, stating that Yusuf should expect to be arrested in the next few weeks. (Yusuf Tr. 5/13/16 p. 190). At about this time Yusuf painted pro-ISIL graffiti on a wall. He could not remember whether he did this before or after getting the text message from his then-attorney. At trial, he called his behavior "childish." (Yusuf Tr. 5/16/16 p. 12). Yusuf met with the conspiratorial group and they decided that Yusuf should try, once again, to leave the country, via either Mexico or Canada. (Yusuf Tr. 5/13/16 pp. 190-191). In reaction to this text from his lawyer, Yusuf met with the group approximately three times to discuss his options. (Yusuf Tr. 5/16/16 p. 21). The group (with the exception of defendant Guled Omar) was in favor of Yusuf fleeing the United States, and Yusuf

8

began planning to depart.  Yusuf, however, settled down after speaking with his father and an uncle, decided to remain in the United State, and abandoned his nascent plan to flee the country.  (Yusuf Tr. 5/16/16 p. 30).

### III.    ARGUMENT

Absent a motion for a downward departure from the United States pursuant to U.S.S.G. § 5K1.1, a guidelines sentence of fifteen years would be appropriate in this case.

### A.  The Report of Presentence Investigation

The United States has no objections to the factual statements set forth in the Report of Presentence Investigation prepared by the United States Probation and Pretrial Services Office.

### B.  The Sentencing Guidelines

The Report of Presentence Investigation accurately calculates defendant Yusuf's adjusted offense guidelines offense level as 35 (with a three level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1) and his criminal history category as VI. The resulting advisory guidelines term of imprisonment is 292 to 365 months.  However, because the offense to which defendant Yusuf pled guilty, conspiracy to provide material support to a designated terrorist organization, in violation of 18 U.S.C. § 2339B, has a statutory maximum term of imprisonment of 15 years, or 180 months, defendant Yusuf's advisory guidelines sentence also caps at 180 months.

The adjusted offense level and criminal history score are both quite high for this defendant in part because of the application of the terrorism enhancement at U.S.S.G. § 3A1.4.  This victim-related, Chapter Three adjustment recognizes that "an act of terrorism

represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir.) *cert. denied sub nom. Haouari v. United States*, 538 U.S. 1068 (2003). "We have recognized that 'Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under [U.S.S.G.] § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *United States v. Stewart*, 590 F.3d 93, 143 (2d Cir. 2009) (*quoting Meskini, supra*, 319 F.3d at 92).

### C. 18 U.S.C. § 3553(a)

The factors that a district court should take into account in fashioning an appropriate sentence are listed at 18 U.S.C. § 3553(a).

### (1) The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.

The nature and circumstances of the offense are set forth in detail in Common Appendix A. Defendant Abdullahi Yusuf was born in a refugee camp in Kenya in 1999 and emigrated to the United States as a refugee at the age of three. His father was not able to join the family for five years. During this time, defendant Yusuf taught himself English by watching cartoons on TV. After his father arrived in the United States the family was able to move from Minneapolis to Burnsville. However, the family later moved to Inver

Grove Heights because they were concerned about the bad companions with whom defendant Yusuf was associating.

Defendant Yusuf made a single attempt, in May of 2014, to travel to Syria and join ISIL. He was not honest with law enforcement at the airport. Following the failure of this attempt, he did not formally withdraw from the conspiracy, in a legal sense, by departing and informing law enforcement of the conspiracy's existence. He does, however, simply seem to have stopped associating with the conspirators until the Fall of 2014. In the Fall of 2014, after receiving a text message from his lawyer, warning Yusuf to be prepared for an imminent arrest, Yusuf re-engaged with the conspirators, but shortly afterwards he again disassociated himself from them. Following his arrest, Yusuf began cooperating with the government. That cooperation will be detailed in a substantial assistance motion that will be forthcoming from the government.

According to information received from the jail, defendant Yusuf has had no rule infractions while incarcerated, nor has he given jail staff any difficulty.

### (2) The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

Defendant Yusuf has been convicted of a very serious crime. Three people, at least, have died in Syria as a result of this conspiracy – Douglas MacAuthur McCain, Abdi Nur, and Yusuf Jama. The offense's seriousness would be adequately reflected in a fifteen-year advisory guidelines sentence, as would be respect for the law and just punishment. As the Supreme Court has recognized, "combating terrorism is an urgent objective of the highest order." *Holder v. Humanitarian Law Project,* 561 U.S. 1, 28 (2010).

In other sentencing position pleadings filed in this case, the government is noting that one reason for imposing a significant sentence in this particular case is that this case was tried in an intimidating atmosphere.  This factor does not apply to defendant Yusuf, however, as he was the attempted object of intimidation, not a perpetrator of intimidating acts or speech, nor one who encouraged others to engage in such behavior.  In fact, at one point Yusuf's testimony had to be interrupted because community members attending the trial were attempting to harass Yusuf's mother, in full view of him as he testified.  (Yusuf Tr. 5/13/16 pp. 118-126).

**(3) The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct, and the Need for the Sentence Imposed to Protect the Public from Future Crimes of This Defendant.**

General deterrence is necessary to deter other people from committing similar crimes.  "Congress specifically made general deterrence an appropriate consideration . . ., and we have described it as 'one of the key purposes of sentencing.'" Ferguson v. United States, 623 F.3d 627, 632 (8th Cir. 2010) (quoting United States v. Medearis, 451 F.3d 918, 920 (8th Cir. 2006)).  Individual deterrence is needed to prevent re-offending by the particular defendant being sentenced.

In this case, general deterrence remains important, as not too long ago, Minnesota suffered a wave of young men traveling to join al Shabaab, and presumably many of those young men are now dead.  Despite these deaths and the surrounding investigation and prosecutions, here yet another group of Minnesota men attempted to leave the United States to become terrorists.  As the Court witnessed in the Courtroom and surrounding press coverage, despite the gravity of the charges, the defendants had significant support.

General deterrence is necessary to impress upon a certain number of people in the community that no matter your age, religion, or politics, trying to become a terrorist has serious, dire consequences.  In the case of defendant Yusuf, however, general deterrence takes on a different meaning.  Defendant Yusuf chose to assist the United States, and therefore was the object of the ire of some people, not the object of their support. A significant sentence imposed on defendant Yusuf would be, paradoxically, counter-productive from the point of view of general deterrence, as it would inevitably convey the message that reforming one's life is futile, as a long prison sentence will still follow.

The government sees little, if any, need for individual deterrence as to Abdullahi Yusuf, who has, since his arrest, convincingly renounced terrorism and the intolerance which breeds terrorism.

### (4) The Need for the Sentence to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.

Since his arrest, defendant Yusuf has participated in extensive programming, arranged with the Court's assistance, through the nonprofit organization Heartland Democracy.  In the view of the U.S. Attorney's Office this programming has been very beneficial to defendant Yusuf, and any sentence imposed would, we hope, be crafted in such a way as to allow defendant Yusuf to continue with that programming upon release from custody.

### (5) The Kinds of Sentences Available

The United States has submitted a Report concerning sentences imposed on defendants who have traveled overseas, or attempted to travel overseas, in the past two years in support of a designated foreign terrorist organization.

A review of the sentences imposed is telling.  Of 20 defendants, in 14 cases, convicted of an 18 U.S.C. § 2339B violation, 14 of those defendants, or nearly three-quarters, were sentenced to the statutory maximum sentence of fifteen years' imprisonment.  Only four of these convictions followed trial; the rest were all the result of guilty pleas.  In short, courts are imposing the maximum sentences allowed by law in 2339B cases, even when defendants have admitted to their wrongdoing and initiated the rehabilitative process by pleading guilty.

### IV.    CONCLUSION

The United States respectfully asks that the Court sentence the defendant in accordance with the sentencing recommendation set forth in the forthcoming U.S.S.G. § 5K1.1 motion.  The United States will be recommending a sentence of 42 months, a substantial, but warranted and deserved, downward departure from the presumptive advisory guidelines sentence of 180 months.  A detailed letter to the district court judge

will be filed together with the 5K1.1 motion, detailing Defendant's cooperation, its magnitude, and its contribution to the successful prosecution of this case.

Dated:  November 3, 2016

Respectfully Submitted,

ANDREW M. LUGER
United States Attorney

*s/ John Docherty*

BY:    JOHN DOCHERTY
Assistant United States Attorney
Attorney Reg. No. 017516X

ANDREW R. WINTER
Assistant United States Attorney
Attorney Reg. No. 232531

JULIE E. ALLYN
Assistant United States Attorney
Attorney Reg. No. 256511

**COMMON APPENDIX A – THE SYRIAN INSURRECTION AND ISIL**

This Appendix A to the Government's Sentencing Positions describes (a) historical and Syrian current affairs context that is common to all nine Sentencing Positions being submitted to the Court by the government, and (b) a capsule summary of the facts proven at trial. This Appendix is reproduced in each of the government's sentencing positions, and is identical in each. No attempt has been made to write a factual summary that is more comprehensive than the very thorough Reports of Pre-Sentence Investigation written in this case by United States Probation officers. However, this Common Appendix A does go into more detail than the PSRs about the history of the Syrian insurrection, and the role in that insurrection of the designated foreign terrorist organization the Islamic State in Iraq and the Levant, or "ISIL." If there is interplay between events in Syria and events in Minnesota, Common Appendix A tries to correlate events in Syria with significant events that were happening in this case, here in Minnesota, at about the same time as the events in Syria.

As to the first part of Common Appendix A, history and current events, Common Appendix A relies upon the trial testimony of the government's expert witness, Charles R. Lister, Senior Fellow at the Middle East Institute, Washington, D.C. Common Appendix A does not summarize all of Mr. Lister's testimony. Instead, it highlights those parts of his testimony which are important to understanding the issues in these sentencings. These matters are a short history of the Syrian insurrection, the origins of ISIL, as well as ISIL's extraordinary brutality and the part such brutality plays in ISIL's recruitment of foreign fighters. Finally, this Common Appendix A concludes with a brief description of ISIL's

1

understanding of the importance, to what in ISIL's view would be an observant Muslim, of participating in the fighting now taking place in Syria.

The second part of Common Appendix A seeks to provide an overview of the facts of the case, and to provide a description of the facts of the case that can be referred to in all of the government's sentencing position papers.

The facts concerning historical background and Syrian current events in Common Appendix A are taken from a transcript of the trial testimony of the government's expert witness, Charles R. Lister, Senior Fellow at the Middle East Institute, Washington, D.C. As to other trial facts, which have not yet been transcribed, Common Appendix A relies on the contemporaneous notes of Assistant U.S. Attorneys and FBI Special Agents.

**Developments in Syria from the Arab Spring (2011) to 2013 Abu Musab al-Zarqawi's founding of ISIL (2013)**

Syrian President Bashar al-Assad took power in 2000, continuing the reign of his father, Hafez al-Assad.  Between them, the two Presidents al-Assad have ruled Syria as a dictatorship for more than forty years.  Bashar al-Assad has used brutal repression against his political opponents, including extensive and intrusive police surveillance followed by arrest, torture, and execution.  The efforts of ordinary citizens, during the "Arab Spring," to protest against the regime, were met by the Assad regime with violence.

The Arab Spring began at the end of 2011, and was triggered by a Tunisian man who burned himself to death in a desperate act of protest after being humiliated by the police.  The Arab Spring anti-dictatorship movement spread across North Africa and the Middle East in the months that followed.

In Syria, the wealthy had for decades been supporters of the regime.  After Bashar al-Assad took power in 2000, this increased, and the gap between rich and poor in Syria became even more stark than it had been.   When Bashar al-Assad introduced economic liberalization measures, with support given to small businesses, it turned out that the small businesses that received assistance were the small businesses of regime supporters.

On March 6, 2011, the Syrian internal security services arrested 15 schoolboys in the southern Syrian city of Deraa, alleging that they had been chanting revolutionary songs as they walked home from school.  All the boys were tortured, and several of them were killed.  Peaceful protests of the boys' arrest were met by the regime with live ammunition, resulting in several deaths.  Over the next few days, protests spread to numerous Syrian cities.  The arrest and torture of these schoolboys in Deraa, and the regime's heavy-handed response to it, marks the beginning of the Syrian insurrection against President Bashar al-Assad.  The insurrection soon transitioned from peaceful protest to armed revolt against the Assad regime.

The reaction of the Bashar al-Assad regime to the events in Deraa was consistent with the reaction to opposition of President Bashar al-Assad's father, Hafez al-Assad, during the time he had been Syria's president.  For example, in the 1980s a splinter faction of the Muslim Brotherhood tried to rise up in arms against President Hafez al-Assad in the Syrian city of Hamaa.  President Hafez al-Assad responded with months of artillery shelling of Hamaa, which killed between 10,000 and 40,000 of the city's inhabitants.

As protests and fighting spread across Syria during 2011, the United States expressed sympathy for Syrians engaged in peaceful, anti-Assad protests.   U.S.

Ambassador to Syria Robert Ford attended several anti-regime protests, a clear signal of U.S. government support. The regime responded by physically threatening the U.S. Embassy, and at one point withdrew security personnel from around the embassy and allowed pro-regime thugs to ransack the building. The United States then withdrew its diplomats from Syria. The United States has had no diplomatic or consular representation in Syria since 2011.

Arab Spring opposition to the Assad regime spanned all sectors of Syrian society. One component of the anti-regime opposition was a specifically religious, Islamic opposition. For a time following the U.S. invasion of Iraq, President Bashar al-Assad was able to neutralize the Islamic opposition within Syria by busing Islamic fighters over the border into Iraq, where they could fight Americans and their Iraqi allies. Eventually some of these Islamic fighters returned from Iraq (or Lebanon, another place to which the Assad regime had sent them) to Syria.

## I. THE SYRIAN HISTORICAL AND CURRENT EVENTS CONTEXT OF THIS CASE.

### A. Abu Musab al-Zarqawi, the Origins of ISIL, and the Roots of ISIL's Extreme Violence

In 1999, Abu Musab al-Zarqawi was released from the Jordanian prison where he had been serving a sentence for support of a terrorist organization. Shortly after his release from prison, Zarqawi traveled to Afghanistan, where he made contact with the senior leadership of al-Qaeda. With $200,000 of al-Qaeda's money, and a plot of land donated by the Taliban, Zarqawi established a terrorist training camp in Afghanistan. In 2000, Zarqawi and the organization he had founded attempted to perpetrate the "millennium

plot," which included attacks on the Radisson Hotel in Amman, and several other western hotels in Amman.  The plot was foiled.

When the U.S. invaded Afghanistan following the attacks of September 11, 2001, Zarqawi fought for a short while, but then fled Afghanistan, going first to Iran, and then on to northern Iraq.  Following the U.S. invasion of Iraq, Zarqawi and his organization conducted a campaign of bombings against the United States military and other targets, including the United Nations and the Jordanian embassy. At this time, Zarqawi did not have any official relations with al-Qaeda, but in late 2003 and on into 2004 Zarqawi reached out to al-Qaeda in an effort to have his organization and al-Qaeda work together. In May of 2004, Zarqawi conducted his first videotaped beheading, of U.S. hostage Nicholas Berg.  Several months after this atrocity, in October of 2004, Zarqawi "made *baya*" (swore allegiance) to al-Qaeda. Zarqawi's organization took the name "al-Qaeda in Iraq," and became al-Qaeda's first international affiliate.

Zarqawi was ferociously anti-Shiah, and his organization in turn became deeply anti-Shiah. Zarqawi believed the Shiah had to be fought until they were all exterminated. Zarqawi dispatched his own father to carry out a suicide bombing at a Shiah shrine in the Shiah holy city of Qatib, in southern Iraq, which killed a Shiah ayatollah.  Shiah were referred to by the insulting term "rafidi" which means "one who refuses," specifically, one who refuses to recognize the legitimacy of the line of succession from the prophet that is recognized by Sunni Islam.  The Assad regime, although its top members are Alawites, gets support from Iran, the dominant Shiah power in the middle east, and opposition or

support for the Assad regime tends to fall along Shiah-Sunni lines, with Shiah in support of the regime, and Sunni in opposition to it.

Following the pledge of *baya*, tension between Zarqawi and al-Qaeda persisted, primarily over the issue of brutality and the killing of Muslims.  Zarqawi's bombing campaign in Iraq may have targeted non-Muslims, but the bombs were very powerful, were often detonated in public places, and as a result they killed many Muslims.  In Zarqawi's view, such deaths were acceptable, because Zarqawi believed Iraqi society needed to be thoroughly cleansed of all western and secular influences.  To al-Qaeda, however, Zarqawi's bombings were a catastrophe in terms of al-Qaeda's ability to maintain the support of ordinary Muslims.  There was an exchange of letters between al-Qaeda and Zarqawi over this issue, at the end of which al-Qaeda ordered Zarqaqi to be more discriminating in his bombing.  In response, Zarqawi's behavior, if anything, actually got worse.

Zarqawi was killed by American military action in June of 2006.  In October of 2006 one of his successors as the leader of al-Qaeda in Iraq renamed the organization "the Islamic State in Iraq."  After some years in which it was not clear whether the Islamic State in Iraq was or was not still part of al Qaeda, the two organizations formally split in 2013.

Before the split, in May through August of 2011, discussion began about opening a Syrian wing of the Islamic State in Iraq.  In August of 2011, seven senior members of the organization crossed into Syria, and activated a dormant network of safehouses in northeastern Syria.  In Syria, this group went by the name Jabhat al-Nusra, the "support group."  When the split between the Islamic State and al-Qaeda occurred in 2013, Jabhat

al-Nusra remained a part of al-Qaeda, while the Islamic State went on its own, independent path.

In June of 2014, abu Bakr al-Baghdadi, then leader of what had become the Islamic State in Iraq and the Levant, or "ISIL," mounted the steps of the pulpit in a mosque in Mosul, Iraq and proclaimed the re-establishment of a caliphate, a supreme Islamic religious and political entity that had a legitimate claim to the loyalty of every Muslim in the world.

### B.  ISIL's Need for, and Recruitment of, Foreign Fighters

Several factors drove ISIL to need foreign fighters to fill its ranks.

First, as testified to by Mr. Lister, ISIL did not govern populations so much as it controlled them.  Its theological rulings were bizzare (the sale of ice cream was forbidden because ice cream did not exist in the prophet's time, and the sale of cucumbers was forbidden because cucumbers were sexually suggestive, for example), and its punishments for even minor infractions were extraordinarily sadistic and carried out in public. ISIL could recruit from the local population only through fear, and as a result local recruits understandably tended not to be good fighters.  Second, from August of 2013 until July of 2014, ISIL did not fight the Assad regime; instead, it waged war on other anti-regime opposition groups.  Of the 7,000 people killed in combat by ISIL during the first six months of 2014, not one was an Assad regime soldier.  At this same time, the Assad regime stopped fighting ISIL, probably because the regime recognized that ISIL was doing the regime's work for it.  These facts made it impossible for ISIL to augment its numbers by allying with other opposition groups.

In response, ISIL recruited very heavily from abroad, relying on three different recruiting messages.

First, abu Bakr al-Baghdadi, in his role as caliph and leader of the faithful, claimed that it was the duty of all Muslims throughout the world to come and join the Islamic State, and to fight for that state. Second, ISIL used its extreme brutality as a recruiting tool. To do so, ISIL characterized its actions to a local audience as expressions of power and dominance over a Shiah-dominated Iraqi government, and to an international audience as an organization that was bringing power back to Sunni Islam by showing no mercy to the enemies of Sunni Islam. To publicize its brutal acts, ISIL has proven very savvy at using electronic media. As the evidence at trial showed, many ISIL propaganda videos were enthusiastically viewed by defendants in this case.

Third and finally, ISIL has adopted an apocalyptic ideology about the end times which places great value on dying as a martyr in Syria at this particular time in human history. At the end of human history, ISIL preaches, Jesus will descend from heaven to the white minaret of the main mosque in Damascus, and from there will lead an army to the Syrian village of Dabiq, northeast of Aleppo, where the final battle between the forces of good and the forces of evil will be fought. As Mr. Lister explained:

> . . . one of the reasons why ISIL has been so effective at recruiting so heavily from non-Syrian and Iraqi populations is because it has claimed to be operating in Syria within this broader mindset. The idea that you can go and fight in Syria in order to contribute towards bringing about the end of the world is something that its ideology – its propaganda, sorry, has made very clear for a long time. In fact, Dabiq was something that Abu Musab al-Zarqawi all the way back in the 2000s spoke about very clearly, our armies will one day reach Dabiq, and, you know, bring about the end of days. So

it's a core tenet, it's a core principle of ISIL's belief.  And fundamentally, it's a core reason for why they wanted to operate in Syria all along.

When asked to link this ideology to the recruitment of a potential foreign fighter, Mr. Lister continued:

> I mean, generally speaking, there is a belief within these organizations that if you fight in the name of Allah, in the name of God, and you die as a martyr, you will automatically go to paradise.  I believe their understanding is that if you die in these battles, which ISIL claims to be bringing out the end of days, then you will obtain a, you know, a high place in paradise alongside God.  So the importance of fighting in Syria specifically, as I say, is of that utmost importance.

Finally, Mr. Lister pointed out in his testimony that some of the outrages perpetrated by ISIL, such as the beheadings of western hostages, were "trying to bait the west into intervening more," in order to precipitate the final battle between Muslims and non-believers.

As a result of all three factors, a vast majority of ISIL's forces at for example, the battle of Kobani, under the command of ISIL commander Omar al-Shishani, were foreigners, who sustained huge casualties.  Of note, the battle of Kobani pitted ISIL against Kurdish militia.  At no time, did the battle of Kobani involve combat between ISIL and Assad regime forces.

## II.     THE FACTS OF THIS CASE

The evidence at trial demonstrated the existence of a conspiracy among the defendants to travel to Syria via Turkey, cross the border into Syria, and there join, and fight for, ISIL.  There were three major efforts by the defendants to reach Syria, in the Spring of 2014, the Fall of 2014, and the Spring of 2015.

9

The Spring of 2014 effort had two components.  In one, defendant Guled Omar, together with Abdirahman Bashir (then a member of the conspiracy, later a cooperating human source for the FBI) and Yusuf Jama, attempted to drive to Mexico and travel onwards from Mexico to Turkey and then Syria.  In preparation for this attempt, defendant Omar withdrew $5,000 in cash using his federal student financial aid debit card.  Those funds were never repaid, and as a result of this financial behavior, defendant Omar was later found guilty of federal financial aid fraud, in violation of 20 U.S.C. § 1097.  The attempt at driving was thwarted by defendant Omar's family.  Later, however, on June 9, 2014, Yusuf Jama left the Twin Cities by Greyhound bus, traveled to New York City's John F. Kennedy International Airport (hereinafter "JFK"), and flew from there to Turkey and onwards to Syria.  Jama is believed to have later been killed in combat while fighting for ISIL and against Kurdish militia at the battle of Kobani.

The second component of the conspirators' Spring of 2014 effort involved cooperating defendant Abdullahi Yusuf's attempt to travel on May 28, 2014, and Abdi Nur's successful travel on May 29, 2014.  Yusuf was booked on an itinerary that would have taken him on the Russian airline Aeroflot from Minneapolis-Saint Paul to JFK, then on to Moscow, Russia, before taking an Aeroflot flight from Moscow to Istanbul.  However, when Yusuf applied for a passport on April 28, 2014, he aroused the suspicions of an alert passport specialist in the Minneapolis passport office.  The passport specialist relayed his suspicions to his supervisor, who told the FBI.  As a result, FBI Agents were waiting for Yusuf when he arrived at the Minneapolis – Saint Paul airport on May 28 to

catch his flight to JFK. Yusuf was denied boarding, and after continuing to falsely claim to the FBI that he was going solo to Istanbul for vacation, sent home.

The Fall of 2014 effort also had two components. In the first, defendant Guled Ali Omar again tried to reach Mexico, this time by taking a flight from Minneapolis – Saint Paul to San Diego. The FBI was told that defendant Omar had made a travel booking, and federal agents met Omar at the airport. Omar arrived at the airport carrying no luggage, and in possession of his passport. He was denied boarding and sent home. After being turned away at the airport, defendant Omar telephoned defendant Hanad Musse, using "Magic Jack," an application that disguises one's telephone number. In that call, defendant Omar pleaded with defendant Musse to drop their own plans to travel to Syria. In that telephone call, defendant Omar told defendant Musse that "I just got caught up."

The plans from which defendant Omar was trying to dissuade defendant Musse involved Musse and three other defendants – Mohamed Farah, Hamza Ahmed, and Zachariah Abdurahman – following the example of Yusuf Jama by taking Greyhound buses to JFK, and flying from there to various destinations in southeastern Europe, such as Athens, Istanbul, and Sofia, and then traveling on to Turkey and, ultimately, Syria.

Musse refused to drop the plans and "the JFK Four" continued to New York. There, they were met by agents of the FBI and denied boarding. Defendant Hamza Ahmed had boarded his flight, and was escorted off the aircraft by federal agents. When three of the four were interviewed by the FBI in New York (defendant Hanad Musse left JFK without being interviewed; however, Mohamed Farah, Hamza Ahmed, and Zachariah Abdurahman were interviewed at JFK), they lied, claiming that they did not know each other, and that

11

they were all traveling to Europe, by themselves, for vacation.  In the case of defendant Mohamed Farah, this meant that he claimed to be traveling to Sofia, Bulgaria, in November, for a beach vacation lasting one day.  Upon return to Minnesota, each of the defendants was given a target letter from the U.S. Attorney's office, telling them they were targets of a federal criminal investigation into allegations of conspiracy to provide material support to a designated foreign terrorist organization.  The JFK Four were then again interviewed, this time by Minneapolis-based FBI agents.  They maintained the fictions they had given to the New York FBI agents. (Defendant Hanad Musse had not been interviewed in New York.)

Later in November of 2014, defendant Abdullahi Yusuf, who had been at liberty since trying to leave in late May, was arrested on a criminal complaint charging him., together with Abdi Nur, with conspiring to provide material support and resources to ISIL, and with actually providing material support and resources to ISIL (the material support and resources provided was the person of Abdi Nur).  In February of 2015, defendant Hamza Ahmed was arrested, and detained pending trial.  Defendant Ahmed was therefore unable to conspire with his codefendants when, in the Spring of 2015, they began conspiring yet again to go to Syria to join ISIL.

The failure of the Fall 2014 attempt did not lead the defendants to drop their ambitions to travel to Syria.  In the Spring of 2015, they again began planning to leave the United States, go to Turkey, then go onwards into Syria to join, and fight for, ISIL.  Shortly after this third and final round of plotting began, Abdirahman Bashir decided to cooperate

with the FBI's investigation.  He wore a recording device and recorded many hours of incriminating conversations between March and April of 2015.

The defendants had hoped to make a connection in Tijuana, Mexico, with a source for false passports.  When this plan could not be completed, because Abdi Nur, in Syria, was unable to connect with the Mexican ISIL fighters who were to provide the contact information in Tijuana, Bashir, with the approval of the FBI, stated that he had a source for false passports in San Diego.

On April 17, 2015, Bashir, together with defendants Mohamed Farah and Abdirahman Daud, left home in defendant Daud's Honda Civic, bound for San Diego. Upon arrival in San Diego on Sunday, April 19, defendants Daud and Farah were arrested at a warehouse in San Diego when they took possession of fake passports from "Miguel," a San Diego police officer who had been acting the part of a procurer of fake passports. The arrests in San Diego were followed within minutes by the arrests in Minnesota of the remaining defendants:  Guled Ali Omar, Adnan Abdihamid Farah, Zachariah Yusuf Abdirahman, and Hanad Mustofe Musse.